UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MAKE THE ROAD NEW YORK, AFRICAN SERVICES
COMMITTEE, CENTRAL AMERICAN REFUGEE
CENTER NEW YORK, CATHOLIC CHARITIES
COMMUNITY SERVICES (ARCHDIOCESE OF NEW
YORK), CATHOLIC LEGAL IMMIGRATION
NETWORK, INC., ALICIA DOE, BRENDA DOE, CARL
DOE, DIANA DOE, and ERIC DOE,

                             Plaintiffs,

                 - against -

MICHAEL POMPEO, in his official capacity as Secretary
of State; the UNITED STATES DEPARTMENT OF
STATE; DONALD TRUMP, in his official capacity as
President of the United States; ALEX AZAR, in his official
capacity as Secretary of the Department of Health and
Human Services; and the UNITED STATES
DEPARTMENT OF HEALTH & HUMAN SERVICES,

                             Defendants.

---

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

        Plaintiffs Make the Road New York ("MRNY"), African Services Committee

("ASC"), Central American Refugee Center New York ("CARECEN-NY"), Catholic Legal

Immigration Network, Inc. ("CLINIC"), Catholic Charities Community Services (Archdiocese of

New York) ("CCCS"), Alicia Doe, Brenda Doe, Carl Doe, Diana Doe, and Eric Doe, for their

Complaint against defendants Michael Pompeo, Donald Trump, and Alex Azar, in their

respective official capacities, and the United States Departments of State and Health and Human

Services, allege as follows:

### TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

JURISDICTION AND VENUE ......................................................................................... 8

    I.     Plaintiffs .................................................................................................. 8

    II.    Defendants ............................................................................................ 22

FACTUAL ALLEGATIONS ........................................................................................... 23

    I.     Obtaining LPR Status through Consular Processing and the Public
         Charge Provisions of the INA ............................................................. 23

    II.    Defendants' Attempts to Rewrite the Immigration Statutes by
         Executive Action ................................................................................. 27

    III.   The Consular Rules Stand in Stark Opposition to the  Consistent
         Historic Interpretation of the INA's Public Charge Provisions .......... 57

ARGUMENT ..................................................................................................................... 68

    I.     The IFR, the FAM Revisions and Proclamation Implementing Actions
         Violate the Administrative Procedure Act ........................................... 68

    II.    The Process for Promulgating the Consular Rules Blatantly Violated
         the Procedural Rules in the Administrative Procedure Act .................. 75

    III.   The IFR, the FAM Revisions, and the Proclamation Are Motivated by
         Animus Against Immigrants of Color and Will Have a Heavily
         Disparate Impact on Nonwhite Immigrants ........................................ 80

    IV.   The Proclamation Exceeds the Scope of Authority Authorized by 8
         U.S.C. § 1182(f), is *Ultra Vires*, and Violates the Constitution .......... 91

    V.    The Rule Will Cause Irreparable Harm to Plaintiffs ........................... 96

    COUNT ONE  (Violation of Administrative Procedure Act – Substantively
         Arbitrary and Capricious, Abuse of Discretion, Contrary to
         Constitution or Statute) ...................................................................... 105

    COUNT TWO  (Violation of Administrative Procedure Act – Procedurally
         Arbitrary and Capricious, Notice and Comment) ............................... 107

    COUNT THREE  (Violation of the Fifth Amendment – Equal Protection and
         Due Process) ...................................................................................... 108

    COUNT FOUR  (*Ultra Vires*) ....................................................................... 109

PRAYER FOR RELIEF .................................................................................................. 109

## INTRODUCTION

1.    For generations, immigration to America has represented an opportunity for families to strive for a better life together.  Central to this expression of our national values is our family-based immigration system, which ensures that hundreds of thousands of U.S. citizens and lawful permanent residents can petition for their husbands, wives, parents, children, and siblings to obtain lawful permanent residence status ("green cards") in the United States.  This system is intended to maintain family unity, integrity, and stability.  It is enshrined in statute.  And it has never been reserved for the wealthy.  To the contrary, immigrants have endured incalculable hardship to escape grinding poverty around the globe, with the promise held out to them that our immigration laws will allow them the chance, one day, to reunite with their families in this country.

2.    Since January 2017, the Trump Administration has tried to reverse all of this by executive fiat.  Showing utter disdain not only for these values, but for the statutes that codify them into law—and for the Constitution—the Defendants in this case have sought to render lawful immigration into this country a privilege for the wealthy and the white, imposing unlawful income requirements on people seeking family unity and the chance for a better life.  If the Administration wishes to impose its boldly stated preferences for excluding people of color and admitting only the wealthy, however, it cannot do so by executive action.  Not in defiance of statutes that say otherwise.  And not in the face of the Constitution.  These unlawful executive actions should be enjoined.

3.    Specifically, Plaintiffs seek to stop three interrelated government actions that apply to intending immigrants seeking to enter the U.S. as lawful permanent residents ("LPRs"): (a) the Department of State's ("DOS") January 2018 changes to the public charge

provisions of its Foreign Affairs Manual ("FAM"), which governs consular processing (the

"FAM Revisions"); (b) the DOS's October 11, 2019 Interim Final Rule, which changes the

public charge regulations that apply at the point of consular processing (the "IFR"); and (c) the

October 4, 2019 "Presidential Proclamation Suspending the Entry of Immigrants Who Will

Financially Burden the Health Care System" (the "Proclamation"), as well as subsequent actions

to implement the Proclamation by DOS and the U.S. Department of Health and Human Services

("HHS") ("Proclamation Implementing Actions").  In this Complaint, we refer to the FAM

Revisions, the IFR, the Proclamation, and the Proclamation Implementing Actions collectively as

the "Consular Rules."

    4.  These Consular Rules were not legislated by Congress.  On the contrary,

like the public charge rule issued by DHS on August 14, 2019 (the "DHS Rule"), which was

subsequently enjoined nationwide, the FAM Revisions, the IFR, and the Proclamation

Implementing Actions explicitly contradict the Immigration and Nationality Act's ("INA")

public charge provision, 8 U.S.C. § 1182(a)(4).  The Proclamation itself also exceeds the

authority granted by Section 1182(f) of the INA.  Some or all of these actions violate not only

the INA but also the Administrative Procedure Act ("APA"), the principle of separation of

powers, and the Equal Protection guarantee of the Fifth Amendment.

    5.  The "public charge" concept in the INA has been distorted beyond all

recognition by Defendants, who have seized on it as a means to implement their anti-poor, anti-

family agenda.  But it has never applied to working families like those of the individual plaintiffs

in this case, and tens of thousands of others like them.  For more than a century, courts and

administrative agencies have recognized that the public charge provisions of the INA apply *only*

to noncitizens who are destitute and wholly unable to work, and who are thus likely to be

predominantly reliant on government aid for subsistence.  In that time, Congress has repeatedly re-enacted the public charge provisions of the Act without change.  Congress has also expressly rejected efforts to broaden its scope by legislation.  Notwithstanding this lack of Congressional authority, Defendants seek to redefine "public charge" to exclude any intending immigrant who a consular officer predicts may use even a minimal amount of supplementary, non-cash public benefits, including health benefits, at any time in the future—*even long after becoming a U.S. citizen*.  These redefinitions would fundamentally transform American immigration law by conditioning lawful permanent residence on high incomes and wealth sufficient to absorb the prospective impacts of the vagaries of life, such as health problems, wage losses, or the ability to navigate the United States' byzantine system of private health insurance.

6.     The Defendants' attempted transformation formally began with the adoption of the 2018 FAM Revisions governing public charge, which for the first time directed consular officers to negatively weigh the receipt of means-tested benefits other than cash assistance by intending immigrants and their financial sponsors.  Without expressly redefining "public charge," the FAM Revisions have been used to deny admission to intending immigrants based on an overbroad, erroneous interpretation of the INA.  Since January 2018, public charge denials have increased dramatically from the levels in the years immediately preceding the revision.  But, contrary to law, no rule-making was undertaken by DOS in connection with adoption of the FAM Revisions.

7.     The FAM Revisions apply only to people seeking to enter the United States, whether as immigrants or as non-immigrants.  Relatedly, on August 14, 2019, DHS introduced a final rule, "Inadmissibility on Public Charge Grounds" that would apply primarily to applicants for LPR status already within the United States, to be effective on October 15,

3

2019.  The DHS Rule purports to implement Section 212(a)(4) of the INA (8 U.S.C. § 1182

(a)(4)).  However, it fundamentally altered the longstanding definition of "public charge," and

was enjoined by five different federal district courts spanning four different federal circuits

between October 11 and October 14, 2019.[1]  Like the FAM Revisions, the 2019 DHS Rule

provided that, for the first time, a public charge would be defined not as a person with no

possible means of support, but rather as a person who at any time in the future might use public

benefits for as little as three or four months in *any* 36-month period, ever.  These public benefits

include such widely-used non-cash assistance as Medicaid, the Supplemental Nutritional

Assistance Program ("SNAP," formerly called "food stamps"), and housing subsidies.

        8.      The same day that the first injunctions were issued blocking the

implementation of the DHS Rule, DOS issued the IFR, also with an October 15, 2019 effective

date.  The substance of the IFR is almost identical to the DHS Rule.  Like the enjoined DHS

Rule, the IFR would dramatically expand public charge inadmissibility to include people who at

any time in the future might use any amount of a minimal number of benefits.  And the IFR's

impact would be enormous.  One study finds that *81 percent* of the world's population would fail

to satisfy a wealth test that is a factor in the public charge determination under the IFR.[2]  DOS

initially stated that the IFR would go into effect on October 15, 2019, but then sought notice-and-

---

[1]   *See Make the Road New York* v. *Cuccinelli,* 19 Civ. 7993, (S.D.N.Y. Oct. 11, 2019), ECF No. 147 ("N.Y. Op.")
(nationwide injunction); *Washington* v. *DHS*, 19-CV-5210 (E.D. Wash. Oct. 11, 2019), ECF No. 162 ("Wash.
Op.") (nationwide injunction); *City & Cty. of S.F.* v. *USCIS*, 19-cv-04717, (N.D. Cal. Oct. 11, 2019), ECF No.
115 ("Cal. Op.") (injunction covering multiple states); *Casa de Md.* v. *Trump*, PWG-19-2715 (D. Md. Oct. 14,
2019), ECF No. 65 ("Md. Op.") (nationwide injunction) and *Cook Cty., Ill.* v. *McAleenan*, 19 C 6334, (N.D. Ill.
Oct. 14, 2019), ECF No. 65 ("Ill. Op.") (statewide injunction in one state).  All five district courts to consider
the DHS Rule issued preliminary injunctions enjoining implementation and enforcement.  The Fourth and Ninth
Circuits have stayed the injunctions issued in Maryland, California, and Washington.

[2]   Danilo Trisi, *Administration's Public Charge Rules Would Close the Door to U.S. to Immigrants Without
Substantial Means*, Center on Budget and Policy Priorities 7 (November 11, 2019), *available at*
https://www.cbpp.org/sites/default/files/atoms/files/11-11-19imm.pdf.

comment on a form required for the public charge determination.  It is unclear whether DOS is

implementing the IFR without this form.  As with the FAM changes, DOS did not undertake full-

notice and comment rulemaking in connection with the IFR.

        9.      Despite professing to be justified in using extraordinary rulemaking

procedures, DOS purports to have placed the IFR on hold to some unknown date.  Specifically,

during proceedings in *Mayor and City of Baltimore* v. *Trump*, 18-cv-3636 (D. Md.), a separate

challenge to the FAM Revisions, the Administration stated that it has postponed the effective

date of the IFR, but did specify how long the postponement will last or with what notice the IFR

will go into effect.  Simultaneously, the DOS website claims that the rule is postponed pending

promulgation of certain implementing forms at an unknown date in the future.

        10.    On October 4, 2019, while motions to enjoin the DHS rule were pending,

and shortly before the publication of the IFR, Defendant Trump issued the Proclamation, which

suspended the entry of any individuals seeking immigrant visas who could not demonstrate that

they could obtain certain forms of "approved" private health insurance within 30 days of entry or

that they had sufficient financial capacity to absorb "reasonably foreseeable medical costs."[3] The

Proclamation, to be implemented by Defendants DOS and HHS, stated that it would go into

effect on November 3, 2019.  On November 2, 2019, a federal district court in the District of

Oregon issued a temporary restraining order that enjoined implementation of the Proclamation,

and subsequently issued a preliminary injunction on November 26, 2019.[4]  The court found a

---

[3]   *See* Presidential Proclamation 9945, *available at* https://www.federalregister.gov/documents/2019/10/09/2019-22225/suspension-of-entry-of-immigrants-who-will-financially-burden-the-united-states-healthcare-system-in.

[4]   *Doe #1* v. *Trump*, No. 3:19-CV-01743-SB, 2019 WL 5685204, at *8 (D. Or. Nov. 2, 2019); *Doe* v. *Trump*, No. 3:19-CV-1743-SI, 2019 WL 6324560, at *1 (D. Or. Nov. 26, 2019).

likelihood that the Proclamation conflicts with the public charge provision of the INA and related federal health care statutes.

11.     Recognizing that each of the Consular Rules is intended to accomplish the same goals of fear, confusion, and exclusion, the instant case seeks to enjoin all three Consular Rules.  As federal courts found in enjoining the DHS Rule, this Administration's new scheme threatens grave harm to the United States citizens, intending immigrants, and immigrant assistance organizations who are plaintiffs here—as well as to immigrant communities and the public interest.  The scheme that Defendants have devised runs contrary to governing statutes and the Constitution.

12.      Defendants fully understand and intend the havoc these changes will wreak on immigrant families by fundamentally changing U.S. immigration law and rewriting duly-enacted Congressional acts through administrative fiat.  Stephen Miller, the President's senior advisor on immigration and a principal architect of the IFR, as well as the parallel DHS Rule, described these administrative actions as "transformative."  He is correct.  But under the Constitution, it is up to Congress, not the Executive, to "transform[]" U.S. law.

13.     Defendants seek to achieve by executive action what the Trump Administration has failed to achieve through legislation.  The Administration has explicitly sought to reduce family-based immigration and convert U.S. immigration policy to an arbitrary and discriminatory wealth-based system.  Its efforts to achieve that goal through legislation have failed.  The Consular Rules at issue here circumvent Congress in furtherance of that goal.

14.     The Consular Rules violate the APA because they purport to change both the deployment, and the long-term understanding, of public charge in a manner that is contrary to the INA.  They are not in accordance with law because they fail to comport with notice-and-

comment requirements, and because they are arbitrary, capricious, and an abuse of discretion. Indeed, they substantially undermine numerous statutes under which immigrants are afforded access to public benefits, including the Affordable Care Act ("ACA") and the Children's Health Insurance Reauthorization Act ("CHIPRA").

15.    Further, the Proclamation exceeds presidential authority as set forth in Section 1182(f) of the INA, which does not permit cursory orders rewriting and contradicting entire statutory systems nor allows adoption of permanent immigration bans.

16.    The Consular Rules also discriminate against people with disabilities contrary to Section 504 of the Rehabilitation Act of 1973.  29 U.S.C. § 794.

17.    Finally, the Consular Rules violate the Constitution because their adoption was driven by unconstitutional animus against immigrants of color.  These changes reflect the President's longstanding hostility to non-white immigrants, who come from what he has referred to as "shithole countries," and whom he has characterized as "animals" who are "infesting" the United States.  He has repeatedly referred to immigration from the southern border as an "invasion."  Defendant Trump has relied on Stephen Miller, the White House Advisor associated with white nationalist groups, to engineer his immigration policy, including the Consular Rules.

18.    For these reasons, plaintiffs—individuals facing exclusion from the United States, their petitioning United States citizen relatives, and nonprofit organizations that advise, assist, advocate and serve hundreds of thousands of low-income noncitizens and their families in New York and nationwide—bring this action under the INA, the APA, and the Fifth Amendment to the United States Constitution to enjoin the Consular Rules and the Proclamation Implementing Actions, to declare them unlawful, and to set them aside.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343, as this case arises under the United States Constitution and federal statutes, including the APA, 5 U.S.C. § 551 *et seq*., and the INA, 8 U.S.C. § 1101 *et seq*.

20.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Plaintiffs Alicia Doe, Brenda Doe, and Eric Doe reside in this district, Plaintiffs MRNY, ASC, and CCCS-NY have offices in this district, and Plaintiffs CARECEN-NY and CLINIC serve clients and affiliates in this district.

I.      **Plaintiffs**

21.     Plaintiff Make the Road New York ("MRNY") is a nonprofit, membership-based community organization with more than 23,000 members residing in New York.  Its mission is to build the power of immigrant and working-class communities to achieve dignity and justice.  MRNY represents thousands of immigrants in removal proceedings and affirmative applications for immigration benefits, including citizens and LPRs seeking to help family members obtain immigrant visas and intending immigrants themselves.  MRNY also assists immigrants in accessing health services, navigating the health system, and advocating for improved access to health care.  MRNY also provides English as a second language, civics, basic adult education, and citizenship classes for immigrant New Yorkers.

22.     MRNY was deprived of an opportunity to comment on DOS's changes to the public charge guidelines before the FAM Revisions were published or before the IFR was issued.  Nonetheless, following publication of the IFR and the opening of a truncated, post-implementation comment period, MRNY submitted to DOS a detailed comment documenting numerous harms the DOS's process was inflicting and would inflict on its members and

immigrant communities.  MRNY's comment demonstrated the IFR's substantial chilling effect

on families and individuals entitled to nutritional and health assistance, the risks to public health

and children should the IFR take effect, and the economic losses and increased suffering of

immigrant communities.  MRNY's comment also criticized the IFR's racist intent and

disproportionate impact on Latinx communities, as well as the incoherence and unlawfulness of

the IFR's alteration of the longstanding test to determine whether an immigrant is or may

become a public charge.  Although MRNY was able to draft and submit its own comments

following publication of the IFR, DOS gave less than 48 hours' notice for the public to submit

comments on an information collection related to the Proclamation, forcing MRNY to sign on to

a group comment letter.

    23.  The Consular Rules are causing substantial harm to MRNY.  MRNY's

mission of advocating for the rights of low-income immigrant communities is inseparable from

the interests of its members in not being denied admission or adjustment of their immigration

status, in receiving vital public benefits, and in maintaining family integrity and unity.

Defendants' actions harm MRNY, and threaten it with ongoing and future harm, by causing the

organization to divert resources otherwise needed elsewhere in response to Defendants' actions.

In particular, MRNY must divert resources to address its clients' and members' need for

information about the impact that receipt of public benefits has on their own or family members'

immigration goals, such as serving as a sponsor and obtaining LPR status through consular

processing.  MRNY's provision of health enrollment services, as well as its representation of,

and consultation with, clients considering consular processing now require more time, which

prevents MRNY from assisting in as many consular processing clients.  MRNY must also inform

its members, clients and impacted community members of the heightened risk that family

members seeking immigrant visas will be denied as a result of the Consular Rules, which will result in family separation for MRNY clients and members.

24.     Plaintiff African Services Committee ("ASC") is a Harlem-based non-profit human rights agency dedicated to mobilizing and empowering immigrants, refugees, and asylees from Africa, the Caribbean, and across the African Diaspora.  ASC provides, among other things: housing placement and health services; legal representation in immigration proceedings, including representing sponsors and navigating consular processing; English language classes; food pantry and nutrition services; and assistance in the development of leadership skills through community education and organizing.

25.     During the public notice-and-comment period following the publication of the DHS public charge rule, ASC submitted to DHS a detailed comment documenting numerous harms that changes to the public charge determination would inflict on its clients and immigrant communities generally, with a particular focus on the risks to health care access for those with HIV and AIDS.  The publication of the Consular Rules without a meaningful opportunity for notice-and-comment deprived ASC of the opportunity to provide comments detailing the extensive harms imposed by Defendants here.

26.     Defendants' actions threaten substantial harm to ASC's ability to accomplish its mission, which includes helping immigrant families stabilize their circumstances in the United States through family reunification, as well as connecting them to government services and benefits for which they are eligible as an additional means of support.  The support provided by reuniting families through family-based immigration and connecting them to needed forms of assistance is especially important for ASC's clients, who are vulnerable due to chronic health conditions and usually lack private health insurance.  The Consular Rules are adversely

affecting ASC's ability to link clients with the family, benefits, and services they need because the rules have created the warranted fear that receiving such benefits today will be held against them in the future when they pursue their goals of seeking LPR status through consular processing, or when they help a family member to do so by serving as a sponsor.

27.     Because the impact of the Consular Rules on ASC clients and constituents can be so severe – illness and even fatal health deterioration, as well as family separation – the organization has no choice but to devote significant resources to responding to the impact of the new Consular Rules, diverting resources form the many legal needs of ASC's clients.

28.     Plaintiff CARECEN – NY is a non-profit human rights agency founded in 1983 to provide advocacy, education and legal services to immigrants who live on Long Island, and to protect them from exploitation and discriminatory treatment.  Although the majority of CARECEN – NY's clients live on Long Island, it also serves immigrants who reside in New York City and other parts of New York state.  Nearly one hundred percent of CARECEN – NY's clients are foreign-born, and the organization's advocacy initiatives are guided by the priorities identified by the immigrant community.  CARECEN – NY currently has approximately 400 clients who are applying for immigrant visas, who are already subject to the FAM Revisions and will be subject to the Proclamation, and ultimately, the IFR at their consular interviews.

29.     CARECEN – NY's staff have already expended significant additional time, and consequently organizational resources, beyond the organization's traditional resource allocations, as a result of Defendants' actions.  All CARECEN – NY staff had to be trained on the implications of the Consular Rules in order to effectively consult with clients and address the widespread confusion and fear in the immigrant community resulting from those changes.

Among other actions, CARECEN – NY has been forced to amend its intake and representation protocols and procedures in response to the Consular Rules.

30.     Additionally, CARECEN – NY staff commenced communicating with clients who are projected to have immigrant visa interviews within the next six months, notifying them that they will be required to provide proof of medical insurance coverage pursuant to the Proclamation, and strategizing around how to obtain this coverage, in addition to other documentation and evaluations required under the current FAM and IFR.  CARECEN – NY has also begun holding community education workshops to educate its immigrant clients on the implications of the Consular Rules.  Although the Proclamation has been preliminarily enjoined nationwide by a federal district court in Oregon, and the DHS rule has been preliminarily enjoined by other federal courts, the FAM Revisions remain in effect, and CARECEN – NY has to continue the additional work of educating clients about the potential effects of the Proclamation should any preliminary injunction be limited or overturned, as well as the impact of the IFR in light of an uncertain environment and an unspecified date of implementation.

31.     Ensuring family unity for immigrant families is a central CARECEN – NY's mission.  The Consular Rules individually, and together, all have a tremendous chilling effect on the ability of CARECEN – NY clients to be reunited with family members in the United States, and therefore on CARECEN – NY's mission itself.  Approximately 98 percent of CARECEN – NY clients are working class, with household income under 125 percent of the Federal Poverty Guideline ("FPG").  For these clients, not only will their household income, resources, and family status be subject to a new negative weight under the FAM Revisions and IFR, but paying for the private or catastrophic health insurance required under the Proclamation

will be financially impossible for the overwhelming majority of CARECEN – NY's clients—
thereby foreclosing their ability to be reunited with their family members.

32.     This chilling effect has not only been felt by CARECEN – NY clients, but
CARECEN – NY itself.  The immigrant visa cases that CARECEN – NY files are almost
exclusively fee-for-service.  As basic eligibility for immigrant visas changes based on the FAM,
IFR, and the inability to obtain expensive medical insurance, this will necessarily cause a
commensurate decrease in the number of fee-for-service cases CARECEN – NY takes on.  The
fees generated by immigrant visa cases form a significant part of CARECEN – NY's revenue
stream, comprising approximately 20 percent of its annual budget, and projected budget losses
will significantly impede and reduce CARECEN – NY's ability to serve the directly impacted
population and to provide adequate legal assistance for its clients.

33.     Because of the impact the Consular Rules have on CARECEN – NY
clients and constituents, in addition to the many legal needs presented by clients, the organization
has no choice but to devote significant additional resources to responding to the Consular Rules.

34.     Plaintiff Catholic Charities Community Services ("CCCS-NY") is part of
Catholic Charities, New York, and the New York Archdiocese.  It is a nonprofit organization
with offices throughout New York City and the Lower Hudson Valley.  CCCS-NY's mission is
to provide high quality human services to New Yorkers of all religions in need, including and
especially the most vulnerable.  CCCS-NY has been pursuing this mission since 1949 through a
network of offices and services that enable participants to access, among other things,
immigration legal services, refugee resettlement, and English as a Second Language services.

35.     CCCS-NY operates a 150-employee Immigration and Refugee Services
Division, which provides legal counsel for immigrants, including assisting citizen and LPR

13

sponsors and intending immigrants in pursuing immigrant visas through consular processing, as well as three immigration resource hotlines.  Two of the hotlines are fundamental to the provision of legal services and legal information by New York City and New York State, which sponsors them.  These hotlines— the "ActionNYC" and the "Office for New Americans" hotline—answer over 43,000 calls in 29 languages and make more than 79,000 referrals to social service providers throughout New York State each year.  The Immigration and Refugee Division also provides resettlement and integration services, English language and civics classes, assistance with obtaining work authorization, as well as facilitating reunification of many immigrants with members of their families.  During 2019, the Division of Immigrant and Refugee Services program services and organizing work affected over 28,000 individuals— children, families, workers—in New York.

36.     CCCS-NY was deprived of an opportunity to comment on DOS's changes to the public charge guidelines before the FAM Revisions were published or before the IFR was issued.  Nor was CCCS-NY able to comment on the implementation of the Proclamation within the 48-hour window that was allotted.

37.     Defendants' actions directly harm CCCS-NY in multiple ways.  The Consular Rules threaten CCCS-NY's ability to achieve its core mission of assisting vulnerable immigrant families in establishing their footing in the communities they serve, whether through obtaining LPR status to preserve and protect family unity, or ensuring that clients who are eligible continue to access critical government services and benefits that support vulnerable families.  These Consular Rules also require CCCS-NY to devote substantial resources to assisting clients in understanding and addressing their impact.  Given the critical role the CCCS-NY hotlines play in the State and City response to public charge, CCCS-NY is also on the front

14

line of responding to the impact of the Consular Rules.  In this capacity, CCCS-NY assists both

U.S. citizens and LPRs who want to help family members wishing to act as sponsors and who

fear the negative implications of receiving government benefits, and those who want to obtain

LPR status themselves and need assistance with the consular process.

      38.    Plaintiff Catholic Legal Immigration Network, Inc. ("CLINIC") is a

national non-profit training and resource network focused on equipping immigration

organizations with the tools necessary to provide comprehensive immigration representation.

CLINIC's network includes approximately 370 affiliate immigration programs, which operate

over 400 offices in 49 states and the District of Columbia.  Its network employs more than 2,300

attorneys and accredited representatives who, in turn, serve hundreds of thousands of low-

income immigrants each year, including aiding them with applications for adjustment of status.

In seeking to further its mission of embracing the Gospel value of welcoming strangers, CLINIC

supports its network by hosting in-person and multi-day trainings on immigration related

matters, providing e-learning courses and webinars, publishing newsletters, fact sheets, and

reports with developments in the immigration landscape, and, in some instances, providing direct

funding for affiliates working directly with immigrant communities.

      39.    CLINIC affiliates employ not only attorneys but also Department of

Justice-accredited representatives. Accredited representatives are non-attorney staff or volunteers

who are approved by the Department of Justice to represent noncitizens in immigration court or

before the Board of Immigration Appeals or the United States Citizenship and Immigration

Services ("USCIS").  An accredited representative must work for a non-profit or social service

organization that provides low- or no-cost immigration legal services.  Many CLINIC affiliates

rely on accredited representatives for the day-to-day work of their organization.  In turn, those accredited representatives rely on CLINIC's resources for training and guidance.

40.     CLINIC was deprived of an opportunity to comment on DOS's changes to the public charge guidelines before the FAM Revisions were published and before the IFR was issued.  Nonetheless, following publication of the IFR and the opening of a truncated, post-implementation comment period, CLINIC submitted to DOS a detailed comment documenting the harms and burdens the IFR would inflict on immigrant communities and legal representatives and pointed out significant legal and practical flaws in the IFR's scheme.  These flaws included, among others, the IFR's failure to justify changes to longstanding practice, its bypassing of the legislative process, and its inconsistency with Congressional intent and the plain meaning of "public charge."  CLINIC also submitted a comment in connection with implementation of the Proclamation within the 48-hour window allotted to do so.  The CLINIC comments stated, among other things, that the proposed questions consular officers would ask immigrant visa applicants are arbitrary and vague, provide too much discretion to consular officers, and improperly limit visa eligibility to applicants with financial resources.

41.     Defendants' actions threaten to impede CLINIC's mission, have already directly harmed CLINIC and threatened ongoing and future harm to CLINIC, including through the devotion of substantial resources to address the Consular Rules and their impact.  Attorneys and accredited representatives from affiliates submit inquiries regarding individual immigration matters that are particularly complex and rely on CLINIC staff provides an expert consultation.  CLINIC has experienced increased demand for consultations since changes to the FAM Revisions were published and since publication of both the Proclamation and the IFR.

42.     CLINIC has no choice to apply its resources to addressing the emergencies precipitated by the Consular Rules, both through advising on individual cases brought to them by affiliates and providing accurate information to its immense network.

43.     Plaintiff Alicia Doe is an intending immigrant from El Salvador who lives in Upper Manhattan with her U.S. citizen husband, also from El Salvador, and their two citizen daughters, ages 16 and 14.[5]  Alicia is the beneficiary of a Form I-130 "Petition for Alien Relative," filed by her husband and approved by USCIS.  Alicia's husband supports the family by working at a restaurant full-time for minimum wage.  Alicia does not work outside the home. She spends much of her time tending to the special needs of her younger daughter who has severe disabilities stemming from cerebral palsy.  Her daughter cannot walk, and she has trouble speaking and doing many other basic activities of daily living.  The daughter has received Supplemental Security Income ("SSI") since she was three-years old on account of her disabilities.  The family also lives in public housing, which means the rent, except for Alicia's share, is subsidized by the federal government, which is necessary to ensure that the rent is affordable on Alicia's husband's wages.  The household, not including Alicia, also receives SNAP to help with food expenses.  Except for Alicia, the other household members receive State-funded health insurance.  Although Alicia is eligible for state-funded Medicaid, she is healthy and has not signed up for state insurance for fear that it would affect her ability to obtain an immigrant visa.  She cannot afford a private plan.  A worker assigned by the City of New

---

[5]     Alicia, Brenda, Carl, Diana and Eric Doe are the pseudonyms for individual plaintiffs who fear public exposure because of their uncertain immigration status or the uncertain immigration status of their relatives, whose applications for lawful permanent residence status is pending. Plaintiffs intend to file a motion to seek leave from the Court to proceed anonymously pursuant to *Sealed Plaintiff* v. *Sealed Defendant* #1, 537 F.3d 185 (2d Cir. 2008).

York to assist Alicia's disabled daughter has agreed to be a financial co-sponsor.  Upon information and belief, the worker makes approximately $62,000 per year.

44.     Alicia's goal is to obtain LPR status.  Because Alicia has resided in the U.S. without authorization after entering without inspection, she will have to leave the country to seek her immigrant visa at a U.S. consulate abroad.  Without a waiver of her period of unlawful presence, Alicia would be required to remain outside the U.S. for ten years before she could obtain LPR status.  Alicia applied for a waiver of inadmissibility for unlawful presence based on extreme hardship (Form "I-601A waiver"), and her application was approved.  This means that she is able to return to El Salvador for consular processing without the ten-year waiting period, provided she is otherwise eligible for an immigrant visa.  In her application, she explained the extreme hardship that her family would suffer without the waiver, including her role as primary caregiver for her disabled daughter, which would be very difficult for her U.S. citizen husband to provide, as he works to support the family.  Although Alicia would not have been denied admission on public charge grounds under the consular rules that pre-dated the FAM Revisions, were she to undergo consular processing and face application of any of the Consular Rules challenged in this case, her immigrant visa would likely be denied, and she would be separated from her family indefinitely.  Once Alicia obtains her green card, she would want to find a job compatible with her family's needs to increase the household's income.

45.     Plaintiff Brenda Doe is an intending immigrant from the Dominican Republic who lives in the Bronx with her U.S. citizen husband, who is also from the Dominican Republic, and their three children.  The younger two children are both U.S. citizens: one is a minor and the other is a college student who struggles with a learning disability.  They also have a young adult son who has permanent residence, and who is currently unemployed.  Brenda is

the beneficiary of an I-130 "Petition for Alien Relative" filed by her husband and approved by

USCIS.  Brenda's husband always worked and supported the family, but he lost his sight due to

glaucoma in 2015, and was forced to stop working due to his disability.  He is certified legally

blind by the State of New York.  His last job before becoming disabled was at a very high-end

New York City restaurant where he was making approximately $60,000 per year.  He receives

Social Security Disability benefits with a supplement for his minor daughter.  In addition to their

Social Security benefits, the family, except for Brenda, receives support in the form of SNAP

benefits.  Brenda's husband receives Medicare, and the two younger children receive State-

funded health insurance.  Brenda is eligible for State-funded Medicaid but she did not apply to

receive it because she is healthy and is concerned that receiving the insurance would impact her

immigration case.  She cannot afford private insurance.  Brenda's sister-in-law (her husband's

sister) has agreed to be Brenda's financial co-sponsor.  The sister-in-law has no dependents and

together with her husband, makes approximately $140,000 a year in income.  Once Brenda

obtains her green card, she aims to find a job compatible with her family's needs to increase their

household income.

   46. Brenda's goal is to obtain LPR status.  Because Brenda has resided in the

U.S. without authorization after entering without inspection, she will have to leave the country to

seek her immigrant visa at a U.S. consulate abroad.  Without a waiver of her period of unlawful

presence, Brenda would be required to remain outside the U.S. for ten years before she could

obtain LPR status.  Brenda applied for an I-601A waiver of inadmissibility, and her application

was approved.  This means that she is able to return to the Dominican Republic for consular

processing without the ten-year waiting period, provided she is otherwise eligible for an

immigrant visa.  In her application, she explained the extreme hardship that her family would

suffer without the waiver.  In particular, she is the primary caregiver for her disabled husband.

Although Brenda would not have been denied admission on public charge grounds under the

consular rules that pre-dated the FAM Revisions, were she to undergo consular processing and

face application of any of the Consular Rules challenged in this case, her immigrant visa would

likely be denied, and she would be separated from her family indefinitely.

47.     Plaintiff Carl Doe is an intending immigrant and a member of MRNY who

lives in Queens with his U.S. citizen wife and adult stepdaughter.  His goal is to obtain LPR

status.  His wife's I-130 petition on his behalf was granted, and USCIS has granted his I-601A

waiver request on account of extreme hardship to his wife, who depends on him for financial and

emotional support.  Carl speaks English and owns his own business, from which he earned

$20,000 last year.  Because he resided in the U.S. without authorization after entering without

inspection, once he receives an appointment date for consular processing, he will be required to

return to his country of origin, El Salvador, for an interview with a DOS consular officer.

Although he would not have been deemed likely to become a public charge in the past, he now

faces the risk of being unable to return to the U.S. as a result of the Consular Rules, subjecting

himself and his family to indefinite separation.  Although Carl Doe is 32, has never had any

health problems, and is eligible for state-funded Medicaid, to mitigate the risks to his

immigration petition imposed by the Consular Rules, he will be forced to have his company

purchase an expensive health plan that does not provide adequate health care coverage.

48.     Plaintiff Diana Doe is an intending immigrant and a member of MRNY

who lives in Long Island in the home she owns with her husband.  Her husband is 67 years old

and their daughter 12; both are U.S. citizens.  Her husband's I-130 petition on her behalf was

granted.  Because Diana Doe has resided in the U.S. without authorization after entering without

inspection, she will have to leave the country to seek her immigrant visa at a U.S. consulate

abroad.  Without a waiver of her period of unlawful presence, Diana would be required to remain

outside the U.S. for ten years before she could obtain LPR status.  She will file an I-601A request

for a waiver of inadmissibility for unlawful presence based on extreme hardship, which she is

currently preparing.  Once it is granted, Diana Doe will have to return to her country of origin,

Mexico, for an interview with a DOS consular officer.  Because Diana Doe's husband is retired

and disabled, he receives Social Security income as well as retirement benefits from his union,

totaling about $28,000 last year.  Diana Doe is the sole caretaker for her husband and adolescent

daughter, and shares caretaking duties for her 85-year-old mother, also a U.S. citizen, with her

siblings.  Diana Doe would not have been deemed likely to become a public charge in the past,

but should Diana Doe depart the U.S. to wait for a consular processing appointment, she will

face the imminent risk of being unable to return to the U.S. as a result of the Consular Rules,

subjecting her and her family to indefinite separation.  Although Diana Doe has typically paid

out-of-pocket at neighborhood clinics to obtain health care, to mitigate the risks imposed by the

Consular Rules, she will have to deplete her small savings in order to purchase an expensive

health plan that does not provide adequate health care coverage.

49.     Plaintiff Eric Doe is a U.S. citizen originally from Mexico.  He resides in

Manhattan with his wife, an intending immigrant from Mexico, and three of their children.  Eric

filed an I-130 "Petition for Alien Relative" on behalf of his wife, which was approved by USCIS.

Eric is a superintendent for several New York City apartment buildings, and makes

approximately $52,000 per year.  Eric also has a chronic form of leukemia which requires

ongoing treatment, but he has been able to keep working despite periods during which he

becomes very ill.  Each of the family members receives state-funded health insurance, but no

other government benefits.  Eric's wife, who works part-time cleaning homes, wants to obtain

LPR status.  Because she has resided in the U.S. without authorization after entering without

inspection, she will have to leave the country to seek her immigrant visa at a U.S. consulate

abroad.  Without a waiver of her period of unlawful presence, she would be required to remain

outside the U.S. for ten years before she could obtain LPR status.  Eric's wife has been approved

for an I-601A waiver of inadmissibility, which means she is able to return to Mexico for consular

processing without the ten-year waiting period provided she is otherwise eligible for an

immigrant visa.  In her I-601A application, she explained the extreme hardship that her family

would suffer without the waiver, especially her husband.  Although Eric's wife would not have

been denied admission on public charge grounds under the consular rules that pre-dated the FAM

Revisions, were she to undergo consular processing and face application of any of the Consular

Rules challenged in this case, her immigrant visa would likely be denied, and Eric would either

have to return with their children to Mexico at the risk of Eric's health or be separated from his

wife indefinitely.

## II.      Defendants

50.      Defendant Michael Pompeo is the Secretary of State, the federal agency

that oversees consular processing and the entries of intending immigrants seeking adjustment.

He is responsible for overseeing the enforcement and implementation of the Proclamation for all

Department of State staff and is charged by statute with the administration and enforcement of

immigration laws, including those related to the powers, duties, and functions of consular

officers not reserved to the officers themselves.  8 U.S.C. § 1104.  Defendant Pompeo is sued in

his official capacity.

51.     Defendant DOS is a cabinet department of the United States federal government.  DOS is charged with the issuance of immigrant visas abroad and consular processing of intending immigrants seeking admission.

52.     Defendant Alex Azar is the Secretary of the United States Department of Health and Human Services, the federal agency that regulates private and public health insurance.  He is responsible for overseeing enforcement and implementation of the Proclamation by staff at the Department of Health and Human Services.  Defendant Azar is sued in his official capacity.

53.     Defendant HHS is a cabinet agency within the United States federal government.  The Proclamation assigns to HHS a variety of responsibilities regarding its implementation and enforcement.

54.     Defendant Trump is President of the United States.  He is sued in his official capacity.  In that capacity, he issued the Proclamation.

## FACTUAL ALLEGATIONS

**I.      Obtaining LPR Status through Consular Processing
        and the Public Charge Provisions of the INA**

55.     To understand how the Defendants seek to radically undo, by executive action, the duly enacted federal immigration statutes, it is necessary first to understand how the INA, together with implementing regulations, comprehensively addresses who may and may not become a lawful permanent resident of the United States.

56.     The INA defines "lawfully admitted for permanent residence" to mean "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws . . ."  8 U.S.C. § 1101(a)(20).

An LPR, or green card holder, has received an "immigrant visa" and has permission to live and

work in the U.S. permanently as long as the person abides by the law, as well as the right to

petition for certain family members to join them in the U.S. as LPRs.  LPR status is also a

precondition for most immigrants to be eligible for obtaining U.S. citizenship through

naturalization.

57.     There are various paths through which an intending immigrant can obtain

LPR status.  Family-based immigration is the predominant path, accounting for 66 percent of all

adjustments to LPR status.[6]  Other paths to LPR status include (without limitation): humanitarian

entry provided to refugees, asylees, and certain survivors of crime; employer sponsorship; and

the diversity visa lottery.  How an intending immigrant obtains LPR status through a family

member depends on whether they are applying from within the United States, in which case the

process is called "adjustment of status," or seeking to enter the U.S. with an immigrant visa

through consular processing in a Department of State consular office or foreign embassy.

58.     Obtaining an adjustment to LPR status through a family member requires

the intending immigrant, among other things, to have a qualifying relationship with certain U.S.-

citizen or LPR relatives.[7]  Family members file DHS Form I-130 to petition for their beneficiary

---

[6]     *See* Dep't of Homeland Security, *Annual Flow Report: Lawful Permanent Residents*, at 5 (2018), *available at* https://www.dhs.gov/sites/default/files/publications/Lawful_Permanent_Residents_2017.pdf.

[7]     One category of qualifying relationships is "immediate relative," meaning a spouse of a U.S. citizen, an unmarried child under the age of 21 of a U.S. citizen, or the parent of a U.S. citizen who is at least 21 years old. 8 U.S.C. §§ 1151(b)(2)(A)(i); 1151(f).  The INA places annual numerical limits on the number of immigrant visas available to relatives of U.S. citizens and LPRs in certain categories, but there are no such limits on the number of persons seeking to obtain LPR status through an immediate relative.  *Id.* § 1151(b).  Other relatives of a U.S. citizen or LPR may qualify under "family-based preference" categories.  *Id.* § 1153(a).  These include unmarried adult sons or daughters of citizens; spouses and unmarried sons or daughters of LPRs; married sons or daughters of citizens; and brothers and sisters of citizens, but there are annual numerical limits placed on the immigrant visas available in each of these family-based preference categories.  *Id.* § 1151(a)(1).  Most family-based applicants for LPR status are required to have a financial sponsor who can support them at or above 125 percent of the FPG.  *See id.* at § 1183a.

family members to establish the qualifying family relationship.  Where an intending immigrant

seeks LPR status through her employer, the employer files DHS Form I-140 to petition for

beneficiary employees to establish the qualifying employee/employer relationship.  Once these I-

130 or I-140 petitions are approved, the beneficiary continues the process of seeking immigrant

status by filing a Form I-485 application to adjust status, together with voluminous information

to demonstrate that the beneficiary is eligible for an immigrant visa and is not inadmissible

pursuant to the INA.

      59.     Consular processing begins with a Form I-130 or I-140 filed on behalf of

the intending immigrant.  Once one of those forms is approved, the beneficiary continues the

process of seeking immigrant status by filing a Form DS-260 immigrant visa electronic

application, together with voluminous information to demonstrate that the immigrant is eligible

for immigrant visas and is not inadmissible under the provisions of the INA.

      60.     Family-based applicants for LPR status – both those adjusting their status

and those undergoing consular processing – need to demonstrate that none of the grounds of

inadmissibility set forth in section 212 of the INA are applicable.  *Id.* § 1182 (a)(1)–(10)

(including, *e.g*., grounds related to health, unlawful presence, criminal convictions, national

security, and others).  One such ground relates to whether the applicant is likely to become a

public charge.  Where any of the grounds of inadmissibility are present and not waived, the

application for admission or adjustment will be denied.  If the applicant is found to be eligible

and there is no basis for denial, the application for status adjustment is approved, and the

applicant is issued a lawful permanent resident card or green card.

      61.     Some intending immigrants have previously entered the United States

without admission or parole, which is a ground of inadmissibility.  *See* 8 U.S.C. § 1182(a)(6)(A).

In such cases, the intending immigrant cannot adjust her status within the United States.  In such cases, the intending immigrant must depart the U.S. to continue the consular process, typically in the country of origin.  If the intending immigrant has accrued between six months and one year of unlawful presence, she is subject to a three-year bar on returning; if she has accrued more than one year of unlawful presence, the bar is ten years.  8 U.S.C. § 1182(a)(9)(B).  There is an unlawful presence waiver process for which intending immigrants can apply to avoid the three- or ten-year exclusion and the resulting displacement from their community and family.  In order to qualify for the Form I-601A waiver, the intending immigrant must demonstrate extreme hardship to the sponsoring family member that would occur if the sponsor either had to remain outside the country with the intending immigrant, or were to become separated from the intending immigrant during the period of exclusion.  Where the I-601A waiver is granted, the intending immigrant typically leaves the United States when their consular interview is scheduled.  At that interview, the DOS consular officer must evaluate all the bases for denying admission set forth in the INA, including the public charge provision.

62.     The public charge basis for inadmissibility is set forth in § 1182(a)(4) of the INA, which bars admission to a noncitizen who "in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible."  *Id.* § 1182(a)(4)(A).[8]

---

[8]   A separate provision of the INA renders "deportable" noncitizens who, within five years after the date of entry, have "become a public charge from causes not affirmatively shown to have arisen since entry."  *Id.* § 1227(a)(5).  Regulations governing this provision would be promulgated by the Department of Justice and are not at issue here.

63.     The INA identifies five factors that a consular officer or the Attorney

General must consider when making a prospective public charge determination in the

admissibility context: (1) age; (2) health; (3) family status; (4) assets, resources, and financial

status; and (5) education and skills.  *Id.* § 1182(a)(4)(B)(i).  The statute does not ascribe

particular weight to any factor and requires that these five factors be considered "at minimum."

The INA also permits a consular officer or the Attorney General to "consider any affidavit of

support" from a financial sponsor.  8 U.S.C. § 1182(a)(4)(B)(ii).

64.     In addition to the barriers to admission set forth in 8 U.S.C. § 1182(a), the

INA also provides for the President to issue proclamations to temporarily "suspend" or "impose"

restrictions on the entry of foreign-born persons if he "finds" such entry to be "detrimental to the

interests of the United States."  8 U.S.C. § 1182(f).  However, the proclamation power does not

permit the President to "override particular provisions of the INA," as the Supreme Court

recently reaffirmed. *Trump* v. *Hawaii*, 138 S. Ct. 2392, 2411 (2018).

## II.     Defendants' Attempts to Rewrite the Immigration Statutes by Executive Action

65.     The Defendants' attempts to transform the statutorily-mandated

immigration scheme set forth above has taken multiple forms, including through the Consular

Rules challenged in this action.

### A.     DHS Promulgates the "Public Charge" Rule, Based on Nativist and Flawed Social Science

66.     The actions challenged in this lawsuit originated in an April 2016 policy

proposal by the Center for Immigration Studies ("CIS"), a group that the Southern Poverty Law

Center designates an "anti-immigrant hate group."[9]  The policy-drafting group's brief history

traces to its founder, a white supremacist who believed "that for European-American society and

culture to persist, it requires a European-American majority and a clear one at that,"[10] and who

feared that America's white majority was threatened by the "greater reproductive powers of

Hispanic immigrants."[11]

67.     The CIS publication that was the genesis of the actions challenged here

lists numerous proposals for limiting immigration of low-income people and asylum seekers

from non-European countries, including using "the public charge doctrine to reduce the number

of welfare-dependent foreigners living in the United States."[12]

68.     Critical to CIS's approach is its laundering of information to reverse

engineer support for policies to reduce immigration by people of color.  In essence, CIS seeks

through misrepresenting and misstating data and slipshod logic to provide intellectual cover for

racist exclusion.  Conservative think tanks such as the libertarian Cato Institute have criticized

CIS's "unsound methodological choice[s]" that are made to "inflate[]" the apparent use of public

benefits programs by noncitizens so as to justify expanding public charge.[13]

---

[9]     See Southern Poverty Law Center listing of Center for Immigration Studies as an "anti-immigrant hate group," Southern Poverty Law Center, available at https://www.splcenter.org/fighting-hate/extremist-files/group/center-immigration-studies.

[10]    See Matt Schudel, John Tanton, architect of anti-immigration and English-only efforts, dies at 85, Wash. Post (July 21, 2019), available at https://www.washingtonpost.com/local/obituaries/john-tanton-architect-of-anti-immigration-and-english-only-efforts-dies-at-85/2019/07/21/2301f728-aa3f-11e9-86dd-d7f0e60391e9_story.html.

[11]    Id.

[12]    Center for Immigration Studies, A Pen and A Phone 8 (Apr. 6, 2016), available at https://cis.org/sites/cis.org/files/79-actions_1.pdf.

[13]    See Alex Nowrasteh, Center on Immigration Studies Overstates Immigrant, Non-Citizen, and Native Welfare Use, Cato Institute (Dec. 6, 2018), available at https://www.cato.org/blog/center-immigration-studies-overstates-immigrant-non-citizen-native-welfare-use.

69.     Within a week of President Trump's inauguration, a draft of an executive order targeting immigrant-headed families that had used any means-tested public benefit, including children's health insurance for U.S. citizen children, was leaked to the public, initiating a pattern across the country of fear, and resulting in mass immigrant withdrawal from public services and benefits.  The draft executive order, among other things, directed DHS to issue new rules defining "public charge" to include any person receiving means-tested public benefits and ordered similar amendments of the FAM.[14]

70.     The draft Executive Order was never signed.  But DHS embarked on drafting changes to the public charge criteria through notice-and-comment rulemaking, and on October 10, 2018, DHS published a Notice of Proposed Rulemaking entitled "Inadmissibility on Public Charge Grounds."  Inadmissibility on Public Charge Grounds, 83 Fed. Reg. 51,114 (proposed Oct. 10, 2018) (to be codified at 8 C.F.R. pts. 103, 212, 213, 214, 245, 248).  The proposed rule was met with comments from more than 266,000 think tanks, scholars, advocacy groups, legal services organizations, children's aid groups and other nonprofits, states, municipalities, and individuals—the "vast majority" of which "opposed the Rule," according to DHS.  84 Fed. Reg. at 41,304.

71.     On August 14, 2019, USCIS published the final DHS Rule.  Twenty-three states and the District of Columbia, six municipalities, nineteen non-profit immigrants' rights, public interest, and health advocacy organizations; and two individual plaintiffs filed suit in five different federal courts around the country.  Between October 11 and October 14, 2019, all five

---

[14]   *See* Executive Order on Protecting Taxpayer Resources by Ensuring Our Immigration Laws Promote Accountability and Responsibility (Jan. 23, 2017), *available at* https://cdn3.vox-cdn.com/uploads/chorus_asset/file/7872571/Protecting_Taxpayer_Resources_by_Ensuring_Our_Immigration_Laws_Promote_Accountability_and_Responsibility.0.pdf.

courts enjoined the DHS Rule before it was to take effect on October 15, 2019.  Two appellate

courts have stayed the effect of injunctions issued by District Courts in California and

Washington, and in Maryland, but the DHS Rule remains enjoined.

**B.      DOS Pursues Analogous Changes to its Consideration of "Public Charge"**

72.      As DHS undertook the process of promulgating the DHS Rule, Defendant

DOS simultaneously embarked on similar changes to its own rules and regulations, first through

the revisions to its Foreign Affairs Manual embodied in the FAM Revisions, published in

January 2018 without any notice-and-comment period, and then through publication of the IFR

on October 11, 2019, also without advance notice-and-comment.

73.      Like the enjoined DHS Rule, the FAM Revisions and the IFR seek to

implement objectives of the CIS "wish list" and the draft executive order.

**(i)      The FAM Revisions**

74.      The FAM is the "single, comprehensive, and authoritative source for the

Department's organization structure, policies, and procedures that govern the operation of the

State Department, the Foreign Service, and, when applicable, other federal agencies."[15]  The

FAM "convey[s] codified information to Department staff and contractors so they can carry out

their responsibilities in accordance with statutory, executive, and Department mandates."[16]

Scholars have described the FAM as representing "the official policies of the Department of

---

[15]   *Foreign Affairs Manual and Handbook*, U.S. Dep't of State, *available at* http://fam.state.gov/.

[16]   *Id.*

State" and constituting "binding authority on consulates, as well as on all other agencies within the Department of State."[17]

75.     From 1999 until 2018, the FAM has defined "public charge" as a non-citizen who "is likely to become primarily dependent on the U.S. Government for subsistence" either from "[r]eceipt of public cash assistance for income maintenance" or "[i]nstitutionalization for long-term care." 9 FAM § 302.8-2(B)(1) [pre 2018 revisions].  This definition is consistent with the 1999 INS Field Guidance, which specifically excluded from public charge determinations consideration of noncash benefits programs, such as Medicaid, SNAP, and housing assistance.  64 Fed. Reg. at 28,689 (May 26, 1999).

76.     Until January 3, 2018, the FAM explicitly *prohibited* consular officers from considering a visa applicant's past, current, or future use of non-cash benefits: "Neither the past nor possible future receipt of such non-cash or supplemental assistance may be considered in determining whether an alien is likely to become a public charge." *See id.*

77.     The FAM also provided a non-exclusive list of non-cash benefits programs that should be excluded from consideration, including SNAP, Medicaid, Child Health Insurance Program ("CHIP"), and other nutrition and food assistance programs.  Additionally, the FAM directed consular officers to consider "a properly filed, non-fraudulent Form I-864 [Affidavit of Support] in those cases where it is required, . . . [as normally] sufficient to meet the [8 U.S.C. § 1182](a)(4) requirements [under the INA] and satisfy the 'totality of the circumstances' analysis."  9 FAM § 302.8-2(B)(1) [pre-2018 revisions].

---

[17]   Victoria Degtyareva, *Defining Family in Immigration Law: Accounting for Nontraditional Families in Citizenship by Descent*, 120 Yale L.J. 862, 872 (2011).

78.     The January 3, 2018 FAM Revisions radically expanded who is likely to
be found inadmissible on "public charge" grounds by consular officers in multiple ways.  The
FAM Revisions are extremely broad—in some respects, going even farther than the enjoined
DHS Rule.

79.     Specifically, the FAM Revisions direct consular officers to look for any
"[p]ast or current receipt of public assistance of *any* type by the visa applicant *or a family
member* in the visa applicant's household," including non-cash benefit programs, as evidence
that the applicant will likely become a "public charge" in the future.  9 FAM 302.8-2(B)(2)
[post-2018 revisions] (emphasis added).

80.     In addition, Defendant DOS drastically reduced the weight given to a
properly filed Affidavit of Support, specifying that an Affidavit of Support will simply be a
"positive," as opposed to *dispositive*, factor.  Although the FAM still explicitly permits a
nonrelative to serve as a joint sponsor, stating "[t]he joint sponsor can be a friend or third party
who is not necessarily financially connected with the sponsor's household," *see* 9 FAM 302.8-
2(C)(7) [post-2018 revisions], the FAM now incorporates language encouraging the consular
officer to consider the "likelihood that the sponsor(s) will support the visa applicant . . ."  9 FAM
302.2(B)(3)(U)(1)(b) [post-2018 revisions].  This tension within the FAM Revisions—between
permitting anyone to be a joint sponsor and at the same time inviting subjective judgement as to
who is more "likely" to abide by the contractual obligation set forth in the Affidavit of Support—
invites arbitrary and inconsistent evaluation of the Affidavit of Support.  For example, since the
FAM Revisions were enacted, consular officers located in Ciudad Juarez, Mexico have advised
consular interviewees that Forms I-864 demonstrating a current individual annual income at or
above the legal requirements is no longer sufficient.  Some applicants presenting Affidavits of

Support from a joint sponsor were advised, either orally or in writing, to submit one instead from

a family member or to further document the relationship between the joint sponsor and the

applicant.  In other cases, consular officers are advising applicants that a better choice of sponsor

would be one who is a family member or lives with the applicant.

   81. The FAM Revisions also work retroactively, as they direct consular

officers to consider past receipt of benefits, which was not previously contemplated in the FAM.

For example, the FAM Revisions direct consular officers to consider the past use of non-cash

benefits by visa applicants and their sponsors and does not limit that consideration to benefits

used after the FAM Revisions.  The Rule thus penalizes noncitizens for decisions they made or

their sponsors and family members in reliance on then-existing law and the INS Field Guidance.

   82. DOS has not identified *any* authority that would permit it to promulgate

retroactive rules.  Without express authorization from Congress, DOS lacks the power to apply

the standards in the FAM Revisions retroactively.

   83. The FAM Revisions were promulgated absent required rulemaking

procedures.  None of these alterations were made with proper notice, explanation, or opportunity

for comment to the public.

   84. Following publication of the FAM Revisions, initial denials on public

charge grounds increased dramatically.  While DOS findings of inadmissibility on public charge

grounds totaled 1,033 in fiscal year 2016, a total of 12,973 initial denials on public charge

grounds were issued in fiscal year 2018—a *twelve-fold* increase. [18]  The highest increases in

---

[18]  *See* DOS tables linked to in Ted Hesson, *Visa denials to poor Mexicans skyrocket under Trump's State Department*, Politico (Aug. 6, 2019), *available at* https://www.politico.com/story/2019/08/06/visa-denials-poor-mexicans-trump-1637094.

denials fell on Mexican applicants. While just seven Mexican nationals were refused an immigrant visas on public charge grounds in fiscal year 2016, a total of 5,343 Mexican nationals were refused an immigrant visa on public charge grounds during the first ten months of fiscal year 2019.[19] Intending immigrants from India, Pakistan, Bangladesh, Haiti, and the Dominican Republic also saw notable increases in initial findings of inadmissibility based on public charge grounds.[20] In contrast, there were either no, or in limited cases no meaningful, increase in applicants refused visas on public charge grounds from predominantly white countries.[21]

85.     The FAM Revisions are currently being challenged in the United States District Court for the District of Maryland. *See Mayor and City Council of Baltimore* v. *Trump*, No. 1:18-cv-03636 (D. Md., Filed November 28, 2018). On September 20, 2019, the court denied the government's motion to dismiss, holding that the FAM Revisions "contain all the hallmarks of a legislative rule" that is "subject to notice and comment under the APA." 2019 WL 4598011 at *32-33 (D. Md. Sept. 20, 2019). Further, the court held that the plaintiffs in that case had plausibly alleged that the FAM Revisions were impermissibly retroactive and that they violated the Equal Protection guarantee of the Fifth Amendment. *Id.*

---

[19]   *Id*.

[20]   For instance, public charge denials for Pakistani national increased to 563 in the first ten months of 2019, from just two denials in fiscal year 2016. Similarly, public charge denials for Bangladeshi nationals rocketed upwards to 1,262 in just the first ten months of fiscal year 2019, from 324 denials in fiscal year 2017. *Id*.

[21]   *Id*. The number of visa denials for applicants from Spain remained the same as compared between fiscal year 2016 to the first ten months of 2019 (one visa denial in each time period). Similarly, across that same time period, the number of visa denials for Bulgarian and German applicants only increased from one to two, and two to three, respectively. Visa denials for Russian applicants actually fell from fiscal year 2016 to 2019, from 14 to 11.

(ii)     **The Interim Final Rule**

86.     On October 11, 2019, as five federal courts were drafting or issuing

decisions blocking the DHS public charge rule from taking effect, DOS published an interim

final rule (IFR), amending 22 C.F.R. § 40.41.  *Visas: Ineligibility Based on Public Charge*

*Grounds*, 84 F.R. 54996 (October 11, 2019).

a.     **The Substance of the IFR Mirrors that of
the Enjoined DHS Rule**

87.     The IFR states that it is amending the FAM and is "intended to align the

Department's standards with those of the Department of Homeland Security," to avoid

inconsistent applications of the public charge provision between the two federal agencies.  84

Fed. Reg. at 54,996.  Thus, the IFR takes the applicable provisions and definitions from the DHS

public charge rule and incorporates those into the FAM.  *See id*.

88.     The amendments include definitions of "public charge," "public benefit,"

"alien's household," "age," and "receipt of public benefits."  84 Fed. Reg. at 54,996; 55,001-11.

These amendments represent a dramatic change to the standards related to public charge set forth

in the 1999 INS Field Guidance.

89.     *First*, the IFR defines "public charge" to mean a person "who receives one

or more [specified] public benefits . . . for more than 12 months in the aggregate within any 36-

month period (such that, for instance, receipt of two benefits in one month counts as two

months)."  84 Fed. Reg. at 55,014 (proposed 22 C.F.R. § 40.41(b)).  DOS offers no cogent

explanation for this 12-month trigger or why it considers the appropriate threshold to be 12

months rather than 6, 24, or any other number.

35

90.     *Second*, the IFR defines "public benefit" to mean *any* amount of benefits from *any* of the programs enumerated in the Rule.  84 Fed. Reg. at 55,014 (proposed 22 C.F.R. § 40.41(c)).   The IFR defines "public benefits" to include a wide range of cash and non-cash benefits that offer short-term or supplemental support to eligible recipients.  These benefits include cash benefits such as SSI, 42 U.S.C. § 1381 *et seq.*; TANF, 42 U.S.C. § 601 *et seq.*; "Federal, state or local cash benefit programs for income maintenance;" and non-cash supplemental benefits such as SNAP, 7 U.S.C. §§ 2011–2036c; Section 8 Housing Assistance under the Housing Choice Voucher Program, 24 CFR part 984; 42 U.S.C. §§ 1437f & 1437u; Section 8 Project-Based Rental Assistance, 24 C.F.R. parts 5, 402, 880–884, 886; federal Medicaid, 42 U.S.C. §§ 1396 *et seq.* (with certain narrow exclusions);[22] and Public Housing under section 9 of the U.S. Housing Act of 1937, 42 U.S.C. § 1437 *et seq.*  84 Fed. Reg. 54,999.[23]  In contrast, the 1999 Field Guidance directs consideration of only the likelihood that an individual will become primarily dependent on the government, as shown by receipt of monthly cash assistance or long-term institutionalization, in making a public charge determination, and specifically excludes from consideration such non-cash benefits.

91.     The definition of "public charge" in the IFR also radically changes the amount as well as the type of benefits that can trigger a public charge finding.  While under the

---

[22]   Medicaid benefits excluded from the public charge analysis include benefits paid for an emergency medical condition, services or benefits provided under the Individuals with Disabilities Education Act, school-based benefits provided to children at or below the eligible age for secondary education, and benefits received by children under 21 years of age, or woman during pregnancy and 60 days post-partum.  84 Fed Reg. at 55,014 (proposed 22 C.F.R. § 40.41(c)).

[23]   The definition of "public benefits" excludes benefits received by (i) individuals enlisted in the armed forces as well as their spouses and children, (ii) individuals during a period in which they are exempt from the public charge inadmissibility ground, and (iii) children of U.S. citizens whose admission for lawful permanent residence will automatically result in their acquisition of citizenship.  84 Fed. Reg. at 54,999 (proposed 22 C.F.R. § 40.41(b)).

Field Guidance, as noted, only a person who was considered "primarily dependent" on the government for subsistence was considered a public charge, the IFR renders an immigrant an excludable public charge upon receipt of *any* amount of the listed benefits for *any* 12 months "in the aggregate" during the 36-month period prior to filing a visa application.  Under this "aggregate" calculus, receipt of two benefits in one month would count as two months.  *See* 84 Fed. Reg. at 55,013 (proposed 22 C.F.R. § 40.41(c)).

92.     As with the now-enjoined DHS Rule, the IFR's sweeping redefinition of "public charge" would drastically increase the number of persons potentially denied admission or entry on that basis.  According to a November 2019 report from the Center on Budget and Policy Priorities ("CBPP"), nearly *81 percent of the world's population* would fail to satisfy one particular criterion found in both the DHS Rule and the IFR: the "income test," which has a negative impact on immigrants' public charge consideration if their income falls below 125 percent of the U.S. FPG.[24]

93.     As further illustration, by one estimate, in any one year, 30 percent of U.S.-born citizens receive one of the benefits included in the rule's definition (compared to approximately 5 percent of U.S.-born citizens who meet the current benefit-related criteria in the public charge determination under the 1999 Field Guidance).  Similarly, in any given year, 16 percent of U.S. workers receive one of those benefits, compared to 1 percent who meet the current benefit-related criteria.  As set forth in its public comment on the parallel DHS Rule, the Center on Budget and Policy Priorities estimates that 40 percent of U.S.-born individuals

---

[24]    *See* Center on Budget and Policy Priorities, *Administration's Public Charge Rules Would Close the Door to U.S. to Immigrants Without Substantial Means* (Nov. 11, 2019), *available at* https://www.cbpp.org/research/immigration/administrations-public-charge-rules-would-close-the-door-to-us-to-immigrants.

covered by a 2015 survey participated in one of those programs between 1998 and 2014—a

figure that, after adjusting for underreporting, is likely approximately 50 percent.[25]  A more

recent report by the same organization explains that, "[i]f one considers benefit receipt of the

U.S.-born citizens over the 1997-2017 period, some 43 to 52 percent received one of the benefits

included in the proposed public charge rule," and that more than 50 percent of the U.S.-born

citizen population would receive such benefits over their lifetimes.[26]  While U.S. citizens are not

subject to either the FAM Revisions or the IFR, these figures illustrate the extraordinarily broad

potential impact of those portions of the Consular Rules challenged in this action.

       94.    The predictive nature of the test set forth in the IFR further magnifies the

harm of the aggregate consideration of benefits.  It is difficult to imagine how a consular officer

could find that a person is likely in the future to receive only one benefit for twelve months

instead of two benefits for six months, three benefits for four months, etc.  Thus, a substantial

probability exists that the 12-month use limit will be theoretical only, with prediction being

reduced simply to whether a person will or won't be likely to ever use a non-cash benefit.

       95.    *Third*, the IFR defines the statutory phrase "likely at any time to become a

public charge" to mean "more likely than not at any time in the future to become a public charge,

. . . based on the totality of the alien's circumstances."  84 Fed. Reg. at 55,012 (proposed 22

---

[25]  *See* CBPP, Comment on Proposed Rule on Public Charge Ground of Inadmissibility (Dec. 7, 2018), at 2, 7–8, 10, *available at* https://www.regulations.gov/document?D=USCIS-2010-0012-37272; *see also* Center for American Progress, Comments on Department of Homeland Security, Inadmissibility on Public Charge Grounds, RIN 1615-AA22, 83 Federal Register 51114, at 15 (Dec. 10, 2018) ("the proposed redefinition would mean that most native-born, working-class Americans are or have been public charges") *available at* https://cdn.americanprogress.org/content/uploads/2018/12/11075803/CAP-Comments-on-Public-Charge-Admissibility.pdf.

[26]  *See* Center on Budget and Policy Priorities, *Trump Administration's Overbroad Public Charge Definition Could Deny Those Without Substantial Means a Chance to Come to or Stay in the U.S.* (May 30, 2019), *available at* https://www.cbpp.org/research/poverty-and-inequality/trump-administrations-overbroad-public-charge-definition-could-deny.

C.F.R. § 40.41(a)).  Thus, the IFR expressly disclaims *any* limit on how far into the future evaluation of the public charge analysis is to extend.

96.     *Fourth*, the IFR creates and inserts a complex and confusing scheme of positive and negative "factors," including certain "heavily weighted" factors, that supplants the statutory totality of circumstances test used to determine whether a noncitizen is likely to become a public charge under the INA.  84 Fed. Reg. at 55,012–13 (proposed 22 C.F.R. § 40.41(a)).

97.     The bottom line of this scheme is straightforward: the rule defines public charge solely by reference to use of benefits in any amount and uses factors that focus overwhelmingly on the noncitizen's income and financial resources, and past or current receipt of public benefits will be weighted heavily in favor of a determination that the noncitizen is inadmissible and ineligible for LPR status.  For example, one of the "heavily weighted negative factors" under the IFR is past or current receipt of public benefits.  84 Fed. Reg. at 55,012 (proposed 22 C.F.R. § 40.41(a)).  Another "heavily weighted negative factor" is an applicant's diagnosis with a medical condition that is "likely to require extensive medical treatment" when the applicant lacks private health insurance or financial resources to pay for anticipated costs.  *Id.*

98.     Indeed, every "heavily weighted positive factor" under the IFR similarly focuses on the immigrant's assets and financial resources, such as (1) having combined income, assets or resources, and support of at least 250 percent of the FPG; (2) being authorized to work and currently employed with an annual income of at least 250 percent of the FPG; or (3) possessing private health insurance.  *Id.*  The IFR also expressly excludes from consideration as private health insurance any insurance purchased using premium tax credits under the ACA.  *Id.*

99.     Even the factors under the IFR that are not "heavily weighted" also focus predominantly on assets and financial resources.  For example, the IFR's "income test" provides

that consular officers will consider whether the applicant's household's annual gross income is at least 125 percent of the most recent FPG based on household size. *See* 84 Fed. Reg. at 55,012-13 (proposed 22 C.F.R. § 40.41(a)). If the applicant's household's annual gross income is below that level, DHS will consider this a negative factor, unless the total value of the applicant's household assets and resources is at least *five times* the difference between the household's income and 125 percent of the FPG. *See id.*[27]

100.    The IFR also penalizes applicants who are under the age of 18—merely because of their age, even though they have their whole working lives ahead of them—as well as those aged 62 and over, adults well below the typical retirement age in today's punishing economy. *See* 84 Fed. Reg. at 55,001 (proposed 22 C.F.R. § 40.41(a)). Thus, for example, even "in the case of a 17-year-old who has a credible offer of lawful employment that would make him- or herself-sufficient, *the alien's age would be a negative factor*." 84 Fed. Reg. at 55,001 (emphasis added). Further, while the IFR states that it does not "intend . . . [the] standard to imply that individuals over early retirement age are unable to work," it retains the rigid 62-plus age line as a negative factor. *Id.*

101.    Apparently recognizing that retroactive application would be unlawful, the IFR does not adopt the FAM's approach to past benefits and instead states that consular officers should consider only those benefits received after October 15, 2019 in determining whether an applicant for admission is likely to become a public charge. *Id.* at 55,006. Notably, this

---

[27]   This amount is reduced to three times the difference for an immigrant who is the spouse or child of a U.S. citizen, and one times the difference for an immigrant who is an orphan who will be adopted in the United States after acquiring permanent residence. *See id.*

language does not appear to be impacted by the subsequent postponement of the IFR's implementation, and thus all benefits received since October 15 will count upon implementation.

102.    The IFR provides further that DOS will consider additional vague and unprecedented factors for which there appears to be no specific standard.  For example, for the first time, DOS will evaluate an intending immigrant's English language proficiency, without articulating any standard or level of proficiency an applicant is required to attain or how such proficiency is to be measured.  84 Fed. Reg. at 55,013 (proposed 22 C.F.R. § 40.41(a)(5)).  In contrast, when determining a naturalization applicant's English language proficiency, USCIS's regulation sets out clear standards for ability to read, write and speak "words in ordinary usage" and directs applicants to test-study materials and testing procedures on the USCIS website.  *See* 8 C.F.R. § 312.1.

103.    DOS contends that it will still consider submission of an Affidavit of Support, but the approach outlined in the IFR departs from practices pre-dating the FAM Revisions by decreasing the impact of a sufficient Affidavit of Support on the public charge determination.  Under the IFR, an Affidavit of Support will no longer be sufficient to rebut a public charge finding.  Rather, it will simply be one positive factor—and not even a heavily weighted one—in the new test.  *See* 84 Fed. Reg. at 55,013 (proposed 22 C.F.R. § 404.41(a)(7)).  Moreover, the IFR will no longer accept an Affidavit of Support at face value, but requires the consular officer to evaluate "the likelihood that the sponsor would actually provide the required financial support, based on available information about the sponsor." 84 Fed. Reg. 55,004.

104.    The impact of these factors is to multiply the number of grounds for deeming noncitizens inadmissible as public charges and barred from LPR status.  By focusing virtually all the factors DHS chooses to identify—including the majority of "heavily-weighted

factors"—on an immigrant's assets and resources, the IFR provides immigration officers with an

abundance of options to deny green cards to low-income immigrants, whether they have ever

accessed public benefits or not.  As discussed above, this approach represents a sharp departure

from the consistent historical understanding and application of the public charge inadmissibility

standards.  The income and resources-focused factors are not targeted to determining who is

currently or predicted to be primarily dependent on the government for subsistence.  Rather, they

are geared toward excluding a much broader group of low- and middle-income noncitizens in the

public charge dragnet.

**b.      The IFR Was Issued Without
          Notice-and-Comment Rulemaking**

105.    Nearly three weeks before the IFR was issued, on September 20, 2019,

defendants received a ruling finding that the FAM Revisions constituted substantive, legislative

rules and thus were subject to notice-and-comment rulemaking.  Nonetheless, DOS issued the

IFR four days before it was to go into effect and allowed no opportunity for public comment pre-

implementation.

106.    The IFR was thus issued without formal notice-and-comment rulemaking

and without at least 30 days' notice of its effective date, as typically required by the

Administrative Procedure Act. 5 U.S.C. §§ 553(b)(B), (d)(3).  Instead, the IFR states that

Defendant DOS has "concluded that the good cause exceptions in 5 U.S.C. § 553(b)(B) and

(d)(3) apply to [the IFR] as the delay associated with notice and comment rulemaking would be

impracticable, unnecessary, or contrary to the public interest."  84 Fed. Reg. at 55,011.

107.    The APA provides that a rule is exempt from notice-and-comment

rulemaking procedures "when the agency for good cause finds (and incorporates the finding and

42

a brief statement of the reasons therefore in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."  5 U.S.C. § 553(b)(B). The APA separately provides that a rule is exempt from the statutory 30-day waiting period between the rule's publication and effective date when "provided by the agency for good cause found and published with the rule."  5 U.S.C. § 553(d)(3).  These provisions are generally invoked in three circumstances: (1) when an emergency, or some other exigent circumstances outside the agency's control, make compliance with standard notice-and-comment procedures impracticable; (2) when compliance with notice-and-comment procedures would cause harm or otherwise subvert the purposes of the rule; or (3) when Congress has implicitly waived the APA's notice-and-comment rulemaking requirements.[28]

108.    In support of its conclusion that the IFR fulfills the good cause exception to notice-and-comment procedures, Defendant DOS provides only conclusory statements of public harm created by self-inflicted exigency.  Specifically, DOS claims that different public charge standards in DHS and DOS regulations will cause inconsistent adjudication, and that these standards must be aligned prior to the original intended effective date of the DHS Rule. DOS willfully excludes the fact that it waited more than a year after DHS initially published its public charge rule to take action, itself causing the exigent circumstances that it now attempts to utilize as "good cause" to sidestep the APA's regular notice-and-comment procedures.

109.    Specifically, the IFR states that any delay would be impracticable because the DHS Rule was set to take effect October 15, 2019 and "[c]oordination of Department and DHS implementation of the public charge inadmissibility ground is critical to the Department's

---

[28]    Jared P. Cole, Cong. Research Serv., R44356, *The Good Cause Exception to Notice and Comment Rulemaking: Judicial Review of Agency Action* 4–8 (2016).

interest in preventing inconsistent adjudication standards and different outcomes between

determination of visa eligibility and determination of admissibility at a port of entry." *Id.*

110.    Although oral arguments in the challenges to the DHS Rule had taken

place earlier that week or the week before, with courts strongly indicating that they intended to

issue injunctions, DOS claimed "good cause" for skipping notice and comment as if the DHS

Rule had not been subject to any emergency challenge: "[I]f implementation of the rule is

delayed pending completion of notice and comment, consular officers would apply public

charge-related ineligibility standards differed from those apply by DHS and, consequently, might

issue visas to applicants who would later arrive at a port of entry and be found inadmissible by

U.S. Customs and Border Protection." *Id.*  Remarkably, DOS did not explain how this disparity

in definitions created an exigency given that the FAM changes of January 2018 meant that DHS

and DOS were already applying different public charge assessments.

111.    Nor did the IFR provide any explanation for why, if "coordination" with

DHS was paramount, Defendant DOS had failed to issue a proposed rule with adequate time for

public notice and comment for *more than a year* after DHS published its public charge rule for

comment on October 10, 2018.

### c.    It Remains Unclear Whether the IFR Is In Effect

112.    Although the IFR states that it was to go into effect on October 15, 2019,

subsequent to issuance Defendant DOS opened public comments for thirty days, with a deadline

for public comment on November 12, 2019.

113.    Subsequently, on October 24, 2019, DOS announced that it would open a

60-day comment period in order to permit public comments on a form required for consular

officers to make public charge determinations.  The deadline for public comment on the Form

DS-5540 is December 23, 2019.

114.    It remains unclear whether the IFR is in effect now, or, if it is not, when it

will go into effect—and if so, with what, if any, notice.  This slapdash and confusing approach to

rulemaking and effective dates makes it impossible for intending immigrants to know when they

will be subject to the IFR or how, if at all, the FAM Revisions are to be applied.

### (iii)    The Public Benefits Targeted by the FAM Revisions and the IFR Provide Temporary and/or Supplemental Support to Individuals Who Work

115.    As noted, the IFR defines "public charge" to mean a person who receives

certain enumerated public benefits for more than 12 months in any 36-month period.  The

"public benefits" at the root of the public charge inquiry include, for the first time, noncash

benefits designed to address hunger, health, and housing.  As INS recognized in issuing the 1999

Field Guidance, these benefits "are by their nature supplemental and do not, alone or in

combination, provide sufficient resources to support an individual or family."  64 Fed. Reg. at

28,692.  Three of the most salient public benefits programs, SNAP, Medicaid, and federal

housing assistance, are widely used by working families, like plaintiffs, to supplement their other

income.  And they are, by design, available to people with incomes well above the poverty line

and, in some cases, to people with significant assets.

### a.    SNAP

116.    Congress created the food stamp program (now known as the

Supplemental Nutrition Assistance Program, or "SNAP") in 1964, in order to "safeguard the

health and well-being of the Nation's population by raising levels of nutrition among low-

income households."[29]   The current maximum monthly allotment of SNAP benefits an individual

is eligible for is $192 for an individual, or $504 for a family of three,[30] which amounts to less

than $6 per person daily.  Most receive less.  The average actual allotment for a family of three

in 2019 is estimated to be approximately $378 per month, or little more than $4 per person

daily.[31]

117.    The supplemental nature of SNAP is evident not only from its name and

relatively limited maximum amount, but from the significant number of SNAP recipients who

work.  Over one-third of non-disabled adults work in *every* month they participate in SNAP.[32]

Many SNAP recipients must meet strict work requirements to maintain eligibility.[33]  Although

most SNAP recipients are subject to income and resource eligibility requirements, many

recipients have significant assets and income above the poverty line.  Among other things, many

significant assets are excluded from SNAP eligibility determinations, including homes of

residence, the full or partial value of certain vehicles, and most retirement and pension plans. 7

U.S.C. § 2014(g); 7 C.F.R. § 273.8(e).  Certain households are exempt from the resource cap

---

[29]   Food Stamp Act of 1964, Pub. L. No. 88-525, 78 Stat. 703 (codified at 7 U.S.C. § 2011); *accord* 7 C.F.R. § 271.1 (reiterating same purpose).

[30]   U.S. Dep't of Agriculture Food & Nutrition Serv., *SNAP Eligibility*, *available at* https://www.fns.usda.gov/snap/recipient/eligibility#How much could I receive in SNAP benefits? (providing monthly SNAP benefits by household size, for the period October 1, 2018 through September 30, 2019).

[31]   *See* Center on Budget and Policy Priorities, *A Quick Guide to SNAP Eligibility and Benefits* at Table 1 (Oct. 16, 2018),  *available at* https://www.cbpp.org/research/food-assistance/a-quick-guide-to-snap-eligibility-and-benefits, (estimating 2019 averages based on FY 2017 SNAP Quality Control Household Characteristics Data, the "most recent data with this information"); *accord* CBPP, Comment on Proposed Rule on Public Charge Ground of Inadmissibility (Dec. 7, 2018), at 44, *available at* https://www.regulations.gov/document?D=USCIS-2010-0012-37272 ("SNAP benefits average only about $1.40 per meal, or about $126 per month per person.").

[32]   CBPP, Comment on Proposed Rule on Public Charge Ground of Inadmissibility (Dec. 7, 2018), at 44, *available at* https://www.regulations.gov/document?D=USCIS-2010-0012-37272.

[33]   For example, Able Bodied Adults without Children, or "ABAWDs" are required to work or participate in a work program for at least 20 hours per week in order to receive SNAP benefits for more than three months in a 36-month period. *See* 7 C.F.R. § 273.24.

altogether.  Households with earned income can maintain SNAP eligibility up to 150 percent of the FPG, and households with childcare expenses up to 200 percent.

> **b.     Medicaid and State-Funded Health Insurance**

118.    Congress created the federal Medicaid program in 1965 to assist states in furnishing medical assistance to individuals and families.[34]  Medicaid provides health coverage to millions of individuals, among them low-income adults, children, pregnant women, elderly adults and people with disabilities.[35]  Many recipients of Medicaid work.  Nearly 80 percent of non-elderly, non-disabled adult Medicaid beneficiaries are in working families.[36]  Among Medicaid enrollees who work, over half work full-time *for the entire year* in which they participate in the program.[37]  Research shows that access to affordable health insurance and care, like Medicaid, "promotes individuals' ability to obtain and maintain employment."[38]

119.    In the 37 states (including the District of Columbia) that have adopted Medicaid expansion under the ACA, the program is available to people with no resources cap

---

[34]  Social Security Amendments of 1965, Pub. L. No 89-97, 79 Stat. 286.

[35]  Centers for Medicare & Medicaid Services, *Medicaid*, *available at* https://www.medicaid.gov/medicaid/index.html.

[36]  CBPP, Comment on Proposed Rule on Public Charge Ground of Inadmissibility (Dec. 7, 2018), at 44, *available at* https://www.regulations.gov/document?D=USCIS-2010-0012-37272

[37]  Rachel Garfield et al., *Understanding the Intersection of Medicaid and Work: What Does the Data Say?*, Kaiser Family Foundation, at 4 (Aug. 2019), *available at* http://files.kff.org/attachment/Issue-Brief-Understanding-the-Intersection-of-Medicaid-and-Work-What-Does-the-Data-Say.

[38]  CBPP, Comment on Proposed Rule on Public Charge Ground of Inadmissibility (Dec. 7, 2018), at 40—41, *available at* https://www.regulations.gov/document?D=USCIS-2010-0012-37272 (quoting Larisa Antonisse and Rachel Garfield, *The Relationship Between Work and Health: Findings from a Literature Review*, Kaiser Family Foundation (Aug. 2018), *available at* https://www.kff.org/medicaid/issue-brief/the-relationship-between-work-and-health-findings-from-a-literature-review/).

and with earnings above the poverty level.[39]   For example, parents with dependent children, and

adults aged 19–64, can qualify for federal Medicaid if their income does not exceed 138 percent

of the FPG.[40] Medicaid expansion was a key component of the ACA.[41]

120.    Individuals who become an LPR through a family-based visa petition

generally would become eligible for federal Medicaid after they have held a "qualified"

immigrant status," *see* 8 U.S.C. § 1641(b), for five years.

121.    Through New York State of Health, New York's state-run Health

Exchange, New Yorkers are screened for and enrolled in Medicaid as well as other types of

government-funded health insurance, government-subsidized private health insurance, and non-

subsidized private health insurance.  Government-funded insurance provided by New York

includes medical assistance that is available to persons not eligible for federal Medicaid. *See*

N.Y. Soc. Serv. Law §§ 366(1)(g), 369-gg.  Immigrants who are eligible for this form of state-

funded health insurance include qualified immigrants subject to the five-year waiting period, and

persons considered permanently residing under color of law, including persons granted relief

under the deferred action for childhood arrivals ("DACA") program or other deferred action, and

applicants for asylum.

122.    Some New Yorkers are eligible for New York's Basic Health Plan, called

the "Essential Plan."  N.Y. Soc. Serv. Law §§ 366(1)(g), 369-gg.  The Essential Plan provides

---

[39]   Kaiser Family Foundation, *Status of State Medicaid Expansion Decisions: Interactive Map*, (Aug. 1, 2019), *available at* https://www.kff.org/medicaid/issue-brief/status-of-state-medicaid-expansion-decisions-interactive-map/.

[40]   42 U.S.C. § 1396a(a)(10); 42 C.F.R. § 435.603(d)(4). Although the ACA provided for Medicaid expansion up to 133% FPL, regulations provide for a 5 percent disregard that makes the effective rate 138%.

[41]   John Cannan, *A Legislative History of the Affordable Care Act: How Legislative Procedure Shapes Legislative History*, 105 Law Libr. J. 131, 137 (2013).

coverage to certain immigrants who are ineligible for federal Medicaid, as well as for New

Yorkers with income from 139 percent to 200 percent of the FPG who must pay a low monthly

premium for coverage.[42]  As required by Congress, immigrants must be "lawfully present" to be

eligible for private qualified health plans pursuant to the ACA, including the Essential Plan.

123.    Although non-federal Medicaid does not count as a "public benefit" under

the public charge test, many noncitizens fear that enrollment in state-funded programs and even

private coverage will carry adverse immigration consequences.  Almost all recipients of New

York Medicaid are required to enroll in private Medicaid-managed care plans.  N.Y. Soc. Serv.

Law § 364-j.  Since many of the same health insurance companies offer commercial, Medicaid,

Medicare, Essential Plan, and/or Children's Health Insurance Program coverage, many New

Yorkers do not understand which program they are in, especially if their eligibility shifts year to

year.

### c.    Federal Housing Assistance Benefits

124.    The IFR includes three types of federal housing assistance in its definition

of "public benefit":  (i) public housing; (ii) Section 8 vouchers; and (iii) project-based Section 8.

Most tenants of public housing pay 30 percent of their income (after certain deductions) for rent

and utilities.  Federal subsidies, issued by the Department of Housing and Urban Development to

the local public housing authority that owns and manages the public housing, are intended to

cover the gap between tenant rents and operating costs.  Section 8 housing choice vouchers

provide a rental subsidy to the participant household that can be used to rent a privately owned

---

[42]    *See* N.Y. State of Health, *Essential Plan at a Glance* (June 2019), *available at* https://info.nystateofhealth.
ny.gov/sites/default/files/Essential%20Plan%20At%20A%20Glance%20Card%20-%20English.pdf; *see also*
N.Y. State Department of Health, *Essential Plan; New York's Basic Health Program* (2018), *available at*
https://www.health.ny.gov/health_care/managed_care/essential/docs/2018_basic_
health_program.pdf. (noting the relevant federal poverty line levels).

housing unit.  42 U.S.C. §§ 1437f, 1437u.  Households receiving project-based Section 8 benefit

from a subsidy that is attached to the residence where they reside.  42 U.S.C. § 1437f; 24 C.F.R.

parts 5, 402, 880–884, 886.  Each of these federal housing assistance programs has an income

eligibility requirement measured by the local Area Median Income ("AMI") for the size of the

family receiving the benefit.

        125.    Federal housing assistance programs support work by enabling low-

income households to live in stable homes.  Indeed, of the non-elderly, non-disabled households

receiving federal housing assistance, approximately two-thirds are headed by working adults.[43]

That number is even higher for households containing non-citizens, where approximately three-

quarters of non-elderly, non-disabled households report earning wages.[44]

        126.    As with SNAP and Medicaid, recipients of federal housing assistance may

have incomes above the poverty threshold and assets or other resources.  Under these three

housing assistance programs, while there are requirements for targeting assistance to lower-

income households (below 30 percent of AMI), a household can qualify for assistance with

income up to 80 percent of the AMI, which for a family of four in New York City is $85,360 per

year,[45] more than three times above the FPG of $25,750 for a family that size.[46]

---

[43]    CBPP, Comment on Proposed Rule on Public Charge Ground of Inadmissibility (Dec. 7, 2018), at 48, *available at* https://www.regulations.gov/document?D=USCIS-2010-0012-37272.

[44]    *Id.*

[45]    N.Y.C. Dep't of Housing Preservation & Development, *Area Median Income (AMI)*, *available at* https://www1.nyc.gov/site/hpd/renters/area-median-income.page.

[46]    *See* U.S. Dep't of Health & Human Services, *U.S. Federal Poverty Guidelines Used to Determine Financial Eligibility for Certain Federal Programs*, *available at* https://aspe.hhs.gov/poverty-guidelines.

C.      The Health Care Proclamation

(i)      Issuance of the Proclamation

127.      On October 4, 2019, the President issued Proclamation 9945, the
"Presidential Proclamation on the Suspension of Entry of Immigrants Who Will Financially
Burden the United States Healthcare System" (the "Proclamation").  84 Fed. Reg. 53,991 (Oct. 9,
2019).

128.      The Proclamation contains minimal findings, consisting primarily of
unsupported assertions pertaining to costs within the American health care system and similarly
unsupported claims regarding immigrants, attempting to connect the former and latter.

129.      First, the Proclamation contends that "[h]ealthcare providers and taxpayers
bear substantial costs" as a result of individuals accessing healthcare without insurance or
individual finances capable of paying their full medical bills.  *Id.*

130.      The Proclamation declares that the total cost of uncompensated care "ha[s]
exceeded $35 billion in each of the last 10 years."  *Id.*  No support for the citation is provided.

131.      The Proclamation further claims that the existence of uninsured residents
strains government budgets by relying upon taxpayer-funded public programs.  *Id.*  No estimate
of the impact is claimed.

132.      Second, the Proclamation alleges that uninsured individuals are more
likely to use emergency rooms, resulting in "overcrowding and delays for those who truly need
emergency services."  *Id.*  No estimate of the purported impact is provided.

133.      Thereafter, the Proclamation claims in conclusory terms that "the United
States Government is making the problem worse by admitting thousands of aliens who have not
demonstrated any ability to pay for their healthcare costs."  *Id.*  The Proclamation states, with

neither citation nor further detail, that immigrants are "about three times more likely than United States Citizens to lack health insurance." *Id.*

134.    Purporting to exercise the President's power under 8 U.S.C. § 1182(f), the Proclamation declares that the entry "as immigrants of aliens who will financially burden the United States" would "be detrimental to the interests of the United States." *Id.* The Proclamation requires that this assessment be conducted separately and independently of any other determination of admissibility. *Id.*

135.    The Proclamation defines immigrants as financially burdensome unless the intending immigrant either has "approved health insurance," as defined in the Proclamation, within 30 days of arriving in the United States or "financial resources to pay for reasonably foreseeable medical costs."

136.    The Proclamation expressly excludes Medicaid from the definition of "approved health insurance" for any person over 18 years old and identifies nine forms of coverage that it deems to be "approved health insurance." 84 Fed. Reg. 53,992 § 3. The entirety of that list includes:

> (i)     An employer-sponsored plan;
>
> (ii)    An unsubsidized health plan offered in the individual market within a State;
>
> (iii)   A short-term limited duration health policy effective for a minimum of 364 days—or until the beginning of planned, extended travel outside the United States;
>
> (iv)    A catastrophic plan;
>
> (v)     A family member's plan;
>
> (vi)    A medical plan under chapter 55 of title 10, United States Code, including coverage under the TRICARE program;

(vii)    A visitor health insurance plan that provides adequate coverage for medical care for a minimum of 364 days—or until the beginning of planned, extended travel outside the United States;

(viii)    A medical plan under the Medicare program; or

(ix)    Any other health plan that provides adequate coverage for medical care as determined by the Secretary of Health and Human Services or his designee.

137.    The Proclamation provides neither definition nor citation for any of the terms and offers no standards by which to determine what falls within those phrases.

138.    Limited classes of immigrants are excluded from the Proclamation's restriction.[47]  The largest of these classes include lawful permanent residents, certain special immigrant visa holders, children of United States citizens, people seeking admission as asylees or refugees, and people subject to either withholding of removal, the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT").  *See id.*

139.    The Proclamation vests the Secretary of State with the ability to "establish standards and procedures" for determining admissibility under the Proclamation; to determine in consultation with the Attorney General whether an intending immigrant's entry furthers "United States law enforcement objectives"; and to determine whether an intending immigrant's entry is in the "national interest."  *Id.*

---

[47]    Exclusions include: lawful permanent residents, asylees, refugees, individuals subject to withholding of removal, and individuals protected under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), people holding valid immigrant visas predating the Proclamation, nationals of Afghanistan or Iraq, or their children, seeking entry pursuant to SI or SQ Special Immigrant Visas; children of U.S. citizens seeking to enter pursuant to IR-2, IR-3, IR-4, IH-3, or IH-4 visas; people seeking to enter the United States pursuant to an IR-5 visa whose sponsors demonstrate that the applicants healthcare will not "impose a substantial burden on the United States Healthcare system"; people seeking to enter on SB-1 visas; children other than those accompanying parents subject to the Proclamation; people whose immigration would "further important United States law enforcement objectives"; and people whose "entry would be in the national interest." 84 Fed. Reg. 53,992-3 § 2.

140.    The Proclamation does not purport to provide an end date, instead calling

for the Secretary of State, in consultation with the Secretaries of Health and Human Services and

Homeland Security and the "heads of other appropriate agencies" to submit a report within 180

days regarding "the continued necessity of and any adjustments that may be warranted to the

suspensions." *Id.*  Thus, although it purports to be a "suspension," it is in fact an open-ended

ban.

141.    The Secretary of State is required to submit the report annually after the

first production and is directed to immediately advise the President if the Secretary determines

that circumstances no longer warrant the suspension.  *Id.*

**(ii)    Agency Implementation of the Proclamation**

142.    The Proclamation was scheduled to take effect on November 3, 2019.  *Id.*

In the interim, DOS took at least three steps towards implementing the Proclamation as part of

the Proclamation Implementing Actions.

143.    First, on October 24, 2019, the DOS published a "60-Day Notice of

Proposed Information Collection: Public Charge Questionnaire" proposing to adopt a new form,

DS-5540.  60-Day Notice of Proposed Information Collection: Public Charge Questionnaire, 84

Fed. Reg. 57,142 (Oct. 24, 2019).

144.    Proposed form DS-5540 is entitled "Public Charge Questionnaire" and is

primarily focused on implementing the IFR.  However, the first substantive questions on the DS-

5540 ask whether the applicant has health insurance currently, will have such insurance within

30 days of entering the United States, and what the specific plan and coverage date are, if

applicable.  *Id.*

145.    Second, on October 29, 2019, DOS published a "Notice of Information

Collection" for "Emergency Review" ("The Emergency Notice"), referring to Form "DS-5541

(oral information collection)."  Notice of Information Collection Under OMB Emergency

Review: Immigrant Health Insurance Coverage, 84 Fed. Reg. 58,199 (Oct. 30, 2019).  In the

Emergency Notice, the Department of State claimed that "emergency review" of the proposed

information collection was "necessary for the Department to prepare consular officers to

implement" the Proclamation.  *Id.*

146.    The Emergency Notice went on to specify the methodology by which the

Proclamation would be implemented.  Specifically, the Emergency Notice indicated that

consular officers "will verbally ask" immigrants subject to the Proclamation "whether they will

be covered by health insurance in the United States within 30 days of entry to the United States

and, if so, for details relating to such insurance."  *Id.*

147.    Where an applicant answered in the affirmative, the Emergency Notice

further required that consular officers to request that the applicant identify the plan and coverage

beginning date and any other information that the officer deemed necessary.  *Id.*

148.    The Emergency Notice purported to explain what "reasonably foreseeable

medical expenses" included, defining those only as "expenses related to existing medical

conditions, relating to health issues existing at the time of visa adjudication."  *Id.*  The

Emergency Notice provided no further explanation.

149.    The Emergency Notice established a comment period terminating

November 1, 2019, fewer than 48 hours after the Notice's publication.  *Id.*  Such a comment

period is plainly illusory.

150.　Third, DOS has issued implementation materials for consular officials, including All Diplomatic and Consular Posts Collective messages ("ALDACs"; question-and-answer documents, and presentations).  These DOS materials mandate how the consular officers will implement the Proclamation, including providing definitions to ambiguous terms.

151.　For example, in an ALDAC dated October 30, 2019, DOS provided narrow examples of when a person's entry would be "in the national interest" and directed officers to contact the Department for approval of an exemption if they believed one of the narrow exceptions applied.

152.　Underscoring the mandatory nature, the ALDAC specifically directs consular officers not to implement the Proclamation prior to updates to corresponding updates to the FAM—in effect overriding the Proclamation's stated effective date.

153.　DOS did not engage in any notice and comment procedures despite narrowing the ability of individuals to access entry into the United States.  DOS' last minute and slipshod efforts to implement the Proclamation confirm media reports that government officials were scrambling to implement and enforce it by the effective date.  On information and belief, and in light of the directives of the Proclamation, these efforts necessarily include DOS and HHS officials.[48]

**(iii)　The Case in the U.S. District Court of Oregon**

154.　On October 30, 2019, a coalition of civil rights organizations brought a

---

[48]　Dan Diamond, Health officials: Trump immigration order could be illegal, Politico (Oct. 11, 2019), *available at* https://www.politico.com/news/2019/10/11/trump-immigrants-health-insurance-illegal-044716 ("HHS will continue to work with the State Department to implement the president's proclamation," a spokesperson said.)

56

class action lawsuit challenging the Proclamation only in the U.S. District Court for the District

of Oregon ("the Oregon Proclamation Challenge").  On November 2, 2019, the district court

granted the plaintiffs' motion for an emergency temporary restraining order, and issued a 28-day

temporary restraining order, barring the Government from implementing the Proclamation.  *Doe*

*#1* v. *Trump*, No. 3:19-CV-01743-SB, _ F. Supp. 3d _, 2019 WL 5685204 (D. Ore. Nov. 2,

2019).  On November 26, 2019, the court granted a preliminary injunction enjoining the

Proclamation.

III.    **The Consular Rules Stand in Stark Opposition to the**
        **Consistent Historic Interpretation of the INA's Public Charge Provisions**

155.    The Consular Rules are inconsistent with the language of the INA and

more than a century of judicial precedent and administrative practice.  As Judge Daniels found in

enjoining the DHS Rule, "the plain language in the INA, the history and common-law meaning

of 'public charge,' agency interpretation, and Congress's repeated reenactment of the INA's

public charge provision without material change" demonstrated that the new definition proposed

by the Trump Administration's proposed definition represents a fundamental departure from the

"long-standing definition" of "public charge."  *See Make the Road New York* v. *Cuccinelli*, No.

19 Civ. 7993, 2019 WL 5484638, at *7 (S.D.N.Y. Oct. 11, 2019).

156.    Since the "public charge" inadmissibility provision became part of federal

immigration law in 1882, courts and administrative agencies have consistently interpreted the

term "public charge" to refer to noncitizens who rely primarily on the government for

subsistence.  Congress has repeatedly considered and rejected efforts to expand the definition of

public charge in a manner similar to the definition in the adopted by the Consular Rules.

A.      **The Original Meaning of "Public Charge" Referred to A Narrow Class of Persons Wholly Unable to Care for Themselves**

157.    The term "public charge" first appeared in federal immigration law in the Immigration Act of 1882, which provided that "any person unable to take care of himself or herself without becoming a public charge" could be denied admission to the United States.  22 Stat. 214, § 2.  Later bills changed the wording of the clause to "likely to become a public charge," and that language has been retained in the statute to the present.[49]

158.    While the 1882 Act and its successors did not define the term "public charge," Congress considered the phrase to refer to those who were likely to become long-term residents of "poor-houses and alms-houses"—*i.e.*, persons who were institutionalized and wholly dependent on the government for subsistence.  13 Cong. Rec. 5109 (June 19, 1882).  The state statutes from which the 1882 Act is derived used the term "public charge" to refer to residents of public institutions for the destitute, such as almshouses and workhouses.[50]

159.    Early judicial interpretations of the original public charge provisions confirmed that Congress did not intend the public charge exclusion to apply broadly to any noncitizens who relied on any modicum of outside assistance.  The Second Circuit, for instance, was "convinced that Congress meant [by public charge] to exclude persons who were likely to become occupants of almshouses for want of means to support themselves in the future."  *Howe* v. *United States ex rel. Savitsky*, 247 F. 292, 294 (2d Cir. 1917).

---

[49]   *E.g.*, 1891 Immigration Act, 26 Stat. 1084 § 1; Immigration Act of 1903, 32 Stat. 1213, 1214 § 2 (excluding from the United States "persons likely to become a public charge," among others); Immigration Act of 1917, 39 Stat. 874, 876 (same); Immigration and Nationality Act of 1952, 66 Stat. 163, 183 (1952) (excluding noncitizens "who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission, are likely at any time to become public charges").

[50]   *See* Hidetaka Hirota, *Expelling the Poor* 180–204 (2017).

160.    Consistent with this narrow understanding of public charge, federal immigration officials in the early 20th century excluded only a minuscule percentage of arriving immigrants on public charge grounds.  According to DHS's own data, of the approximately 21.8 million immigrants admitted to the United States as lawful permanent residents between 1892 and 1930, approximately 205,000—*less than one percent*—were deemed inadmissible as likely to become public charges.  More recently, between 1931 and 1980, only 13,798 immigrants were excluded on public charge grounds out of more than 11 million immigrants admitted as lawful permanent residents—an exclusion rate of approximately *one-tenth of one percent*.[51]

**B.    Administrative Decisions Affirm the Original Understanding of Public Charge**

161.    Decisions of the Board of Immigration Appeals (the "BIA") and the Attorney General in the mid-twentieth century narrowly limited the circumstances in which an immigrant could be deported or denied admission or adjustment of status on public charge grounds.  BIA decisions have "clarified . . . that receipt of welfare would not, alone, lead to a finding of likelihood of becoming a public charge."  83 Fed. Reg. at 51,125.

162.    In 1948, the BIA held that "acceptance by an alien of services provided by a State . . . to its residents, services for which no specific charge is made, does not in and of itself make the alien a public charge."  *Matter of B-*, 3 I. & N. Dec. 323, 324 (B.I.A. 1948).  A noncitizen was removable as a public charge *only* if (1) the noncitizen was "charged" for receipt

---

[51]    *See Table 1. Persons Obtaining Lawful Permanent Resident Status: Fiscal Years 1820 to 2016*, Department of Homeland Security (Dec. 18, 2017), *available at* https://www.dhs.gov/immigration-statistics/yearbook/2016/table1; Immigration and Naturalization Service, *2001 Statistical Yearbook of the Immigration and Naturalization Service* 258 (2003), *available at* https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_2001.pdf; *see also* Mae Ngai, *Impossible Subjects: Illegal Aliens and the Making of Modern America* 18 (2004).  Similarly, during the Great Depression, the INS did not consider immigrants who were "victims of the general economic depression" deportable simply because they received public relief.  *Id.* at 72.

of a public benefit under the law, (2) a demand for payment was made, and (3) the noncitizen or

a family member failed to pay.  *Id.* at 326.  *Matter of B-* has remained the law for more than

seventy years.[52]

163.    In 1952, four years after *Matter of B-* was decided, Congress reenacted the

public charge provision in the Immigration and Nationality Act of 1952 (the "1952 Act").  *See*

66 Stat. 163, 183.  The Senate report accompanying the corresponding bill that became the 1952

Act carefully traced the administrative and court decisions interpreting the public charge

provisions of the Act, and proposed retaining the existing provisions without defining the term

"public charge."  S. Rep. No. 1515, at 348-49 (1950).

164.    These administrative decisions continue to reflect a narrow definition of

"public charge" despite the increasingly broad array of public benefits that became available

since the 1882 Immigration Act.[53]

### C.    Congress Repeatedly Rejected Efforts to Change Existing Law Regarding Public Charge Determinations

165.    More recently, Congress has repeatedly confirmed the public charge

provisions of the INA without material change.  First, Congress left the provisions virtually

unchanged when passing the Immigration Act of 1990.  The legislative history of the 1990 Act

recognized that something more than mere receipt of benefits was required to label an immigrant

---

[52]    The holding in *Matter of B-* that mere receipt of public benefits does not render a person a public charge has been applied in the context of admissibility as well as removal.  *See Matter of Martinez-Lopez*, 10 I. & N. Dec. 409 (B.I.A. 1962; A.G. 1964) ("the [INA] requires more than a showing of a possibility that the alien will require public support"); *see also Matter of Perez*, 15 I. & N. Dec. 136, 137 (B.I.A. 1974) (noncitizens' receipt of welfare is insufficient to establish that they are likely to become a public charge); *Matter of Harutunian*, 14 I. & N. Dec. 583, 590 (1974) (outlining circumstances under which noncitizen found likely to become a public charge).

[53]    Such public benefit programs include the Aid to Dependent Children program (1935), public housing (1937), food stamps (1964), Medicaid (1965), Supplemental Security Income (1972), and Section 8 housing vouchers (1974).

as a public charge.[54]  In the debate leading to enactment of the 1990 Act, one Congressman

characterized someone who "would become a public charge" as a person "who gets here who is

helpless."[55]

166.    In 1996, Congress passed two major pieces of legislation: the Personal

Responsibility and Work Opportunity Reconciliation Act ("PRWORA," colloquially called the

"Welfare Reform Act") and the Illegal Immigration Reform and Immigrant Responsibility Act

("IIRIRA").  Neither statute purported to alter the longstanding meaning of "public charge," or

the types of benefits that would be relevant in such a determination.  Although PRWORA

restricted access to federal benefits for certain immigrants, it retained eligibility for some

immigrants, and authorized states to cover a broader group of noncitizens in state or local public

benefits programs.  8 U.S.C. § 1621(d).  Subsequent legislation restored or expanded access to

federally-funded government benefits for many immigrants.[56]  Congress plainly concluded that

---

[54]    A 1988 House Report explained that courts associated the likelihood of becoming a public charge with "destitution coupled with an inability to work," and noted the Supreme Court's finding in 1915 that a person deemed likely to become a public charge "is one whose anticipated dependence on public aid is primarily due to poverty and to physical or mental afflictions." H. Report Series 7, 100th Cong., 2d Sess., at 121 (Sept. 1988) (citing *Gegiow* v. *Uhl*, 239 U.S. 3 (1915)).

[55]    135 Cong. Rec. S14,291 (July 12, 1989) (statement of Mr. Simpson).

[56]    In legislation following enactment of PRWORA, Congress expanded the availability of certain benefits, particularly SNAP and Medicaid, to qualified immigrants.  *See* Agricultural Research, Education and Extension Act of 1998 (AREERA), Pub. L. No. 105-185 (1998)(restoring eligibility for certain elderly, disabled, and child immigrants who resided in the United States when PRWORA was enacted); The Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171 (2002) (restoring eligibility for food stamps (now SNAP) to qualified immigrant adults who have been in the United States at least five years, and immigrants receiving certain disability payments and for children, regardless of how long they have been in the country); Children's Health Insurance Reauthorization Act of 2009 (CHIPRA), Pub. L. No. 111-3 (2009) (providing an option for states to cover lawfully present immigrant children and pregnant women, regardless of their date of entry into the U.S., under the federal Medicaid and Children's Health Insurance Program (CHIP) matching programs).

restoring access to benefits for immigrants would serve important policy goals and would not require a change in public charge policy.[57]

167.    Nothing in PRWORA purported to change the meaning of "public charge" or to overturn its longstanding administrative application.  Nor was this accidental.  If Congress had wanted to change the settled interpretation to include receipt of minimal amounts of non-cash benefits, it could have done so as part of PRWORA.  Congress declined to do so.

168.    In addition, IIRIRA—which was passed the month after PRWORA—codified the existing standard for determining whether a noncitizen was inadmissible as a public charge.  Pub. L. No. 104-208 § 531, 110 Stat. 3009 (1996) (amending 8 U.S.C. § 1182).  Nothing in the final passage of IIRIRA purported to expand the definition of public charge, or reflected an intent by Congress to use the public charge provision to refuse admission or status adjustment based upon past or likely future receipt of supplemental or noncash public benefits.

169.    In fact, in the debate leading up to the enactment of IIRIRA, Congress specifically considered and rejected a proposal to label as a public charge anyone who received certain means-tested public benefits, including Aid to Families with Dependent Children, Medicaid, food stamps, SSI, and other programs "for which eligibility for benefits is based on need."  Immigration Control & Financial Responsibility Act of 1996, H.R. 2202, 104th Cong. § 202 (1996).  The express purpose of this proposed provision was to overturn the settled

---

[57]    In the analysis of comments published along with the final DHS Rule, on which the IFR is modeled, DHS conceded that PRWORA's policy statements about self-sufficiency were not codified in the INA, including in the public charge inadmissibility provision, which makes no mention of "self-sufficiency."  *See* 84 Fed. Reg. at 41,355–56 ("although the INA does not mention self-sufficiency in the context of section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), DHS believes that there is a strong connection between the self-sufficiency policy statements [in PRWORA] (even if not codified in the INA itself) at 8 U.S.C. 1601 and the public charge inadmissibility language in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), which were enacted within a month of each other.").

understanding of "public charge" found in the case law.  When the bill was considered by the

Senate, Senator Alan Simpson (a proponent of the provision) explained during debate that the

purpose of the new public charge definition was to override "a 1948 decision by an

administrative law judge"—*Matter of B*-, discussed *supra* ¶¶ 162-4.  *See* 142 Cong. Rec. S4401,

S4408–09 (1996).

170.     The effort to overturn *Matter of B*- and change the settled definition of

public charge was met with substantial criticism.  For example, Senator Patrick Leahy expressed

concern that the bill "is too quick to label people as public charges for utilizing the same public

assistance that many Americans need to get on their feet."  S. Rep. No. 104-249, at 63 (1996).

Senator Leahy was "disturbed that the [proposed expanded] definition of public charge goes too

far in including a vast array of programs none of us think of as welfare," including medical

services and supplemental nutritional programs and urged that the bill "will yield harsh and

idiosyncratic results that no one should intend."  *Id*. at 64.

171.     The effort to redefine the public charge in IIRIRA thus failed.  Although a

version of the bill including the expansive definition of public charge cleared one chamber of

Congress, the bill could not be passed until the provision was removed.  In a statement on the

Senate floor the day IIRIRA was enacted, Senator Jon Kyl, a floor manager of the bill and

proponent of the provision, explained:

> [I]n order to ensure passage of this historic immigration measure,
> important provisions of title 5 have been deleted . . . .  [One] provision that
> was removed from title 5 would have clarified the definition of "public
> charge."  Under the House-passed conference report, an immigrant could
> be deported—but would not necessarily be deported—if he or she received
> Federal public benefits for an aggregate of 12 months over a period of 7
> years. That provision was dropped during Saturday's negotiations.

142 Cong. Rec. S11872, S11882 (statement of Sen. Kyl).

172.     IIRIRA thus specifically rejected this redefinition of "public charge," and codified the longstanding INA public charge policy relating to admission and status adjustment. *See* 8 U.S.C. § 1182(a)(4).

173.     In 2013, Congress again turned back efforts to redefine public charge to include anyone receiving means-tested public benefits when the Senate debated the proposed Border Security, Economic Opportunity, and Immigration Modernization Act, a bill that sought to create a path to citizenship for noncitizens who could show they were not "likely to become a public charge." S. 744, 113th Cong. § 2101 (2013). During committee deliberations, Senator Jeff Sessions sought to amend the definition of public charge to include receipt of "noncash employment supports such as Medicaid, the SNAP program, or the Children's Health Insurance Program." S. Rep. No. 113-40, at 42 (2013). The proposed amendment was rejected by voice vote. *Id.*

174.     In short, Congress has repeatedly rejected efforts to expand the definition of public charge along the lines now proposed by DOS. In so doing, it has demonstrated its clear intent to continue to apply the historical definition of public charge that has endured for over 140 years.

175.     Moreover, and in contrast to those efforts that were repeatedly rejected, in legislation following enactment of PRWORA, Congress significantly expanded the availability of certain means-tested benefits, particularly SNAP and Medicaid, to qualified immigrants, including under CHIPRA and the ACA. The ACA, enacted by Congress in 2010, explicitly sought to increase access to affordable health coverage for millions of people and significantly reduced the number of uninsured individuals in the United States. Pub. L. 111-148 (Mar. 23, 2010) (initially titled the Patient Protection and Affordable Care Act ("PPACA"), as amended by

the Health Care and Education Reconciliation Act ("HCERA") (together, the "Affordable Care

Act" or "ACA") 124 Stat. 119.  With over 10 titles and at over 900 pages, the ACA authorized

the creation of local, state-based markets or "health exchanges" to provide an array of affordable

insurance coverage options for consumers, including state-run-exchanges, a federally facilitated

exchange available at the healthcare.gov website, or a combination of both.  *See supra* ¶¶ 121-23

(describing health exchange and available products in New York State).

176.     To purchase health insurance through an ACA exchange, a person must

prove that they: (1) reside in a U.S. state or territory; and (2) are "lawfully present."  42 U.S.C.

§ 18032(f)(1)(A)(ii); 45 C.F.R. § 155.305(a)(1)-(3).  For those purchasing health insurance

through the ACA's exchanges, Congress also provided premium tax credits to help offset the

cost of insurance, 26 U.S.C. § 36B, and to lower individuals' out-of-pocket costs by requiring

insurers to provide cost sharing reductions for copayments (for medical visits and prescription

drugs), coinsurance, and deductibles.  42 U.S.C. § 18071.  In October 2017, however, the Trump

administration discontinued reimbursements to insurers for those cost-sharing reduction

payments.[58]  On the ACA's sliding scale, applicants with incomes up to 400 percent of the

federal poverty line qualify for a tax credit.  *See* 26 U.S.C. § 36B(b)(3)(A)(i).  Congress

specifically extended those tax credits to any taxpayer who is "lawfully present in the United

States" and "has a household income which is not greater than 100 percent of . . . the poverty line

for a family of the size involved."  *Id*. at § 36B(c)(1)(B).  The ACA thus expressly provides

---

[58]   *See Trump Administration Takes Action to Abide by the Law and Constitution, Discontinue GSR Payments*,
U.S. Department of Health and Human Services (Oct. 12, 2017), *available at*
https://www.hhs.gov/about/news/2017/10/12/trump-administration-takes-action-abide-law-constitution-
discontinue-csr-payments.html.

avenues for lawfully present immigrants to purchase health insurance through the exchanges and to receive premium tax credits for which they qualify.  *Id.*

177.    Congress not only explicitly increased and expanded access to health care under the ACA, but also designed the ACA to ensure an essential standard of care in the provision of health coverage in the U.S., requiring all health insurers to offer a selection of plans that cover "essential health benefits."  These benefits include coverage for the following: hospitalization, prescription drugs, mental health services, ambulatory patient services, maternity and newborn care, mental health and substance use disorder services, preventive and wellness services, and pediatric services, including oral and vision care.  42 U.S.C. § 18022(b)(1).  All individual market plans, including ACA-defined and regulated catastrophic health plans,[59] must provide such essential health benefits, cover preexisting conditions, and may not impose annual or lifetime dollar limits on essential coverage.

178.    Rather than penalize immigrants for their use of means-tested public benefits, since 1996 Congress has affirmatively, explicitly, and deliberately decided to provide immigrants with access to public benefits, and expanded further access to affordable and comprehensive health insurance, including for pre-existing conditions, in the ACA.

**D.    Administrative Field Guidance Reaffirms the Settled Interpretation of Public Charge**

179.    Administrative guidance over the years has also reaffirmed the settled interpretation of "public charge."  For instance, in 1999, the INS issued its Field Guidance regarding public charge inadmissibility, 64 Fed. Reg. at 28,689 (May 26, 1999), and a parallel

---

[59]    Short-term limited duration insurance ("STLDI") plans, plans that insurers remain permitted in certain states to sell in addition to essential health plans, are exempt from the mandates of the ACA and cannot be offered or purchased on ACA exchanges; STLDI plans are thus non-comprehensive and do not provide the full scope of essential health benefits, and they can and often do deny coverage based on pre-existing conditions.

proposed regulation, 64 Fed. Reg. at 28,676 (May 26, 1999).  The Field Guidance specifically excluded from public charge determinations consideration of noncash benefits programs, such as Medicaid, SNAP, and housing assistance.

180.    The Field Guidance defined "public charge" as a noncitizen "who is likely to become (for admission/adjustment purposes) '*primarily* dependent on the government for subsistence, as demonstrated by either (i) the receipt of public cash assistance for income maintenance or (ii) institutionalization for long-term care at government expense.'"  *Id.* at 28,689.  The Field Guidance expressly excluded from public charge determinations consideration of noncash benefits programs, such as  Medicaid, SNAP, and housing assistance. *Id.*  (emphasis added).[60]  INS explained that "[i]t has never been [INS] policy that any receipt of services or benefits paid for in whole or in part from public funds renders an alien a public charge, or indicates that the alien is likely to become a public charge."  *Id.* at 28,692.

181.    In identifying only primary dependence on monthly cash assistance for income maintenance purposes as a trigger for the public charge determination, the Field Guidance made expectations clear both to applicants for adjustment and admission and to immigration officers tasked with implementing it.  Indeed, the Field Guidance has been in effect continuously in the 20 years since it was adopted.  During that time, consistent with the Field

---

[60]    INS further concluded that noncash benefit programs should not be considered in public charge determinations because benefits under such programs "are by their nature supplemental and do not, alone or in combination, provide sufficient resources to support an individual or family."  *Id.* at 28,692.  It explained that such benefits "are increasingly being made available to families with incomes far above the poverty level, reflecting broad public policy decisions about improving general health and nutrition, promoting education, and assisting working-poor families in the process of becoming self-sufficient."  *Id.*  INS also emphasized that it did not expect this definition "to substantially change the number of aliens who will be found deportable or inadmissible as public charges."  *Id.*

Guidance and longstanding agency interpretation, the number of noncitizens excluded as likely to become a public charge has remained small.

## ARGUMENT

**I.      The IFR, the FAM Revisions and Proclamation Implementing Actions Violate the Administrative Procedure Act**

182.    The Consular Rules, taken together and separately, violate the APA in several respects, including that they are "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "contrary to constitutional right," *id.* § 706(2)(B), and "in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(C).

### A.      The IFR and FAM Revisions are Contrary to Law

183.    As an initial matter, the IFR and FAM Revisions, alone and together, are contrary to law in numerous respects.

#### (i)      The IFR's Definition of "Public Charge" Is Contrary to the INA Definition

184.    As discussed above, the IFR's definition of "public charge" as an individual who may at some time in the future receive a minimal amount of noncash public benefits is contrary to the interpretation of "public charge" that has endured for 130 years:  an individual primarily dependent on the government for subsistence.  The statutory meaning of the term "public charge" is evident from, among other things, and as demonstrated above: (i) the plain meaning of the phrase, (ii) the judicial and administrative interpretation of the term since it first became part of federal immigration law; (iii) Congress' approval of that interpretation in repeatedly reenacting the statute; and (iv) Congress' rejection of efforts to expand that interpretation in the manner the IFR now seeks to accomplish.

185.    Accordingly, the IFR is not in accordance with the law and is in excess of DOS' statutory jurisdiction.  5 U.S.C. §§ 706(2)(A), 706(2)(C).  Further, even without expressly defining "public charge" in contravention of 8 U.S.C. § 1182(a)(4), the FAM Revisions implement the public charge provision to deny admission to intending immigrants based on an overbroad, erroneous interpretation inconsistent with the INA.

### (ii)    The Proclamation Implementing Actions Are Contrary to the INA and the INA's "Public Charge" Definition, and other Federal Statutes

186.    The Proclamation is to be implemented by the Secretary of State, who is permitted to establish standards and procedures governing determinations of  "who should be barred from the United States due to failing to meet the Proclamation's requirements."  84 Fed. Reg. at 53,993, § 3.  In implementing the Proclamation's dictates through agency guidelines, DOS acts contrary to the INA.

187.    This is so because the Proclamation itself conflicts directly with the statutory text of 8 U.S.C. § 1182(a)(4) of the INA.  The Proclamation, and the implementing actions, effectively erase the statutorily mandated "totality of the circumstances" evaluation under the INA, excluding all of the other statutorily mandated factors and substituting the statutory test with one sole factor as dispositive: the financial ability to buy health insurance or to absorb foreseeable medical costs, to justify denial of admission.

188.    The Proclamation also contravenes the ACA and CHIPRA, because both statutes authorize and attempt to encourage immigrant families' access to public benefits and health care that the Proclamation would now categorically exclude.  Both of these statutes express and reflect Congress' clear intent to expand access to meaningful and affordable health insurance coverage to immigrants who are lawfully present in the United States, along with U.S.

citizens, at a certain guaranteed level of comprehensive coverage.  Where the Proclamation

denies admission to all immigrants who are unable either to purchase the listed health insurance

plans or who cannot pass a vague and undefined "wealth test" that condemns applicants who

would otherwise be eligible to enter the United States and receive health insurance benefits like

Medicaid, CHIP, or financial assistance under the ACA to a category "detrimental to the United

States"— the Proclamation expressly contravenes acts of Congress, and is contrary to law.

        (iii)     **The IFR, the FAM Revisions, and the Proclamation Implementing Actions Discriminate Against People with Disabilities and Violate the Rehabilitation Act**

       189.     The Consular Rules discriminate against people with disabilities in

violation of the Rehabilitation Act of 1973 ("Rehabilitation Act"), Pub L. No. 93-112, 87 Stat.

355.  The IFR and the FAM Revisions do so by expressly treating disability as a negative

factor—indeed, as multiple negative factors—in making public charge determinations.  The

Proclamation does so by requiring intending immigrants, who are unlikely to be able to purchase

any "approved" health insurance plan, to demonstrate ability to absorb privately the foreseeable

costs of medical care, which for a person with, for example, HIV, diabetes, or mobility

impairment, can be prohibitive for all but the wealthiest.  The Consular Rules thus conflict with

Section 504 of the Rehabilitation Act, which provides that "[n]o otherwise qualified individual

with a disability in the United States . . . shall, solely by reason of her or his disability, be

excluded from participation in, be denied the benefits of, or be subjected to discrimination . . .

under any program or activity conducted by an Executive agency."  29 U.S.C. § 794(a).

190.     As a program or activity conducted by DOS, public charge determinations are subject to the Rehabilitation Act.[61]  DOS regulations implementing the Rehabilitation Act prohibit the agency from denying a benefit or service "on the basis of handicap."  22 C.F.R. § 142.4(b)(1). These provisions provide further that the agency may not "utilize criteria or methods of administration" that would: "(i) have the effect of subjecting qualified handicapper persons to discrimination on the basis of handicap"; or "(ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the [agency's] program or activity with respect to handicapped persons." *Id.* § 142(b)(4).

191.     The IFR and the FAM Revisions violate the Rehabilitation Act and the implementing regulations by creating a new discriminatory scheme that is triggered by disability.

192.     *First*, the IFR imposes a negative "health" factor based on disability alone, providing that "diagnos[is] with a medical condition that is likely to require extensive medical care or institutionalization, or that will interfere with the alien's ability to provide and care for himself or herself, to attend school, or to work," with nothing more, is treated as a negative factor.  *See* 84 Fed. Reg. at 55,012 (proposed 22 C.F.R. § 40.41(a)(2)).

193.     *Second*, the IFR imposes an additional *heavily weighted* negative factor for applicants who (a) have a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with their ability to provide for himself or herself, attend school, or work; and (b) are uninsured and have neither the prospect of obtaining private health

---

61      *See* Dawn E. Johnsen, Department of Justice Office of Legal Counsel, *Letter Opinion for the General Counsel Immigration and Naturalization Service* (Apr. 18, 1997); Robert B. Shanks, *Memorandum Re: Section 504 of the Rehabilitation Act of 1973* (Feb. 2, 1983).

insurance, nor the financial resources to pay for reasonably foreseeable medical costs related to such medical condition.  *See* 84 Fed. Reg. at 55,013 (proposed 22 C.F.R. § 40.41(a)(8)(i)(C)).

194.    The IFR thus takes a single characteristic common to individuals with disabilities—a chronic health condition—and counts it as a negative factor *twice* in the totality of the circumstances analysis: once as a negative factor relating to "health," and once as an independent "heavily-weighted negative factor" relating to health and financial resources.  DOS provides no explanation to justify this double-counting, which results in disproportionally punishing individuals with disabilities.  In the DHS Rule, on which the IFR is modeled, DHS affirmatively "acknowledges that multiple factors may coincide or relate to each other," and makes no effort to explain or justify its conclusory denial that it is "impermissibly counting factors twice." 84 Fed. Reg. at 41,407.  DOS does not provide any justification or explanation for its similar use of duplicative factors.

195.    The Proclamation Implementing Actions take the discriminatory approach to immigrants with disabilities one step further.  Rather than weighting various factors, they impose just one requirement: the possession of an approved private health insurance plan or enough wealth to cover foreseeable medical costs.

196.    Requiring immigrants with disabilities to demonstrate greater financial resources to cover chronic health conditions and disabilities than immigrants without disabilities is discriminatory on its face, and unlawful under Section 504 of the Rehabilitation Act and DOS regulations implementing the Act.  29 U.S.C. § 794(a); 22 C.F.R. §§ 1142.4(b)(1), (b)(4). [62]

---

[62]    *See generally,* David A. Super, Professor of Law, Georgetown Law School (Oct. 31, 2019), Comment, *Information Collection Burden Assessment* DS-5541 -- Public Notice: 10934 84 Fed. Reg. 58,199 (Oct. 30, 2019) at 6-7, *available at*  https://www.regulations.gov/document?D=DOS-2019-0039-0190.

197.     The Proclamation Implementing Actions also contravene the anti-discrimination mandates of Section 504 of the Rehabilitation Act to the extent they deny admission to individuals who will use non-private ACA-approved health exchange plans such as New York State of Health's Essential Plan, which covers pre-existeable conditions, including disabilities recognized under Section 504, and to the extent the Proclamation Implementing Actions encourage the use of short term limited duration insurance ("STLDI") or visitor plans, which are exempt from the ACA mandate prohibiting discriminatory coverage exclusions for pre-existing conditions.  The Proclamation Implementing Actions fail to address how they conflict with Section 504, as well as how they effectively discriminate against and increases limitations on immigrants with disabilities, including immigrants with HIV/AIDS.[63]

198.     The IFR, the FAM Revisions, and the Proclamation Implementing Actions are thus arbitrary and capricious because they discriminate against people with disabilities in contravention of Section 504 of the Rehabilitation Act.

**B.     The IFR, FAM Revisions and Proclamation Implementing Actions are Arbitrary and Capricious**

199.     The Consular Rules are complex, confusing and internally inconsistent, and invite arbitrary enforcement.  They transform the process for determining public charge through a series of changes both to the benefits considered relevant to the public charge

---

[63]   In discouraging the use of the NY Essential Plan and other ACA Plans, and encouraging the use of STLDI and visitor plans which exclude pre-existing conditions from coverage, or otherwise requiring an immigrant with HIV/AIDS demonstrate more independent financial resources to cover foreseeable medical costs via high-deductible catastrophic or private health insurance than someone without HIV/AIDS, the Proclamation also functionally discriminates against immigrants with HIV/AIDS as a pre-existing health condition, and conflicts with the explicit repeal of the 22-year travel restriction on the immigration of individuals with HIV/AIDS signed into law by President Obama in 2010. *See* Medical Examination of Aliens—Removal of Human immunodeficiency virus (HIV) infection from definition of communicable disease of public health significance. Final rule. 74 Fed. Reg. 56,547 (Nov. 2, 2009), (codified at 42 C.F.R. § 34.)

determination, and to the assessment and "weighting" of other qualities.  The IFR and FAM

Revisions and the many internal inconsistencies within them fail to give applicants notice of

conduct to avoid, and fail to provide adjudicators with clear guidelines to apply.

200.    These vague, broad, and standardless factors make it impossible for

consular officers to administer the IFR and the FAM Revisions in an objective and consistent

manner, or for applicants to predict how they will be applied.

201.    For example, since the FAM Revisions took effect, consular officers in the

Ciudad Juarez, Mexico consulate refused applicants who have submitted Affidavits of Support

from co-sponsors that meet the income requirements where the co-sponsors are not family

members or do not reside with the applicant.  Such arbitrary, unlawful implementation is invited

by vagueness of the FAM Revisions, and makes it very difficult for visa applicants to prepare a

successful application.

202.    Other vague factors also invite arbitrary enforcement of the Consular

Rules.  For example, the English proficiency factor in the IFR—which comes with no standard

for "proficiency" to guide either the applicant or the immigration officer—may be applied by

each officer in a different way depending on the officer's own language comprehension skills or

the officer's ability to understand a non-U.S. accent.

203.    The health insurance factors are similarly confusing.  The IFR specifically

states that, if an applicant has a medical condition that is likely to require extensive treatment, an

immigration officer should consider whether the applicant can pay for reasonably foreseeable

medical costs through *private* health insurance.  84 Fed. Reg. at 55,013 (proposed 22 C.F.R.

§ 40.41(a)(8)(i)(C)).  It is unclear how consular officers, untrained in medical care or the

complexities of the health care system, can make such a determination.

204.    The agency action implementing the Proclamation was equally arbitrary

and capricious.  The DOS has, as alleged above, propounded a new form DS-5540, and

published the Emergency Notice, DS-5541.  The Emergency Notice establishes no workable

standards for implementing the Proclamation.  It calls for the oral collection of information, no

guidance to consular officers as to what constitutes "approved plans" under the Proclamation,

vague guidance as to what constitutes "reasonably foreseeable medical expenses," and, critically,

fails to define "adequate coverage for medical care."  The Proclamation provides that either the

Secretary of Health and Human Services or his designee can determine that an unlisted plan

suffices if it "provides adequate coverage for medical care."  The Proclamation does not define

this term and provides no guidance for consular officers or applicants, nor does the Emergency

Notice.  And HHS has failed to act to give DOS consular officers any notice.  As a result, it is a

standardless inquiry.  For example, it is unclear if a plan provides "adequate coverage" if it meets

the minimum requirements of the also-undefined "catastrophic coverage" or short-term limited

duration insurance plans, or if it requires approximating the clearer, comprehensive coverage of

an individual marketplace or Medicare plan.

## II.    The Process for Promulgating the Consular Rules Blatantly
     Violated the Procedural Rules in the Administrative Procedure Act

205.    The IFR, FAM Revisions and the Proclamation's implementing

regulations violate the APA because they were promulgated "without observance of procedure

required by law."  5 U.S.C. § 706(2)(D).  DOS's haphazard processes for promulgating dramatic

changes to the immigration system were deficient because (a) DOS implemented the FAM

Revisions and the IFR without opportunity for notice and comment, absent "good cause"

required by the APA; (b) DOS issued notices instructing the public to provide comment on

implementing regulations within a 48-hour period that utterly failed to comport with notice and

comment requirements; (c) DOS is implementing the broad-ranging change wrought by the

Proclamation without opportunity for notice and comment; and (d) DOS failed to provide a

reasoned explanation for changing policy direction from the 1999 Field Guidance.

A.     **The DOS Process for Promulgating the Consular Rules**
      **Violated Notice and Comment Requirements**

206.    DHS, as part of its plan to rewrite the statutory provisions of the INA by

agency action, published a notice of proposed rulemaking on October 10, 2018, inviting public

comments on its so-called "public charge" rule, over a 60-day period.  *See* 83 Fed. Reg. 51,114.

Inexplicably, and in stark contrast, DOS failed to do the same with any of the Consular Rules.

Instead, DOS promulgated the FAM Revisions with almost *no* notice to the public, *see supra*

¶¶ 83, 85, and, separately, when faced with a clear federal court decision that the Revisions

required formal rulemaking, issued the IFR *four days* before it was to go into effect.  And the

Emergency Notice implementing the Proclamation arrived with an *ad hoc* 2-day comment

period, while the directives transmitted to consular officers by State have undergone no

rulemaking process.

207.    The process associated with the FAM Revisions is the very opposite of

appropriate process under the APA.  Indeed, the FAM was posted in a bare (and incomplete)

memorandum on the DOS website with absolutely no notice or opportunity for comment.  It was

then, within weeks, withdrawn from the website.  DOS, outside of litigation, has *never* offered

reasoned justification for the FAM Revisions, notwithstanding the fundamental change they

wreak on the immigration system.  And, of course, DOS provided no opportunity for comment

on what is unquestionably a final agency action that imposes direct legal consequences on those

affected—and thus the kind of paradigmatic agency matter that should be subject to proper rulemaking.  No exceptions to notice and comment rulemaking apply to the FAM.

208.    The process leading to the IFR was no better.  DOS issued the IFR four days before it was to go into effect and allowed no opportunity for public comment pre-implementation.  The IFR was thus issued without formal notice-and-comment rulemaking and without at least 30 days' notice of its effective date, as typically required by the Administrative Procedure Act.  *See* 5 U.S.C. § 553(d).  And, as alleged above, in support of its conclusion that the IFR fulfills the good cause exception to notice-and-comment procedures, Defendant DOS provides only conclusory statements of public harm created by self-inflicted exigency.

209.    The DOS action implementing the Proclamation was likewise flawed.  Specifically, DOS propounded an Emergency Notice that permitted less than *forty-eight hours* to comment.  This is the barest and most pretextual nod to proper administrative process.  Given that the Proclamation would effectively override not only the INA but the entire body of regulations implementing it, in favor of a single-issue dispositive test that could reduce immigration to the United States by two-thirds, DOS clearly failed to follow the APA in issuing it.

210.    Likewise, despite the mandatory nature of the guidance sent to consular officials and the certainty that the guidance will shape the ability of immigrants to gain admission to the United States, DOS has not engaged in any notice and comment process for the DOS implementation materials.

**B.      DOS Failed to Justify its Departure from the 1999
         Field Guidance in issuing the IFR and the FAM Revisions**

211.    DOS fails to provide a reasoned explanation for changing policy direction

from the Field Guidance and promulgating the IFR for several reasons.  It provided no

explanation whatsoever for the FAM Revisions.

212.    At no point has DOS identified or discussed any problems with INS's

implementation of the 1999 Field Guidance, which has been in effect for over 20 years.  DOS

does not suggest that the Field Guidance has been ineffective or difficult to administer, or that it

has had any adverse consequences, including to the American immigration system or to the

public.  DOS also fails to provides any examples of how the IFR's goal of self-sufficiency has

not been served by the Field Guidance.  And the FAM Revisions arrived with no explanation at

all.

213.    DOS fails to explain why its new definition of "public charge" better

reflects congressional intent than the definition established in the Field Guidance.  DOS offers no

evidence suggesting that INS misunderstood Congress' intent when it issued the Field Guidance

in 1999, or that Congress viewed the Field Guidance as inconsistent with its intent.

214.    Likewise, DOS offers no reasoned explanation for why it is necessary or

appropriate to redefine "public charge" to mean the receipt of even a minimal amount of

supplemental benefits available to working families at any time in the future.

215.    DOS also offers no reasoned explanation for rejecting the expert views of

agencies that administer the relevant public benefits that are reflected in the Field Guidance.  In

issuing the Field Guidance, INS explained that its definition of public charge—and decision to

exclude noncash benefits from consideration—reflected evidence and input it received after

"extensive consultation with" the agencies that administer such benefits.  64 Fed. Reg. at 28,692.

The IFR provides no such evidence of expert consultation, or any explanation for its

abandonment of the "primary dependence" standard in the Field Guidance in favor of the

durational standard in the rule: likelihood of receipt of any enumerated benefits for 12

cumulative months in a 36-month period.

216.    Nowhere does the IFR even acknowledge the ardent public concern about

the public health impacts of discouraging use of public benefits that characterized the discussion

and formal comment on the DHS Rule in the months during which leaked versions and formal

proposals spread fear in immigrant families who may have waited years to pursue their goals of

establishing family stability through LPR status or reunifying with relatives living abroad.  Given

the voluminous evidence of the "chilling effects" of changes to the DHS Rule, DOS was on

notice that it would need to address the dramatic impacts the IFR will have on immigrant

communities and public health more generally.

217.    Finally, DOS fails to address the legitimate reliance interests engendered

by the Field Guidance.  The Field Guidance, and the long history of public charge on which it is

based, has permitted generations of immigrant families to build lives in the U.S. without fearing

that their choices, including whether to seek public benefits, may have a negative impact on their

immigration status (other than the choice to receive cash assistance or long-term institutional

care).  Likewise, sponsors have relied on the Field Guidance to decide that accessing

supplemental benefits like health insurance would not impact their ability to sponsor family

members as long as they meet the income requirements, whereas the FAM Revisions now

penalize such use retroactively.  U.S. immigration lawyers and advocates have likewise relied

upon the simplicity and clarity of the Field Guidance to aid clients in making decisions about

their lives and the consequences of using public benefits.  There is no evidence that DOS

considered the existence of these reliance interests and how they might affect implementation of

FAM Revisions and the IFR.

### III.    The IFR, the FAM Revisions, and the Proclamation Are Motivated by Animus Against Immigrants of Color and Will Have a Heavily Disparate Impact on Nonwhite Immigrants

218.    The Trump Administration's immigration policy has been characterized

by consistently hostile regulatory and sub-regulatory actions justified by inflammatory, false, and

racist rhetoric.  The changes the Administration has proposed and in many cases implemented to

the asylum system, to various deferred-action programs, and to the family-based immigration

system represent not neutral policy choices, but rather a radical reimagining of the nation's

immigration laws.  The purpose and effects of this reimagining – often in clear violation of

Congressional mandate – are to exclude from lawful status immigrants from predominately

nonwhite countries.

219.    The changes to the public charge rules, as expressed through the Consular

Rules, as well as the now-blocked DHS Rule, originated in a "wish list" published in 2016 by

CIS"), entitled "A Pen and a Phone: 79 immigration actions the next president can take," which

lists numerous proposals for limiting immigration of low-income people and asylum seekers

from non-European countries.  Action #60 on this list urges the next president to "make use of

the public charge doctrine to reduce the number of welfare-dependent foreigners living in the

United States."[64]  The Trump Administration adopted much of the wish list as policy guidance upon taking office.

220.    The stated rationale for the Consular Rules, and the now-blocked DHS Rule—to ensure that immigrants are self-sufficient—is a pretext for discrimination against non-wealthy immigrants from predominately nonwhite countries, even those who are complying with the country's long-standing rules for obtaining lawful permanent residence.  None of these discriminatory new rules are tailored to serve any compelling government interest.

**A.     Disparate Impacts of the Consular Rules**

221.    Individually and together, the Consular Rules have and will have a discriminatory impact on people from poorer countries where most residents are persons of color, effectively creating a wealth test for entry into the United States.  This wealth test will have "racially disparate impacts, as people from countries with low incomes are disproportionately people of color." [65]

222.    Following publication of the FAM Revisions, denials on public charge grounds increased dramatically.  While DOS findings of inadmissibility on public charge grounds totaled 1,033 in fiscal year 2016, 12,973 initial public charge denials were issued in

---

[64]   Center for Immigration Studies, *A Pen and A Phone* 8 (Apr. 6, 2016), *available at* https://cis.org/sites/cis.org/files/79-actions_1.pdf.

[65]   Danilo Trisi, *Administration's Public Charge Rules Would Close the Door to U.S. to Immigrants Without Substantial Means*, Center on Budget and Policy Priorities 2 (November 11, 2019), *available at* https://www.cbpp.org/sites/default/files/atoms/files/11-11-19imm.pdf.

fiscal year 2018 – a *twelve-fold* increase.[66]  The highest increases in denials fell on Mexican

applicants.[67]

223.    The FAM Revisions, which have been in effect since January of 2018,

have already had a dramatic effect on immigrants from countries where the residents are

predominately nonwhite, and the denial rate of Mexicans, in particular, has skyrocketed.  While

just seven Mexican nationals were denied admission on public charge grounds in fiscal year

2016, 5,343 Mexican nationals received initial denials on public charge grounds in the first ten

months of fiscal year 2019.[68]  Intending immigrants from India, Pakistan, Bangladesh, Haiti, and

the Dominican Republic also saw notable increases in findings of inadmissibility based on public

charge grounds.[69]  In contrast, there was no increase in visa denials for applicants from

predominantly white countries, or the increase numbered in the single digits.[70]  *See supra* ¶¶ 84,

n. 20.

224.    Similarly, the IFR, which codifies much of the FAM Revisions and is

explicitly meant to be consistent with the currently-enjoined DHS Rule, like that rule, will have a

dramatically disparate impact on nonwhite immigrants.  For example, as the CBPP has

---

[66]  *See* DOS tables linked to in Ted Hesson, *Visa denials to poor Mexicans skyrocket under Trump's State Department*, Politico (Aug. 6, 2019), *available at*  https://www.politico.com/story/2019/08/06/visa-denials-poor-mexicans-trump-1637094.

[67]  *See id*.

[68]  *See Id*.

[69]  For instance, public charge denials for Pakistani national increased to 563 in the first ten months of 2019, from just two denials in fiscal year 2016.  Similarly, public charge denials for Bangladeshi nationals rocketed upwards to 1,262 in just the first ten months of fiscal year 2019, from 324 denials in fiscal year 2017.  *Id*.

[70]  *Id*. The number of visa denials for applicants from Spain remained the same as compared between fiscal year 2016 to the first ten months of 2019 (one visa denial in each time period).  Similarly, across that same time period, the number of visa denials for Bulgarian and German applicants only increased from one to two, and two to three, respectively.  Visa denials for Russian applicants actually fell from fiscal year 2016 to 2019, from 14 to 11.

documented, one of the IFR's heavily-weighted negative factors – an income of less than 125

percent of the FPG – is likely to exclude "the vast majority" of immigrants from many

countries,[71] because "the arriving individual will have income on their home country's wage

scale."[72]  Indeed, in its comment submitted on the DHS Rule, the CBPP estimated, for every

country in the world, the percentage of the population that would be assigned a "negative factor"

under the Rule due to having a family income below 125 percent of the FPG.[73]  The results

confirm that the "125 percent test will disproportionately affect immigrants from poor countries

and have a racially disparate impact on who is allowed into the U.S."[74]  For example, 99.2

percent of the population of South Asia, 98.5 percent of the population of Sub-Saharan Africa,

and 79.1 percent of the population of Latin America and the Caribbean would fall below the 125

percent threshold.  By contrast, less than 10 percent of the populations of countries like Norway,

Germany, and France fall below the threshold.[75]

       225.    Conversely, the DHS Rule's main heavily weighted positive factor, an

income of at least 250 percent of the FPG, was likely not to apply to 71 percent of applicants

---

[71]   Center on Budget and Policy Priorities, *Administration's Public Charge Rules Would Close the Door to U.S. to Immigrants Without Substantial Means* (Nov. 11, 2019), *available at* https://www.cbpp.org/research/immigration/administrations-public-charge-rules-would-close-the-door-to-us-to-immigrants.

[72]   *Id*. at 2.

[73]   CBPP, Comment on Proposed Rule on Public Charge Ground of Inadmissibility (Dec. 7, 2018), at 11-17 & table 2, *available at* https://www.regulations.gov/document?D=USCIS-2010-0012-37272CBPP.

[74]   *Id.* at 12.

[75]   *See id.* at 12–13.

from Mexico and Central America, 69 percent from Africa, 75 percent from the Philippines, and 63 percent from China, compared to only 36 percent from Europe, Canada, and Oceania.[76]

226.    The IFR's requirement that applicants meet an unknown level of "English language proficiency" will similarly favor immigrants from English speaking countries, which are disproportionately white.

227.    The FAM Revisions and the IFR purport to identify immigrants who will become public charges, but the factors they adopt bear no reasonable relationship to the public charge inquiry.  Neither low-income status nor lack of English proficiency accurately predict whether an immigrant will permanently have no means of support or become institutionalized.

228.    The Proclamation's rationale – concern for taxpayers – is similarly pretextual.  In 2017, recent immigrants who lacked health insurance, accounted for less than one-tenth of 1 percent of U.S. medical expenditures.[77]  But because the Proclamation requires immigrants to purchase expensive health insurance plans unless they can prove they have no medical conditions that could require care, it creates onerous and likely insurmountable financial burdens on low-income immigrants, who are likely to be from countries with predominately

---

[76]    Jeanne Batalova et al., *Through the Back Door: Remaking the Immigration System via the Expected "Public-Charge" Rule*, Migration Policy Institute (Aug. 2018), *available at* https://www.migrationpolicy.org/news/through-back-door-remaking-immigration-system-expected-public-charge-rule; *See* Legal Aid Justice Center, Comment, at 8 (Dec. 10, 2018) (citing Boundless Immigration Inc., *Looming Immigration Directive Could Separate Nearly 200,000 Married Couples Each Year* (Sept. 24, 2018), *available at* https://www.boundless.com/blog/looming-immigration-directive-separate-nearly-200000-married-couples/).

[77]    Kristina Cooke, Mica Rosenberg, *Trump Rule on Health Insurance Leaves Immigrants, Companies Scrambling for Answers*, Reuters (October 31, 2019), *available at* https://www.reuters.com/article/us-usa-immigration-insurance/trump-rule-on-health-insurance-leaves-immigrants-companies-scrambling-for-answers-idUSKBN1XA1G6.

nonwhite populations.[78]  Those seeking immigrant visas through family-based petitions, who are primarily nonwhite, or through the diversity visa, who are majority African, are particular targets.[79]

### B.     The Discriminatory Impact on Nonwhite Immigrants is the Intended Purpose of the Consular Rules

229.    These discriminatory impacts are deliberate and purposeful.  Curtailing immigration by people of color has been a consistent thread uniting each of the Trump Administration's numerous attempts to change existing immigration regulations.  President Trump has a long and well-documented history of disparaging and demeaning immigrants, particularly those from Latin American, African, and predominately Muslim nations—or, as he has put it while considering changes to immigration rules, immigrants from "shithole countries."[80]

230.    Trump's racist statements, both during his campaign for President and once in office, include:

(i)     Statements that Mexicans entering the United States are "bringing drugs. They're bringing crime. They're rapists."[81]

(ii)    Characterizations of Central American immigrants as subhuman, stating "[y]ou wouldn't believe how bad these people are. These aren't people. These are animals."[82]

---

[78]   Swapna Reddy et al., Proclamation on Health Insurance Requirements: The Administration's Latest Attack on Immigration, Health Affairs (Oct. 30, 2019), *available at* *https://www.healthaffairs.org/do/10.1377/hblog20191028.484680/full/.*

[79]   *Id*.

[80]   BBC, *Donald Trump's 'racist slur' provokes outrage* (Jan. 12 2018), *available at* https://www.bbc.com/news/world-us-canada-42664173.

[81]   Washington Post, Transcript of Donald Trump's Presidential Bid Announcement (June 16, 2015), *available at* https://www.washingtonpost.com/news/post-politics/wp/2015/06/16/full-text-donald-trump-announces-a-presidential-bid/.

(iii)     Calls for "a total and complete shutdown on Muslims entering the United States"[83]; justifying that by citing the internment of Japanese Americans during World War II;[84] and calling for the surveillance of mosques in the United States.[85]

(iv)     Expressions of dismay that the United States does not "have more people from places like Norway," contrasting such immigrants with those from "shithole countries" such as Haiti and countries in Africa.[86]

(v)     Calls for four members of Congress, all women of color and three of whom were born in the United States, to "go back . . . [to] the totally broken and crime infested places from which they came."[87] And, in reference to Representative Ilhan Omar, a former refugee from Somalia who arrived in the United States as a child and became a citizen in 2000, encouragement of supporters at a campaign rally to chant "send her back."[88]

231.    President Trump has repeatedly directed particular hostility toward low-income immigrants, whom he perceives as "invading" or "infesting" this country and draining its

---

82    Héctor Tobar, *Trump's Ongoing Disinformation Campaign Against Latino Immigrants*, The New Yorker (Dec. 12, 2018), *available at* https://www.newyorker.com/news/daily-comment/trumps-ongoing-disinformation-campaign-against-latino-immigrants.

83    Jenna Johnson, *Trump Calls for 'Total and Complete Shutdown of Muslims Entering the United States,'* Wash. Post (Dec. 7, 2015), *available at* https://www.washingtonpost.com/news/post-politics/wp/2015/12/07/donald-trump-calls-for-total-and-complete-shutdown-of-muslims-entering-the-united-states/.

84    Meghan Keneally, *Donald Trump Cites These FDR Policies to Defend Muslim Ban*, ABC News (Dec. 8, 2015), *available at* https://abcnews.go.com/Politics/donald-trump-cites-fdr-policies-defend-muslim-ban/story?id=35648128.

85    Jeremy Diamond*, Trump Doubles Down on Calls for Mosque Surveillance*, CNN (June 15, 2016), *available at* https://www.cnn.com/2016/06/15/politics/donald-trump-muslims-mosque-surveillance/index.html.

86    Jen Kirby, *Trump Wants Fewer Immigrants from "Shithole Countries" and More from Places Like Norway*, Vox (Jan. 11, 2018 5:55 PM), *available at* https://www.vox.com/2018/1/11/16880750/trump-immigrants-shithole-countries-norway.

87    Katie Rogers & Nicholas Fandos, *Trump Tells Congresswomen to 'Go Back' to the Countries They Came From*, N.Y. Times (July 14, 2019), *available at* https://www.nytimes.com/2019/07/14/us/politics/trump-twitter-squad-congress.html.

88    *See* Meagan Flynn, *'Malignant, dangerous, violent': Trump rally's 'Send her back!' chant raises new concerns of intolerance*, Wash. Post (July 8, 2019), *available at* https://www.washingtonpost.com/nation/2019/07/18/malignant-dangerous-violent-trump-rallys-send-her-back-chant-raises-new-concerns-intolerance/?noredirect=on.

resources.[89]  In March, 2019, he was quoted as stating, "I don't want to have anyone coming in that's on welfare."[90]  He has also spread disinformation about immigrant access to benefits, retweeting a post falsely claiming that "[i]llegals can get up to $3,874 a month under Federal Assistance program. Our social security checks are on average $1200 a month. RT [retweet] if you agree: If you weren't born in the United States, you should receive $0 assistance."[91]

232.    Often these false and hostile statements are linked directly to hostility to immigrants from predominately nonwhite countries.  During the presidential campaign, Trump complained that the Mexican government was deliberately sending immigrants to the United States "because they don't want to pay for them. They don't want to take care of them."[92]  In a June 2017 Oval Office meeting, the President is said to have berated administration officials about the number of immigrants who had received visas to enter the country that year, complaining that 15,000 Haitians "all have AIDS," and that 40,000 Nigerians would never "go back to their huts" after seeing the United States.[93]

---

[89]   Donald J. Trump (@realDonaldTrump), Twitter (June 19, 2018, 9:52 AM), *available at* https://twitter.com/realDonaldTrump/status/1009071403918864385.

[90]   Alexander Marlow, et al., *Exclusive—President Donald Trump on Immigration: "I Don't Want to Have Anyone Coming in That's on Welfare"* (Mar. 11, 2019), *available at* https://www.breitbart.com/politics/2019/03/11/exclusive-president-donald-trump-on-immigration-i-dont-want-to-have-anyone-coming-in-thats-on-welfare/.

[91]   Héctor Tobar, *Trump's Ongoing Disinformation Campaign Against Latino Immigrants*, The New Yorker (Dec. 12, 2018), *available at* https://www.newyorker.com/news/daily-comment/trumps-ongoing-disinformation-campaign-against-latino-immigrants.

[92]   Andrew O'Reilly, *At GOP debate, Trump says 'stupid' U.S. leaders are being duped by Mexico*, Fox News, (Aug. 6, 2015), *available at* https://www.foxnews.com/politics/at-gop-debate-trump-says-stupid-u-s-leaders-are-being-duped-by-mexico.

[93]   Michael Shear & Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, N.Y. Times (Dec. 23, 2017), *available at* https://www.nytimes.com/2017/12/23/us/politics/trump-immigration.html.

233.    Similarly, President Trump has referred to family-based immigration with the derogatory term "chain migration," repeatedly calling it a "disaster" and falsely claiming that it allows citizens to bring in relatives who are "15 times removed."[94]  He has associated family-based immigration preferences with terrorism, using discrete events to launch into attacks on what he calls the "sick, demented" statutory scheme that has been in place for decades.  He has called immigrants who arrive pursuant to family preferences "the opposite of [origin countries'] finest," "truly EVIL," and "not the people that we want."[95]

234.    Other high-ranking officials involved in the decision-making process have demonstrated similar hostility toward nonwhite and low-income immigrants.  President Trump's principal advisor on immigration policy, Senior Policy Advisor Stephen Miller, has asserted that the United States' current immigration system "cost[s] taxpayers enormously because roughly half of immigrant head[s] of households in the United States receive some type of welfare benefit," and that "a recent study said that as much as $300 billion a year may be lost as a result of our current immigration system in terms of folks drawing more public benefits than they're paying in."[96]  These statements are apparently based on misleading assertions by CIS, and they do not distinguish between immigrants exempt from public charge determinations, other non-LPRs, LPRs, U.S. citizen children of noncitizens, and naturalized citizens.

---

[94]    Meghan Keneally, *8 Times Trump Slammed "Chain Migration" Before It Apparently Helped His Wife's Parents Become Citizens*, ABC News (Aug. 10, 2018), *available at* https://abcnews.go.com/US/times-trump-slammed-chain-migration-apparently-helped-wifes/story?id=57132429.

[95]    Jessica Kwong, *Donald Trump Says 'Chain Migration' Immigrants 'Are Not the People That We Want'—That Includes Melania's Parents*, Newsweek (Jan. 14, 2019), *available at* https://www.newsweek.com/donald-trump-chain-migration-immigrants-melania-1291210.

[96]    The White House, *Press Briefing by Press Secretary Sarah Sanders and Senior Policy Advisor Stephen Miller* (Aug. 2, 2017), *available at* https://www.whitehouse.gov/briefings-statements/pressbriefing-press-secretary-sarah-sanders-senior-policy-advisor-stephen-miller-080217/.

235.    Miller has taken an active role in agency processes focused on furthering
the Trump Administration's anti-immigrant policies.  Miller has specifically focused on
expanding the definition of public charge, even directing federal agencies to "prioritize" this
matter over their "other efforts."[97]  Miller's drive to push the Rule and other anti-immigration
policies ahead despite opposition from officials who questioned their legality, practicability, or
reasonability, was reported to be one of the primary reasons why former DHS Secretary Nielsen
was forced to resign, along with other officials at DHS.[98]  Miller reportedly exerted pressure to
force the resignation of USCIS Director Cissna because of the perceived lack of urgency in
finalizing the DHS Rule, which Miller predicted would be "transformative."[99]  Emails obtained
through a FOIA request show Miller berating Cissna in June 2018 over the perceived delay in
publishing the proposed public charge rule, with Miller writing "I don't care what you need to do
to finish it on time."[100]

236.    More recently, emails have surfaced demonstrating Miller's long-time
affiliation with white supremacist think tanks.  These emails evince hostility toward Latinos,
immigrants, and non-white people.  For example, in one email, Miller suggested that a novel
promoting the idea that white people are subject to "genocide" through racial diversity could be
an effective counterpoint to Pope Francis' pro-refugee rhetoric.  In others, Miller writes

---

[97]   Tal Kopan, *Sources: Stephen Miller Pushing Policy to Make It Harder for Immigrants Who Received Benefits to Earn Citizenship*, CNN (Aug. 7, 2018), *available at* https://www.cnn.com/2018/08/07/politics/stephen-miller-immigrants-penalizebenefits/index.html.

[98]   *See* Eileen Sullivan & Michael D. Shear, *Trump Sees an Obstacle to Getting His Way on Immigration: His Own Officials*, N.Y. Times (Apr. 14, 2019), *available at* https://www.nytimes.com/2019/04/14/us/politics/trump-immigration-stephen-miller.html?action=click&module=Top%20Stories&pgtype=Homepage.

[99]   *See id.*

[100]  Ted Hesson, *Emails show Stephen Miller pressed hard to limit green cards*, Politico (Aug. 2, 2019), *available at* https://www.politico.com/story/2019/08/02/stephen-miller-green-card-immigration-1630406.

favorably of 1920s immigration laws under President Coolidge, which were based upon eugenics and limited immigration from certain parts of the world.  Throughout, Miller repeatedly links immigrants and people of color with low education, crime, and terrorism.[101]

237.    Multiple courts adjudicating claims over the Trump Administration's immigration policies have found that Trump's statements, including those during the presidential campaign, provide evidence of animus behind decisions, including the decisions to change public charge determinations through the FAM Revisions, to rescind temporary protected status for Haitians, Salvadorans, and Hondurans; and to end the policy of Deferred Action for Childhood Arrivals, a program whose beneficiaries are primarily Mexican and Latino.[102]

238.    Further, several courts have concluded that "even if [high-ranking officials] did not 'personally harbor animus . . . . their actions may violate the equal protection guarantee if President Trump's alleged animus influenced or manipulated their decision-making process.'"[103]  The only court to have evaluated equal protection challenges to the FAM

---

[101]    Michael Edison Hayden, *Stephen Miller' Affinity for White Nationalism Revealed in Leaked Emails*, SPLC Hatewatch (November 12, 2019), *available at* https://www.splcenter.org/hatewatch/2019/11/12/stephen-millers-affinity-white-nationalism-revealed-leaked-emails.

[102]    *See, e.g.*, *Mayor of Baltimore* v. *Trump*, No. CV ELH-18-3636, 2019 WL 4598011, at *19 (D. Md. Sept. 20, 2019) (denying motion to dismiss equal protection claims in challenge to FAM Revisions); *NAACP* v. *U.S. Dep't of Homeland Sec.*, 364 F. Supp. 3d 568, 578 (D. Md. 2019) (concluding that President Trump's statements were sufficient to plausibly alleged that DHS's decision to rescind immigrants' temporary protected status violated equal protection); *Saget* v. *Trump*, 345 F. Supp. 3d 287, 303 (E.D.N.Y. 2018) (same); *Ramos* v. *Nielsen*, 321 F. Supp. 3d 1083, 1123-24 (N.D. Cal. 2018) (same); *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 279 (E.D.N.Y. 2018) (holding that plaintiff had plausibly alleged that DHS's decision to rescind the Deferred Action for Childhood Arrivals policy violated equal protection based on the President's statements)

[103]    *Ramos* v. *Nielsen*, 336 F. Supp. 3d 1075, 1098 (N.D. Cal. 2018); *see also CASA de Maryland, Inc.* v. *Trump*, 355 F. Supp. 3d 307, 326 (D. Md. 2018)  ("Defendants contend that the Secretary was the decision-maker, not the President, and that the Secretary's decision did not involve classification of a group of foreign nationals on the basis of their individual characteristics, but rather the classification of a foreign state. As to the first of these contentions, there can be no doubt that if, as alleged, the President influenced the decision to terminate El Salvador's TPS, the discriminatory motivation cannot be laundered through the Secretary."); *Centro Presente* v. *U.S. Dep't of Homeland Security*, 332 F. Supp. 3d 393, 414–15 (D. Mass. 2018) ("Defendants argue that the allegations regarding statements by Trump are irrelevant because animus held by the President cannot be

Revisions found that plaintiffs had plausibly alleged connections between the actions taken by

high-level executive branch officials and Trump's wishes, stating that "the State Department got

the message because, approximately a year after the draft [Executive] order [commanding

changes to the FAM's evaluation of public charge determinations], it broadened the FAM's

definition of public charge."[104] Another court found that statements from "people plausibly

alleged to be involved in the decision-making process, and an allegedly unreasoned shift in

policy [are] sufficient to allege plausibly that a discriminatory purpose was a motivating factor in

a decision."[105]

239.    The intent of the Consular Rules is to dramatically reduce the number of

nonwhite immigrants who can reunite or remain with family in the United States.  If the FAM

Revisions remain in effect, and if the IFR and Proclamation are implemented, that is just what

they will do.  Viewed in isolation, each policy is likely evidence of animus, viewed in unison no

other conclusion can survive.

## IV.    The Proclamation Exceeds the Scope of Authority Authorized by 8 U.S.C. § 1182(f), is *Ultra Vires*, and Violates the Constitution

240.    The Proclamation exceeds the scope of authority delegated by Congress to

the executive branch under section 1182(f) of the INA.  Unlike "Enhancing Vetting Capabilities

and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other

Public-Safety Threats," 82 Fed. Reg. 45,161 (Sept. 27, 2017) ("Muslim Ban"), better known as

---

imputed to Duke or Nielsen, the two officials who terminated the TPS designations at issue, notwithstanding
allegations that the White House was closely monitoring decisions regarding TPS designations. . . . [B]ecause
the exact time that the new policy regarding the criteria for TPS designations was made and the exact
participants involved in that decision are unclear, it would be premature to conclude that President Trump had
nothing to do with that decision such that his statements would be irrelevant.").

[104]    *Mayor of Baltimore v. Trump*, 2019 WL 4598011, at *19

[105]    *Centro Presente*, 332 F. Supp. 3d at 415.

the "Muslim Ban," there is no foreign policy nor is there any national security interest articulated by the President in the text of the Proclamation nor in the Emergency Notice issued by DOS.[106] In ultimately finding that the Muslim Ban proclamation was authorized by statute, the Supreme Court made unequivocally clear that its analysis was specific to the national security context, where "the entry suspension has a legitimate grounding in national security concerns, quite apart from any religious hostility," *Id.* at 2421, despite recognizing "a series of statements by the President and his advisers casting doubt on the official objective of the Proclamation." *Id.* at 2417.

241.    The circumstances the Court found in *Hawai'i* stand in stark contrast to the facts here.  There, the Court held that (1) the proclamation in that case was consistent with and supported "Congress' individualized approach for determining inadmissibility," *id*. at 2411, (2) the President had ordered DHS and other agencies "to conduct a comprehensive evaluation," then "set[] forth extensive findings" justifying why "it was in the national interest to restrict entry of aliens who could not be vetted with adequate information"—both to protect national security and public safety, and to incentivize policy change in their home countries, *id*. at 2409; and (3) that, in order to provide equitable relief from its harms, "the Proclamation creates a waiver program open to all covered foreign nationals seeking entry as immigrants or nonimmigrants," directing "DHS and the State Department to issue guidance elaborating upon the circumstances that would justify a waiver." *Id.* at 2422-23.

242.    Here, none of that is so.  The Proclamation's stated purpose is to protect the country's health care system and taxpayers "from the burdens of uncompensated care" by

---

[106]    *See Trump* v. *Hawai'i*, 138 S. Ct. 2392 (2018).

suspending the "entry into the United States of certain immigrants who lack health insurance or

the demonstrated ability to pay for their healthcare." 84 Fed. Reg. 53,991. Rather than introduce

a tailored, targeted country-specific approach intended to "encourage foreign governments to

improve their . . . practices" as a national security matter in vetting and information sharing, *see*

Muslim Ban, 82 Fed. Reg. 45,162, the Proclamation here is unprecedented in its subject matter

and its scope: it sweeps in hundreds of thousands of immigrants into a blunt and blanket denial

dragnet without any articulated or unarticulated foreign policy or national security interest,

entirely and exclusively on the basis of their ability to afford health insurance.

       243.    Nothing in the text of the Proclamation indicates that one of its purposes is

to improve the "screening and vetting protocols and procedures associated with" the visa-

issuance process, *see* Muslim Ban, 82 Fed. Reg. 45,162, § 1, or that it is intended to address any

matter of national security.  Moreover, 8 U.S.C. § 1182(f) requires the President to make factual

findings to justify the Proclamation.  As alleged above, the Proclamation does not even attempt

to set forth factual findings to justify its sweeping prohibition and suspension of nearly two

thirds of prospective immigrants around the world seeking admission to the United States.

       244.    Indeed, the Proclamation is wholly irrational.  There are no factual

findings, for instance, explaining how entry of an immigrant who would be fully insured with

comprehensive ACA coverage post-arrival, even with financial assistance, could be detrimental

to the country, or addressing the Proclamation's purpose of reducing the number of uninsured

individuals.  Nor are there any factual findings explaining how entry of an immigrant who would

be underinsured or practically uninsured – for example, someone with visitor insurance or a

STLDI plan – would advance the Proclamation's stated purpose.  If the goal of the Proclamation

is to address uncompensated care costs lost by hospitals, particularly "uncompensated emergency

93

care costs" often suffered by emergency rooms, driving new immigrants towards STLDI and similar non-comprehensive plans is more likely do the opposite, and is thus patently unreasonable.

245.    The limited options for STLDI, emergency travel, or catastrophic coverage provide extremely limited coverage and would likely leave individuals underinsured or uninsured for common needs such as prescription drugs, as well as hospitalization or emergency care.  STLDI private health care plans in particular are prohibited under New York and California state law.[107] Oregon, Colorado, Maryland, New Mexico, and the District of Columbia have restricted duration of STLDI plans to three or six months in length, with no extensions or renewals allowed under state law; thus they do not meet the Proclamation's 364-day coverage requirement, and are not practically viable because they limit the states in which an intending immigrant can live.[108]  None of these types of plans are offered or purchased on ACA Exchanges, because visitor and STLDI plans are not required to provide essential health benefits. Because they are non-comprehensive, these types of plans often leave individuals underinsured or effectively uninsured.

---

[107]  *See* N.Y. State Department of Financial Services Insurance Circular Letter No. 7 (2018), *available at* https://www.dfs.ny.gov/insurance/circltr/2018/cl2018_07.htm (clarifying that short-term health plans are prohibited from sale in New York state, citing N.Y. Insurance Law §§ 3216(g)(1), 3221(p)(1) and (2), 4304(b)(2), 4304(c)(2), and 4305(j)(1) and (2)); California State Department of Insurance December 18, 2018 Bulletin Notice, Prohibition Regarding Short-Term Limited Duration Health Insurance Policies, *available at* http://www.insurance.ca.gov/0250-insurers/0300-insurers/0200-bulletins/bulletin-notices-commiss-opinion/upload/ProhibitionRegardingShortTermLimitedDurationHealthInsurancePolicies.pdf  (clarifying that short-term limited duration health plans are prohibited from sale in the state of California, citing Cal. Ins. Code § 10123.61 (Stats 2018, ch. 687)).

[108]  *See* Dania Palanker, Maanasa Kona & Emily Curran*, States Step Up to Protect Insurance Markets and Consumers from Short-Term Health Plans, Appendices* (Commonwealth Fund, May 2019), *available at:* https://www.commonwealthfund.org/publications/issue-briefs/2019/ may/states-step-up-protect-markets-consumers-short-term-plans; https://www.commonwealthfund.org/sites/default/files/2019-05/Palanker_states_step_up_short_term_plans_Appendices.pdf  (last visited Nov. 24, 2019).

246.     The Proclamation's 364-day minimum coverage requirement also effectively prohibits immigrants from switching immediately to a regular, comprehensive plan, irrespective of their own interest in doing so, their own financial resources, or any need for financial assistance.

247.     By encouraging the entry of immigrants under visitor and STLDI plans, and requiring coverage for their first year or longer, the terms of the Proclamation itself undermine its stated goal of reducing uncompensated costs associated with uninsured health care, in addition to (as alleged above) flouting duly enacted statutes designed to expand access to affordable healthcare and reduce uncompensated costs among lawfully present immigrants, including the ACA and CHIPRA.

248.     Moreover, the Proclamation, which seeks to exclude certain immigrants based on the inability to obtain specific types of health insurance or pay for medical care, not only exceeds the scope of Presidential authority under 8 U.S.C. § 1182(f), it violates constitutional separation of powers principles.  The stated intent, terms, and effect of the Proclamation contravene the goal of family unification and the statutorily mandated totality of circumstances test and public charge provisions under the INA, as well as the express language and intent of the ACA and CHIPRA, designed by Congress to extend certain health-care related benefits and provide an essential minimum level of coverage to all eligible and lawfully present immigrants and citizens in the United States.  The Congress has not authorized the President to contravene other statutes using his section 1182(f) discretion.  If Congress had attempted to do so, the delegation in section 1182(f) would itself be constitutionally impermissible.

**V.      The Rule Will Cause Irreparable Harm to Plaintiffs**

249.   Unless enjoined, the Consular Rules will cause each of the individual and organizational plaintiffs substantial, concrete, and particularized harm in the form of destroying their families, penalizing the use of essential benefits for which they and their families are eligible, and diverting their resources and injuring their mission.  These harms flow from the predictable and in fact intended consequences of each of the Consular Rules, which defendants have used to erect an "invisible wall" to prevent low-income immigrants from building a permanent future in the United States.  By definition, immigrants seeking to obtain LPR status through a family member have extremely close ties to U.S. citizens and permanent residents, and many, like the individual plaintiffs, are already an essential part of the families and communities they have built in the U.S.  For these plaintiffs in particular, application of the Consular Rules means indefinite separation from family – their beloved spouses and children.

250.   The numbers quantifying the impact of these rules on are staggering. Since the FAM Revisions went into effect in January 2018, there has been a twelve-fold increase in public charge denials at consular processing.[109]  If the IFR takes effect, the increase in public charge denials is likely to increase exponentially.  A whopping 81 percent of the world's population cannot meet the 125 percent of the U.S. Federal Poverty Guideline threshold test imposed by the DOS public charge rule.[110]  Finally, the Proclamation would result in two-thirds of intending immigrants – approximately 375,000 people – being denied entry and admission

---

[109]   *See* DOS tables linked to in Ted Hesson, *Visa denials to poor Mexicans skyrocket under Trump's State Department*, Politico (Aug. 6, 2019), *available at* https://www.politico.com/story/2019/08/06/visa-denials-poor-mexicans-trump-1637094.

[110]   Danilo Trisi, *Administration's Public Charge Rules Would Close the Door to U.S. to Immigrants Without Substantial Means*, Center on Budget and Policy Priorities 7-8 (November 11, 2019), *available at* https://www.cbpp.org/sites/default/files/atoms/files/11-11-19imm.pdf.

according to estimates by the non-partisan Migration Policy Institute.[111]  These statistics are not

merely a regrettable consequence of a policy shift, but rather, by design, they are the product of

policies that fundamentally conflict with the laws adopted by Congress and the balance of

powers enshrined by the Constitution.

251.    The Consular Rules cause harm to plaintiffs in three main categories:

(1) the harms caused by a huge increase in immigrant visas refused, both the increase that has

already taken place, and the even higher increase to come, and resulting family separation; (2)

the harm caused by citizen and LPR sponsors, or persons desiring to be sponsors in the future,

giving up or being reluctant to access government benefits for themselves and their family-

members due to the negative weight such receipt is given under the FAM Revisions, as well as

the chilling effect on benefits use caused by all three Consular Rules; and (3) the impact of the

above on the organizational plaintiffs who must divert resources to meet the pressing needs of

the individuals and communities they serve affected by the Consular Rules at the expense of

engaging in other activities to further their missions.

**A.    Increase in Denials and the Resulting Separation of Families**

252.    Each of the individual plaintiffs are facing impossible circumstances.

They have built full lives in the U.S., are essential to the well-being of their families and

communities, and want to obtain LPR status so they can enjoy the security of permanent

residence.  They have invested in the process of seeking a waiver for unlawful presence, and for

most, those waivers have been approved based on DHS's recognition that separation from their

---

[111]   Julia Gelatt and Mark Greenberg, *Health Insurance Test for Green-Card Applicants Could Sharply Cut Future U.S. Legal Immigration*, Migration Policy Institute (Oct. 2019), *available at* https://www.migrationpolicy.org/news/health-insurance-test-green-card-applicants-could-sharply-cut-future-us-legal-immigration.

families would cause extreme hardship.  Under the pre-January 2018 regulatory framework, they

would almost surely be granted immigrant visas.  Now, the Consular Rules make it likely that

their applications will be denied.  For each of them, the prospect of denial is the prospect of

indefinite separation from their families and the resulting hardship that they themselves, and

those closest to them, will experience should they be separated.

   253. Plaintiffs Alicia Doe and Brenda Doe are likely to be denied a visa under

each of the three Consular Rules.  The households of Alicia Doe and Brenda Doe both receive

government benefits that would be counted against them under the FAM, including SSI, SNAP,

government-funded health insurance, and in the case of Alicia Doe, public housing.  But neither

Alicia nor Brenda receive benefits on their own account.  Both plan to use co-sponsors that do

not reside in their households, and following the FAM Revisions, DOS has refused to give credit

to such co-sponsors' affidavits of support in certain consulates.  They would likewise be

considered likely public charges under the IFR.  Each of the households has income, but the

income is slightly short of the 125 percent of the FPG standard for their household size.  Neither

Alicia Doe nor Brenda Doe has substantial, recent work experience, education, training, or

English language skills.  The focus of all three women has been to take care of disabled family

members.  None of them can afford to meet the requirements of the Proclamation.  Alicia and

Brenda Doe are currently eligible for State-funded Medicaid but fear signing up because of the

likely immigration consequence for their cases.  Of the types of insurance that satisfy the

Proclamation, they either cannot afford such insurance, or the insurance products are not

available to them.  Similarly, Diana Doe faces greatly increased risk that she will be deemed

likely to become a public charge, because she does not have substantial, recent work experience

and, like Alicia and Brenda Doe, her focus has been to care for family members.  Plaintiff Eric

Doe fears that his wife is also likely to be denied for the same reasons.

254.    For each of these plaintiffs, the consequences of denial would be a

singular, life-altering, and devastating event.  Alicia Doe would lose her husband and her

children to return to El Salvador when her whole life is in New York.  Her husband would

somehow need to handle full-time work while caring for their daughter with cerebral palsy, and

their other teenage daughter would lose her mother.  Brenda Doe would likewise lose her family.

She would return to the Dominican Republic, where she has not lived for over 20 years.  She

would say goodbye to her three children, and her husband who has depended on her greatly since

he became legally blind in 2015.  Her family would not only lose a mother and spouse, but they

would lose her capacity to earn wages to contribute to the tight household budget once she

obtains her green card.  Carl Doe would be forced to return to El Salvador after more than a

decade and a half in New York, and would lose his wife and the business he is working so hard

to build; his wife would lose his crucial financial and emotional support.  Multiple generations of

Diana Doe's family depend on her, including her mother, her spouse, and her children.  Eric Doe

would lose his wife and life-partner who is essential to his ability to continue working despite his

chronic health problems, and their young children would lose their mother at a critical juncture in

their development.

255.    Plaintiffs would also suffer irreparable harm specifically as a result of the

Proclamation.  Most plaintiffs do not have the funds to purchase the few kinds of private health

insurance available to them in the New York marketplace.  But even those with some ability to

pull funds together will be harmed.  For example, Carl Doe's nascent business may be able to

purchase some forms of substandard, and expensive, health insurance with reserves.  But these

funds will deplete the business's small reserves and provide Carl Doe with health insurance that

covers less than state-funded public health insurance.  These are funds that will never be

reimbursed to his business, and that put it in a precarious position just as it is launching.

Similarly, Diana Doe has some savings, but those are needed for emergency expenses for her

family and to help her survive in Mexico while she is awaiting consular processing.  Spending

those non-reimbursable funds on substandard health insurance that covers less than state-funded

health insurance would put her and her family at financial and physical risk.

### A. Sponsors and Would-be Sponsors Foregoing Benefits and the Overall Chilling Effect on Benefits Use

256.    The second category of harms flows from two impacts of the Consular

Rules: (a) the FAM Revisions' imposition of an explicit, direct, and unlawfully retroactive

penalty on an intending immigrant who has used or is using government benefits that are not

cash or long-term institutional care and their sponsor or household members' use of the same;

and (b) the chilling effect that all the Consular Rules cause low-income immigrants who are

eligible for benefits, even those who are not subject to the Consular Rules.

257.    Each of the individual plaintiffs suffers from this category of harm. Alicia

Doe and Brenda Doe have both chosen to forego accessing state-funded Medicaid for which they

are eligible based on their approved I-130s because of their justified fears of the immigration

consequences.  They also have justified fear that their household members' benefits receipt will

be counted against them.  The benefits are critical to their families' health and sustenance and

otherwise supplement low-wage work and income gaps created by family-members' disabilities.

They had no warning that the FAM Revisions would penalize their families' receipt, and giving

up the benefits is not a realistic or economically wise choice.  Yet they are in an impossible bind

because receipt of those supplemental benefits will almost certainly lead to their immigrant visa applications being denied short of an injunction.  Similarly, plaintiff Eric Doe makes a good living for his family but his employers do not provide health insurance.  Given his critical health needs – he has a chronic cancer diagnosis – his very survival depends on his continued access to affordable health care.  Giving up his state-funded health insurance to make his wife's application for an immigrant visa more viable is not an option for him.

**B.      Diversion of Resources and Frustration of the Organizational Plaintiffs' Missions To Assist Struggling Immigrant Families and Communities**

258.      Dealing with the grave concerns of sponsors and intending immigrants about the prospect of family separation and the fear of receiving needed benefits is the province of the organizational plaintiffs.  They are the front-lines for dealing with the concerns of clients and the consequences of these policies and will have to deal with them until the Consular Rules are enjoined.  In turn, the organizational plaintiffs experience harms in the form of diversion of resources – in money, time, and personnel – and frustration of their organizational mission, both of which are irreparable.

259.      The time it takes to provide legal representation to low-income families seeking to achieve immigration goals that involve consular processing has become greatly increased due to the Consular Rules, their complexity, and the uncertainty about their implementation.  At the outset, organizational plaintiffs help clients identify achievable goals and weigh the risks.  They complete immigration paperwork, which requires extra time to anticipate concerns caused by the Consular Rules.  They deal with clients where they themselves or their family members are stuck in their country of origin, sometimes for many months.  For example, it takes MRNY up to six months to handle consular processing denials.  Organizational plaintiffs

prepare clients for the prospect of removal or permanent exclusion.  Each of these is a sensitive and complicated task.  Prior to the FAM Revisions and introduction of the IFR and Proclamation, the outcome of consular processing was much more predictable.  The staff time (and the funding it represents) now needed to contend with the new regime created by the Consular Rules is budgeted to other activities that fulfill the organizational plaintiffs' missions.

260.    For example, CARECEN – NY currently has approximately 400 clients who are applying for immigrant visas and who are already subject to the FAM Revisions and will be subject to the Proclamation and, ultimately, the IFR at their consular interviews. Approximately 15 of these individuals are anticipated to be scheduled for visa interviews before February 2020.  CARECEN – NY's four attorneys and eleven legal support staff have already expended significant time, and consequently organizational resources, as a result of the Consular Rules, and CARECEN – NY has been forced to amend its intake and representation protocols and procedures in response to the rules.  CARECEN – NY is also paid on a fee for service model. The extra time spent dealing with consular issues is causing a 20 percent drop in its projected annual budget for 2020.  Projected budget losses will significantly impede and reduce CARECEN – NY's ability to serve the directly impacted population and to provide adequate legal assistance for its clients seeking petitions for admission.

261.    ASC has had to change its advice and practice for clients who want to obtain LPR status through consular processing, due to the uncertainty and the accompanying risk the Consular Rules will create for clients, who would otherwise be eligible for permanent resident status through consular processing with a I-601A waiver.  Taking the steps to obtain LPR status is particularly important for ASC's clients impacted by HIV or AIDS, who cannot otherwise access needed state services and tools essential to place them on the road to financial

independence, and for healthy intending immigrants whose U.S. citizen spouse or children have HIV and rely on their hardworking family member. Because ASC will no longer be able to secure legal status for its vulnerable clients, and public benefits incident to status, ASC faces losing government grants awarded to facilitate family stabilization of immigrant families impacted by HIV. Finally, in the past, ASC secured I-601A waivers of inadmissibility in order to spare U.S. citizen clients with HIV or AIDS the hardship of losing the support of their hardworking family members. Ironically, now the very hardship upon which the waiver is granted is likely to render the family member inadmissible unless the U.S. citizen with HIV foregoes benefits related to a family member's disability.

262. CLINIC, which serves affiliates in 49 states, and its staff field questions about individual cases form those affiliates, and will have to expend a significant amount of time advising affiliates on the impact the Proclamation will have on applicants for immigrant visas. Providing proper advice requires learning the complex web of Proclamation-compliant health insurance options for immigrants in markets for 49 states as well as the regulatory framework governing health insurance in each state. For example, Proclamation-compliant STLDI plans are prohibited under New York and California state law. Other states allow STLDI plans but they do not comply with the Proclamation. The time it will take CLINIC staff to navigate the intricacies of 49 state insurance markets and develop local contacts needed to verify the rules and products available will divert time from other work that CLINIC is planning to perform in the way of training and resource development. CLINIC also could lose revenue from affiliates' membership and training revenue fees due to the impact of all three Consular Rules if affiliates serve fewer clients, receive less in fees, and have a reduced amount to spend on the services CLINIC provides.

263.     In addition to the diversion of time dealing with the legal needs of clients, organizational plaintiffs see both the direct consequences and the chilling effect of all three Rules on the use of benefits.  *First*, the penalties and fear caused by the Consular Rules complicate the client service work described above as clients weigh their immigration options against their needs and their families' need for benefits.  *Second*, clients giving up benefits means increased demand for the types of free and low-fee services provided by organizational plaintiffs, including health services, food pantries, and English language classes.  *Third*, even apart from immigration counseling, clients who are not in the process of immigrating or helping a family-member immigrate have fear that accessing benefits may somehow hurt them or their families, now or in the future, and require extra care and individualized advice to explain how the Consular Rules do or do not apply to them specifically.  *Fourth*, organizational plaintiffs are spending more time conducting outreach to clients who are experiencing the chilling effect and may not feel comfortable walking into the doors of an established non-profit organization.

264.     The prospect of denial and family separation predominantly affecting immigrants of color also does fundamental damage to the mission of organizational plaintiffs – to increase power in immigrant communities, promote family unity and stability, and achieve racial justice.  Their mission is also impaired when due to the illegal Consular Rules there are simply no good options for clients seeking to adjust or who need benefits for which they are eligible.  Clients with a path to obtain LPR status can either stay put and remain without permanent status or risk indefinite separation from their families and communities.  Clients who need benefits can either meet their needs and those of their families or go without and still face great risk of denial based on past use.  Further damage to plaintiffs' mission is caused by the draining of resources from other important goals and client needs.

265.    The effects described are already being felt.  In many cases, the harm will only become more pronounced when the IFR and Proclamation go into effect.

## COUNT ONE

**(Violation of Administrative Procedure Act – Substantively Arbitrary
and Capricious, Abuse of Discretion, Contrary to Constitution or Statute)**

266.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

267.    The APA, 5 U.S.C. § 706(2), prohibits federal agency action that is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right"; or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

268.    DOS and HHS are each an "agency" under the APA.  5 U.S.C. § 551(A).

269.    In implementing the FAM Revisions, defendants DOS and Pompeo took unconstitutional and unlawful action, in violation of the APA, by, among other things, as set forth herein: (a) expanding the definition of "public charge" in a manner contrary to the statutory meaning of the term; (b) seeking to establish a framework for making public charge determinations that will deny admission to large numbers of intending immigrants who would be approved for admission to the U.S. as immigrants or non-immigrants under an approach consistent with the Act; (c) establishing a scheme that is so confusing, vague, and broad that it fails to give applicants notice of the conduct to avoid and inviting arbitrary, subjective, and inconsistent enforcement; (d) seeking to establish a framework for public charge determinations that undermines the Congressional goal of promoting family unity; (e) seeking to establish a framework that appears to apply retroactively directing consular officers to consider the past use

of benefits by visa applicants and their family members; (f) promulgating a rule that

discriminates against individuals with disabilities in violation of the Rehabilitation Act of 1973;

and (g) promulgating a rule that is motivated by animus against nonwhite immigrants.

270.    In promulgating the IFR, Defendants DOS and Pompeo took

unconstitutional and unlawful action, in violation of the APA, by, among other things, as set

forth herein: (a) expanding the definition of "public charge" in a manner contrary to the statutory

meaning of the term; (b) seeking to establish a framework for making public charge

determinations that will deny admission to large numbers of intending immigrants who would be

approved for admission to the US under an approach consistent with the Act; (c) identifying

"negative factors" and "heavily weighted negative factors" for public charge determinations that

are contrary to law; (d) establishing a scheme that is so confusing, vague, and broad that it fails

to give applicants notice of the conduct to avoid and inviting arbitrary, subjective, and

inconsistent enforcement; (e) seeking to establish a framework for public charge determinations

that undermines the Congressional goal of promoting family unity; (f) seeking to establish a

framework that appears to apply retroactively, directing consular officers to consider the past use

of non-cash benefits by visa applicants, (g) promulgating a rule that discriminates against

individuals with disabilities in violation of the Rehabilitation Act of 1973; and (h) promulgating

a rule that is motivated by animus against nonwhite immigrants.

271.    In implementing the Proclamation Defendants DOS, Pompeo, HHS and

Azar took unconstitutional and unlawful actions in violation of the APA by, among other things,

informing visa applicants and consular officials of new unlawful requirements.

272.     Defendants DOS, Pompeo, HHS and Azar acted arbitrarily and capriciously, otherwise not in accordance with law, and contrary to constitutional right, and abused their discretion, in violation of the APA.

273.     These violations by Defendants DOS, Pompeo, HHS, and Azar have caused and will continue to cause ongoing harm to plaintiffs and the general public.

## COUNT TWO

### (Violation of Administrative Procedure Act – Procedurally Arbitrary and Capricious, Notice and Comment)

274.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

275.     The APA, 5 U.S.C. §§ 553 and 702(2)(D), prohibits federal agency action that affects substantive rights "without observance of procedure required by law."

276.     DOS is an "agency" under the APA.  5 U.S.C. § 551(A).

277.     In issuing the FAM Revisions, promulgating the IFR, and otherwise implementing the Proclamation, defendants will change the substantive criteria regarding evaluating whether an individual is a public charge.  This change will impact plaintiffs' substantive rights.

278.     The FAM Revisions and the IFR must comply with the APA process for notice-and-comment rulemaking.  5 U.S.C. § 553.

279.     Under the APA, agencies engaged in notice-and-comment rulemaking must, among other things, (a) provide reasonable basis for departing from prior agency actions; (b) support their actions with appropriate data and evidence; and (c) provide a reasoned response to significant public comments.

280.     Defendants DOS and Pompeo have failed to comply with these obligations.

281.     These violations will cause ongoing harm to plaintiffs.

## COUNT THREE

### (Violation of the Fifth Amendment – Equal Protection and Due Process)

282.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

283.     The Due Process Clause of the Fifth Amendment prohibits the federal government from denying equal protection of the laws.

284.     The IFR, the FAM Revisions and the Proclamation and the Proclamation Implementing Actions target individuals for discriminatory treatment based on their race, ethnicity, and/or national origin, without lawful justification.

285.     These actions were each motivated, in whole or in part, by a discriminatory motive and/or a desire to harm a particular group: nonwhite immigrants.

286.     Nonwhite immigrants will be disproportionately harmed by these actions.

287.     The Proclamation targets individuals for discriminatory treatment because they are members of a disfavored group: non-wealthy immigrants who plan to settle permanently in the United States, and so is not rationally related to a legitimate government interest.

288.     By taking these actions, defendants violated the equal protection and due process guarantees of the Fifth Amendment.

289.     This violation will cause ongoing harm to plaintiffs.

## COUNT FOUR

### (*Ultra Vires*)

290.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

291.    The Proclamation is illegal and therefore *ultra vires*.

292.    Courts "ordinarily presume that congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command." *Bowen* v. *Michigan Academy of Family Physicians*, 476 U.S. 667, 681 (1986).

293.    The President's attempt to indefinitely ban certain immigrants based on the inability to obtain specific types of health insurance or pay for medical care, and to create a new ground of inadmissibility that Congress has previously considered and chosen not to include in the INA, exceeds Congress's delegated power to the President's power to suspend the entry of noncitizens and issue reasonable rules for the entry of noncitizens.

294.    The President's attempt to ban certain immigrants based on the inability to obtain specific types of health insurance or pay for medical care violates constitutional separation of powers principles because it contravenes Congress's expressed intent to provide a certain minimum level of coverage to all legal immigrants and citizens in the United States and to extend certain health care-related benefits to legal immigrants.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that the Court:

a.    Issue a declaratory judgment stating that the IFR, the FAM Revisions, the Proclamation, and Proclamation Implementing Actions are unauthorized by and contrary to the Constitution and laws of the United States;

b.      Vacate and set aside the FAM Revisions, the IFR and the Proclamation;

c.      Preliminarily and permanently enjoin defendants from implementing the FAM Revisions, the IFR, and the Proclamation, or taking any actions to enforce or apply it;

d.      Award plaintiffs attorneys' fees; and

e.      Grant such additional relief as may be just and proper.

Dated: New York, New York
        December 19, 2019

THE LEGAL AID SOCIETY

By: _____
        Susan E. Welber, Staff Attorney, Civil
        Practice, Law Reform Unit

Janet Sabel, Attorney-in-Chief
Adriene Holder, Attorney-in-Charge, Civil Practice
Judith Goldiner, Attorney-in-Charge, Law Reform
Unit
Susan Cameron, Supervising Attorney, Law Reform
Unit
Hasan Shafiqullah, Attorney-in-Charge,
Immigration Law Unit
Rebecca Novick, Director, Health Law Unit
Lillian Ringel, Staff Attorney, Health Law Unit

199 Water Street
New York, New York  10038
(212) 577-3320
JSabel@legal-aid.org
AHolder@legal-aid.org
JGoldiner@legal-aid.org
SCameron@legal-aid.org
SEWelber@legal-aid.org
HHShafiqullah@legal-aid.org
RANovick@legal-aid.org
LRingel@legal-aid.org


CENTER FOR CONSTITUTIONAL RIGHTS

By: _____
        Ghita Schwarz
        Brittany Thomas
        Baher Azmy
666 Broadway
7th Floor
New York, New York  10012
(212) 614-6445
gschwarz@ccrjustice.org
bthomas@ccrjustice.org
bazmy@ccrjustice.org

Dated: New York, New York
       December 19, 2019

THE LEGAL AID SOCIETY

By: _____
         Susan E. Welber, Staff Attorney, Civil
         Practice, Law Reform Unit

Janet Sabel, Attorney-in-Chief
Adriene Holder, Attorney-in-Charge, Civil Practice
Judith Goldiner, Attorney-in-Charge, Law Reform
Unit
Susan Cameron, Supervising Attorney, Law Reform
Unit
Hasan Shafiqullah, Attorney-in-Charge,
Immigration Law Unit
Rebecca Novick, Director, Health Law Unit
Lillian Ringel, Staff Attorney, Health Law Unit

199 Water Street
New York, New York  10038
(212) 577-3320
JSabel@legal-aid.org
AHolder@legal-aid.org
JGoldiner@legal-aid.org
SCameron@legal-aid.org
SEWelber@legal-aid.org
HHShafiqullah@legal-aid.org
RANovick@legal-aid.org
LRingel@legal-aid.org

CENTER FOR CONSTITUTIONAL RIGHTS

By: _____
         Ghita Schwarz
         Brittany Thomas
         Baher Azmy
666 Broadway
7th Floor
New York, New York  10012
(212) 614-6445
gschwarz@ccrjustice.org
bthomas@ccrjustice.org
bazmy@ccrjustice.org

111

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

By: _Andrew Ehrlich_____

    Andrew J. Ehrlich
    Jonathan H. Hurwitz
    Christopher L. Filburn
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
aehrlich@paulweiss.com
jhurwitz@paulweiss.com
cfilburn@paulweiss.com


THE NATIONAL IMMIGRATION LAW
CENTER

By: _____

    Joanna Elise Cuevas Ingram (JC 2704)
P.O. Box 170392
Brooklyn, NY 11217
(213) 377-5258
cuevasingram@nilc.org

Nicholas Espíritu* (*pro hac vice forthcoming*)
3450 Wilshire Blvd., 108-62
Los Angeles, CA 90010
espiritu@nilc.org

Max S. Wolson*  (*pro hac vice forthcoming*)
P.O. Box 34573
Washington, DC 20043
wolson@nilc.org


*Counsel for Plaintiffs*

112

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

By: _____
    Andrew J. Ehrlich
    Jonathan H. Hurwitz
    Christopher L. Filburn
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
aehrlich@paulweiss.com
jhurwitz@paulweiss.com
cfilburn@paulweiss.com


THE NATIONAL IMMIGRATION LAW
CENTER

By: _____
    Joanna Elise Cuevas Ingram (JC 2704)
P.O. Box 170392
Brooklyn, NY 11217
(213) 377-5258
cuevasingram@nilc.org

Nicholas Espíritu* (*pro hac vice forthcoming*)
3450 Wilshire Blvd., 108-62
Los Angeles, CA 90010
espiritu@nilc.org

Max S. Wolson* (*pro hac vice forthcoming*)
P.O. Box 34573
Washington, DC 20043
wolson@nilc.org


*Counsel for Plaintiffs*

112