**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MAKE THE ROAD NEW YORK, et al.          )
                                        )
              Plaintiffs                )
                                        )
       v.                               )       Civil Action No. 19-11633 (GBD)
                                        )
MICHAEL POMPEO, Secretary of State, et al.   )
                                        )
              Defendants                )

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY**
**INJUNCTION AND IN SUPPORT OF MOTION TO DISMISS**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT..................................................................................... 1

BACKGROUND ........................................................................................................ 2

    I.      Statutory and regulatory background.................................................... 2

           A.      Applications for U.S. visas ........................................................ 2

           B.      "Public charge" inadmissibility under the INA ......................... 3

           C.      The Foreign Affairs Manual and the January 2018 revision to 9 FAM § 302.8-2 ........................................................................ 4

           D.      The October 2019 rule amending the public charge regulation, 22 C.F.R. § 40.41.............................................................................. 7

           E.      The President's authority to suspend entry under 8 U.S.C. § 1182(f)...... 10

           F.      The President's Proclamation No. 9945 .................................... 10

    II.     Proceedings in this case ..................................................................... 12

ARGUMENT............................................................................................................ 12

    I.      Applicable legal standards .................................................................. 12

    II.     Because the plaintiffs cannot meet the jurisdictional requirements of standing and ripeness, preliminary relief should be denied, and this action should be dismissed. ................................................................. 13

           A.      The jurisdictional requirements of standing and ripeness........................ 13

           B.      The plaintiffs lack standing to assert claims against the HHS defendants because they do not identify any present HHS actions that cause them injury. .......................................................... 15

           C.      The individual plaintiffs lack standing to challenge the Proclamation because none of them alleges that they or family members applying for visas have "reasonably foreseeable medical costs" they are not prepared to cover............................................................................. 15

           D.      The individual plaintiffs additionally lack standing in this action because they do not allege immediate plans to leave the country and apply for visas................................................................................ 16

i

E. The five organizational plaintiffs lack standing in this suit, because they have not suffered any concrete injury attributable to any of the challenged actions. ............................................................................................................... 18

F. The reasons that undermine the plaintiffs' claims of immediate injury also undermine their claims of irreparable harm. ............................................. 20

III. The plaintiffs' claims are legally invalid, and so they cannot demonstrate a likelihood of success on the merits, and the complaint should be dismissed. ...... 21

A. The claims challenging the Department of State actions fail to state a claim for relief under the Administrative Procedure Act. .......................... 21

    1. The plaintiffs cannot rely on the APA because policies relating to admission and exclusion of aliens are subject to statutory review only when affirmatively authorized by Congress. ......................... 21

    2. The APA does not authorize claims against the President. ........... 22

    3. The organizational plaintiffs cannot seek relief under the APA because they are not within the zone of interests arguably protected by the pertinent provisions of the INA. ........................................ 22

    4. The APA does not permit claims challenging future agency action. .................................................................................................... 23

    5. The January 2018 guidance is not subject to judicial review and did not require notice and comment because it consists of interpretive rules with no legal effect. ......................................... 24

    6. The January 2018 guidance comports with the INA. .................. 29

    7. The January 2018 guidance does not have impermissible retroactive effect. ........................................................................ 29

    8. The October 2019 rule fell within the good cause exception to the notice and comment requirements of the APA .............................. 31

    9. The October 2019 rule comports with the INA and reflects reasonable policy choices. ........................................................... 33

    10. The Rehabilitation Act of 1973 does not apply to overseas visa processing. .............................................................................. 39

B. The plaintiffs' challenge to the Proclamation fails to state a claim for relief. ...................................................................................................... 40

    1. The Proclamation is a valid exercise of the President's authority under 8 U.S.C. § 1182(f). .............................................................. 40

    2. The President's findings and actions under § 1182(f) are not subject to judicial review under any statute or directly under the Constitution. ................................................................................ 42

C.   The plaintiffs do not state valid equal protection claims because they do not allege facts connecting the challenged actions to discriminatory intent on the part of either the President or the agency defendants. ................... 44

D.   The separation of powers bars injunctive relief against the President. ...... 47

IV.   The other factors in the preliminary injunction analysis weigh against relief. ..... 48

V.   There is no basis for nationwide relief in this action. .......................................... 49

CONCLUSION ................................................................................................................. 50

# TABLE OF AUTHORITIES

**CASES**

*A.X.M.S. Corp. v. Friedman*,
948 F. Supp. 2d 319 (S.D.N.Y. 2013) .................................................................... 20

*Abourezk v. Reagan*,
785 F.2d 1043 (D.C. Cir. 1986) ............................................................................. 41

*Allen v. Wright*,
468 U.S. 737 (1984) ............................................................................................... 14

*Am. Tort Reform Ass'n v. Occupational Safety & Health Admin.*,
738 F.3d 387 (D.C. Cir. 2013) ............................................................................... 24

*Archut v. Ross Univ. Sch. of Veterinary Med.*,
No. 10-1681(MLC), 2012 WL 5867148 (D.N.J. Nov. 19, 2012) ......................... 40

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................... 13, 45, 47

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................... 13

*Bennett v. Spear*,
520 U.S. 154 (1997) ............................................................................................... 22

*Boniface v. U.S. Dep't of Homeland Sec.*,
613 F.3d 282 (D.C. Cir. 2010) ............................................................................... 30

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ............................................................................................... 49

*Caplin & Drysdale, Chartered v. United States*,
491 U.S. 617 (1989) ............................................................................................... 19

*Carter v. HealthPort Techs. LLC*,
822 F.3d 47 (2d Cir. 2016) .................................................................................... 13

*Cave v. E. Meadow Union Free Sch. Dist.*,
514 F.3d 240 (2d Cir. 2008) .................................................................................. 13

*Celtronix Telemetry, Inc., v. FCC*,
272 F.3d 585 (D.C. Cir. 2001) ............................................................................... 30

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994) ............................................................................................... 35

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
|868 F.3d 104 (2d Cir. 2017) ................................................................... 18

*Chevron U.S.A. Inc. v. NRDC, Inc.*,
467 U.S. 837 (1984) ................................................................................. 34

*Christensen v. Harris County*,
529 U.S. 576 (2000) ................................................................................. 25

*City & County of San Francisco v. U.S. Citizenship & Immig. Servs.*,
944 F.3d 773 (9th Cir. 2019) ............................................................ 34, 35

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......................................................................... 16, 17

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) ................................................................................. 14

*Dalton v. Specter*,
511 U.S. 462 (1994) ...................................................................... 22, 42, 43

*De Dandrade v. U.S. Dep't of Homeland Sec.*,
367 F. Supp. 3d 174 (S.D.N.Y. 2019) ..................................................... 22

*Dep't of Homeland Sec. v. New York*,
140 S. Ct. 599 (U.S. Jan. 27, 2020) (mem.) ...................................... 33, 49

*Doe v. Trump*,
Case No. 3:19-cv-1743-SI, 2019 WL 6324560 (D. Or. Nov. 26, 2019) ............... 11

*FCC v. Beach Commc'ns, Inc.*,
508 U.S. 307 (1993) ................................................................................. 46

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ................................................................................. 36

*FCC v. Nat'l Citizens Comm. for Broad.*,
436 U.S. 775 (1978) ................................................................................. 39

*Fiallo ex rel. Rodriguez v. Bell*,
430 U.S. 787 (1977) ................................................................................. 21

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .......................................................... 22, 42, 43, 47

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ................................................................................. 14

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) ...................................................................................... 49

*Herrera-Molina v. Holder*,
    597 F.3d 128 (2d Cir. 2010) ............................................................................ 30

*INS v. Jong Ha Wang*,
    450 U.S. 139 (1981) (per curiam) .................................................................... 34

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994) ......................................................................................... 13

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004) ......................................................................................... 20

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*,
    104 F.3d 1349 (D.C. Cir. 1997) ...................................................................... 45

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    134 S. Ct. 1377 (2014) ..................................................................................... 22

*Mahon v. Ticor Title Ins. Co.*,
    683 F.3d 59 (2d Cir. 2012) .............................................................................. 14

*Make the Road N.Y. v. Cuccinelli*,
    19 Civ. 7993 (GBD), 2019 WL 5484638 (S.D.N.Y. Oct. 11, 2019) ........... 1, 22, 23

*Maryland v. King*,
    567 U.S. 1301 (2012) (Roberts, C.J., in chambers) ....................................... 48

*Mathews v. Diaz*,
    426 U.S. 67 (1976) ........................................................................................... 46

*Matter of B——*,
    3 I. & N. Dec. 323 (B.I.A. 1948, Att'y Gen. 1948) ........................................ 36

*Matter of Harutunian*,
    14 I. & N. Dec. 583 (INS Reg'l Comm'r 1974) .............................................. 36

*Matter of Martinez-Lopez*,
    10 I. & N. Dec. 409 (B.I.A. 1962; Att'y Gen. 1964) ...................................... 36

*Matter of Perez*,
    15 I. & N. Dec. 136 (B.I.A. 1974) .................................................................. 36

*Mayor & City Council of Balt. v. Trump*,
    Civil Action No. ELH-18-3636, 2019 WL 4598011 (D. Md. Sept. 20, 2019)
    ............................................................................................................. 28, 31, 47

*Mejia-Ruiz v. INS*,
      51 F.3d 358 (2d Cir. 1995) ......................................................................... 25

*Miller v. Clinton*,
      687 F.3d 1332 (D.C. Cir. 2012) ................................................................ 25

*Mississippi v. Johnson*,
      71 U.S. (4 Wall.) 475 (1867)...................................................................... 47

*Mobile Relay Assocs. v. FCC*,
      457 F.3d 1 (D.C. Cir. 2006) ...................................................................... 30

*Morrison v. Nat'l Austl. Bank Ltd.*,
      561 U.S. 247 (2010)..................................................................................... 39

*Munaf v. Geren*,
      553 U.S. 674 (2008)..................................................................................... 14

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
      545 U.S. 967 (2005)..................................................................................... 36

*Nat'l Org. for Marriage, Inc. v. Walsh*,
      714 F.3d 682 (2d Cir. 2013) ............................................................... 14, 15

*Nat'l Petrochemical & Refiners Ass'n v. EPA*,
      630 F.3d 145 (D.C. Cir. 2010) .................................................................. 31

*New York v. U.S. Dep't of Homeland Sec.*,
      408 F. Supp. 3d 334 (S.D.N.Y. 2019) ........................................................ 1

*Nken v. Holder*,
      556 U.S. 418 (2009)..................................................................................... 48

*Norton v. S. Utah Wilderness All.*,
      542 U.S. 55 (2004)....................................................................................... 24

*NRDC v. Nat'l Hwy. Traffic Safety Admin.*,
      894 F.3d 114 (2d Cir. 2018) ...................................................................... 32

*NRDC, Inc. v. U.S. Dep't of the Interior*,
      397 F. Supp. 3d 430 (S.D.N.Y. 2019) ....................................................... 27

*Perez v. Mortg. Bankers Ass'n*,
      135 S. Ct. 1199 (2015)..................................................................... 24, 25, 27

*Pers. Adm'r v. Feeney*,
      442 U.S. 256 (1979)..................................................................................... 45

*Petry v. Block*,
  737 F.2d 1193 (D.C. Cir. 1984)............................................................... 32

*Right to Life of Dutchess Cty., Inc. v. FEC*,
  6 F. Supp. 2d 248 (S.D.N.Y. 1998) ......................................................... 50

*Rodriguez ex rel. Rodriguez v. DeBuono*,
  175 F.3d 227 (2d Cir. 1999) (per curiam) .............................................. 20

*Sale v. Haitian Ctrs. Council, Inc.*,
  509 U.S. 155 (1993).................................................................................. 40

*Sampson v. Murray*,
  415 U.S. 61 (1974).................................................................................... 13

*Scales v. INS*,
  232 F.3d 1159 (9th Cir. 2000) .................................................................. 25

*Schweiker v. Wilson*,
  450 U.S. 221 (1981).................................................................................. 45

*Se. Cmty. Coll. v. Davis*,
  442 U.S. 397 (1979).................................................................................. 40

*Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*,
  549 U.S. 422 (2007).................................................................................. 13

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009)......................................................... 17, 18, 19, 50

*Sweet v. Sheahan*,
  235 F.3d 80 (2d Cir. 2000) ................................................................ 27, 28

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).................................................................................. 13

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018)...................................................................... passim

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
  136 S. Ct. 1807 (2016).............................................................................. 23

*United States ex rel. Knauff v. Shaughnessy*,
  338 U.S. 537 (1950).................................................................................. 41

*United States v. Mead Corp.*,
  533 U.S. 218 (2001).................................................................................. 34

*United States v. Yuzary*,
    55 F.3d 47 (2d Cir. 1995) .................................................................................. 26, 43

*Va. Soc'y for Human Life, Inc. v. FEC*,
    263 F.3d 379 (4th Cir. 2001) ...................................................................................... 50

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ..................................................................................................... 45

*Warth v. Seldin*,
    422 U.S. 490 (1975) ................................................................................................ 14, 19

*White v. Shalala*,
    7 F.3d 296 (2d Cir. 1993) .................................................................... 24, 26, 27, 29

*Winter v. NRDC, Inc.*,
    555 U.S. 7 (2008) ................................................................................................ 12, 48, 50

*Zino Davidoff SA v. CVS Corp.*,
    571 F.3d 238 (2d Cir. 2009) ................................................................................... 35

**FEDERAL STATUTES**

6 U.S.C. § 202(4) ....................................................................................................... 3

6 U.S.C. § 236(b)(1) ......................................................................................... 3, 34, 37

Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706 ............................... passim

Immigration and Nationality Act (INA), Pub. L. No. 82-414, 66 Stat. 163 (1952)........ 1, 2

        8 U.S.C. § 1101(a) ............................................................................................. 3

        8 U.S.C. § 1181(a) ............................................................................................. 2

        8 U.S.C. § 1182 .............................................................................................. 40

            8 U.S.C. § 1182(a) ......................................................................... passim

            8 U.S.C. § 1182(f) ........................................................................... passim

        8 U.S.C. § 1185(a)(1).................................................................................. 10, 42

        8 U.S.C. § 1185(d) .......................................................................................... 3

        8 U.S.C. § 1201 ........................................................................................... 2, 3

        8 U.S.C. § 1202............................................................................................... 2

8 U.S.C. § 1225(a) .................................................................................... 3

8 U.S.C. § 1227(a)(5) .............................................................................. 36

8 U.S.C. § 1361 ......................................................................................... 3

Paperwork Reduction Act, 44 U.S.C. §§ 3501–3520 ................................... 9, 11

Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105 .......................................................................... 37

Rehabilitation Act of 1973, 29 U.S.C. § 794 ................................................ 39

## FEDERAL REGULATIONS

22 C.F.R. § 40.41 ............................................................................. passim

22 C.F.R. § 41.121(a) ................................................................................ 2

22 C.F.R. § 42.62 ..................................................................................... 2

22 C.F.R. § 42.71 ..................................................................................... 2

22 C.F.R. § 42.81(a) ................................................................................. 3

## OTHER AUTHORITIES

Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 Fed. Reg. 28,689 (May 26, 1999) ................................................................ 27

Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41,292 (Aug. 14, 2019) ............ 8

Notice of Information Collection Under OMB Emergency Review: Immigrant Health Insurance Coverage, 84 Fed. Reg. 58,199 (Oct. 30, 2019) .................................. 11

Proclamation No. 8342, 74 Fed. Reg. 4093 (Jan. 22, 2009) ............................... 41

Proclamation No. 9945, 84 Fed. Reg. 53,991 (Oct. 4, 2019) .................................. passim

S. Rep. No. 81-1515 (1950) ...................................................................... 34

U.S. Dep't of State, Foreign Affairs Manual (2018) ............................................ 1, 4, 5, 25

9 FAM § 101.1 ...................................................................................... 26

9 FAM § 302.8 ..................................................................................... passim

9 FAM § 302.8 (2017) ............................................................................. 6, 7

18 FAM § 201.1-1 .............................................................................................. 4, 5

U.S. Dep't of State, Update to 9 FAM 302.8 Public Charge—INA 212(A)(4) (Jan. 4, 2018) ..................................................................................................... 5

Visas: Ineligibility Based on Public Charge Grounds, 84 Fed. Reg. 54,996 (Oct. 11, 2019) ............................................................................................................... passim

## PRELIMINARY STATEMENT

In each of the three Federal Government actions challenged in this case, the President or the Secretary of State properly exercised authority delegated under the Immigration and Nationality Act (INA) to establish policies regulating the entry of foreign nationals into the United States. The plaintiffs object to the policy choices made by the President and the Secretary of State, but they do not allege the kind of imminent injury needed to establish a "case or controversy" appropriate for resolution by a court, and they do not raise any valid legal objections to the challenged policies. The plaintiffs' request for preliminary relief should be denied, and the action should be dismissed.

The January 2018 guidance published by the Department of State in its Foreign Affairs Manual[1] only clarifies how Department of State personnel will apply the "public charge" provision of the INA, 8 U.S.C. § 1182(a)(4), and has no legal effect of its own. Under the Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706, agency interpretive guidance of this kind is not subject to judicial review and does not require notice and comment.

The October 2019 final rule[2] in which the Department of State amended its regulation implementing the "public charge" provision is a lawful exercise of the Department of State's authority to administer the provisions of the INA. The Government recognizes that the validity of the Department of State rule turns on some of the same issues that the Court has decided against the Government in other pending cases concerning a parallel rule published by the Department of Homeland Security (DHS).[3] Nevertheless, the Government believes both agencies' rules are

---

[1] U.S. Dep't of State, Foreign Affairs Manual (2018) [*hereinafter* FAM], https://fam.state .gov/.

[2] Visas: Ineligibility Based on Public Charge Grounds, 84 Fed. Reg. 54,996 (Oct. 11, 2019) (to be codified at 22 C.F.R. § 40.41).

[3] *Make the Road N.Y. v. Cuccinelli*, 19 Civ. 7993 (GBD), 2019 WL 5484638 (S.D.N.Y. Oct. 11, 2019), *appeal docketed*, No. 19-3595 (2d Cir. Oct. 31, 2019); *New York v. U.S. Dep't of Homeland Sec.*, 408 F. Supp. 3d 334 (S.D.N.Y. 2019), *appeal docketed*, No. 19-3591 (2d Cir. Oct. 31, 2019).

valid, and the Supreme Court's recent ruling staying the preliminary injunctions entered in the other two cases provides especially strong reason for the Court to reconsider its earlier reasoning.

The President's October 2019 Proclamation concerning Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System, in Order to Protect the Availability of Healthcare Benefits for Americans, Proclamation No. 9945, 84 Fed. Reg. 53,991 (Oct. 4, 2019), is a valid exercise of authority expressly granted to the President under the INA to suspend entry of certain classes of foreign nationals, 8 U.S.C. § 1182(f). Under Supreme Court precedent, the Proclamation is not subject to judicial review.

The Court should deny preliminary relief and should dismiss this action.

## BACKGROUND

**I.      Statutory and regulatory background**

**A.      Applications for U.S. visas**

Under the Immigration and Nationality Act (INA), Pub. L. No. 82-414, 66 Stat. 163 (1952) (codified as amended in scattered sections of 8 U.S.C.), a person seeking to enter the United States who is not a U.S. citizen or lawful permanent resident generally must apply for and be issued a visa.[4] There are two main types of visas: immigrant visas, for persons seeking to reside in the United States permanently, and nonimmigrant visas, for temporary stays in the United States. *See* 8 U.S.C. § 1181(a); *id.* § 1182(a)(7).

A person seeking a visa of either type must complete an application and in most cases must schedule an in-person interview before a consular officer at a U.S. embassy or consulate. *See id.* § 1202(a), (e); 22 C.F.R. § 42.62. The consular officer then makes a determination to grant or deny the visa application. *See* 8 U.S.C. § 1201(a)(1); 22 C.F.R. §§ 41.121(a), 42.71,

---

[4] This Background section is intended to provide a broad overview of the visa application process and the applicable law as it pertains to this case, not to cover every possible circumstance contemplated under the applicable law and agency procedures. Some aspects of the visa application process entail details and exceptions not relevant to this case.

42.81(a). The applicant bears the burden to demonstrate "to the satisfaction of the consular officer" that he or she is eligible for the type of visa for which he or she is applying. 8 U.S.C. § 1361. No visa "shall be issued to an alien" if "it appears to the consular officer" from the application papers "that such alien is ineligible to receive a visa" or if "the consular officer knows or has reason to believe" that the alien is ineligible. *Id.* § 1201(g).

Although a visa normally is necessary for admission to the United States, it does not guarantee admission; a visa holder still must be found admissible upon inspection at a port of entry. *See id.* §§ 1201(h), 1185(d), 1225(a); *see also id.* § 1101(a)(4) (specifying that an application for a visa is distinct from an application for admission).

By statute, authority over "regulations with respect to" the provisions of the INA relating to "the processing of visa applications by consular officers" rests with the Secretary of Homeland Security, 6 U.S.C. § 236(b)(1); *see also id.* § 202(4), but the statute specifies that the Secretary of Homeland Security exercises this authority "through the Secretary of State," *id.* § 236(b)(1). The Secretary of Homeland Security also has delegated authority to the Secretary of State through a memorandum of understanding, as is authorized under 6 U.S.C. § 236(b)(2).

### B.    "Public charge" inadmissibility under the INA

Part of a consular officer's adjudication of a visa application entails examining whether the applicant is ineligible for a visa based on a statutory ground of inadmissibility. 8 U.S.C. § 1182(a). One such ground of inadmissibility, set out at 8 U.S.C. § 1182(a)(4), establishes that an applicant is inadmissible if the consular officer determines that the applicant is "likely . . . to become a public charge":

> **(4) Public charge**
>
> **(A) In general**
>
> Any alien who, in the opinion of the consular officer at the time of application for a visa . . . is likely at any time to become a public charge is

inadmissible.

. . .

*Id.* The statute specifies that, in determining whether an individual is likely to become a public charge, the consular officer must consider, "at a minimum," five factors: the applicant's (1) age; (2) health; (3) family status; (4) assets, resources, and financial status; and (5) education and skills. *Id.* § 1182(a)(4)(B)(i). The consular officer may also consider the "affidavit of support" provided by a required sponsor or sponsors who assume financial responsibility for an applicant for an immigrant visa in certain categories. *Id.* § 1182(a)(4)(B)(ii). The statute does not specify that any of these factors is determinative. The Department of State has published regulations implementing the public charge provisions at 22 C.F.R. § 40.41.

As explained above, the Secretary of State has authority to issue regulations implementing the provisions of the INA that relate to the granting or refusal of visas by consular officers. Accordingly, the Department of State may establish policies relating to the application of the public charge provision in the context of consular determinations. DHS and the Department of Justice may establish policies relating to the application of the public charge provision in other contexts, such as admission or adjustment of status (which are subject to DHS policy) or removal proceedings before immigration judges (which are subject to Department of Justice policy).

C.      **The Foreign Affairs Manual and the January 2018 revision to 9 FAM § 302.8-2**

The Department of State maintains a detailed manual intended for its personnel worldwide, the Foreign Affairs Manual (FAM). As explained within the FAM itself, the FAM "articulates official guidance, including procedures and policies, on matters relating to Department management and personnel." 18 FAM § 201.1-1(A), https://fam.state.gov/FAM /18FAM/18FAM020101.html. Together with the accompanying Foreign Affairs Handbook

4

Series, it provides "a single, comprehensive, and authoritative source . . . for organizational structures, policies, and procedures that govern the operations of the Department [of State], the Foreign Service, and, when applicable, other Foreign Affairs agencies," *id.* § 201.1-1(B)(b)(1), in the interest of making "information available to program management and operating offices so that they can carry out their responsibilities in accordance with statutory and Executive mandates," *id.* § 201.1-1(B)(a). Directives contained within the FAM "derive their authority from statutes, Executive orders, other legal authorities, and Presidential directives, such as OMB circulars, and Department policies," *id.* § 201.1-1(A)(a), but FAM directives do not purport to establish legal requirements in their own right.

Volume 9 of the FAM provides guidance to consular officers on the adjudication of visa applications. More specifically, 9 FAM § 302.8 provides guidance on how to apply the "public charge" provisions of the INA, 8 U.S.C. § 1182(a)(4), and the applicable regulation, 22 C.F.R. § 40.41. This FAM provision was revised in January 2018. *See* U.S. Dep't of State, Update to 9 FAM 302.8 Public Charge—INA 212(A)(4) (Jan. 4, 2018), https://travel.state.gov/content/dam /visas/policy_updates/18_STATE_942.pdf (cable announcing the revision to 9 FAM § 302.8). The last update to the FAM before the January 2018 revision was in August 2017.[5]

Both the January 2018 revised version and the previous version of 9 FAM § 302.8 explain that the ultimate inquiry for whether an applicant is likely to become a "public charge" is whether the applicant is likely to become "primarily dependent on the U.S. Government," including State or local government, "for subsistence," either through (a) "[r]eceipt of public cash assistance for income maintenance" or (b) "[i]nstitutionalization for long-term care at U.S.

---

[5] The current version of 9 FAM § 302.8 is available on the Department of State's Web site at https://fam.state.gov/FAM/09FAM/09FAM030208.html. It incorporates the January 2018 revisions as well as some later revisions not challenged in this case.

Government expense."[6] Both the January 2018 version and the previous version indicate that the consular officer must consider the five required factors identified in 8 U.S.C. § 1182(a)(4)(B)(i) (age; health; family status; assets, resources, and financial status; and education and skills), where applicable, may consider an affidavit of support, and must make an ultimate determination based on the "totality of the circumstances."[7]

The January 2018 revised version did change the instructions given to consular officers in some respects, in the interest of better aligning the guidance with the analysis required under the statute. For example, the January 2018 version explains that a consular officer may consider past receipt of certain noncash or supplemental public benefits such as the Supplemental Nutrition Assistance Program (SNAP), Medicaid, and the Children's Health Insurance Program (CHIP), "as part of the totality of the applicant's circumstances in determining whether an applicant is likely to become a public charge." 9 FAM § 302.8-2(B)(1)(d)(1) (2018). The former version had excluded consideration of "non-cash or supplemental assistance." 9 FAM § 302.8-2(B)(1)(c)(1) (2017). The January 2018 version further instructs that consular officers should consider such benefits "*only* . . . as part of the totality of . . . circumstances." 9 FAM § 302.8-2(B)(1)(d)(1) (2018) (emphasis added). Accordingly, past receipt of such benefits does not automatically warrant a determination that the applicant is likely to become a "public charge." And such benefits still do not count as "public cash assistance" for purposes of determining whether an individual is likely to become a public charge in the future. *Id.* (explaining that the identified forms of noncash public benefits "should not be considered to be benefits when examining the applicant under INA 212(a)(4) [8 U.S.C. § 1182(a)(4)], and may only be considered as part of the

---

[6] *Compare* 9 FAM § 302.8-2(B)(1)(a)(1) (2018) *with* 9 FAM § 302.8-2(B)(1)(a)(1) (2017). *See* 9 FAM 302.8-2(B)(1)(b)(3) (2017) (noting that "public cash assistance" includes "State and local cash assistance").

[7] *Compare* 9 FAM § 302.8-2(B)(1)(a)(2), (B)(2), (B)(3)(a) (2018) *with* 9 FAM § 302.8-2(B)(1)(a)(3), (B)(2)(a), (B)(3) (2017).

6

totality of the applicant's circumstances").

The January 2018 version also instructs consular officers that, as part of the analysis of an applicant's assets, resources, and financial status, receipt of public benefits by family members of an applicant is "relevant to determining whether the applicant is likely to become a public charge in the future," though it also emphasizes that "the determination must be made on the present circumstances." 9 FAM § 302.8-2(B)(2)(f)(1)(b)(i) (2018). The January 2018 version also notes that receipt of public benefits by a dependent family member of the applicant "is a heavily negative factor in the totality of circumstances unless the applicant can demonstrate that his or her prospective income and assets with the income and assets of the others in the family will be sufficient for the family to overcome the poverty income guideline for the family." *Id.* § 302.8-2(B)(2)(f)(2)(b)(ii). The earlier version of the FAM had instructed consular officers to consider "[p]ast or current receipt of cash benefits for income maintenance by a family member of the visa applicant . . . only when such benefits also constitute(d) the primary means of subsistence of the applicant." 9 FAM § 302.8-2(B)(3)(b)(1) (2017).

With respect to affidavits of support, the January 2018 revised version instructs that a properly filed affidavit, in a case where an affidavit is required, "is a positive factor," but still must be considered along with all other factors "in the totality of the circumstances." 9 FAM § 302.8-2(B)(2)(a)(3) (2018). The earlier version of the FAM instructed that such an affidavit "should normally be considered sufficient to meet the INA 212(a)(4) [8 U.S.C. § 1182(a)(4)] requirements and satisfy the 'totality of the circumstances' analysis," though it also noted that other factors could lead to a different result "in an unusual case." 9 FAM § 302.8-2(B)(3)(a)(2) (2017); *see also id.* § 302.8-2(B)(2)(c) (2017).

**D.      The October 2019 rule amending the public charge regulation, 22 C.F.R. § 40.41**

In October 2019, the Department of State published an interim final rule amending the

7

Department of State regulation governing the application of the "public charge" provision, 22 C.F.R. § 40.41. Visas: Ineligibility Based on Public Charge Grounds, 84 Fed. Reg. 54,996 (Oct. 11, 2019) (to be codified at 22 C.F.R. § 40.41).

The October 2019 rule adopts new standards for determining whether an applicant is likely to become a "public charge." The standards adopted by the Department of State largely mirror the standards adopted by DHS in the August 2019 rule governing public charge determinations within DHS's purview, Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41,292 (Aug. 14, 2019) (to be codified in scattered sections of 8 C.F.R.). The Department of State noted that a key factor behind its new rule was an interest in keeping its standards in alignment with the standards adopted by DHS, so as to prevent situations in which individuals are issued visas to travel to the United States by Department of State consular officers but then, upon their arrival in the United States, are denied admission by DHS officers. *See* 84 Fed. Reg. at 55,000. The Department of State made clear, however, that it was exercising its own authority under the public charge statute, and that some aspects of its rule deviated from the approach taken by DHS where the context of consular determinations warranted different treatment. *See id.* at 55,000–01.

The Department of State's October 2019 rule, like the DHS rule adopted in August 2019, makes a person inadmissible under the "public charge" provision if the person is found likely to "receive[] one or more public benefits for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months' worth of benefits)." *Id.* at 54,998. "Public benefits," for the purposes of the rule, includes various types of publicly funded cash assistance for income maintenance, as well as certain noncash public benefits, including Supplemental Nutrition Assistance Program benefits, Medicaid, and federal housing benefits. *See id.* at 54,999. The new rule differs in two major ways from the Department's earlier interpretation of the public charge statute, which was reflected in the

8

January 2018 guidance and earlier guidance: First, the October 2019 rule adopts a numeric threshold—likely receipt of more than 12 months' worth of benefits, in the aggregate, in a 36-month period—while the Department's earlier interpretation asked whether an applicant is likely to become "primarily dependent" on government support "for subsistence." 9 FAM § 302.8-2(B)(1)(a)(1). Second, the new rule expands the types of benefits to be considered in the analysis. Under the October 2019 rule, a consular officer evaluates whether the applicant is likely to receive either cash public benefits or certain types of noncash public benefits, while the Department's former interpretation called for consular officers to evaluate only whether the applicant was likely to receive "public *cash* assistance for income maintenance" or "[i]nstitutionalization for long-term care" at government expense. *Id.* (emphasis added).

The Department of State published the October 2019 rule as a final rule without prior notice and comment, relying on the "good cause" exception to the notice and comment requirements of the APA. The Department of State accepted comments for 30 days after publication.

The plaintiffs state that the October 2019 rule "would replace" the January 2018 FAM guidance but is not yet "in effect." Mem. of Law in Supp. of Pls.' Mot. for a Prelim. Inj. (Pls.' Mem.) 1, 11, ECF No. 44. Those characterizations misunderstand the relationship between the Department's regulations and the FAM. The Department's regulations establish rules with substantive legal effect. The FAM, however, is simply an agency manual that instructs the Department's personnel on how to comply with applicable statutes and regulations—in this case, 8 U.S.C. § 1182(a)(4) and 22 C.F.R. § 40.41. The provisions of the FAM do not have any legal effect of their own. The Department's October 2019 final rule was effective October 15, 2019, 84 Fed. Reg. at 54,996, and it became substantive law on that date. However, the Department has instructed consular officers not to apply the new rule until the Department has obtained approval under the Paperwork Reduction Act of 1995, 44 U.S.C. §§ 3501–3520, of a new questionnaire,

9

Form DS-5540, for use in implementing the October 2019 rule. The Department intends to issue new instructions to its consular officers when the form has been approved. Until the instructions are updated, consular officers have been applying the previously issued Foreign Affairs Manual guidance, including the January 2018 revisions and later revisions.

### E.    The President's authority to suspend entry under 8 U.S.C. § 1182(f)

The INA provides, under 8 U.S.C. § 1182(f):

(f) Suspension of entry or imposition of restrictions by President

> Whenever the President finds that the entry of . . . any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of . . . any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate. . . .

*Id.* The Supreme Court has held that this provision grants "the President broad discretion to suspend the entry of aliens into the United States." *Trump v. Hawaii*, 138 S. Ct. 2392, 2408 (2018). Complementary authority is provided under 8 U.S.C. § 1185(a)(1), which makes it unlawful "for any alien to . . . enter or attempt to . . . enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." *Id.*

### F.    The President's Proclamation No. 9945

On October 4, 2019, based on his authority under 8 U.S.C. §§ 1182(f) and 1185(a), the President issued Proclamation No. 9945, which aims to ensure that certain entering immigrants are prepared to cover the costs of their healthcare needs in the United States. The Proclamation suspended, subject to certain exceptions, entry into the United States of some types of immigrants "who will financially burden the United States healthcare system," meaning they fail to show either that they will be covered by approved health insurance, as set out in the Proclamation, within 30 days of entering the United States, or that they otherwise have "the

10

financial resources to pay for reasonably foreseeable medical costs." Proclamation § 1. The

President found that entry of these immigrants "who lack health insurance or the demonstrated

ability to pay for their healthcare" is detrimental to the United States because it increases the

burdens that uncompensated care imposes on healthcare providers and, ultimately, other

healthcare consumers and taxpayers. *See* Proclamation, 84 Fed. Reg. at 53,991.

The Proclamation is modest in application. It applies only to certain persons seeking

immigrant visas and does not apply to persons seeking to enter the United States on any type of

nonimmigrant visa, asylees, or refugees. It provides numerous exceptions, such as for

unaccompanied minors. And applicants need not show they will have approved insurance

coverage if they are in good health and consequently have no reasonably foreseeable medical

costs.

The Proclamation was effective November 3, 2019, but its implementation has been

suspended by a preliminary injunction issued by the District of Oregon in *Doe v. Trump*, Case

No. 3:19-cv-1743-SI, 2019 WL 6324560 (D. Or. Nov. 26, 2019), *appeal docketed*, No. 19-36020

(9th Cir. Dec. 4, 2019).

The plaintiffs misunderstand the nature of an October 30, 2019, notice published by the

Department of State in the Federal Register, Notice of Information Collection Under OMB

Emergency Review: Immigrant Health Insurance Coverage, 84 Fed. Reg. 58,199 (Oct. 30, 2019),

*discussed in* Pls.' Mem. 15. The Department of State did not publish that notice in connection

with any rulemaking action; it published the notice to comply with provisions of the Paperwork

Reduction Act of 1995, 44 U.S.C. §§ 3501–3520, that require an agency to publish a notice in the

Federal Register and obtain approval from the Office of Management and Budget when it seeks

to collect information from members of the public, *see id.* § 3507. The information collection

notice describes how the Department of State will collect information from visa applicants

needed to comply with the Proclamation, but the information collection notice does not itself

11

establish any legal standard or requirement.

## II.    Proceedings in this case

In this case, five immigrant advocacy and service organizations and five unidentified individual plaintiffs challenge the three actions discussed above: the January 2018 revisions to 9 FAM § 302.8, the October 2019 rule issued by the Department of State amending 22 C.F.R. § 40.41, and Proclamation No. 9945. The plaintiffs assert that the two Department of State actions, as well as action taken by the Department of State and the Department of Health and Human Services to implement the Proclamation, violate the requirements of the Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706. Compl. for Declaratory and Injunctive Relief ¶¶ 266–281, ECF No. 1. The plaintiffs further assert that the Proclamation exceeds the President's authority under the INA. Compl. ¶¶ 290–294. The plaintiffs also assert that the actions violate equal protection because they were rooted in animus toward nonwhite immigrants. Compl. ¶¶ 282–289. The plaintiffs seek declaratory and injunctive relief against the President, the Secretary of State and the Department of State, and the Secretary of Health and Human Services and the Department of Health and Human Services. Compl. at 109–10.

On January 21, 2020, the plaintiffs filed a motion requesting a preliminary injunction. Notice of Mot., ECF No. 43. The plaintiffs seek nationwide relief. Pls.' Mem. 49–50.

## ARGUMENT

## I.    Applicable legal standards

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008) "A plaintiff seeking a preliminary injunction must establish [(1)] that he is likely to succeed on the merits, [(2)] that he is likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in his favor, and [(4)] that an injunction is in the public interest." *Id.* at 20. The same standards apply to a request to stay

12

administrative action under § 705 of the APA, 5 U.S.C. § 705. *See Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court considers "the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The court accepts the factual allegations as true, but "bare assertions" and "conclusory" allegations are "not entitled to be assumed true." *Iqbal*, 556 U.S. at 678, 681. The complaint must allege facts that are "enough to raise a right to relief above the speculative level." *Bell Atl. Corp.*, 550 U.S. at 555. This requires factual allegations "plausibly suggesting," and "not merely consistent with," a valid claim for relief. *Id.* at 557. The court applies this standard both when analyzing whether the complaint meets the requirements of subject matter jurisdiction and when analyzing whether the complaint states a valid claim for relief. *See Carter v. HealthPort Techs. LLC*, 822 F.3d 47, 56 (2d Cir. 2016).

**II.   Because the plaintiffs cannot meet the jurisdictional requirements of standing and ripeness, preliminary relief should be denied, and this action should be dismissed.**

**A.   The jurisdictional requirements of standing and ripeness**

A plaintiff seeking to invoke the jurisdiction of a federal court bears the burden of establishing that the court's exercise of jurisdiction is within the bounds of the Constitution and is authorized by statute. *See Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377 (1994). A court must resolve all issues of subject matter jurisdiction before it proceeds to the merits of the plaintiff's claims. *See, e.g.*, *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007). If a court lacks subject matter jurisdiction over a claim, it may not issue preliminary relief related to that claim. *See Cave v. E. Meadow Union Free Sch. Dist.*, 514

13

F.3d 240, 251 (2d Cir. 2008). Moreover, a "difficult question of jurisdiction" makes it more difficult for the plaintiffs to show a likelihood of success on the merits. *Munaf v. Geren*, 553 U.S. 674, 690 (2008).

The jurisdictional requirement of "standing" is rooted in the constitutional separation of powers. It prevents courts from taking action to address matters better suited to legislative or executive action. *See Allen v. Wright*, 468 U.S. 737, 750 (1984). A plaintiff in federal court must show "such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975). Standing entails three elements:

> [A] plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). A plaintiff asserting more than one claim must show that it satisfies the requirements for standing with respect to each claim independently; establishing standing for one claim in the case does not excuse the plaintiff from having to establish standing for other claims. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 351–53 (2006). When a plaintiff asserts similar claims against multiple defendants, the plaintiff must meet the requirements of standing separately for each defendant. *See Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62–66 (2d Cir. 2012).

A plaintiff in federal court also must show that his claim is ripe. "To be justiciable, a cause of action must be ripe—it must present 'a real, substantial controversy, not a mere hypothetical question.' . . . A claim is not ripe if it depends upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013). Ripeness incorporates both a constitutional requirement

14

and a prudential requirement. The constitutional ripeness requirement overlaps with the "injury-in-fact" requirement of standing. *See id.* at 688–89. The prudential ripeness test calls for a court to "evaluate . . . the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 691.

### B. The plaintiffs lack standing to assert claims against the HHS defendants because they do not identify any present HHS actions that cause them injury.

The Department of Health and Human Services (HHS) and the Secretary of Health and Human Services should be dismissed from this action because the plaintiffs have not identified any action "fairly traceable" to HHS that has caused them any injury. HHS is not responsible for either the Proclamation or the two challenged actions of the Department of State. Accordingly, the plaintiffs cannot establish standing for claims against HHS.

The Proclamation does give the Secretary of Health and Human Services a role in identifying other health plans that provide adequate coverage for medical care, *see* Proclamation § 1(b)(ix), and in developing policy recommendations, *see* Proclamation § 4(a), (c). But the plaintiffs cannot challenge unspecified future action that has not yet been taken and has not caused the plaintiffs any injury. Standing and ripeness both require an "actual or imminent" injury.

The HHS defendants therefore should be dismissed as defendants. For similar reasons, the plaintiffs also cannot challenge future actions not yet taken by the Department of State or the President.

### C. The individual plaintiffs lack standing to challenge the Proclamation because none of them alleges that they or family members applying for visas have "reasonably foreseeable medical costs" they are not prepared to cover.

The individual plaintiffs lack standing to challenge the Proclamation because none of them alleges that they or their family members have "reasonably foreseeable medical costs" that

they are not prepared to cover. Applicants who are prepared to cover their reasonably foreseeable medical costs would not be denied visas under the Proclamation, regardless of whether they have health coverage or from what source. Thus, the plaintiffs will not be injured by the Proclamation.

Some of the plaintiffs claim to be affected by the challenged actions because they themselves intend to apply for visas; others, because family members intend to apply for visas. None of the individual plaintiffs alleges that the prospective visa applicant has reasonably foreseeable healthcare costs that they are not prepared to cover: Three of the plaintiffs allege that the applicant is "healthy" or "has never had any health problems." Compl. ¶¶ 43, 45, 47. A fourth plaintiff, Diana Doe, alleges that she "has typically paid out-of-pocket at neighborhood clinics to obtain health care" and states in an affidavit that that has "worked" for her. Compl. ¶ 48; Decl. of Andrew J. Ehrlich in Supp. of Pls.' Mot. for a Prelim. Inj. (Ehrlich Decl.) Ex. 16 ¶ 16, ECF No. 45. The fifth plaintiff, Eric Doe, does not describe his wife's health status but does not allude to any significant health problems (and he himself, as a U.S. citizen, would not be subject to the Proclamation). Compl. ¶ 49.

As explained above, if an applicant is healthy and therefore has minimal or no reasonably foreseeable medical costs, the person would not be denied entry under the Proclamation, regardless of whether or how the person has healthcare coverage. *See* Proclamation § 1(a). Because none of the plaintiffs faces more than a speculative prospect of suffering injury based on the Proclamation, they lack standing to challenge the Proclamation. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 415–18 (2013) (holding that the plaintiffs could not establish standing based on potential future injury that was not "certainly impending," and similarly also could not establish standing based on actions they took "in response to a speculative threat").

> **D.    The individual plaintiffs additionally lack standing in this action because they do not allege immediate plans to leave the country and apply for visas.**

The individual plaintiffs also lack standing because they allege that they or their family

16

members are currently in the United States, and they do not allege that they have any immediate plans to leave the country and apply for visas.

Each of the plaintiffs alleges that the prospective visa applicant is currently in the United States, has either obtained or is seeking approval for a waiver of inadmissibility for unlawful presence, and intends to leave the United States and apply for a visa. Compl. ¶¶ 44, 46–49. But the complaint does not specify when any of the prospective visa applicants plan to leave the United States, nor does it even generally specify that it will be in the near future.

"'[S]ome day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of . . . 'actual or imminent' injury . . . ." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). Even assuming the prospective visa applicants will someday follow through on their plans to leave the country and apply for visas, their individual circumstances may be entirely different by that time, including in ways that affect the potential application of the challenged policies. Or the challenged policies themselves may have changed by that time. Because there is no "certainly impending" collision between the plaintiffs' interests and the challenged policies, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013), there is no concrete "case or controversy" within the meaning of Article III, and the plaintiffs cannot establish subject matter jurisdiction.

For similar reasons, the plaintiffs also cannot establish injury in connection with their present decisions about whether to obtain public benefits. The challenged policies do not directly bar the plaintiffs from obtaining public benefits; rather, the plaintiffs allege that they intend to forgo receipt of public benefits because they fear it might affect later visa applications. But because there is no "certainly impending" injury, *Clapper*, 568 U.S. at 409, precautionary steps taken by the plaintiffs to avoid injury do not establish standing. *See id.* at 416 ("[R]espondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."); *id.* at 418 ("[A]llegations of a

17

subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." (quoting *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972))).

> **E.**     **The five organizational plaintiffs lack standing in this suit, because they have not suffered any concrete injury attributable to any of the challenged actions.**

The organizational plaintiffs also cannot establish standing to challenge any of the actions at issue in this case.

The organizational plaintiffs assert that they are injured by the challenged actions because they assist immigrants and their families and have spent time and resources educating and advising immigrants and their families about the challenged actions. *See* Compl. ¶¶ 21, 23, 24, 26–30, 33, 34–35, 37–38, 41–42; Pls.' Mem. 38–39. But that is not a sufficient basis for standing. Injuries of this kind can support standing when the challenged actions impede the plaintiffs' "ability to carry out" their "core activities," or require them to provide entirely new services they did not provide before. *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109–11 (2d Cir. 2017). But in this case, the plaintiffs have alleged only that they have had to make changes to the education and advice they previously provided to immigrants and their families. A need to make changes to services the plaintiffs were already providing is not a valid basis for standing—if it were, any lawyer would have standing to challenge the validity of any law that affects advice he provides to his clients.

Some of the organizational plaintiffs further contend that they were injured because they were denied an adequate opportunity to comment on the Department of State actions. Compl. ¶¶ 22, 25, 36, 40. But procedural injuries of this kind cannot support standing unless they are linked to some concrete personal injury. *See Summers*, 555 U.S. at 496–97. As discussed above, none of the organizational plaintiffs has identified any such injury.

Plaintiff CARECEN–NY further asserts that it may be injured by the challenged actions if fewer immigrant visas are issued and a decline in the immigrant population shifts demand for

CARECEN–NY's fee-based services. Compl. ¶ 32; Pls.' Mem. 39 n.27. That is not an adequate basis for standing because it relies on speculative assumptions about how the challenged actions will affect demand for its services. Moreover, those assumptions are at odds with CARECEN–NY's suggestion that the challenged actions will increase CARECEN–NY's work load, Compl. ¶¶ 30, 33.

Plaintiff Make the Road New York alleges that it is a membership association. A membership association can sometimes establish standing based on injuries to its members, but only if it identifies at least one member that has suffered an injury. *Summers*, 555 U.S. at 497–99. Make the Road New York has not identified any member who has been injured by the challenged actions.

The organizational plaintiffs also cannot bring claims based on supposed violations of their clients' constitutional rights, rather than their own rights. A plaintiff in federal court ordinarily "must assert his own legal rights and interests." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). An exception to the rule, "jus tertii," sometimes permits a plaintiff to assert the constitutional rights of third parties with whom it has a special relationship and who are impeded from bringing suit themselves. *See generally Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989). This principle does not establish standing in this case. A plaintiff seeking to rely on jus tertii must show an injury to itself—jus tertii allows a plaintiff to rely on the *rights* of other persons, but not the *injuries* of other persons. *See id.* (explaining that when an "entity seeks standing to advance the constitutional rights of others," the first question is whether the litigant has "suffered some injury-in-fact, adequate to satisfy Article III's case-or-controversy requirement"). As explained above, the organizational plaintiffs have not shown that they are injured by the challenged actions. The plaintiff organizations also do not meet the other jus tertii requirements. The plaintiff organizations do not have a special relationship with unidentified clients, and the participation of the five individual plaintiffs in this action shows that immigrants

19

are not impeded from bringing suit themselves. *See Kowalski v. Tesmer*, 543 U.S. 125, 130–34 (2004) (holding that attorneys could not rely on the rights of indigent criminal defendants because the attorneys did not show they had a sufficiently close relationship with hypothetical future clients or that those clients were hindered in protecting their own rights).

> **F.**     **The reasons that undermine the plaintiffs' claims of immediate injury also undermine their claims of irreparable harm.**

The plaintiffs' failure to point to any immediate harm they have suffered from the challenged actions not only prevents them from meeting the requirements of standing but also prevents them from showing the irreparable harm needed to justify a preliminary injunction.

The plaintiffs have not asserted that they or their family members plan to either apply for visas or receive public benefits at any time before the final resolution of this case. Accordingly, even if the plaintiffs' claimed injuries were sufficient to establish standing, preliminary relief is not necessary to prevent any irreparable harm while the litigation proceeds. The plaintiffs would be fully served by a ruling in their favor on final judgment, and they will not suffer any additional harm if they must wait for final judgment. *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 235 (2d Cir. 1999) (per curiam) ("[T]he harm must be so imminent as to be irreparable if a court waits until the end of trial to resolve the harm.").

Similarly, the organizational plaintiffs have not suggested that, if preliminary relief is granted, they will cease educating and advising immigrants about the challenged actions during the litigation. Even if those plaintiffs' claimed injuries are sufficient to support standing, preliminary relief would not actually abate those supposed injuries during the litigation. *A.X.M.S. Corp. v. Friedman*, 948 F. Supp. 2d 319, 336 (S.D.N.Y. 2013) ("[T]he Court should not grant the injunction if it would not . . . prevent [the asserted] injury.").

Because none of the plaintiffs has shown that preliminary relief is needed to prevent irreparable harm while the case is before the Court, preliminary relief should be denied.

**III.     The plaintiffs' claims are legally invalid, and so they cannot demonstrate a likelihood of success on the merits, and the complaint should be dismissed.**

**A.       The claims challenging the Department of State actions fail to state a claim for relief under the Administrative Procedure Act.**

1.     *The plaintiffs cannot rely on the APA because policies relating to admission and exclusion of aliens are subject to statutory review only when affirmatively authorized by Congress.*

The plaintiffs cannot challenge the Department of State actions under the Administrative Procedure Act because the separation of powers bars statutory challenges to policy decisions relating to the admission and exclusion of aliens except in situations where Congress has affirmatively authorized review.

The APA does not authorize judicial review when judicial review is precluded by statute or agency action is committed to agency discretion by law. *See* 5 U.S.C. § 701(a). These principles bar judicial review in this case because the Supreme Court "ha[s] long recognized the power to . . . exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo ex rel. Rodriguez v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953)). "The conditions of entry for every alien, the particular classes of aliens that shall be denied entry altogether, the basis for determining such classification, the right to terminate hospitality to aliens, [and] the grounds on which such determination shall be based" are "wholly outside the power of [the courts] to control." *Id.* at 796 (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 596–97 (1952) (Frankfurter, J., concurring))). Thus, there is no basis for statutory review of the challenged Department of State actions under the APA.[8]

---

[8] The Supreme Court in *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), did not rule on whether the separation of powers barred statutory claims relating to exclusion of foreign nationals. *See id.* at 2407. The Court rejected the plaintiffs' statutory claims on the merits, which made it unnecessary to decide whether the claims were otherwise barred. *See id.* at 2407, 2415.

The defendants note that they do not contend that this principle bars *constitutional* claims, though the plaintiffs' constitutional challenges are invalid for other reasons.

21

2.    *The APA does not authorize claims against the President.*

Any claims under the APA directed at the President should be dismissed for failure to state a claim. The Supreme Court has made clear that the President is not an "agency" under the APA and therefore cannot be sued under the APA. *Dalton v. Specter*, 511 U.S. 462, 468–70 (1994); *Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992).

3.    *The organizational plaintiffs cannot seek relief under the APA because they are not within the zone of interests arguably protected by the pertinent provisions of the INA.*

The organizational plaintiffs cannot challenge the actions at issue under the APA because they are not within the "zone of interests" arguably protected by the pertinent provisions of the INA. The claims of the organizational plaintiffs accordingly should be dismissed.

Judicial review under the APA "extends only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388 (2014). To identify the interests protected by a statute, the court employs "traditional tools of statutory interpretation." *Id.* at 1387. The analysis focuses not on the purpose of the statute as a whole but on the "particular provision of law upon which the plaintiff relies." *Bennett v. Spear*, 520 U.S. 154, 175–76 (1997).

The organizational plaintiffs cannot meet the zone of interests test because there is no indication that the provision of the INA at issue here—8 U.S.C. § 1182(a)(4)—reflects any concern for the interests of immigrant service and advocacy organizations. *See De Dandrade v. U.S. Dep't of Homeland Sec.*, 367 F. Supp. 3d 174, 187–90 (S.D.N.Y. 2019) (holding that advocacy organizations did not fall within the zone of interests of the pertinent provisions of the INA), *argued*, No. 19-1002 (2d Cir. Dec. 6, 2019).

This Court's October 2019 ruling in *Make the Road New York v. Cuccinelli*, 19 Civ. 7993 (GBD), 2019 WL 5484638 (S.D.N.Y. Oct. 11, 2019), found that the plaintiff organizations met

22

the zone of interests test because it concluded they were "injured" by the challenged actions, *see id.* at *6, but the defendants respectfully disagree with that conclusion. First, as explained above, the injuries described by the organizational plaintiffs do not qualify as the kind of imminent injury needed to establish standing. Second, injury alone is not enough by itself to satisfy the zone of interests test; a plaintiff must show that he is injured in a way that falls within the zone of interests arguably protected by the provisions of law at issue. While courts have held that economic injuries fall within the zones of interests of statutes other than the INA, *see id.*, the pertinent issue in this case is whether the particular provisions of the INA at issue in this case were designed to take account of the economic interests of immigrant advocacy and service organizations. There is no evidence of such an intent in the provisions at issue.

4.    *The APA does not permit claims challenging future agency action.*

The plaintiffs cannot challenge future action not yet completed by the Department of Health and Human Services defendants or the Department of State defendants, because judicial review under the APA is limited to "final agency action." 5 U.S.C. § 704.

As noted in section II.B above, the jurisdictional requirements of standing and ripeness bar any challenge to unspecified future action by either the HHS defendants or the Department of State defendants. Such a challenge also fails to state a valid claim for relief. The APA limits judicial review to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704; *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016). "[T]wo conditions . . . generally must be satisfied for agency action to be 'final' under the APA. 'First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *Hawkes Co.*, 136 S. Ct. at 1813 (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). A challenge under

23

the APA also must be directed at a discrete, identifiable agency action the agency has taken or failed to take. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62–64 (2004). The APA does not permit a "broad programmatic attack" on a general course of conduct. *Id.* at 64.

These requirements preclude the plaintiffs from seeking relief against future action the agency defendants might take to apply or implement one of the three challenged actions. Actions not yet completed do not meet either of the requirements for final agency action, and the APA does not permit judicial review of an overall program.

> 5.    *The January 2018 guidance is not subject to judicial review and did not require notice and comment because it consists of interpretive rules with no legal effect.*

The January 2018 guidance published in the Foreign Affairs Manual does not have any legal effect of its own; it only instructs Department of State personnel on how to apply the governing statute and regulations. Because the guidance does not have any independent legal effect, it does not qualify as "final agency action," 5 U.S.C. § 704, and therefore is not reviewable under the APA. For the same reason, it also is not subject to the notice and comment requirements of the APA.

The Supreme Court and the Second Circuit recognize two types of agency rules: "legislative" or "substantive" rules that shift legal rights and duties, and "interpretive" or "interpretative" rules that merely clarify or explain the operation of existing rules. *See, e.g.*, *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203–04 (2015); *White v. Shalala*, 7 F.3d 296, 303 (2d Cir. 1993). Interpretive rules, because they do not determine rights or obligations, generally do not qualify as final agency action and therefore are not subject to judicial review under the APA. *See Am. Tort Reform Ass'n v. Occupational Safety & Health Admin.*, 738 F.3d 387, 395 (D.C. Cir. 2013) (recognizing that "interpretative rules or statements of policy generally do not qualify" as final agency action and are not subject to judicial review under the APA

24

"because they are not finally determinative of . . . issues or rights"). Interpretive rules also are exempt from the provisions of the APA that require an agency to provide notice and an opportunity for comment before issuing a legislative rule. *See* 5 U.S.C. § 553(b)(3)(A) (specifying that notice and comment requirements are inapplicable to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice"); *Mortg. Bankers Ass'n*, 135 S. Ct. at 1206.

"An agency's characterization of a rule is the starting point for an analysis of its status as legislative or interpretive." *Mejia-Ruiz v. INS*, 51 F.3d 358, 365 (2d Cir. 1995). In this case, the Department of State published the guidance in a form that does not carry legal force, and it intended the guidance only to clarify the agency's interpretation of the applicable statutes and regulations. As explained in the Background section above, *see supra* pp. 4–5, the FAM is an agency manual whose purpose is to instruct Department of State personnel on Department policies and procedures. The FAM provides guidance to Department personnel on how to comply with legal requirements imposed by statutes and regulations, but the FAM does not purport to carry any legal force of its own. The Ninth Circuit and the D.C. Circuit have each treated FAM directives as not carrying "force of law." *See Scales v. INS*, 232 F.3d 1159, 1166 (9th Cir. 2000) (holding that a statement in the FAM interpreting a federal statute lacked "force of law"); *Miller v. Clinton*, 687 F.3d 1332, 1341 (D.C. Cir. 2012) (describing the Foreign Affairs Manual as a "more informal document[]" in contrast to "rules or regulations" carrying "force of law"). And the Supreme Court has observed that "agency manuals" like the FAM generally "lack the force of law." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000), *cited in Scales*, 232 F.3d at 1166.

Volume 9 of the FAM is no different from the rest of the FAM in this regard. The introductory sections to 9 FAM explain that the volume provides "directives and guidance for Department of State personnel based on statutes, regulations, Executive Orders, Presidential

25

directives, OMB circulars and other sources," with the intent of "providing consular officers with the guidance needed to make informed decisions based on U.S. immigration law and regulations." 9 FAM § 101.1-1, https://fam.state.gov/FAM/09FAM/09FAM010101.html. One of these introductory sections, titled "9 FAM: Relationship to Statutes and Regulations," explains that the applicable legal rules are supplied by the INA, other federal statutes, and regulations published in Title 22 of the Code of Federal Regulations. *Id.* § 101.1-2. The provisions of 9 FAM merely draw on those statutes and regulations and do not establish legal rules in their own right. They "provide[] additional guidance outlining specific policies and procedural information regarding the issuance of visas." *Id.* § 101.1-2(b); *see also* 9 FAM § 302.8-1 (identifying the legal authorities applicable to "public charge" determinations).

Agency guidance can qualify as interpretive even if it draws sharper lines than are drawn by the governing statute or regulation. In *United States v. Yuzary*, 55 F.3d 47 (2d Cir. 1995), for example, the applicable statute and regulation required persons carrying more than $10,000 into or out of the country to make reports. The governing statute and regulation did not explicitly require travelers to report the amount of currency they were carrying, but the Department of the Treasury adopted a reporting form that called for the amount. *See id.* at 49. A person convicted of violating the reporting requirement argued that the form was invalid because it had been adopted without notice and comment, but the Second Circuit found the form was a valid interpretive rule not subject to notice and comment. *See id.* at 53. The court reasoned that the governing regulation was "at worst, ambiguous with respect to the requirement that amounts be reported, and it is the proper function of interpretative rules to clarify ambiguities." *Id.* at 51.

Agency guidance can qualify as interpretive even if its application has significant practical consequences. In *Yuzary*, for example, the contents of the form made the difference in criminal liability. And in *White v. Shalala*, 7 F.3d 296, the agency's interpretation addressed the types of benefits that would be counted as income for purposes of calculating Supplemental

Security Income benefits. *See id.* at 299. Still, the Second Circuit in both cases found the agency's action was interpretive, not legislative. *See White*, 7 F.3d at 303 ("[I]nterpretive rules may have substantive effects . . . ."). Similarly, in *NRDC, Inc. v. U.S. Department of the Interior*, 397 F. Supp. 3d 430 (S.D.N.Y. 2019), the Court found that an agency memorandum was "quintessentially interpretive" even though it could significantly affect how agency personnel enforced the statute and effectively "'insulate[]' private actors from . . . liability." *Id.* at 452–53.

*White* also makes clear that guidance setting forth an agency's interpretation of a statute may qualify as interpretive even if it reflects a change from past agency policy. *See White*, 7 F.3d at 304; *accord NRDC, Inc.*, 397 F. Supp. 3d at 453. And later Supreme Court precedent has established even more clearly that an interpretive rule may depart from a previously adopted interpretation. *See Mortg. Bankers Ass'n*, 135 S. Ct. at 1206 (holding that an agency may issue an interpretive rule revising an earlier interpretive rule without following the notice and comment procedures required for legislative rules).

The January 2018 guidance has no effect on any legal rights or obligations and does not "effectively amend[] a prior legislative rule," *Sweet v. Sheahan*, 235 F.3d 80, 91 (2d Cir. 2000). The guidance does not mandate that any applicant be denied a visa on "public charge" grounds because the applicant or a family member has received public benefits, or for any other reason. Instead, it only provides for receipt of public benefits to be considered as part of a broad analysis. In every case, the ultimate weighing of relevant factors, and the ultimate determination of whether the applicant is likely to become a public charge, is made by the consular officer based on the "totality of the circumstances," just as it was under the prior FAM guidance. Furthermore, the January 2018 guidance did not replace a prior legislative rule—the Department's prior guidance was not issued through notice-and-comment rulemaking, and the Department had consistently characterized and understood it as interpretive guidance without independent legal effect. The same is true of the 1999 interim field guidance issued by the

27

Immigration and Naturalization Service, Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 Fed. Reg. 28,689 (May 26, 1999).

*Sweet v. Sheahan*, 235 F.3d 80, does not support treating the January 2018 guidance as legislative. The Second Circuit's conclusion that the rule in *Sweet* was legislative relied on key factors that are not present in this case: the agency explicitly invoked its authority to promulgate regulations, it engaged in notice-and-comment rulemaking, and it published the resulting rule in the Code of Federal Regulations. *See id.* at 91–93 & n.8. None of those occurred in this case, and the Department of State has consistently treated the guidance (as well as the prior guidance) as interpretive.

The plaintiffs argue, citing the ruling of the District of Maryland in *Mayor & City Council of Baltimore v. Trump*, Civil Action No. ELH-18-3636, 2019 WL 4598011 (D. Md. Sept. 20, 2019), that the guidance should be considered legislative because it eliminated a "safe harbor once extended to the receipt of non-cash benefits." Pls.' Mem. 21–22. But there was never any safe harbor accorded to visa applicants who accepted noncash benefits. Such applicants were always at risk of being determined likely to be public charges based on factors other than receipt of noncash benefits, including the very same financial conditions that led them to qualify for benefits or accept the benefits. Moreover, under the January 2018 FAM guidance, past acceptance of noncash benefits does not itself trigger a determination that a visa applicant is likely to become a public charge. The January 2018 FAM guidance employs exactly the same standard as the prior guidance, directing a consular officer to make a predictive judgment based on the totality of the applicant's circumstances, not based on any single factor.

The fact that, in October 2019, the Department of State issued a new legislative rule concerning the same subject matter does not transform the Department's earlier interpretive guidance into a legislative rule. Interpretive guidance and legislative rulemaking are simply different policy tools. An agency cannot issue an interpretive rule that conflicts with a prior

28

legislative rule, but nothing prevents an agency from issuing a legislative rule to govern a subject that was previously addressed by interpretive guidance. *See, e.g.*, *White*, 7 F.3d at 304 (concluding that the rule in question was interpretive, but noting that the Secretary had announced plans to codify the rule in a regulation adopted with notice and comment). Indeed, the policies the plaintiffs favor—the policies reflected in the FAM guidance before the January 2018 revisions—were never codified in any regulation or legislative rule; they were set forth only in interpretive rules that explained how the Department understood and applied the requirements of 8 U.S.C. § 1182(a)(4) and 22 C.F.R. § 40.41.

6.       *The January 2018 guidance comports with the INA.*

The January 2018 guidance also comports with the terms of the INA.

The plaintiffs assert that the FAM guidance violates the INA because it identifies past receipt of public assistance by other household members as one factor potentially relevant to whether a person is likely to become a public charge. Pls.' Mem. 18. But nothing in the INA precludes consideration of family members' past receipt of benefits as one of many factors that can be considered as part of the totality of circumstances. The statute does not limit the factors that may be considered; it only identifies certain factors that must be considered "at a minimum." 8 U.S.C. § 1182(a)(4)(B)(i). Moreover, those mandatory factors include "family status" and "assets, resources, and financial status," which suggests it is entirely appropriate to consider information concerning other household members. *Id.* § 1182(a)(4)(B)(i)(III)–(IV).

7.       *The January 2018 guidance does not have impermissible retroactive effect.*

The January 2018 guidance also does not have impermissible retroactive effect. The guidance does not attach new legal consequences to past events; rather, it allows for consideration of past events as a factor in visa determinations to be made in the future. That is not the kind of retroactive effect that is prohibited under the APA.

29

As explained above, the guidance does not have legal force of its own; it only instructs Department of State personnel on how to apply the legal requirements imposed by the governing statutes and regulations. Thus, the guidance has no legal effect at all, retroactive or otherwise. But even if the guidance could be viewed as establishing a new legislative rule, it would not have impermissible retroactive effect.

An administrative agency generally may not issue rules with retroactive effect unless specifically authorized by statute. An agency therefore generally cannot issue a rule that "alter[s] the *past* legal consequences of past actions." *Celtronix Telemetry, Inc., v. FCC*, 272 F.3d 585, 588 (D.C. Cir. 2001) (alteration in original) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 219 (1988) (Scalia, J., concurring)). But a rule that alters the "*future* effect" of past actions is not considered retroactive. *Id.*; *accord Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 10–11 (D.C. Cir. 2006). For example, in *Boniface v. U.S. Department of Homeland Security*, 613 F.3d 282 (D.C. Cir. 2010), the D.C. Circuit considered a regulation that called for consideration of past criminal convictions as part of a determination of whether a driver should be licensed to transport hazardous materials. The court held that even though the regulation drew on events predating the regulation, the regulation was not impermissibly retroactive. *See id.* at 288. The court noted that, under the regulation, a past conviction did not automatically disqualify a driver from obtaining a hazardous-materials endorsement; instead, it only created a rebuttable presumption that the driver posed an unacceptable risk. *Id.*; *see also Herrera-Molina v. Holder,* 597 F.3d 128, 137–38 (2d Cir. 2010) (holding that a statute was not impermissibly retroactive as applied to the petitioner's application for adjustment of status because, even though the petitioner married before the statute became effective, the petitioner had filed his application after the statute became effective).

Similarly, in this case, the challenged guidance does not attach direct legal consequences to a visa applicant's past receipt of social services; instead, it calls for consideration of past

30

receipt of social services as part of a broader analysis of whether a visa applicant is likely to become a public charge. The FAM guidance is not impermissibly retroactive.

The court in *Mayor & City Council of Baltimore v. Trump*, Civil Action No. ELH-18-3636, 2019 WL 4598011 (D. Md. Sept. 30, 2019), observed that a rule that calls for consideration of past events, without according direct legal effect to those past events, is sometimes considered "secondarily retroactive." *Id.* at *30. But "secondary retroactivity" is not prohibited under the APA; a "secondarily retroactive" rule is "invalid only if arbitrary and capricious." *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145, 159 (D.C. Cir. 2010). In the context of the January 2018 FAM guidance, it is reasonable to identify past receipt of public benefits as one among many factors to be considered in a broad analysis of whether a person is likely to become a public charge.

8.      *The October 2019 rule fell within the good cause exception to the notice and comment requirements of the APA.*

The Department of State was not required to provide for notice and comment before issuing the October 2019 rule because the Department properly invoked the good cause exception to the notice and comment requirements of the APA.

The APA generally requires an agency to provide for notice and public comment before issuing a legislative rule, and requires publication of the rule at least 30 days before its effective date. 5 U.S.C. § 553(b), (d). But prior notice and comment are not required "when the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." *Id.* § 553(b)(B); *see also id.* § 553(d)(3). The Department of State invoked this exception for the October 2019 rule, explaining that it was necessary to put the rule in place immediately given the impending effective date of the August 2019 rule issued by DHS, which was set to take effect October 15, 2019. 84 Fed. Reg. at 55,011. The Department of State stressed that it was "critical" to promptly align the standards applied by Department of State

31

consular officers with the standards applied by U.S. Customs and Border Protection officers at the U.S. border, to prevent situations in which "visa holders arrive at a port of entry and are found inadmissible under the new DHS public charge standards." *Id.*

The plaintiffs, relying on *NRDC v. National Highway Traffic Safety Administration*, 894 F.3d 114 (2d Cir. 2018), argue that the Department of State cannot invoke the good cause exception because the Department is to blame for failing to take action farther in advance of the effective date of the DHS rule. *See* Pls.' Mem. 24–25. *NRDC* is not applicable because, in this case, the Department of State action was made necessary by action taken by a different agency, outside the control of the Department of State. The DHS rule was published August 14, 2019, with an effective date of October 15, 2019, which left the Department of State only two months to align its standards with the standards newly adopted by DHS. *See Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984) (holding that the agency properly invoked the good cause exception based on the "truncated timeframe" after enactment of the statute that made the regulations necessary).

The plaintiffs also argue that Department of State's rationale is at odds with the Department of State's decision in January 2018 to revise the public charge guidance provided in the Foreign Affairs Manual when DHS was still operating under 1999 interim field guidance published by the INS. *See* Pls.' Mem. 24–25. But the January 2018 FAM revisions were not markedly different from either the earlier Department of State guidance or the 1999 interim field guidance issued by the INS. The January 2018 FAM revisions changed some aspects of the instructions issued to consular officers, but it instructed consular officers to employ the same overall standard for public charge determinations—whether, considering the totality of the circumstances, the applicant was likely to become "primarily dependent" on government support "for subsistence," either through "[r]eceipt of public cash assistance for income maintenance" or "[i]nstitutionalization for long-term care at U.S. Government expense." 9 FAM

§ 302.8-2(B)(1)(a)(1). And as the plaintiffs themselves contend, the predictable effect of the January 2018 FAM revision, if any, was that it would increase the frequency of visa denials. That would not create the same problem of persons being issued visas to travel to the United States and then being denied admission at the border.

The August 2019 DHS public charge rule, however, adopted standards that were markedly different from both agencies' prior policies and that could lead to more individuals being denied admission at the border. The disparity in standards could cause problems of the kind the Department of State described.

9.    *The October 2019 rule comports with the INA and reflects reasonable policy choices.*

The October 2019 rule largely tracks the parallel rule adopted by DHS, including, notably, its adoption of a standard defining "public charge" as meaning receipt of public benefits for more than 12 months within a span of 36 months. The Court concluded earlier that that standard is incompatible with the INA, and the Government acknowledges that, if that reasoning were correct, the Department of State's October 2019 rule would be unlawful for the same reason. Nevertheless, the Government respectfully disagrees with the Court's conclusion and still maintains that the standards employed in both agencies' rules are proper and reasonable interpretations of the INA. The Supreme Court's recent order staying the injunctions entered by this Court, *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600–01 (2020) (mem.), provides especially strong reason to reconsider the earlier analysis.

The plaintiffs argue that the statutory term "public charge" is limited to individuals who are institutionalized or primarily dependent on government support, Pls.' Mem. 4, and cannot be interpreted to apply to more limited receipt of public benefits. But nothing in the terms of the statute limits the definition of "public charge" in that way, or prevents the Department of State from implementing the statute in a way that allows a "public charge" finding based on

33

anticipated receipt of a threshold amount of public benefits.

Congress left the definition of the term "public charge" to the Executive Branch agencies administering the INA. Congress did not specify a precise definition of the term, and it authorized the Secretary to issue regulations implementing the statute with respect to visa determinations, thus granting the Secretary authority to define terms in the statute. *See* 6 U.S.C. § 236(b)(1) (granting authority to the Secretary of Homeland Security, acting through the Secretary of State); *United States v. Mead Corp.*, 533 U.S. 218, 229–30 (2001) (noting that a grant of rulemaking authority usually indicates a delegation of authority to interpret a statute); *Chevron U.S.A. Inc. v. NRDC, Inc.*, 467 U.S. 837, 844 (1984); *INS v. Jong Ha Wang*, 450 U.S. 139, 144 (1981) (per curiam). The legislative history of the INA confirms that Congress intentionally left it to administrative agencies to define the term "public charge." *See, e.g.*, S. Rep. No. 81-1515, at 349 (1950) (stating that "[a]s there is no definition of the term 'likely to become a public charge' in the statutes, its meaning has been left to the interpretation of the administrative officials and the courts," and recommending that "there should be no attempt to define the term in the law," and instead the term should be defined through administrative action), *reproduced in* Ehrlich Decl. Ex. 30. Thus, "there is room for discretion as to what, precisely, being a 'public charge' encompasses. In a word, the phrase is 'ambiguous' under *Chevron*; it is capable of a range of meanings." *City & County of San Francisco v. U.S. Citizenship & Immig. Servs.*, 944 F.3d 773, 792 (9th Cir. 2019).

The plaintiffs point to a number of instances in the past when Congress considered, but did not adopt, proposals to modify the public charge provisions of the INA, *see* Pls.' Mem. 5–8 & nn.4, 6, 8, and they argue that the statute therefore requires a narrow definition of "public charge." But this line of argument fundamentally misconceives how laws are made. Congress makes law only when both Houses of Congress pass a bill and then either the bill is signed by the President, or Congress overrides the President's veto. When Congress considers a legislative

proposal, but the proposal is then abandoned by one House of Congress—or even when a proposal is voted down—that does not make new law, nor does it change the meaning of existing law. It certainly does not enshrine the opposite of the discarded proposal in the law. *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994) ("[F]ailed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute. Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change." (citation omitted) (quoting *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990))); *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 243 (2d Cir. 2009); *City & County of San Francisco*, 944 F.3d at 797–98 ("[T]he failure of Congress to *compel* DHS to adopt a particular rule is not the logical equivalent of *forbidding* DHS from adopting that rule.").

By relying on administrative agencies to flesh out the definition of "public charge," Congress allowed for the definition of the term to adapt over time in response to changed conditions, including patterns in immigration and the nature of public benefits provided by federal, State, and local governments. In *City & County of San Francisco*, the Ninth Circuit, after surveying the application of the "public charge" statute since 1882, concluded that:

> [D]ifferent factors have been weighted more or less heavily at different times, reflecting changes in the way in which we provide assistance to the needy. . . . [T]he history of the use of "public charge" in federal immigration law demonstrates that "public charge" does not have a fixed, unambiguous meaning. Rather, the phrase is subject to multiple interpretations, it in fact has been interpreted differently, and the Executive Branch has been afforded the discretion to interpret it.

944 F.3d at 796–97. The court concluded that Congress, when it enacted the present version of the public charge provision in 1996, wrote the provision in a way that maintains that Executive Branch discretion and continues to afford the "agencies enforcing our immigration laws the

35

flexibility to adapt the definition of 'public charge' as necessary." *Id.* at 797. Thus, nothing in the statute forecloses the standards adopted by the Department of State.

The decisions of the Board of Immigration Appeals cited by the plaintiffs also do not foreclose the Department of State's rule. First of all, determinations of whether a person has become a "public charge" for purposes of deportability and whether a person is likely to become a "public charge" for purposes of inadmissibility are governed by separate statutory provisions and call for distinct analyses. *Compare* 8 U.S.C. § 1182(a)(4) *with id.* § 1227(a)(5); *see Matter of Harutunian*, 14 I. & N. Dec. 583, 588–89 (INS Reg'l Comm'r 1974). And none of the BIA, Attorney General, or INS decisions cited by the plaintiffs suggests that likely future receipt of a specified amount of publicly funded benefits is insufficient basis for a public charge finding. *See Matter of B——*, 3 I. & N. Dec. 323, 324–25 (B.I.A. 1948, Att'y Gen. 1948) (holding in the deportation context that consumption of publicly funded services such as free adult education would not necessarily justify a public charge finding); *Matter of Martinez-Lopez*, 10 I. & N. Dec. 409, 421 (B.I.A. 1962, Att'y Gen. 1964) (stating that a public charge finding may be justified by "fact[s] reasonably tending to show that the burden of supporting the alien is likely to be cast on the public"); *Matter of Perez*, 15 I. & N. Dec. 136, 137 (B.I.A. 1974) (same).

The October 2019 rule does reflect a change from prior interpretations of the public charge provision by the Department of State and other agencies, but such a change in interpretation is neither unlawful nor unusual. An agency charged with interpreting a statute may change its interpretation as long as it acknowledges that it is changing its interpretation and provides a reasoned basis for the new policy. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514–15 (2009). The new interpretation may supersede interpretations adopted in earlier agency rules or administrative decisions, as well as prior judicial interpretations. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981–83 (2005).

Congress has charged the Secretary of Homeland Security, acting "through the Secretary

36

of State," with administering the INA in the context of consular determinations concerning granting or refusal of visas. 6 U.S.C. § 236(b)(1). Accordingly, the Department of State is not constrained by past interpretations of other agencies, such as the 1999 interim field guidance issued by the Immigration and Naturalization Service (INS). Indeed, the 1999 interim field guidance has now been superseded by the August 2019 rule issued by DHS.

The Department of State adequately justified its change in policy. The Department explained that its new rule was largely driven by a desire to conform its standard to the standard adopted by DHS so as to avoid situations where a person is issued a visa by a consular officer applying the Department of State rule but then is denied admission by a DHS officer at a port of entry based on the DHS rule. The Department also noted that it had separately assessed the standards adopted by DHS and found they were consistent with the statute and the objectives of Congress as expressed in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105. 84 Fed. Reg. at 55,006−07.

The plaintiffs suggest that the Department of State erred by failing to take into account the possibility that the DHS rule would be enjoined by a court. *See* Pls.' Mem. 11, 23–24. But at the time the Department of State issued its rule, there were no injunctions restricting enforcement of the DHS rule, and it was not certain that any court would enjoin enforcement of the DHS rule, or under what terms. The Department of State was not required to tailor its actions based on speculation about what might happen in the litigation. This position is all the more reasonable given that the DHS rule now is in fact not enjoined nationwide.

The plaintiffs also argue, citing this Court's October 2019 ruling concerning the parallel DHS rule, that the Department of State rule is invalid because it focuses on whether an applicant is likely to *receive* benefits rather than whether an applicant is likely to *need* benefits. *See* Pls.' Mem. 27 (discussing *Make the Road N.Y.*, 2019 WL 5484638, at *8). But this focus on receipt of benefits is appropriate. As the plaintiffs themselves note, Congress enacted the public charge

provision at least partly because of "concerns that [visa applicants] might burden the public fiscally." Pls.' Mem. 32. Persons who receive substantial government benefits are imposing the same burden on the public fisc regardless of whether they absolutely need the benefits.

The plaintiffs also suggest that the rule is arbitrary and capricious because it does not clearly dictate to consular officers how to make the required predictive determination of whether the applicant is likely to receive more than 12 months of benefits in a span of 36 months. *See* Pls.' Mem. 27. But a rule is not arbitrary and capricious simply because it relies on individualized judgments. Many aspects of visa determinations rely on consular officers to exercise discretion and judgment, and indeed the statute expressly specifies that public charge determinations will rely on "the opinion of the consular officer at the time of application for a visa," 8 U.S.C. § 1182(a)(4)(A). And the standard prescribed by the October 2019 rule is not less determinate than the prior standard calling for consideration of whether an applicant was likely to become "primarily dependent" on government support "for subsistence."

The rule's identification of "proficiency in English or proficiency in other languages in addition to English," 84 Fed. Reg. at 54,998, as a factor to consider in public charge determinations is entirely logical. It is true that some individuals can thrive in the United States without English language skills, but it is equally true that English language skills can improve an individual's employment prospects and self-sufficiency. The plaintiff organizations appear to know this well—four of the five plaintiff organizations offer English language instruction as part of their efforts to assist immigrants. Compl. ¶¶ 21, 24, 34–35; Ehrlich Decl. Ex. 20 ¶ 9. The October 2019 rule calls for consideration of English language proficiency only as one of many aspects of an applicant's education and skills, which in turn is only one of several factors considered in the totality of the circumstances. *See* 84 Fed. Reg. at 54,998. The rule therefore allows ample room for an officer to determine that an applicant is not likely to become a public charge despite having limited or no English language skills.

38

The rule's treatment of age likewise is reasonable. The statute mandates consideration of the applicant's age, 8 U.S.C. § 1182(a)(4)(B)(i)(I). The October 2019 rule does not make age under 18 or 62 a determinative factor by itself, and it explicitly allows for consular officers to consider offsetting factors where appropriate. *See* 84 Fed. Reg. 54,996–97.

The plaintiffs also argue that the Department of State has "produced no evidence that the [rule] promotes 'self-sufficiency.'" Pls.' Mem. 28. But an administrative agency performing legislative functions is not required to produce evidence in advance that its policies will achieve its intended goals. *See FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 814 (1978) ("[C]omplete factual support in the record for the [agency's] judgment or prediction is not possible or required; 'a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency.'").

Finally, the plaintiffs argue that the Department of State neglected to weigh the possibility that the rule could have a disparate impact on nonwhite immigrants. Pls.' Mem. 29. But the plaintiffs do not cite any precedent suggesting that an agency adopting a rule is required to analyze its potential for disparate impact. And this Court should not impose such an obligation in the context of visa determinations. If the Department were to sort the countries of the world according to whether they are "predominantly white," Pls.' Mem. 10, and craft visa policy with that distinction in mind, that could do more to promote insidious race-based policymaking than to prevent it.

10.    *The Rehabilitation Act of 1973 does not apply to overseas visa processing.*

The plaintiffs also assert that the Department of State actions conflict with Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. *See* Compl. ¶¶ 16, 189−198, 269−270. Section 504 is inapplicable to consular determinations concerning visas because it does not regulate agency activities outside the United States. "When a statute gives no clear indication of an

39

extraterritorial application, it has none." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010). The principle has "special force" with respect to "statutory provisions that may involve foreign . . . affairs for which the President has unique responsibility." *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 188 (1993). Under these principles, it is clear the Rehabilitation Act does not apply extraterritorially. *See Archut v. Ross Univ. Sch. of Veterinary Med.*, No. 10-1681(MLC), 2012 WL 5867148, at *10 (D.N.J. Nov. 19, 2012), *aff'd*, 580 F. App'x 90 (3d Cir. 2014). The plaintiffs' claims based on the Rehabilitation Act therefore should be dismissed.

Even if the Rehabilitation Act were applicable, it would not conflict with the challenged actions. The Act does not require that Government actors "disregard . . . disabilities"; it only prohibits discrimination against "otherwise qualified" individuals based "solely" on disability. *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 405 (1979). The challenged actions do not provide that visas will be denied based solely on disability; they only treat health conditions as a factor in a broader determination, as is specifically mandated by 8 U.S.C. § 1182(a)(4)(B)(i)(II).

**B.      The plaintiffs' challenge to the Proclamation fails to state a claim for relief.**

1.      *The Proclamation is a valid exercise of the President's authority under 8 U.S.C. § 1182(f).*

The Proclamation is a valid exercise of the President's authority under § 1182(f) to suspend entry of classes of persons whose entry he finds would be detrimental to the United States.

The plaintiffs argue that the Proclamation conflicts with the public charge ground of inadmissibility, but that argument is not supported by the statutory text and is at odds with the structure of 8 U.S.C. § 1182. *See* Pls.' Mem. 13. The statute makes certain categories of persons inadmissible, but it does not make persons outside those categories admissible. The authority granted to the President under § 1182(f) permits him to supplement the enumerated grounds of inadmissibility when circumstances demand it. *See Trump v. Hawaii*, 138 S. Ct. at 2408

40

(explaining that "§ 1182(f) vests the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA") (quoting *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 187 (1993), and citing *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986)). Accordingly, for example, the President can validly restrict entry of foreign government officials responsible for failing to combat human trafficking, Proclamation No. 8342, 74 Fed. Reg. 4093 (Jan. 16, 2009), even though Congress separately defined a ground of inadmissibility related to human trafficking, 8 U.S.C. § 1182(a)(2)(H).

The plaintiffs also argue that the Proclamation conflicts with statutes that make individuals eligible for delivery of federally funded public benefits after they have arrived in the United States. Pls.' Mem. 34. But these statutes only specify whether individuals are eligible for benefits *after* they arrive in the United States; they do not dictate that any individual or any class of individuals must be permitted entry into the United States.

Finally, the plaintiffs suggest that the President's authority under § 1182(f) is restricted to "exigencies of foreign affairs" and cannot be used to address "domestic policy concerns." Pls.' Mem. 34. But § 1182(f) does not limit the President's authority to emergencies. *See Trump v. Hawaii*, 138 S. Ct. at 2412–13 (holding that § 1182(f) is not limited to situations of "exigency or crisis"). And the admission and exclusion of foreign nationals is never a purely domestic matter; it is always a matter of foreign affairs.

The plaintiffs also argue in a footnote that § 1182(f) impermissibly delegates legislative authority to the President. *See* Pls.' Mem. 33 n.20. But statutes addressing "admissibility of aliens . . . implement an inherent executive power." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950). Moreover, "in its delegations of power in the area of foreign relations, Congress 'must of necessity paint with a brush broader than that it customarily wields in domestic areas.'" *Abourezk v. Reagan*, 785 F.2d 1043, 1063 (D.C. Cir. 1986) (R.B. Ginsburg, J.),

41

*aff'd by an equally divided Court*, 484 U.S. 1 (1987).[9]

> 2.    *The President's findings and actions under § 1182(f) are not subject to judicial review under any statute or directly under the Constitution.*

A further reason why the plaintiffs' claims are invalid is that no statute authorizes judicial review of the Proclamation. As discussed above, none of the three actions challenged in this suit is subject to review under the APA, but even if the Department of State actions could be challenged under the APA, the Proclamation cannot. The President is not an "agency" under the APA, and the APA does not permit challenges to Presidential action. *Dalton v. Specter*, 511 U.S. 462, 468–70 (1994); *Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992).

The plaintiffs also cannot challenge the President's action by targeting their challenge at the Department of State policy announcement[10] concerning how it will comply with the Proclamation, or its October 2019 information collection notice. *See* Pls.' Mem. 18, 34–38 (discussion of the "website announcement and Emergency Notice"). Neither of these documents carries any legal force.[11] As discussed above, agency policy statements that simply explain how the agency will interpret or apply existing laws, but that do not have legal force of their own, are treated as "interpretive" rules that are not subject to notice-and-comment requirements and ordinarily are not subject to judicial review. Here, the only relevant legal obligations associated with the Proclamation arise from the governing statute, 8 U.S.C. § 1182(f), and the Proclamation. The Department of State policy announcements do not purport to add to or modify those legal rules; they simply explain how the Department of State interprets and will comply with the

---

[9] Because the Proclamation is clearly authorized by § 1182(f), there is no need for the Court to decide whether it is separately authorized under § 1185(a)(1) or the President's independent authority under the Constitution.

[10] Department of State, Presidential Proclamation on Health Care, *reproduced in* Ehrlich Decl. Ex. 8.

[11] As explained in Background section I.D above, the Department of State's October 30, 2019, notice and request for comment was not a notice of proposed rulemaking under the APA; it was a notice of information collection under the Paperwork Reduction Act. *See supra* pp. 10–11.

Proclamation. *See United States v. Yuzary*, 55 F.3d 47, 50–53 (2d Cir. 1995) (holding that adoption of a form implementing a statutory requirement should be treated as an interpretive rule for which notice and comment was not required). And even if the Department of State's instructions and guidance were set aside, the Department would still be required by law to comply with the Proclamation under § 1182(f).

The plaintiffs suggest that they may challenge the Proclamation directly under the Constitution because they assert that it is "ultra vires" and violates the separation of powers, *see* Pls.' Mem. 32, but that is at odds with longstanding Supreme Court precedent. In *Dalton v. Specter*, the Court made clear that a claim alleging that the President acted in excess of authority granted by statute is a statutory claim, not a constitutional claim. *See* 511 U.S. at 471–77. Review of such claims is generally impermissible when "the statute in question commits the decision to the discretion of the President." *Id.* at 474. The language of § 1182(f) "exudes deference to the President in every clause" and "grants the President broad discretion" with respect to suspension determinations. *Trump v. Hawaii*, 138 S. Ct. 2392, 2408 (2018). Under *Dalton*, the President's Proclamation is not subject to judicial review, and there is no role for the Court to play in judging whether the Proclamation is wise or reasonable.[12]

*Dalton* also precludes the plaintiffs from challenging the adequacy or correctness of the findings the President made in the Proclamation. The President found that entry of immigrants "who lack health insurance or the demonstrated ability to pay for their healthcare" is detrimental to the United States because it increases the burdens that uncompensated care imposes on

---

[12] Justice Scalia's statement in *Franklin v. Massachusetts* that review of Presidential action "can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive," *Franklin,* 505 U.S. at 828 (Scalia, J., concurring in part and concurring in the judgment), *quoted in* Pls.' Mem. 34 n.22, is not at odds with *Dalton.* Justice Scalia's concurrence in *Franklin* pertained to constitutional claims, not statutory claims. *See id.* at 823–24. Justice Scalia joined in the unanimous holding in *Dalton* that the President's action in that case should be viewed as a statutory claim not subject to judicial review. *Dalton*, 511 U.S. at 463.

healthcare providers, and, ultimately other healthcare consumers and taxpayers. Proclamation, 84 Fed. Reg. at 53,991. There is no basis for asking a court to scrutinize the "persuasiveness of the President's justifications," *Trump v. Hawaii*, 138 S. Ct. at 2409.

In any event, the Proclamation is justified, reasonable, and modest in application. The plaintiffs suggest that the types of health insurance identified as "approved health insurance" are unavailable to "many" immigrants, but the Proclamation identifies a range of options for approved plans, so if some types of plans are unavailable or unsatisfactory, an intending immigrant can choose another. And the Proclamation permits the Secretary of Health and Human Services to identify additional categories of coverage as approved plans. Proclamation § 1(b)(ix). The Proclamation also does not demand that an applicant actually obtain coverage before entering the United States; it is enough for the applicant to show that he will obtain coverage within 30 days of entering the United States. Moreover, as noted above, an applicant is not required to show a plan to obtain health coverage at all if the applicant can otherwise show that he or she is prepared to cover reasonably foreseeable medical costs. An applicant who is healthy with no significant health problems would likely have minimal or no reasonably foreseeable medical costs.

> **C.    The plaintiffs do not state valid equal protection claims because they do not allege facts connecting the challenged actions to discriminatory intent on the part of either the President or the agency defendants.**

The plaintiffs do not contend that their constitutional equal protection claims support preliminary relief, and thus the Court should not consider those claims in connection with the plaintiffs' motion for a preliminary injunction. But the Court should dismiss the equal protection claims because the plaintiffs have not alleged facts that could establish that any of the challenged actions was motivated by racial animus on the part of the Department of State or the President.

Even if the plaintiffs could show that the challenged actions will have some known or

predictable disproportionate impact on persons of different races, there would still be no basis for an equal protection claim. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977) (holding that disproportionate impact on a protected class is not enough to demonstrate a violation of equal protection). An equal protection claim requires "more than intent as volition or intent as awareness of consequences." *Pers. Adm'r v. Feeney*, 442 U.S. 256, 279 (1979). Government action implicates equal protection only when "the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.*; *see also Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 104 F.3d 1349, 1353–54 (D.C. Cir. 1997) (rejecting an equal protection claim despite acknowledging that family members of Vietnamese and Laotian migrants "will more often than not be of Vietnamese or Laotian origins").

The plaintiffs do not allege any facts that plausibly suggest that either the Department of State or the President took any action "'because of,' not merely 'in spite of,' . . . its adverse effects upon an identifiable [racial] group." General allegations that the defendants' actions were motivated by racial animus are not enough to state an equal protection claim. *See Ashcroft v. Iqbal*, 556 U.S. 662, 680–83 (2009) (holding that general allegations of discriminatory intent on the part of government officials did not state a claim when not supported by specific facts).

The plaintiffs alternatively assert that the actions should be rejected under rational basis review because they single out a "disfavored group"—economically disadvantaged immigrants—for discriminatory treatment. Compl. ¶ 287. But economic status is a valid, rational, and commonly used criterion for government regulation. *See, e.g.*, *Schweiker v. Wilson*, 450 U.S. 221, 232–34 (1981) (holding that heightened scrutiny did not apply to a regulation that classified residents in public institutions based on their receipt of Medicaid benefits).

The plaintiffs contend that racial animus is evident in a number of statements made or allegedly made by the President or alleged statements or affiliations of a White House adviser.

45

Pls.' Mem. ¶¶ 17, 229–239. But the plaintiffs do not allege any facts that plausibly connect the alleged statements to any of the three challenged actions or indicate that the challenged actions were motivated by unlawful discrimination.

In *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), the plaintiffs challenged a Proclamation by the President that placed entry restrictions on the nationals of eight countries. *Id.* at 2404. The plaintiffs argued that statements made by the President undercut the stated reasons for the Order and revealed "that the primary purpose of the Proclamation was religious animus" against Muslims. *Id.* at 2417. The Supreme Court rejected the claims for reasons that apply with equal force in this case.

First, the Court in *Trump v. Hawaii* noted that the Proclamation dealt with the admission and exclusion of foreign nationals, "a matter within the core of executive responsibility." *Id.* at 2418. The actions challenged in this case deal with the same general subject matter.

Second, the Court observed that the Proclamation at issue in *Trump v. Hawaii* was "neutral on its face" and had a "legitimate grounding in national security concerns, quite apart from any religious hostility." *Id.* at 2418, 2421. Similarly, the actions challenged in this case are neutral on their face, and each bears an obvious connection to a legitimate purpose—specifically, implementing a statute passed by Congress to avoid inordinate fiscal burdens on the United States and to mitigate burdens on the healthcare system. *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314–15 (1993) (noting that, under rational basis scrutiny, as long as there is some *conceivable* set of facts that would justify a classification, the classification prevails, regardless of the actual rationale underlying the Government's action and regardless of whether the conceivable basis is borne out by evidence); *cf. Mathews v. Diaz*, 426 U.S. 67, 80, 82–83 (1976) (observing that Congress may legitimately distinguish between citizens and noncitizens in distribution of welfare benefits and upholding a statute that denied Medicare benefits to noncitizens unless they had been admitted for permanent residence and had resided in the United

States for five years).

Thus, as in *Trump v. Hawaii*, there is no reason for the Court in this case to judge the challenged actions "by reference to extrinsic statements" made by the President. *Trump v. Hawaii*, 138 S. Ct.. at 2418. Because the plaintiffs do not allege any facts that "plausibly suggest" that challenged actions are motivated by animus against particular racial or ethnic groups, their complaint does not state an equal protection claim.

The District of Maryland declined to dismiss an equal protection challenge to the January 2018 FAM guidance, *see Mayor & City Council of Balt. v. Trump*, Civil Action No. ELH-18-3636, 2019 WL 4598011, at *40 (D. Md. Sept. 20, 2019), but it did not distinguish *Iqbal*, which is a highly relevant binding precedent. *Iqbal* suggests that "bare assertions," *id.* at 681, of discriminatory motive are not enough to state a claim, and a plaintiff must provide further factual allegations to push the claims of discriminatory motive over "the line between possibility and plausibility." *Id.* at 678. The plaintiffs' complaint in this action contains no factual allegations connecting the challenged policies to an unlawful motive.

**D.       The separation of powers bars injunctive relief against the President.**

A further reason to dismiss the plaintiffs' claims against the President is that the Supreme Court has held that the separation of powers generally prevents a federal court from issuing an injunction purporting to supervise the President's performance of his duties. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867) ("[T]his court has no jurisdiction of a bill to enjoin the President in the performance of his official duties . . . ."); *accord Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) (plurality opinion); *id.* at 826–29 (Scalia, J., concurring in part and concurring in the judgment). None of the plaintiffs' claims is valid, but if any of the claims were valid, relief could not be awarded against the President.

47

**IV.      The other factors in the preliminary injunction analysis weigh against relief.**

As discussed above, the plaintiffs cannot establish irreparable harm or a likelihood of success on the merits. They also cannot satisfy the other two factors of the preliminary injunction analysis, which require the plaintiffs to demonstrate that "the balance of equities tilts in [their] favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). "These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Preliminary injunctive relief would impose harm on the Government and the public. Interference with the exercise of authority granted to the President and the Department of State under the INA is a substantial harm in itself. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (finding that a State Government suffered irreparable harm when it was prevented from enforcing duly enacted statutes). Moreover, compliance with a temporary injunction would impose significant logistical burdens on the Department of State, which must instruct its consular personnel at more than 200 locations worldwide. A preliminary injunction would also lead to the harms that the Department of State was seeking to prevent when it adopted the October 2019 rule: If the Department of State were enjoined from enforcing the October 2019 public charge rule while DHS is enforcing its August 2019 rule, it would increase the risk that individuals would be found eligible for visas by consular officers and then would be denied admission when they arrive.

Meanwhile, as discussed in section II.F above, *see supra* p. 20, the plaintiffs have not explained how a preliminary injunction would meaningfully improve their situations while the parties await a final ruling on the merits. The individual plaintiffs have not indicated that they or their family members plan to leave the country and apply for visas before the Court has issued a final ruling, and temporary relief while the litigation is pending would not ensure that any future visa applications would be approved. Nor would it enable the organizational plaintiffs to cease

48

their advocacy or education efforts. Because preliminary relief would harm the Government and would not prevent harm to the plaintiffs, the balance of equities and the public interest weigh against preliminary relief.

**V.      There is no basis for nationwide relief in this action.**

For the reasons discussed above, the Court should deny preliminary relief and should dismiss this action. But if the Court grants any preliminary relief, it should be no broader than necessary to prevent irreparable harm to the plaintiffs.

The separation of powers, as embodied in Article III of the Constitution, requires that judicial relief "be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). And under traditional equitable principles, "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). As Justice Gorsuch observed in connection with the Supreme Court's order staying the preliminary injunction against the DHS rule, nationwide injunctions raise serious separation of powers concerns, hamper orderly judicial resolution of issues within and across cases, and improperly disadvantage the Government. *See Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600–01 (2020) (Gorsuch, J., concurring in grant of stay). There is no reason why nationwide relief would be necessary to prevent injury to the plaintiffs. None of the plaintiffs has explained how its interests would be harmed by application of the public charge rules to persons other than themselves and their relatives. Most glaringly, the plaintiffs have not even argued that their interests would be harmed by application of the public charge rules to visa applicants who do not seek to settle in the United States and are seeking only nonimmigrant visas.

The plaintiffs argue that nationwide relief is justified because plaintiff CLINIC is affiliated with other organizations elsewhere in the United States, Pls.' Mem. 49–50, but that is

49

slim reason for nationwide relief when those other organizations are not participating in the suit, they are not identified, and CLINIC has not explained how the other organizations are harmed in a way that equates to harm to CLINIC itself. *Cf. Summers v. Earth Island Inst.*, 555 U.S. 488, 497–99 (2009) (explaining that assertions of probable harm to unidentified members of an organization do not establish standing).

The plaintiffs also argue that the Department of State rules should ultimately be vacated nationwide. Pls.' Mem. 50. The Government disagrees, but even assuming nationwide vacatur would be appropriate on final judgment—which it would not be, *see Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 393–94 (4th Cir. 2001); *Right to Life of Dutchess Cty., Inc. v. FEC*, 6 F. Supp. 2d 248, 252–53 (S.D.N.Y. 1998)—that does not speak to whether *preliminary* relief should extend nationwide. A preliminary injunction is an "extraordinary" remedy, *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008), and any preliminary injunction should be tailored to minimize disruption, *see id.* at 32–33. And the provision of the APA governing stays pending judicial review, 5 U.S.C. § 705, provides that relief should reach only as far as "necessary to prevent irreparable injury." *Id.*

## CONCLUSION

For the reasons above, the Court should deny the request for preliminary relief and should dismiss this case for lack of subject matter jurisdiction or for failure to state a claim.

Date: February 13, 2020                    Respectfully submitted,

                                           JOSEPH H. HUNT
                                           Assistant Attorney General

                                           ALEXANDER K. HAAS
                                           Branch Director

                                           /s/ JAMES C. LUH
                                           JAMES C. LUH
                                           Senior Trial Counsel

50

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St NW
Washington DC 20530
Tel: (202) 514-4938
E-mail: James.Luh@usdoj.gov
Attorneys for Defendants