UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MAKE THE ROAD NEW YORK, AFRICAN SERVICES
COMMITTEE, CENTRAL AMERICAN RESOURCE
CENTER-NY, CATHOLIC CHARITIES COMMUNITY
SERVICES, and CATHOLIC LEGAL IMMIGRATION
NETWORK, INC.,

                                        Plaintiffs,

                       - against -                                    1:19-cv-11633 (GBD)

MICHAEL POMPEO, in his official capacity as Secretary
of State; UNITED STATES DEPARTMENT OF STATE;
ALEX AZAR, in his official capacity as Secretary of
Health and Human Services; and UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN
SERVICES; and DONALD TRUMP, in his official
capacity as President,

                                        Defendants.


**REPLY MEMORANDUM IN FURTHER SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................ 1

ARGUMENT ................................................................................................ 2

I.    Plaintiffs Are Likely To Succeed on the Merits of Their Claims ........................ 2

    A.    The Consular Rules Are Subject to Judicial Review .................................. 2

        1.    The FAM Revisions and the IFR are Final Agency Actions Addressing Immigration and Reviewable under the APA ............. 3

        2.    The Presidential Proclamation Is Subject to Judicial Review. ....... 7

    B.    DOS Blatantly Violated Notice and Comment Rulemaking in Furtherance of the Proclamation, FAM Revisions, and IFR .......................................... 9

        1.    The FAM Revisions are Substantive Regulations Requiring Notice-and Comment Rulemaking ................................................... 9

        2.    DOS Did Not Have "Good Cause" to Evade Notice-and-Comment Rulemaking for the IFR. ............................................................... 12

        3.    The Promulgation of the Emergency Notice violated the APA .... 14

    C.    The Consular Rules Are Contrary to the INA ......................................... 16

        1.    The FAM Revisions and the IFR Conflict With the INA ............. 16

        2.    The Proclamation Conflicts with the INA and Violates Separation of Powers Principles ................................................................... 19

    D.    The Consular Rules are Arbitrary and Capricious .................................... 22

        1.    The FAM Revisions are Arbitrary and Retroactive ..................... 22

        2.    The IFR is Arbitrary and Capricious ........................................... 24

        3.    The DOS Agency Actions Implementing the Proclamation Are Contrary to Law and Arbitrary and Capricious ........................... 25

II.     Plaintiffs Have Standing and Their Claims Are Ripe and in the Zone of Interests
        of the INA. ................................................................................................................ 27

        A.     Individual Plaintiffs Are Actively Engaged in the Process of Obtaining
               Lawful Permanent Residence and Face Harm from the Consular Rules.. 27

        B.     Organizational Plaintiffs Currently Experience Harm Through Diversion
               of Resources and Harm to Their Members, and Are Within the Zone of
               Interests of the INA .................................................................................. 30

III.    Plaintiffs Meet the Equitable Factors For Injunctive Relief ................................. 35

IV.     The Rule Should Be Enjoined Nationwide, but the APA Does Not Preclude More
        Modest Relief. ........................................................................................................ 39

V.      Defendants' Motion to Dismiss Must Fail. ............................................................ 39

        A.     Plaintiffs Have Standing to Make All Their Claims. ................................ 40

               1.     Plaintiffs Have Standing to Establish Equal Protection and
                      Rehabilitation Act Violations ........................................................ 40

        B.     Plaintiffs Have Standing to Assert Claims Against HHS ........................ 42

        C.     Plaintiffs State A Claim Under the Equal Protection Clause.................... 43

        D.     Plaintiffs State a Claim under the Rehabilitation Act .............................. 47

CONCLUSION................................................................................................................ 48

# TABLE OF AUTHORITIES

**CASES**

*A.X.M.S. Corp.* v. *Friedman*,
    948 F. Supp. 2d 319 (S.D.N.Y. 2013)......................................................................38

*Abourezk* v. *Reagan*,
    785 F.2d 1043 (Ginsburg, J.) ......................................................................20, 22

*American Mining Congress* v. *Mine Safety and Health Admin.*,
    995 F.2d 1106,1112 (D.C. Cir. 1993) ......................................................................12

*Armstrong* v. *Exceptional Child Ctr., Inc.*,
    135 S. Ct. 1378 (2015)......................................................................4

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009)......................................................................41, 42, 46

*Batalla Vidal* v. *Nielsen*,
    279 F. Supp. 3d 401 (E.D.N.Y. 2018) ......................................................................25, 40

*Batalla Vidal* v. *Nielsen*,
    291 F. Supp. 3d 260 (E.D.N.Y. 2018) ......................................................................45, 47

*Bekker* v. *Neuberger Berman Grp. LLC*,
    2018 WL 4636841 (S.D.N.Y. Sept. 27, 2018)......................................................................41

*Bennett* v. *Spear*,
    520 U.S. 154 (1997)......................................................................7

*Bob Jones University* v. *United States*,
    461 U.S. 574 (1983)......................................................................19

*Boniface* v. *U.S. Department of Homeland Security*,
    613 F. 3d 282 (D.C. Cir. 2010)......................................................................23

*Carter* v. *HealthPort Technologies, LLC*,
    822 F.3d 47 (2d Cir. 2016)......................................................................40

*Casa de Md., Inc.* v. *Trump*,
    355 F. Supp. 3d 307 (D. Md. 2018) ......................................................................45

*Centro de la Comunidad Hispana de Locust Valley* v. *Oyster Bay*,
    868 F.3d 104 (2d Cir. 2017)......................................................................31, 37

*Centro Presente* v. *U.S. Dep't of Homeland Sec.*,
    332 F. Supp. 3d 393 (D. Mass. 2018) ............................................................45, 47

*INS* v. *Chadha*,
    462 U.S. 919 (1983) ...................................................................................................4

*United States* v. *Chemical Foundation, Inc.*,
    272 U.S. 1 (1926) ....................................................................................................43

*Christensen* v. *Harris County*,
    529 U.S. 576 (2000) .................................................................................................10

*Citizens for Responsibility & Ethics in Wash.* v. *Trump*,
    276 F. Supp. 3d 174 (S.D.N.Y. 2017) ............................................31, 32, 33, 35

*Citizens for Responsibility & Ethics in Wash.* v. *Trump*,
    939 F.3d 131 (2d Cir. 2019) ............................................................................34, 35

*City of Cleburne* v. *Cleburne Living Ctr.*,
    473 U.S. 432 (1985) .................................................................................................48

*United States* v. *City of Yonkers*,
    837 F.2d 1181 (2d Cir. 1987) ..........................................................................46, 48

*Clarke* v. *Sec. Indus. Ass'n*,
    479 U.S. 388 (1987) .................................................................................................34

*USCIS* v. *Cook County*,
    589 U.S. ___ (Feb. 21, 2020) .................................................................................17

*Council of the S. Mountains, Inc.* v. *Donovan*,
    653 F.2d 573 (D.C. Cir. 1981) ...............................................................................13

*Dalton* v. *Specter*,
    511 U.S. 462 (1994) ...................................................................................................7

*Washington* v. *Davis*,
    426 U.S. 229 (1976) .................................................................................................46

*Davis* v. *FEC*,
    554 U.S. 724 (2008) .................................................................................................29

*Dent* v. *Sessions*,
    900 F.3d 1075 (9th Cir. 2018) ...............................................................................48

*Doe #1* v. *Trump*,
    ___ F. Supp. 3d ____, 2019 WL 6324560 (Nov. 26, 2019) ............................ *passim*

iv

*Doe #1* v. *Trump*,
___ F. Supp. 3d ___, 2019 WL 6050111 (D. Or. Nov. 15, 2019) ........................................3, 26

*E. Bay Sanctuary Covenant* v. *Trump*,
909 F.3d 1219 (9th Cir. 2018), *superseded*, 932 F.3d 742 (9th Cir. 2018) ..........................34

*E. Bay Sanctuary Covenant* v. *Trump*,
932 F.3d 753 (9th Cir. 2018) ........................................................................................4, 26

*Fiallo* v. *Bell*,
430 U.S. 787 (1977) .................................................................................................3, 21

*Forest Grove Sch. Dist.* v. *T.A.*,
557 U.S. 230 (2009) .........................................................................................................19

*Franklin* v. *Massachusetts*,
505 U.S. 788 (1992) ......................................................................................................5, 6

*Helsinn Healthcare S.A.* v. *Teva Pharms. USA, Inc.*,
139 S. Ct. 628 (2019) ......................................................................................................18

*Henrietta D.* v. *Bloomberg*,
331 F.3d 261 (2d Cir. 2003) ............................................................................................49

*Herrera-Molina* v *Holder*,
597 F3d 128 (2d Cir. 2010) .............................................................................................24

*Heublein* v. *FTC*,
539 F. Supp. 123 (D. Conn. 1982) ..................................................................................38

*United States ex rel. Knauff* v. *Shaughnessy*,
338 U.S. 537 (1950) ...................................................................................................21, 22

*Leary* v. *United States*,
395 U.S. 6 (1969) .............................................................................................................18

*Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*,
572 U.S. 118 (2014) .........................................................................................................34

*Make the Rd. N.Y.* v. *McAleenan*,
405 F. Supp. 3d 1 (D.D.C. 2019) ...................................................................................14

*Make the Road N.Y.* v. *Cuccinelli*,
No. 19 Civ. 7993, 2019 WL 5484638 (S.D.N.Y. Oct. 11, 2019) .................................. *passim*

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians* v. *Patchak*,
567 U.S. 209 (2012) ...................................................................................................34, 35

*Mayor and City Council of Baltimore* v. *Trump*,
   No. 18 Civ. 3636 (ELH), 2019 WL 4598011 (D. Md. Sept. 20, 2019) .......................... *passim*

*Miller* v. *Clinton*,
   687 F.3d 1332 (D.C. Cir. 2012) ...................................................................................10

*Motor Vehicle Mfrs. Ass'n of the U.S.* v. *State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 ....................................................................................................................22

*N.C. Growers' Ass'n, Inc.* v. *United Farm Workers*,
   702 F.3d 755 (4th Cir. 2012) ......................................................................................16

*Nat'l Mining Ass'n* v. *U.S. Army Corps. of Eng'rs*,
   145 F.3d 1399 (D.C. Cir. 1998) ...................................................................................40

*Nat. Res. Def. Council* v. *EPA.*,
   658 F. 3d 200 (2d Cir. 2011) ........................................................................................26

*Nat. Resources Defense Council* v. *Nat'l Highway Traffic Safety Admin.*,
   894 F.3d 95 (2d Cir. 2018) ....................................................................................13, 14

*Nnebe* v. *Daus*,
   644 F.3d 147 (2d Cir. 2011) ..........................................................................31, 35, 42

*Northern Mariana Islands* v. *U.S.*,
   686 F. Supp. 2d 7 (D.D.C. 2009) ...............................................................................38

*Pac. Capital Bank, N.A.* v. *Connecticut*,
   542 F.3d 341 (2d Cir. 2008) .................................................................................28, 29

*Pennsylvania* v. *President United States*,
   930 F.3d 543 (3d Cir. 2019) .......................................................................................40

*Ramos* v. *Nielsen*,
   336 F. Supp. 3d (N.D. Cal. 2018) ..............................................................................47

*United States* v. *Reynolds*,
   710 F.3d 498 (3d Cir. 2013) .......................................................................................14

*Rich* v. *Fox News Network, LLC*,
   939 F.3d 112 (2d Cir. 2019) .......................................................................................41

*Romer* v. *Evans*,
   517 U.S. 620 (1996) .....................................................................................................48

*Saget* v. *Trump*,
   345 F. Supp. 3d 287 (E.D.N.Y. 2018) ........................................................................45

*Saget* v. *Trump*,
   375 F. Supp. 3d 280 (E.D.N.Y. 2019) ...............................................................15, 40, 45, 47

*Sale* v. *Haitian Centers Council, Inc.*,
   509 U.S. 155 (1993)..........................................................................................................4, 9, 20

*Scales* v. *INS*,
   232 F.3d 1159 (9th Cir. 2000) ...........................................................................................10

*CFTC* v. *Schor*,
   478 U.S. 833 (1986)...........................................................................................................18

*Ser*v. *Employees Int'l Union Local 200 United* v. *Trump*,
   No. 1:19-CV-01073 EAW, 2019 WL 4877273 (W.D.N.Y. Oct. 3, 2019) ............................43

*Sessions* v. *Morales-Santana*,
   137 S. Ct. 1678 (2017)........................................................................................................47

*Sierra Club* v. *Trump*,
   929 F.3d 670 (9th Cir. 2019) (discussing *Dalton,* 511 U.S. at 473).........................................8

*Dep't of Homeland Security* v. *State of New York*,
   589 U.S. ___ (Jan. 27, 2020) ..............................................................................................17

*Susan B. Anthony List* v. *Driehaus*,
   573 U.S. 149 (2014)............................................................................................................28

*Sweet* v. *Sheahan*,
   235 F.3d 80 (2d Cir. 2000)................................................................................................9, 11

*Taylor* v. *Rice*,
   451 F.3d 898 (D.C. Cir. 2006)............................................................................................49

*Tineo* v. *Attorney General of the United States*,
   ___ F.3d ___, 2019 WL 4180460 (3d Cir. Sept. 4, 2019) .....................................................48

*Toyota Motor Mfg., Ky., Inc.* v. *Williams*,
   534 U.S. 184 (2002)............................................................................................................19

*Trump* v. *Hawai'i*,
   138 S. Ct. 2392 (2018)................................................................................................ *passim*

*U.S. Army Corps of Engineers* v *Hawkes Co., Inc.*,
   136 S. Ct. 1807 (2016).....................................................................................................5, 28

*New York* v. *U.S. Dep't of Commerce*,
   315 F. Supp. 3d 766 (S.D.N.Y. 2018)..................................................................................45

*State of New York* v. *U.S. Immigration and Customs Enforcement*,
  __ F. Supp. 3d ___, 2019 WL 6902074 (Dec. 19, 2019)....................................................5, 12

*United Airlines* v. *Brien*,
  588 F.3d 158 (2d Cir. 2009)..........................................................................................18

*Utility Air Regulatory Grp.* v. *EPA*,
  573 U.S. 302 (2014)......................................................................................................17

*Village of Arlington Heights* v. *Metro. Housing Dev. Corp.*,
  429 U.S. 252 (1977)......................................................................................................47

*United States* v. *Yuzary*,
  55 F.3d 47 (2d Cir. 1995) ............................................................................................15

*Zemel* v. *Rusk*,
  381 U.S. 1 (1965)..........................................................................................................22

## STATUTES

5 U.S.C.S. §§ 551, 704....................................................................................................43

5 U.S.C.S. § 706 (1).........................................................................................................43

5 U.S.C. 553..........................................................................................................11, 13, 15

5 U.S.C. § 702....................................................................................................................4

5 U.S.C. § 706(2)..............................................................................................................26

8 U.S.C. §§ 243(h)(1) and 1182(f)....................................................................................9

8 U.S.C. § 1182 ...................................................................................................... *passim*

## OTHER AUTHORITIES

22 C.F.R. § 40.41(b)..........................................................................................................25

22 C.F.R. §144.130 (b)(3)...................................................................................................49

# PRELIMINARY STATEMENT[1]

Plaintiffs challenge three executive actions that seek to transform the rules for admitting immigrants to the United States absent Congressional authority. The Consular Rules not only contradict the long-standing meaning and express language of "public charge" in the Immigration and Nationality Act ("INA"), but also flout the clear standards laid out in the Administrative Procedure Act ("APA") for issuing substantive regulations pursuant to notice-and-comment rulemaking. Defendants do not offer a credible justification for restructuring the family-based immigration system in blatant violation of statutorily-required notice-and-comment procedures and separation of powers principles. Instead, they argue that because the Consular Rules regulate immigrant entry and exclusion, they are not subject to judicial review. This radical argument has no basis in case law, statutory authority, or the Constitution, and should be soundly rejected.

Nor do Defendants credibly deny the harm that Plaintiffs and the public are facing once all of the Consular Rules take effect, as the DOS public charge rule (the "IFR") did earlier this week, on Monday, February 24, 2020. The Consular Rules aim to drastically reduce the numbers of immigrants entering on family-based petitions and target Latino, Black, and Asian immigrants in particular. They discourage immigrants like Brenda Doe, Carl Doe, Diana Doe, and the wife of Eric Doe from seeking lawful permanent residence for fear of separation from their families and communities; prevent U.S. citizens from reunifying with family members abroad; and cause suffering and economic hardship to immigrant communities and the organizations that represent them. Even before they took full effect, the mere prospect of the Consular Rules, along with DHS

---

[1] All capitalized and abbreviated terms used in this Reply are the same as defined in the plaintiffs' opening brief (Dkt. 44), cited herein as "Mot." References to defendants' brief in opposition to the preliminary injunction and in support of their motion to dismiss (Dkt. 54) are cited herein as "Defs.'' Mem.".

Rule, have caused tens of thousands of members of immigrant families to withdraw from benefits to which they are entitled out of fear for their immigration status.

Finally, Plaintiffs have standing to assert all of their claims, as Individual Plaintiffs are actively engaged in pursing applications for lawful permanent residence for themselves or their family members, and Organizational Plaintiffs have demonstrated that the Consular Rules interfere with their missions, cause them to divert resources, and threaten imminent economic loss. Plaintiffs have also made detailed allegations that they are harmed by the Consular Rules, and have stated claims for relief under the Rehabilitation Act and Equal Protection principles of the Due Process Clause.

The Consular Rules must be enjoined and Defendants' motion to dismiss rejected.

## ARGUMENT

### I.    Plaintiffs Are Likely To Succeed on the Merits of Their Claims

#### A.    The Consular Rules Are Subject to Judicial Review

As a threshold matter, Defendants make the unsupported and indeed radical assertion that this Court lacks the jurisdiction to review the legality of the FAM revisions, the IFR, and the Proclamation coupled with its implementing agency actions and regulations.  Defs' Mem. at 21. It cannot reasonably be disputed that the FAM revisions and the IFR are final agency actions plainly reviewable under the APA, which does not except immigration regulations or policies from review. Further, Congress has never granted the President discretion to issue a proclamation that directly conflicts with express provisions of the INA, and courts have repeatedly allowed review of statutory claims challenging presidential proclamations pursuant to 8 U.S.C. § 1182(f).

1.   *The FAM Revisions and the IFR are Final Agency Actions Addressing Immigration and Reviewable under the APA*

The APA does not exempt from review agency action that addresses immigration, and executive agencies routinely promulgate regulations addressing admission and exclusion. Yet Defendants argue that judicial review is unavailable in matters related to "admission and exclusion" and that "there is no basis for statutory review of the challenged Department of State actions under the APA." Defs' Mem. at 21. To support this argument, Defendants point only to cases challenging specific Congressional decisions regarding entry of individual applicants for admission. Defs' Mem. at 21. For example, in *Fiallo* v. *Bell*, the Supreme Court evaluated whether duly enacted provisions of the INA were unconstitutional because they failed to give preferential status to the relationship between "illegitimate children" and their natural fathers. 430 U.S. 787, 788 (1977). The Court did not consider the issue unreviewable. Instead, it "underscore[d] the limited scope of judicial inquiry into immigration *legislation*," noting the Court had "repeatedly emphasized that 'over no conceivable subject is the *legislative* power of Congress more complete than it is over' the admission of aliens." *Id.* at 792.  *Fiallo* does not speak at all to Executive or administrative regulations implementing Congressional legislation.

Here, Plaintiffs challenge agency immigration-related policy, not an exercise of Congress' legislative power or individual visa decisions. The doctrine articulated in *Fiallo* does not apply. Not only are the FAM Revisions and the IFR subject to APA review, so are the agency implementing regulations, policies, and actions in connection with the Proclamation, even if, as Defendants argue, the President cannot be sued under the APA.  *First*, although the President is not an "agency," entities within the executive branch that "implement or incorporate a Presidential proclamation" fall within the APA's broad ambit. *Doe #1* v. *Trump*, ___ F. Supp. 3d ___, 2019 WL 6050111, at *1 (D. Or. Nov. 15, 2019). "[I]nsofar as [the agencies] have incorporated the

Proclamation by reference into the Rule, [this Court] may consider the validity of the agency's proposed action." *E. Bay Sanctuary Covenant* v. *Trump*, 932 F.3d 742, 770 (9th Cir. 2018) (holding that agency rule, together with a Presidential Proclamation, contradicted the INA's asylum provisions and violated the APA). Further, courts have repeatedly reviewed challenges to the executive policy decisions on entry and exclusion of aliens. *Sale* v. *Haitian Centers Council, Inc.*, 509 U.S. 155, 160 (1993) (reviewing challenge to President's use of Section 212(f), as amended and codified at 8 U.S.C. 1182(f), to "suspend[] the entry of undocumented aliens from the high seas"); *Trump* v. *Hawai'i*, 138 S. Ct. 2392, 2407-08 (2018) (reviewing challenge to President's use of Section 1182(f) to suspend entry of nationals from six countries).

It is simply not the case that the Executive Branch can ignore the immigration laws made by Congress, establish policies that are contrary to the nation's laws, and leave individuals and organizations adversely affected without any recourse in the courts. Courts have the power to enjoin "violations of federal law by federal officials." *Armstrong* v. *Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). "Executive action under legislatively delegated authority . . . is always subject to check by the terms of the legislation . . . and if that authority is exceeded it is open to judicial review." *INS* v. *Chadha*, 462 U.S. 919, 953 n.16 (1983). The suggestion that judicial review evaporates when courts are presented with an executive action or regulation on immigration matter is baseless. There is no exception to APA review for Department of State actions that address immigration – as Defendants have effectively conceded for the IFR by invoking the APA's good cause exception – and this court properly has jurisdiction over all three Consular Rules.[2]

---

[2]  Defendants have effectively conceded that their promulgation of the IFR is subject to judicial review by virtue of invoking a good cause exception to the APA's notice-and-comment proceedings. Rules subject to notice-and-comment rulemaking, even if an exception applies, are of course is subject to judicial review through the APA's provision of a cause of action for private parties. 5 U.S.C. § 702

DOS' actions to implement all three Consular Rules are also reviewable because they constitute final agency action. Agency action is considered final under the APA when it "mark[s] the consummation of the agency's decisionmaking process…" and is an action "by which rights or obligations have been determined or from which legal consequences will flow." *U.S. Army Corps of Engineers v Hawkes Co., Inc*., 136 S. Ct. 1807, 1813 (2016) (quoting *Bennett* v. *Spear*, 520 U.S. 154, 177-78 (1997)).  The APA's test for finality is a "pragmatic" one, *Hawkes Co.*, 136 S. Ct. at 1815, that considers whether the agency action "is sufficiently direct and immediate and has a direct effect on day-to-day business." *Franklin* v. *Massachusetts*, 505 U.S. 788, 796-97 (1992) (citation and alterations omitted). In determining whether an action is final, courts evaluate whether the agency has "completed its decisionmaking process" and set about implementing its decision in a manner that "directly affects the parties." *Id.*

Defendants make no credible arguments that the FAM Revisions and the IFR are not final agency action. The FAM Revisions were published on January 1, 2018, and were in effect for more than two years, until the IFR took effect on February 24, 2020. The FAM Revisions did not merely provide guidance to consular officers on public charge determinations. They "embodie[d] a conscious change in policy that is based on a new interpretation of the law," and "legal consequences flow[ed] from this interpretation." *State of New York* v. *U.S. Immigration and Customs Enforcement*, __ F. Supp. 3d ___, No. 19-cv-8876 (JSR), 2019 WL 6906274, at *6-7 (Dec. 19, 2019) (dismissing government's arguments that a policy was not final agency action in denying motion to dismiss). The very fact that the FAM Revisions coincide with a twelve-fold increase in visa denials establishes that it is a final agency action. *Id.* at *6 (citing 1700 percent increase in ICE court house arrests in support of finding that policy is a final agency action).

Nowhere do Defendants explain how Plaintiffs' challenge to these regulations can be understood as "broad programmatic attack[s]" on "future agency action[s]." Defs' Mem. at 23–24.

As for the Proclamation and its agency implementing actions, policies and regulations, they too constitute final, not "future" agency action.[3] As with the FAM Revisions and the IFR, the State Department "completed its decisionmaking process" and set about implementing the Proclamation in a manner that "directly affect[ed] the parties." *Franklin,* 505 U.S. at 796-97.  The Emergency Notice was published on October 24, 2019 and has not been updated in the intervening months. The State Department's cable of October 30, 2019, instructed consular officers "to begin implementation of P.P. 9945 on November 3, 2019." Ehrlich Decl., Ex. 56,  Admin. Rec. at 00129-130. The cable also made clear the only outstanding issue was "approval from the Office of Management and Budget (OMB), under the Paperwork Reduction Act," *id.*, which OMB supplied on November 1, 2019. *Id.*

Before the District Court of Oregon issued a temporary restraining order, there was nothing standing in the way of the State Department's implementation of the Proclamation. *Doe #1* v. *Trump*, ___ F. Supp. 3d ____, 2019 WL 6324560 at * 4 (Nov. 26, 2019). This is textbook final agency action subject to APA review. When the DOS Emergency Notice and Policy were published, they explicitly sought to "establish standards and procedures for governing" admissibility determinations under the Proclamation, as of the date the Proclamation was set to go into effect. Ex. 7, 84 Fed. Reg. at 58,199.  Contrary to Defendants' assertion that neither document "carries any legal force,"  Defs.' Mem. at 42—both clearly operate as final agency actions, imposing distinct legal obligations for compliance that override 1182(a)(4)(A)'s "public charge"

---

[3]   Plaintiffs do not claim that the Proclamation itself is subject to the APA, *cf.* Defs.' Mem. 42; rather, the claim is that DOS' actions implementing the Proclamation violate the APA. Mot. 34-38 (detailing why these actions are contrary to 8 U.S.C. Section 1182(a) of the INA as enacted by Congress, violate notice-and-comment requirements, and are arbitrary and capricious). *See infra* Section B.

factors *see* Mot. at 13, 31-34, requiring otherwise-admissible immigrants, including those not excluded on public charge grounds, to be excluded unless they can demonstrate either (1) they would be "covered by appropriate health insurance" plans within 30 days of entry,  or (2) that they "possess[] the financial resources to pay for reasonably foreseeable medical costs," as of the effective date of the Proclamation.  Ex. 6, 84 Fed. Reg. 53,991-92.  *Bennett* v. *Spear,* 520 U.S. 154, 177–78 (1997) (holding that two conditions must be satisfied for agency action to be final: (1) "the action must mark the consummation of the agency's decisionmaking process", and (2) "the action must be one by which rights or obligations have been determined or from which legal consequences will flow.) The rushed manner in which DOS may have issued these notices does not transform them into non-final actions that have no legal effect; to the contrary, they direct DOS employees to apply the Proclamation during consular processing in order to impose a concrete legal effect on applicants for admission.

Nor are DOS's directives "future" actions in any legally meaningful sense. The IFR went into effect on February 24, 2020. Only a nationwide injunction enjoining the Proclamation itself, as issued by the District of Oregon, prevents the DOS directives from going into effect in the present. *Doe # 1* v. *Trump*, 2019 WL 6324560, at *1. Defendants' request for a stay and appeal of the injunction is pending before the Ninth Circuit, which heard argument on January 9, 2020.  A court's decision to enjoin agency action cannot render that action non-final.

### 2.   *The Presidential Proclamation Is Subject to Judicial Review*

The Court should also reject the unique argument Defendants make with respect to judicial authority to review Plaintiffs' claims that Proclamation is *ultra vires*. Relying on *Dalton* v. *Specter*, 511 U.S. 462 (1994), Defendants argue for the proposition that a claim that the President acted in excess of his authority in adopting the Proclamation "is a statutory claim, not a constitutional claim," and that review of such claims is impermissible when the statute "commits its decision to

the discretion of the President." Defs.' Mem. 43 (quoting *Dalton,* 511 U.S. 471-77).  But *Dalton,*
which addressed the President's discretionary authority to agree to recommendations to close
specific military bases under the Defense Base Closure and Realignment Act of 1990, is not so
broad. The *Dalton* Court merely states that not "every action by the President, or by another
executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution,"
*id.* at 472. It does not stand for the proposition that "action in excess of statutory authority can
*never* violate the Constitution or give rise to a constitutional claim. Statutory and constitutional
claims are not mutually exclusive." *Sierra Club* v. *Trump*, 929 F.3d 670, 696 (9th Cir. 2019)
(discussing *Dalton,* 511 U.S. at 473) (emphasis in original). Moreover, a proclamation to
indefinitely change the requirements for admission under the INA does not resemble a decision to
approve a specific military base closure. Among the few decisions reviewing presidential
proclamations issued pursuant to Section 1182(f), no court has found that the INA grants the
Executive such unfettered or absolute power that it would foreclose constitutional review of a
proclamation that conflicts with the statute or render such review impermissible.

While the Court in *Hawai'i* recognized that Section 1182(f) "grants the President broad
discretion" with respect to suspension determinations, it nonetheless reviewed whether the
proclamation at issue there exceeded the Executive's power and was otherwise constitutional.[4]
*Hawai'i,* 138 S. Ct. at 2408-12 (examining whether the proclamation exceeded the Executive's
power); 2418-23 (examining whether the proclamation was constitutional). *See also Sale,* 509 U.S.
at 171, 187-88 (reviewing text, structure, and applicability of 8 U.S.C. §§ 243(h)(1) and 1182(f)).

---

[4]    The Court in *Hawai'i* "assume[d] without deciding that plaintiffs' statutory claims are reviewable,
notwithstanding consular nonreviewability or any other statutory nonreviewability issue*" Hawai'i,* 138 S. Ct. at
2400 (citing, *inter alia, Sebelius* v. *Auburn Regional Medical Center,* 568 U.S. 145, 153 (2013)). If the Court was
not authorized to review the Proclamation in the first place, the bulk of *Hawai'i* would have been rendered
advisory.

Plaintiffs' challenge to the constitutionality of the Proclamation here are likewise reviewable. As the federal district court in the District of Oregon stated, there is "no reason to forego review on the merits when the Supreme Court has twice engaged in such review. Accordingly, regardless of how Plaintiffs' separation of powers claim is characterized, it is judicially reviewable." *Doe* v. *Trump,* 2019 WL 6324560, at *8-9.

### B. DOS Blatantly Violated Notice and Comment Rulemaking in Furtherance of the Proclamation, FAM Revisions, and IFR

Defendants were required to comply with the procedural requirements of the APA in adopting the Consular Rules, each of which should have been subject to notice-and-comment rulemaking.

#### 1. *The FAM Revisions are Substantive Regulations Requiring Notice-and-Comment Rulemaking*

Despite a district court ruling to the contrary, which Defendants DOS and Pompeo did not appeal, Defendants contend that the FAM revisions were "interpretive" rather than "substantive" and thus did not need to undergo notice-and-comment rulemaking. The language and documented effects of the FAM Revisions make clear that Defendants are wrong.

The FAM revisions did much more than direct DOS "personnel on how to comply with the legal requirements" imposed by the public charge provision of the INA. Defs' Mem. at 25. The FAM revisions altered the 1999 Field Guidance's definition of "public benefit" to include non-cash benefits not only used by applicants but their household members, imposed retroactive consequences for receipt of such benefits, and "effectively amend[ed] a prior legislative rule." *Sweet* v. *Sheahan*, 235 F.3d 80, 91 (2d Cir. 2000) (quoting *American Mining Congress* v. *Mine Safety and Health Admin*., 995 F.2d 1106,1112 (D.C. Cir. 1993)); *see Mayor and City Council of Baltimore* v. *Trump*, No. 18 Civ. 3636 (ELH), 2019 WL 4598011, at *27 (D. Md. Sept. 20, 2019)

("*Baltimore*"). They did not merely interpret the statute but rather altered the legal consequences of immigrant applicants' actions, and were clearly subject to notice-and-comment rulemaking. *Id*.

Rather than address the specific consequences imposed by the FAM Revisions, Defendants make the radical argument that changes to the FAM can never be substantive. Not one case cited by Defendants supports this position. In *Scales* v. *INS,* 232 F.3d 1159 (9th Cir. 2000), the petitioner challenged a deportation order based on the Immigration and Naturalization Service's statement in the FAM that he needed to prove that a blood relation to his U.S. citizen father; the Ninth Circuit held that statement in the FAM did not interpret the relevant statute and was invalid in part because it had been "'arrived at without a formal adjudication or notice-and-comment rulemaking.'" *Id*. at 1166 (quoting *Christensen* v. *Harris County*, 529 U.S. 576, 587 (2000)).[5] Similarly, Supreme Court's observation in *Christensen* that agency manuals generally do not carry "the force of law" did not exempt agency manuals from judicial review; indeed, the *Christensen* court went on to fully review the Department of Labor's opinion letter, holding that it did not contain a valid interpretation of the statute, effectively altered the relevant regulation without notice-and-comment rulemaking, and was entitled to neither *Chevron* nor *Auer* deference.  529 U.S. at 586-88. Finally, the passing reference in *Miller* v. *Clinton,* 687 F.3d 1332, 1341 (D.C. Cir. 2012) to the FAM as an "informal document" does not render every potential change to it interpretive rather than substantive; indeed, *Miller* expressly declines to determine whether provisions in the FAM "would qualify for *Chevron* deference," *i.e.* constitute provisions "'carrying the force of law.'" *Id*. at 1340-41 (internal citation omitted).  Such rules would of course be subject to notice-and-comment rulemaking.

---

[5]     Interestingly, in *Scales* the government took the opposite position it takes here, urging the court to "defer to the FAM as an agency interpretation of statute." 232 F.3d at 1166.

Defendants' position appears to be that the DOS's mere statement that agency action is interpretive is enough to render it beyond the requirements of 5 U.S.C. § 553. Defs' Mem. at 25, citing *Mejia-Ruiz* v. *INS*, 51 F.3d 258 (2d Cir. 1995). Defendants go on to argue that because the 1999 Field Guidance did not go through notice-and-comment rulemaking, it was not a legislative rule; therefore, the FAM Revisions cannot be seen to "effectively amend[ ]a prior legislative rule." Defs' Mem. at 27-28, citing *Sweet* v. *Sheahan*, 235 F.3d 80, 91 (2d. Cir. 2000). This circular logic, if accepted, would invite agencies to refuse to put substantive regulations through notice-and-comment rulemaking, and then argue that this failure in and of itself justifies evasion of notice-and-comment procedures on any subsequent amendments to the regulation.

This argument is plainly wrong. The Second Circuit uses a four-part test to determine whether an agency action is substantive: "'(1) whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties, (2) whether the agency has published the rule in the Code of Federal Regulations, (3) whether the agency has explicitly invoked its general legislative authority, or (4) whether the rule effectively amends a prior legislative rule.'" *Sweet*, 235 F. 3d at 91 (quoting *American Mining Congress* v. *Mine Safety and Health Admin.*, 995 F.2d at 1112). If an agency action or guideline meets any one of the prongs, it is substantive and subject to notice-and-comment rulemaking. *Id*.

Thus it is crucial to evaluate not merely whether the agency chose to publish the regulation in the C.F.R., but whether "in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits" (prong 1) or whether "the rule effectively amends a prior legislative rule" (prong 2). Section 1182(a)(4) does not provide adequate basis, by itself and without more, for enforcing a denial or benefit of admission. Rather,

"the statute itself forbids nothing except acts or omissions to be spelled out by the [relevant agency] in rules or regulations." *American Mining Congress*, 995 F.2d at 1109 (internal quotation marks omitted). Following the change in the benefits landscape wrought by the PRWORA in 1996, the 1999 Field Guidance was necessary for the agency to deny or grant admission; it thus carried the force of law and is a legislative rule. Because the subsequent FAM Revisions "repudiates or…is irreconcilable with an existing legislative rule, " *id*. at 1113, it "effectively amends" the 1999 Field Guidance and is subject to notice-and-comment procedures.

The transformational effects of the FAM Revisions further confirm they the Revisions are substantive. While historically less than one percent of immigrants have been excluded on public charge grounds, denials of admissions on public charge grounds quadrupled from 2017 to 2018, with the most dramatic increases falling on prospective immigrants from Mexico, South Asia, Haiti, and the Dominican Republic. Mot. at 10. These results cannot be squared with a rule that is merely "interpretive" in nature. Rather, coupled with the alteration of the "public benefits" definition and new negative inferences attached to age under 18 and income below 125% of the FPG, they show that the FAM Revisions were final agency actions that were substantive in nature and thus subject to notice-and-comment rulemaking.   *See Baltimore*, 2019 WL 4598011, at *32 ("[T]he FAM effects substantive changes to the definition of public charge in the INA as interpreted and applied by the State Department.); s*ee also State of N.Y.*, 2019 WL 6902074 at *1(allegation that policy on ICE arrests in state courthouses coincided with a 1700 percent increase in such arrests supported the plaintiffs' APA reviewability argument).

**2.     *DOS Did Not Have "Good Cause" to Evade Notice-and-Comment Rulemaking for the IFR***

The APA's notice-and-comment requirements "are not mere formalities"; they "serve the public interest by providing a forum for the robust debate of competing and frequently complicated

policy considerations." *Nat. Resources Defense Council* v. *Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 115 (2d Cir. 2018) (hereinafter "*NHTSA*").  DOS flouted its obligations here, instead invoking the "good cause" exception of 5 U.S.C. § 553(b)(B) and (d)(3). 84 Fed. Reg. at 55,011. Good cause existed, according to DOS, because absent immediate implementation of the IFR, the public charge standards between DHS and DOS would cause "inconsistent adjudication standards and different outcomes between determination of visa eligibility and determination of admissibility at a port of entry."  *Id*.

The "good cause" exception is limited to circumstances where notice-and-comment would be "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). These circumstances do not exist here.

As the Second Circuit has made clear, the "impracticable" prong is narrow, and generally limited to "emergency situations in which a rule would respond to an immediate threat to safety, such as to air travel, or when immediate implementation of a rule might directly impact public safety." *NHTSA*, 894 F.3d at 114. *See also, e.g., Council of the S. Mountains, Inc.* v. *Donovan*, 653 F.2d 573, 581 (D.C. Cir. 1981) (noting the case was one of "life-saving importance" involving miners in a mine explosion).  DOS confronted no such emergency here when issuing the IFR.

The "unnecessary" prong is similarly inapplicable.  It "is confined to those situations in which the administrative rule is a routine determination, insignificant in nature and impact, and inconsequential to the industry and to the public."  *NHTSA*, 894 F.3d at 114 (citation omitted). Nor does DHS's imminent implementation of its Rule meet the "public interest" standard. "[U]rgency alone [is] sufficient only when a deadline imposed by Congress, the executive, or the judiciary requires agency action in a timespan that is too short to provide a notice and comment period." *United States* v. *Reynolds*, 710 F.3d 498, 511 (3d Cir. 2013). Another agency's

implementation of a similar rule does not meet that standard, especially given that for more than two years, DOS has been content to apply the January 2018 FAM Revisions, despite their inconsistency with longstanding 1999 Field Guidance in place at DHS.

If Defendants' rationale were sufficient to avoid the APA's procedural requirements, an agency could "simply wait until the eve of a statutory, judicial, or administrative deadline" and then claim there was good cause to promulgate rules without providing notice and an opportunity to comment. *NHTSA*, 894 F.3d at 114-15. Moreover, Defendants' own actions undermine their claim that the "good cause" exception applies. DHS issued its Notice of Proposed Rulemaking in October of 2018. Defendants failed to act during the full year in which DHS was considering comments on their proposed public charge rule, as well as the two months following publication of the final DHS Rule in August of 2019. Instead, they waited until just four days before the DHS Rule was to go into effect before releasing the IFR. The "court need not defer to an agency's own finding of good cause," especially in cases where Defendants' rationale is undermined by "the agency's own conduct" in creating a delay. *Make the Rd. N.Y.* v. *McAleenan*, 405 F. Supp. 3d 1, 45, 52 (D.D.C. 2019). Indeed, the Second Circuit has made clear that it "cannot agree . . . that an emergency of [the agency's] own making can constitute good cause." *NHTSA*, 894 F.3d at 115 (quoting *Nat. Res. Def. Council* v. *Abraham*, 355 F.3d 179, 205 (2d Cir. 2004)).

### 3.    *The Promulgation of the Emergency Notice violated the APA*

Defendants appear to argue that the Emergency Notice is an "interpretive" rule, not requiring notice-and-comment, because it was a "notice of information collection" that did not "establish any legal standard or requirement." Defs.' Mem. at 11. This position is belied both by Second Circuit case law, Defendants' actions, and by the content of the Emergency Notice and Policy Announcement.

"When evaluating whether the notice-and-comment requirement applies, courts look 'not to labels given by the agency, but rather to the nature of the impact of the agency action.'" *Saget* v. *Trump,* 375 F. Supp. 3d 280, 363 (E.D.N.Y. 2019) (quoting *L.M.* v. *Johnson*, 150 F. Supp. 3d 202, 215 (E.D.N.Y. 2015) (Garaufis, J.); *Lewis-Mota* v. *Sec'y of Labor*, 469 F.2d 478, 481-82 (2d Cir. 1972)). Defendants' reliance on *United States* v. *Yuzary*, 55 F.3d 47, 50-53 (2d Cir. 1995), Defs.' Mem. at 43, for the premise that DOS' Policy Announcement, Emergency Notice and request for comment are "interpretive" rules is misplaced. Unlike *Yuzary*, which involved a form implementing a statutory requirement, the Proclamation is not codified as "an existing statute or regulation," much less a lawful exercise of Presidential authority under 8 U.S.C. § 1182(f), and Defendants cite no authority whatsoever that would define any agency action implementing an Executive Proclamation as "interpretive." Moreover, *Yuzary* made clear that, "[l]egislative rules are those that 'create new law, rights, or duties, in what amounts to a legislative act.'" *Id.* at 51 (internal citations omitted). And noted *supra* at 6-7, the Emergency Notice and Policy Announcement clearly qualify as legislative rules.

Plaintiffs were deprived of any meaningful opportunity to comment due to the extremely truncated comment period. *See* 5 U.S.C. § 553(c) (requiring that agencies provide interested persons with the opportunity to participate in the rulemaking process). Absent "exigent circumstances in which agency action was required in a mere matter of days," courts have been reluctant to accept such a short comment window, and Defendants failed to identify any exigent circumstances warranting this disregard for the APA. *N.C. Growers' Ass'n, Inc.* v. *United Farm Workers*, 702 F.3d 755, 770 (4th Cir. 2012).

The Consular Rules were promulgated in violation of notice-and-comment procedures: the FAM revisions were substantive and never opened for any comment; the IFR does not meet the

narrowly construed "good-cause" exception; and the extremely short comment period allotted for the Emergency Notice blatantly violated the APA. Plaintiffs are likely to succeed on their arguments that Defendants' promulgation of all three Consular Rules violated the procedural requirements of the APA.

### C.     The Consular Rules Are Contrary to the INA

Defendants provide almost no substantive response to Plaintiffs' argument that the FAM Revisions and the IFR conflict with public charge provision of the INA, which has long applied only to applicants who are facing long-term destitution. Nor do they address Plaintiffs' argument that the Proclamation's exclusive emphasis on possessing qualifying healthcare or resources to cover foreseeable medical costs conflicts with the public charge provision of Section 1182(a)(4), which  requires that five different categories be considered "at a minimum." 8 U.S.C. § 1182(a)(4) (listing "health" and "assets, resources and financial status" along with the other minimum factors of "age," "family status," and "education and skills.").

### 1.     *The FAM Revisions and the IFR Conflict With the INA*

The FAM Revisions penalize applicants for using non-cash benefits (their own or their family members'), being under 18 years old, and having income below 125% of the federal poverty guidelines. Mot. at 12. The IFR, while it does not consider benefits received by applicants' family members, does introduce a complex weighting scheme to predict whether an applicant is likely, at any time in the future, to use 12 months' worth of public benefits, including non-cash benefits, in any three-month period. *Id*. at 12-13. As Plaintiffs have shown, defining or applying the public charge factor to penalize receipt of supplemental benefits or to guess whether an applicant may use a minimal number of supplemental non-cash benefits in the future goes against the plain language of the INA, longstanding and consistent historical interpretation, and Congress's repeated approval of that interpretation and rejection of efforts to redefine it. Mot. at 5-8. This Court has

already concluded that a similar rule promulgated by the Department of Homeland Security ("DHS" and the "DHS Rule") contravenes the INA's definition of "public charge," and is contrary to law in violation of the APA. *Make the Road N.Y.* v. *Cuccinelli*, No. 19 Civ. 7993, 2019 WL 5484638, at *11 (S.D.N.Y. Oct. 11, 2019) ("*MRNY*"). Like the DHS Rule, the FAM Revisions' consideration of non-cash supplemental benefits of applicants and their family members, and the IFR's re-definition of "public charge" represent a sharp break from that historical meaning and thus exceed "the bounds of reasonable interpretation." *Utility Air Regulatory Grp.* v. *EPA*, 573 U.S. 302, 321 (2014).

Defendants seek reconsideration of this Court's reasoning in *MRNY* by pointing to the Supreme Court's order staying this Court's October 11, 2019 order enjoining of the DHS Rule, *Dep't of Homeland Security* v. *State of New York*, 589 U.S. ___, 140 S.Ct. 599 (Jan. 27, 2020). But the Supreme Court did not rule on the merits of the DHS Rule. In her dissent to the Supreme Court's order staying the statewide injunction in *USCIS* v. *Cook County*, 589 U.S. ___ (Feb. 21, 2020), Justice Sotomayor pointed out that in staying the nationwide injunction, "[n]o member of this Court discussed the application's merit apart from its challenges to the injunction's nationwide scope." 589 U.S. ___ (Feb. 21, 2020). An ultimate decision on the merits in the government's favor thus "is far from certain here." *Id*.

Defendants' reliance on the Ninth Circuit's decision staying the injunction is similarly misplaced. *USCIS* v. *City and County of San Francisco* acknowledged the extensive history establishing that "public charge" has a commonly understood meaning of persons "unwilling or unable to care for themselves." 994 F.3d 773, 793 (9th Cir. 2019). The few sources cited by defendants and the Ninth Circuit do not support their alternative reading of the historical meaning of public charge. The consistent, century-long interpretation of "public charge" as unable to care

for oneself and therefore primarily dependent on the government for subsistence is powerful evidence of the meaning of that term. "[A] long-standing, contemporaneous construction of a statute by the administering agencies is entitled to great weight, and will be shown great deference." *Leary* v. *United States*, 395 U.S. 6, 25 (1969); *see United Airlines* v. *Brien*, 588 F.3d 158, 172 (2d Cir. 2009). Courts and immigration agencies have uniformly held that receipt (or likely future receipt) of benefits does not render a person a public charge absent additional circumstances showing that she will not be able to fend for herself. Mot. at 4–8.

Moreover, Defendants do not adequately address Plaintiffs' argument that Congress's repeated reenactment of the public charge provision without relevant change evidences its approval of the agency interpretation. (*Id.*). "It is well established that when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the 'congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.'" *CFTC* v. *Schor*, 478 U.S. 833, 846 (1986); *see Helsinn Healthcare S.A.* v. *Teva Pharms. USA, Inc.*, 139 S. Ct. 628, 633-34 (2019) ("[W]e presume that when Congress reenacted the same language in [a new statute], it adopted the earlier judicial construction of the phrase."); *Forest Grove Sch. Dist.* v. *T.A.*, 557 U.S. 230, 239-40 (2009) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."); *Toyota Motor Mfg., Ky., Inc.* v. *Williams*, 534 U.S. 184, 193-94 (2002) ("Congress's repetition of a well-established term generally implies that Congress intended the term to be construed in accordance with pre-existing regulatory interpretations."); *Bob Jones University* v. *United States*, 461 U.S. 574, 600-01 (1983) (Congress's repeated consideration and rejection of bills intended to overturn the IRS's interpretation was "significant" evidence of "Congressional approval of the [IRS] policy.").

18

Congress's repeated rejection of attempts to redefine public charge in the way DOS does here, Mot. at 5-6, makes clear that Defendants' redefinition goes far beyond permissible interpretation of the statute.

### 2. *The Proclamation Conflicts with the INA and Violates Separation of Powers Principles*

The Proclamation does not supplement an enumerated ground for exclusion, Defs.' Mem. 40-41. Instead, it impermissibly "override[s a] particular provision[] of the INA." *Trump* v. *Hawai'i*, 138 S. Ct. 2392, 2411 (2018). Specifically, it replaces the mandatory five-factor test which must include consideration of all five factors "at a minimum," as enumerated under 8 U.S.C. § 1182(a)(4), reducing it to a single factor requirement, and disregards the statutory exemptions for certain survivors of violent crime or domestic violence and their family members. *See* Mot. at 31-33. It also appears to conflict with and override admissibility determinations for victims of domestic violence under the Violence Against Women Act ("VAWA") Provisions of § 1182(a)(4)(E). *See* Mot. 14 n. 14. In contrast, the 2009 Proclamation cited by Defendants in their Opposition brief did nothing to override 8 U.S.C. § 1182(a)(2)(H) at all. *See* Defs.' Mem. 41 (*citing* 74 Fed. Reg. 4093 (Jan. 16, 2009)). Section 1182(a)(2)(H) excludes individuals who had trafficked individuals or who had aided in such trafficking. Complementing that statute, the 2009 Proclamation suspended entry of a new and different class of individuals: foreign government officials and their spouses who impeded or failed to implement "international antitrafficking standards." 74 Fed. Reg. 4093; *cf. Abourezk* v. *Reagan,* 785 F.2d 1043, 1049 n.2 (Ginsburg, J.) (noting that § 1182(f) provides residual authority for those "class[es] of cases . . . *not covered* by one of the categories in Section 1182(a)") (emphasis added). The 2009 Proclamation, much like

every use of Section 1182(f) of the INA prior to this Administration, cannot be said to have supplanted the will of Congress.[6]

Second, Defendants fail to point to a single example of any President exercising the proclamation power under 8 U.S.C. § 1182(f) in the pursuit of goals that are exclusively domestic in interest.  Instead, Defendants argue that, by definition, no exercise of Section 1182(f) power can be purely domestic because the "exclusion of foreign nationals . . . is always a matter of foreign affairs."  Defs.' Mem. 40-41.  This claim of virtually unlimited scope of Section 1182(f) power has no basis in either Supreme Court precedent or past Presidential practice.  Indeed, all past exercises of Section 1182(f) power have involved either efforts to impact the actions of other states by "retaliat[ing] for conduct by . . . governments that conflicted with U.S. foreign policy interests," *Hawai'i*, 138 S. Ct. at 2413, or have adopted "'preventive measure[s] . . . in the context of international affairs and national security" *id. at* 2409 (citing *Holder* v. *Humanitarian Law Project*, 561 U.S. 1, 35 (2010)).  Because no past use of the Section 1182(f) power was based on solely domestic policy considerations, no court has ever endorsed Defendants' new unbounded theory of Section 1182(f) power in any of these previous contexts.  Instead, the only court to consider this claim has rejected it. *See Doe #1* v. *Trump*, 2019 WL 6324560, at *1. This Court should do so as well.

---

[6]   *Sale* v. *Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 188 (1993), Defs.' Mem. 41, merely stands for the proposition that the President can supplement existing entry restrictions, but it does not sanction the Executive *overriding* existing restrictions governing admissibility in the INA.  In *Sale,* the Court examined Presidential proclamations related to naval blockade powers among the Coast Guard. The Court found that the proclamations at issue did not conflict with § 243(h)(1) of the INA, (codified as amended at 8 U.S.C. § 1231(b)(3)), which addresses the Attorney General's power to suspend deportation, because such determinations only applied domestically -- once individuals arrived in the U.S. or at the border to permit legal entry.  *See id.* at 159-88.  Accordingly, the Presidential proclamations in *Sale* addressing naval blockade powers did not operate in the same "sphere" as domestic admissibility determinations under 8 U.S.C. § 243(h)(1).  *See Hawai'i*, 138 S. Ct. 2392, 2414.  Here, in sharp contrast to the extraterritorial foreign and military affairs addressed in *Sale, id.* at 188, as noted *supra* and at Mot. 13-16, the Health Care Proclamation, on its face, purports to address expressly domestic concerns of the in-country uncompensated use of medical care.

Indeed, Defendants' argument provides one more illustration of why this Court should recognize that the Proclamation is outside the scope of 8 U.S.C. § 1182(f).  If this low water mark of exclusion under Section 1182(f) is permissible, then there is virtually zero constraint on the Executive's ability to overrule Congress's complete and proper control of the immigration system, resulting in an unconstitutional delegation of legislative authority. *Cf. Fiallo* v. *Bell*, 430 U.S. 787, 789 (1977) ("over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens") (internal quotations omitted); *Doe* v. *Trump,* No. 3:19-CV-1743-SI, 2019 WL 6324560, at *9 (D. Or. Nov. 26, 2019) (enjoining the Proclamation as a violation of the nondelegation doctrine, observing that "Congress may not transfer to another branch 'powers which are strictly and exclusively legislative.' ") (quoting *Gundy* v. *United States*, ___ U.S. ___, 139 S. Ct. 2116, 2123 (2019); *Wayman* v. *Southard*, 23 U.S. (10 Wheat.) 1, 42-43, 6 L.Ed. 253 (1825)).

However, should this Court reach this issue, it should reject Defendants' half-hearted attempts to justify this delegation on the grounds that it concerns the admissibility of noncitizens. First, the delegation of authority at issue in *United States ex rel. Knauff* v. *Shaughnessy*, 338 U.S. 537 (1950), cited by Defendants at Defs.' Mem. 41, was directly tied to the President's own Article II war powers, and thus not a delegation of full *legislative* power as Defendants' proffered understanding of Section 1182(f) would necessarily produce.  *See Knauff* 338 U.S. *at* 544-45 (restrictions on entry of noncitizens was limited to "when the United States is at war or during the existence of the national emergency proclaimed May 27, 1941").  Additionally, Defendants rely on a misattributed citation to a *dissent* in *Abourezk* as though it was the majority opinion.  *Cf.* Defs.' Mem. 41 *with Abourezk* v. *Reagan,* 785 F.2d 1043, 1063 (Bork, J., dissenting) (*quoting Zemel* v. *Rusk*, 381 U.S. 1, 17 (1965)).  A closer inspection of the underlying case does not help

the Defendants.  In *Zemel*, the Court applied a limiting construction of another statutory provision that provided for a Presidential proclamation of war or national emergency, Section 215 of the Immigration and Nationality Act of 1952, 66 Stat. 190, 8 U.S.C. § 1185 (1958 ed.), to ensure that it was not presented with the issue of an unconstitutional delegation of power.  Indeed, the Court recognized that even where "a statute deals with foreign relations," it does not follow that "[the statute] can grant the Executive totally unrestricted freedom of choice." 381 U.S. at 17.

### D.    The Consular Rules are Arbitrary and Capricious

The Consular Rules are Arbitrary and Capricious and Defendants' arguments to the contrary are unpersuasive.

#### 1.    *The FAM Revisions are Arbitrary and Retroactive*

Defendants do not address Plaintiffs' arguments that the FAM revisions are arbitrary and capricious. Mot. 25–30. Nor can they, as DOS has never provided a rationale for its abrupt departure from the 1999 Field Guidance. *See Baltimore*, 2019 WL4598011 at *29 (finding plaintiffs adequately alleged that FAM revisions were arbitrary and capricious); *see also Motor Vehicle Mfrs. Ass'n of the U.S.* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43(1983). Plaintiffs thus rest on their position in their opening brief that the DOS's alteration of the definition of "public benefits," its consideration of household members' receipt of benefits to penalize the applicant, and the additional factors slipped into the FAM Revisions are arbitrary and capricious. Mot. at 25–30.

The FAM revisions are also impermissibly retroactive. Defendants argue that the FAM revisions are not retroactive because they do not attach new legal consequences to Plaintiffs' actions, and they misstate the decision in *Baltimore*, implying that the court concluded only that the FAM revisions were "secondarily retroactive." Defs' Mem. at 29-31. These arguments do not

address the dramatic consequences that the FAM Revisions attached to past acts in the absence of Congressional authority to promulgate retroactive regulations.

The FAM Revisions penalize applicants for admission for their own and their household members' use of non-cash benefits at any time in the past. 9 FAM § 302.8-2(B)(1). They do so by requiring consular officers to consider such past use, even though, under the 1999 Field Guidance, such non-cash benefits, as well as any benefits received by household members such as U.S. citizen children, were explicitly rendered irrelevant to the public charge determination. To justify these revisions, Defendants cite *Boniface* v. *U.S. Department of Homeland Security*, 613 F. 3d 282 (D.C. Cir. 2010), which permitted the retroactive use of "past criminal convictions" in future licensing decisions. Defs' Mem. at 30.  But unlike the appellant in *Boniface*, the FAM Revisions penalize applicants for prior conduct that was completely *legal*. "Before the changes to the [FAM], the receipt of these benefits was not only lawful, but also sanctioned by the FAM." *Baltimore*, 2019 WL 4598011 *30. Similarly, in *Herrera-Molina* v. *Holder*, the Second Circuit considered the case of an alien who married a United States citizen before IIRIRA went into effect, but applied for adjustment of status after the effective date of IIRIRA, and failed to prove any reliance on government action or statute. *Herrera-Molina v Holder*, 597 F3d 128, 134-136 (2d Cir. 2010). Unlike in *Herrera-Molina*, nothing here bars Individual Plaintiffs from applying for admission, and Plaintiffs relied on the pre-2018 FAM's express safe-harbor provisions for the receipt of non-cash benefits. Ehrlich Decl., Ex. 1. The INA does not authorize DOS to attach retroactive penalties to lawful and indeed authorized conduct, and the FAM revisions are impermissibly retroactive and are also secondarily retroactive. *Baltimore*, 2019 WL 4598011 *30. ("Immigrants (and their families) had 'settled expectations' that receipt of non-cash benefits would have no effect on visa determinations…. Accordingly… the changes to the FAM are retroactive.").

2.      *The IFR is Arbitrary and Capricious*

Defendants misconstrue Plaintiff's arbitrary and capricious argument by concluding that it concerned the "prospective" nature of the public charge determination or the "individualized judgements" granted to consular officers. Mot. at 37-39. Further, Defendants claim that each of the factors is they consider are rationally related to their public charge inquiry. *Id.*

Plaintiffs do not challenge the prospective nature of the public charge inquiry nor the individual judgments of consular officers. Instead, Plaintiffs argue that the IFR offers no rationale for the 12/36-month standard or its stacking scheme, and that the discretion allotted to consular officers to make determinations on a broad array of factors renders the IFR arbitrary and capricious. As with DHS in its promulgation of the Final Rule, "[h]ere, Defendants fail to provide any reasonable explanation for the changing definition of 'public charge' or the framework for evaluating whether a noncitizen is likely to be become a public charge." *MRNY*, 2019 WL 5484638, at *8. Furthermore, Defendants fail to address the IFR's silence as to the standards for a consular officer evaluating an applicant's English proficiency.

Defendants never address the internal inconsistency of the IFR's stacking scheme. The IFR purports not to penalize temporary receipt of public benefits. Yet, the receipt of two public benefits in one month counts as two months for purposes of the 12/36 threshold, *see* 22 C.F.R. § 40.41(b). This internal inconsistency alone renders the IFR arbitrary and capricious. *See Batalla Vidal* v. *Nielsen*, 279 F. Supp. 3d 401, 428 (E.D.N.Y. 2018) ("it would be arbitrary and capricious for the agency's decision making to be internally inconsistent") (quoting *Nat'l Res. Defense Council* v. *U.S. Nuclear Reg. Comm'n*, 879 F.3d 1202, 1204 (D.C. Cir. 2018)).

Defendants' decision to negatively consider a 17-year-old applicant's age is likewise arbitrary and almost nonsensical. While Section 212(a)(4) of the INA authorizes DOS to consider "age" as a factor, it makes no sense at all to attach a negative weight to age under 18, given that

lawful permanent residents are generally not eligible for federal benefits for five years after obtaining LPR status. Thus consular officers will attach negative weight to the age of 17-year-old seeking admission, even though she will not be eligible for SNAP until the age of 22, while remaining neutral on an 18-year-old who will not be eligible for the same benefit until the age of 23. This result is capricious.

"In short, Defendants do not articulate why they are changing the public charge definition, why this new definition is needed now, or why the definition set forth in the Rule—which has absolutely no support in the history of U.S. immigration law—is reasonable. The Rule is simply a new agency policy of exclusion in search of a justification. It is repugnant to the American Dream of the opportunity for prosperity and success through hard work and upward mobility. Immigrants have always come to this country seeking a better life for themselves and their posterity. With or without help, most succeed." *MRNY*, 2019 WL 5484638 at *9.

### 3. The DOS Agency Actions Implementing the Proclamation Are Contrary to Law and Arbitrary and Capricious

The APA prohibits agency action that is arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. *See* 5 U.S.C. § 706(2). For the same reasons stated above with regard to how the Proclamation itself attempts to unlawfully override the INA, as codified at 8 U.S.C. Section 1182(a)(4), DOS agency implementing actions, including the DOS Policy Announcement and Emergency Notice and request for public comment, as final agency actions that incorporate the Proclamation with substantive legal and legislative effect, are contrary to law where they also attempt to "amend the INA" and override Section 1182(a)(4).  *E . Bay Sanctuary Covenant*, 932 F.3d at 770, 774 ("The Proclamation attempts to accomplish one thing. In combination with the Rule, it does indirectly what the Executive cannot do directly: amend the INA"). When the DOS Emergency Notice and Policy were published, they explicitly sought to "establish standards and

procedures for governing" admissibility determinations under the Proclamation, as of the date the Proclamation was set to go into effect.   Ehrlich Decl., Ex. 7, 84 Fed. Reg. at 58,199. In implementing the terms of the Proclamation, DOS's actions effectively override the mandatory five-factor test which must include consideration of all five factors "at a minimum," as enumerated under 8 U.S.C. § 1182(a)(4), reducing it to a single factor requirement, and disregard the statutory exemptions for certain survivors of violent crime or domestic violence and their family members.  *See* Mot. at 13, 31-33.

Moreover, Defendants fail entirely to address the arbitrary and capricious nature of the Emergency Notice and the Proclamation. Defendants do not articulate a "rational connection between the facts found and the choices made." *Nat. Res. Def. Council* v. *EPA.,* 658 F. 3d 200, 215 (2d Cir. 2011) (citations omitted).  They do not discuss the unworkability or obscurity of the Proclamation and Emergency Notice, nor do they address the fact that many of the officially "approved" health plans are legally or practically unavailable to many immigrants. *See Doe #1,* 2019 WL 5685204 at *4; Ehrlich Decl., Ex. 13, Sbrana Decl., ¶¶ 8–9; *id.*, Ex. 11, Palanker Decl., Ex. A, ¶¶ 23–24. Defendants fail to justify the exclusion of health plans available through the Affordable Care Act and they fail to address the numerous terms that go undefined by the Proclamation and the Emergency Notice. Indeed, at the same time that Proclamation and DOS's implementing actions exclude health plans promulgated under the ACA, DHS's Manual implementing the DHS public charge rule states that ACA plans should be considered the standard for adequate coverage. USCIS Manual, Section G, Chapter 9 at 6 ("Not all health insurance plans provide for adequate coverage. An officer should generally consider whether a plan meets the requirements of the Affordable Care Act in limiting cost-sharing, including deductible co-payments, and out of pocket maximum amounts. . . . A health insurance with a high deductible or

other cost-sharing costs would carry less positive weight in the totality of circumstances consideration"). Nor do they offer any rationale for how the Proclamation and Emergency Notice will reach their stated goals.

## II.    Plaintiffs Have Standing and Their Claims Are Ripe and in the Zone of Interests of the INA

### A.    Individual Plaintiffs Are Actively Engaged in the Process of Obtaining Lawful Permanent Residence and Face Harm from the Consular Rules

Brenda Doe, Carl Doe, Diana Doe, and Eric Doe will be harmed as a result of the implementation of the Consular Rules. All four face permanent family separation and deterrence from benefits for which they are otherwise eligible, as well as prolonged insecurity and instability because of their uncertain immigration status. They therefore have standing to challenge the Consular Rules.

To establish standing, plaintiffs "bringing a pre-enforcement facial challenge against a statute need not demonstrate to a certainty" that they will be affected; instead they need only show that they have "an actual and well-founded fear that the law will be enforced against [them]." *Pac. Capital Bank, N.A.* v. *Connecticut*, 542 F.3d 341, 350 (2d Cir. 2008) (citations omitted); *see also United States Army Corps of Eng'rs* v. *Hawkes Co.*, 136 S. Ct. 1807 (2016) ("parties need not await enforcement proceedings before challenging final agency action where such proceedings carry the risk of 'serious criminal and civil penalties'") (quoting *Abbott Labs* v. *Gardner*, 387 U.S. 136, 153 (1967)). Insofar as defendants and plaintiffs disagree about how a statute should be read pre-enforcement, "[i]f a plaintiff's interpretation of a statute is reasonable enough and under that interpretation the plaintiff may legitimately fear that it will face enforcement of the statute, then the plaintiff has standing to challenge the statute." *Pac. Capital Bank, N.A.*, 542 F.3d at 350. (citations omitted); *see also Susan B. Anthony List* v. *Driehaus*, 573 U.S. 149, 158-59 (2014) (permitting pre-enforcement challenge to statute).

27

Defendants' argument that the Individual Plaintiffs lack standing because they have not identified specific dates on which each will leave the country has no support in the case law. Defs' Mem. at 16-17. Three of the four individual Plaintiffs bringing this motion are actively engaged in the lengthy process of applying for lawful permanent residence, and the fourth is sponsoring his wife Ehrlich Decl. Ex. 14, Brenda Doe Decl., ¶¶ 9-12; *id.*, Ex. 15, Carl Doe Decl., ¶¶ 8-9; *id.*, Ex. 16, Diana Doe Decl., ¶¶ 8-9; *id.*, Ex. 17, Eric Doe Decl., ¶¶ 3, 7, 9. They have approved I-130 applications, have either won or are in the process of submitting requests for I-601A waivers, and are preparing the paperwork and plans for completing the immigration process. Individual Plaintiffs do not assert indefinite plans or "'some day intentions'," as Defendants argue, Defs.' Mem. at 17, but rather evidence their desire to continue to follow the process established by DOS that they must but rather evidence their desire to continue to follow the process established by DOS that they must complete to maintain family unity within the United States.

Furthermore, although Defendants speculate that they may change the challenged policies by the time at which applicants undergo their interviews, "the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Davis* v. *FEC*, 554 U.S. 724, 734 (2008) (citations omitted). Plaintiffs have a clear stake in the outcome of this suit and cannot be prohibited from challenging the Consular Rules on the unfounded speculation that DOS might rethink their public charge scheme at some future date.

Defendants further argue that Individual Plaintiffs cannot be harmed by the Proclamation because they do not have "reasonably foreseeable medical costs that they cannot cover." Defs' Mem. at 15-16. This argument is wrong. In some cases, the Doe plaintiffs have chronic health conditions that cause daunting medical expenses. In particular, Diana Doe has diabetes. Ehrlich Decl. Ex. 16, Diana Doe Decl. at ¶ 16.

Defendants also respond by suggesting the Proclamation would not be enforced to exclude those Doe plaintiffs who are currently healthy. Defs' Mem. at 16.  That would be a welcome (though insufficient) development, but there is nothing in the text of the Proclamation limiting the scope of "reasonably foreseeable medical costs" to only the medical costs of people with current medical conditions or illnesses. .  Indeed, the Administrative Record is replete with commentary from DOS employees concerned about how to make this determination to which DOS supervisors cannot provide concrete answers. *See, e.g.*, Ehrlich Decl. Ex. 56, at 00114-120. In fact, given that the Proclamation states that the administration intends to enforce it "to the maximum extent possible," (*see* 84 Fed. Reg. at 53993), it is only natural to assume the opposite.  Medical expenses of all intending immigrants are relevant to the Proclamation under a "reasonable enough" reading, *Pac. Capital Bank, N.A.*, 542 F.3d at 350, which is sufficient to establish standing regardless of what representations Defendants make about their enforcement plans in their briefing papers.

Even if the court embraced a more narrow reading of the Proclamation, Individual Plaintiffs still have standing, because if they are judged to have reasonably foreseeable medical costs, they will need to buy health insurance plans for which they will not be reimbursed. Ehrlich Decl. Ex. 16, Diana Doe Decl. ¶ 16. For example, Diana Doe has diabetes, and it is unclear how consular officers will estimate what constitute "reasonably foreseeable" costs. *See id*., Ex. 56 (Admin Rec.) at 000116-17 (quoting webinar training for consular officers stating that "we can't provide a cost estimate for certain medical conditions" such as diabetes). The fact that Diana Doe has been able to pay for diabetes treatment at community clinics in the past does not mean that a consular officer will not make the prediction that she will be unable to afford them in the future. Further, the fact that to avoid the risk of denial of admission, she will be compelled to use savings to purchase expensive private insurance that may not even cover her medical needs provides her

with standing for injunctive relief.  Without funds to support herself in Ciudad Juarez, Mexico as she awaits consular processing, she will not have the resources to live on or to guard against emergencies. *Id.*, Ex. 16, Diana Doe Decl., ¶16.

In short, the decisions that Individual Plaintiffs face because they are subject to the Consular Rules—whether to withdraw from benefits, whether to purchase wasteful private insurance plans for which they will not be reimbursed, or whether to abandon the last steps of the process for lawful permanent residence—constitute immediate, concrete harm and demonstrate standing.

### B.    Organizational Plaintiffs Currently Experience Harm Through Diversion of Resources and Harm to Their Members, and Are Within the Zone of Interests of the INA.

In *MRNY*, this Court rejected lack-of-standing arguments identical to Defendants' here for four of the five Organizational Plaintiffs.  As the Court recognized, an organization has standing when it is forced "to divert money from its other current activities to advance its established organizational interests[.]" *Centro de la Comunidad Hispana de Locust Valley* v. *Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017); *Citizens for Responsibility & Ethics in Wash.* v. *Trump*, 276 F. Supp. 3d 174, 190 (S.D.N.Y. 2017) ("*CREW*") ("[A]n organization has standing where it is forced to expend resources to prevent some adverse or harmful consequence on a well-defined and particularized class of individuals."), *rev'd on other grounds*, 939 F.3d 131 (2d Cir. 2019). "[O]nly a perceptible impairment of an organization's activities is necessary for there to be injury-in-fact." *Nnebe* v. *Daus*, 644 F.3d 147, 157 (2d Cir. 2011), citing *Havens Realty Corp.* v. *Coleman*, 455 U.S. 363, 379 (1982). In *Nnebe*, the court held that a taxi drivers' advocacy group had standing to assert due process claims challenging the defendants' policies for suspending taxi licenses where those policies required the organization to "expend[] resources to assist its members . . . by providing initial counseling, explaining the suspension rules to drivers, and assisting the drivers in

obtaining attorneys." *Id.* "[S]omewhat relaxed standing rules apply" in cases like this, where "a party seeks review of a prohibition prior to its being enforced." *Oyster Bay*, 868 F.3d at 110. Where "multiple parties seek the same relief, the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Id*. at 109 (quoting *Rumsfeld* v. *Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)).

All five Organizational Plaintiffs have standing to challenge the Consular Rules. Defendants do not dispute that each Plaintiff has already devoted substantial resources to mitigating the Rule's impact on its clients, to the detriment of its other activities, and that this impact will only worsen now that the IFR has become effective.[7] *See* Defs' Mem. at 18; Mot. at 45-46. For example, as its noncitizen clients forgo public benefits and services, Plaintiff African Services Committee ("<u>ASC</u>") has seen increased demand for its food pantries and health services. As a result, ASC will be forced to turn clients away. Ehrlich Decl. Ex. 19, Nichols Decl. ¶¶ 15-16. Plaintiffs that provide direct legal services—MRNY, ASC, CARECEN-NY, CCCS-NY, and CLINIC—must spend additional time and resources on applications for adjustment of status and related proceedings, with correspondingly less time and resources available to represent clients in other immigration matters. *Id*., Ex. 18, Oshiro Decl. ¶¶ 27, 35, 41; *id*., Ex. 19, Nichols Decl. ¶¶ 24-26; *id*., Ex. 20, de Castillo Decl. ¶ 12; *id*. Ex. 21, Russell Decl. ¶¶ 22-24; *id*., Ex. 22, Wheeler Decl. ¶¶ 10-16. These and similar harms affect more than Organizational Plaintiffs' "abstract social interest." Rather, their inability to provide their full spectrum of services harms real human beings who it is Plaintiffs' missions to serve.

---

[7]    For example, ASC's clients have already refused to apply for cash-assistance programs and are instead relying on ASC's housing-assistance programs, jeopardizing the sustainability of ASC's ability to serve its participants. *See, e.g.*, Ehrlich Decl. Ex. 19, Nichols Decl. ¶¶ 18-20.

Defendants' reliance on *CREW* is misplaced. This Court emphasized in *CREW* that the "common thread" in Second Circuit organizational standing cases is that the "organization was compelled to act, with a consequent drain on [its] resource[s], to remedy and counter the adverse consequences flowing from the defendant's conduct or policy." 276 F. Supp. 3d at 190. The plaintiff in *CREW* lacked standing because it failed to allege that the defendants' actions impeded its performance of mission-related activities, or that it used resources to remedy the consequences of defendants' conduct. *Id*. Plaintiffs here, by contrast, have shown that the Defendants' actions have caused them to "expend resources they would not have otherwise spent to avert or remedy some harm."[8] *See id*.

Defendants also contend that Organizational Plaintiffs' claims are not ripe because their allegations of irreparable harm "consist of potential future harms" that would be spurred by decisions of third parties.[9] Defs' Mem. at 14. First, the harms caused by the Consular Rules are not future or prospective; they are already occurring. *E.g.*, Ehrlich Decl., Ex. 18, Oshiro Decl., ¶¶ 32-34; *id*., Ex. 21, Russell Decl., ¶¶ 20-23, 27-34, 36; Ex. 22, Wheeler Decl., ¶ 18.  In any case, the Supreme Court rejected this argument in *Dep't of Commerce* v. *New York*, when it held that New York had standing because its claims rested "on the predictable effect of Government action on the decisions of third parties."  139 S. Ct. 2551, 2556 (2019); *accord CREW II*, 939 F.3d at 150 (That "[p]laintiffs' theory of harm results from decisions of third parties does not preclude finding the cognizable link between the challenged action and the alleged harm that Article III requires.").

---

[8]  Defendants' assertion that a "need to make changes to services the plaintiffs were already providing is not a valid basis for standing," Defs.' Mem. at 18-20, is contrary to the law of this Circuit. The organizational plaintiff in *Nnebe* had standing because it devoted resources to assisting members in defending against legal claims, although doing so was part of its ordinary activities. 644 F.3d at 157–58.

[9]  Defendants argue that plaintiffs' claims are not constitutionally ripe for the same purported "injury-in-fact" rational that defendants supposedly lack standing. Defs.' Mem. at 14–15. Because plaintiffs have standing, this argument should be rejected.

The court in *Baltimore* rejected a similar argument in a challenge to changes to the FAM Revisions challenged here, holding that the impact of the changes on the plaintiff municipality rested on predictable, and intended, activity by potential immigrants. 2019 WL 4598011, at *17. Here, too, the harms to plaintiffs from their noncitizen clients are not speculative, but, as made clear by the DHS Final Rule on which the DOS IFR relies, are results that defendants anticipated and intend. (*See* 84 Fed. Reg. at 41,301; RIA at 3–7, Table 11 at 36–37, 101–10 (describing costs to "immigration advocacy groups," among others).)[10]

Finally, Defendants contend that the organizations lack standing, because *only* a noncitizen wrongly deemed inadmissible as a public charge falls within the zone of interests of section 212(a)(4) of the INA. Defs' Mem. at 22. Yet, as this Court has already held, Plaintiffs "plainly fall within the INA's zone of interests." *MRNY*, 2019 WL 5484638, at *6. The test forecloses suit only when "a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it" would be unreasonable to "assume[] that Congress authorized that plaintiff to sue." *Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*, 572 U.S. 118, 130 (2014).[11] Conversely, plaintiffs "injured by the defendant's alleged violation of a limiting law may sue to enforce the limitation." *Citizens for Responsibility & Ethics in Wash.* v. *Trump*, 939 F.3d 131, 158 (2d Cir. 2019) ("*CREW II*")." In determining Congress' intent, courts must assess not merely the specific provision at issue, but also its "overall context" and "Congress's overall purpose in" enacting the statute. *Clarke* v. *Sec. Indus. Ass'n*, 479 U.S. 388, 401 (1987); *see*

---

[10]   Defendants contend that withholding judicial consideration now will not cause Plaintiffs "significant hardship." Defs' Mem. at 10. But Plaintiffs have already suffered injury and will continue to do so it the Rule is not enjoined. *See* Mot. at 37. Defendants do not identify further factual development that would assist the court and justify delay.

[11]   The test is "not meant to be especially demanding." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians* v. *Patchak*, 567 U.S. 209, 225 (2012) (citation omitted). Indeed, it assumes that "agency action [is] presumptively reviewable" under the APA, and gives plaintiffs "the benefit of any doubt." *Id.*

*Patchak*, 567 U.S. at 226 (analyzing the provision's "context and purpose" and its "role in the [Act's] overall effort."); *Lexmark*, 572 U.S. at 131-32 (same).

Organizational Plaintiffs easily satisfy that standard. Courts have repeatedly held that the INA explicitly contemplates the participation of immigrant advocacy organizations, such as the Plaintiffs, thereby placing them within the statute's zone of interests. *See, e.g.*, *E. Bay Sanctuary Covenant* v. *Trump*, 909 F.3d 1219, 1245 (9th Cir. 2018) (collecting INA provisions that give organizations "a role in helping immigrants navigate the immigration process"), *superseded*, 932 F.3d 742 (9th Cir. 2018); *see also* Mot. at 39-41 (collecting cases). Moreover, Plaintiffs have suffered substantial economic harms as a result of the Rule, and will continue to do so. *See* Mot. at 45-56. These "economic injuries" independently situate Plaintiffs within the statute's zone of interests. *See CREW II*, 939 F.3d at 156 (noting "the longstanding view that a plaintiff's economic injury usually makes her a 'reliable private attorney general.'") (citation omitted).[12]

The government misstates both the law and the facts when it suggests that § 1182 reflects no "concern for the interests of immigrant service and advocacy organizations." MTD at 22. The test does not require any "indication of congressional purpose to benefit the would-be plaintiff." *E.g. Patchak*, 567 U.S. at 225. Instead, Plaintiffs' interests need only be "arguably within the zone of interest to be protected or regulated by the statute." *E.g., id.*, at 225-27 (quotations omitted). Here, as the DHS has conceded, the INA's purposes include promoting "family unity, diversity, and humanitarian assistance," 84 Fed. Reg. at 41,306, which are all core components of the Plaintiffs' missions. *See* Mot. at 46. The public charge provision "at least arguably" regulates

---

[12]   Plaintiffs' economic injury similarly places them squarely within the zone of interests of the Fifth Amendment. *See CREW*, 2019 WL 4383205, at *15 n.13 (rejecting argument that the zone of interests test is more strictly applied to constitutional claims than APA claims); *cf. Nnebe*, 644 F.3d at 156 (finding that advocacy organization had standing to assert Due Process claim based on alleged economic injury sustained by virtue of diverted resources).

these interests by setting limits on who can be excluded on public charge grounds. *Patchak*, 567 U.S. at 227. The Defendants' violations of these statutory limits have thus predictably frustrated Plaintiffs' organizational missions and caused them associated financial harm.[13] Plaintiffs are therefore "reasonable—indeed, predictable—challengers of the [Defendants'] decisions: Their interests, whether economic," or otherwise, "come within [§ 1182's] regulatory ambit."

## III.   Plaintiffs Meet the Equitable Factors For Injunctive Relief

Defendants attempt to summarily dismiss Plaintiffs' showing of irreparable harm, Defs. Mem. at 20, 48, but the record contains ample evidence of the irreparable harm supporting Plaintiffs' claims for injunctive relief. *See generally* Mot. 41-46 (citing individual and organizational plaintiff declarations containing allegations of irreparable harm).

*First*, preliminary injunctive relief is the only remedy that would stem the harm suffered by the Individual Plaintiffs because the *only* barriers standing between them and a successful immigrant visa application are the Consular Rules, for the reasons explained in the Plaintiffs' opening brief. Mem. at 43, n. 30-35. In pursuit of their goal of becoming lawful permanent U.S. residents, Individual Plaintiffs have invested enormous time, emotional energy, and money preparing their immigrant visa applications. Without permanent status, they live with the insecurity that comes with uncertain status and the fear of separation from their families. Individual Plaintiffs have followed the rules to seek sponsors and to obtain waivers of the unlawful presence bar by pursuing I-601A waivers, an extensive and time-consuming process itself. The waivers have been approved (Brenda Doe, Eric Doe's wife, Carl Doe) or are actively being prepared (Diana Doe).

---

[13]   *See, e.g.*, Ehrlich Decl., Ex. 18 Oshiro Decl. ¶¶ 5, 36, JA 314, 324 (Plaintiff Make the Road New York's mission is to "build[] the power of immigrant and working-class communities to achieve dignity and justice through organizing, policy innovation, transformative education, and survival services"); *id.*, Ex. 21, Russell Decl. ¶¶ 4, 42, JA 339, 353; *id.*, Ex. 19, Nichols Decl. ¶¶ 4, 7-8, 10, 12, 15, 18, 20, 24, 26, JA 464-74; *id.*, Ex. 21, Wheeler Decl. ¶¶ 10, 14, 16, 18, JA 502-05; *id.*, Yoo Decl. ¶¶ 21-25, JA 491-93.

*See* Ehrlich Decl., Ex. 14, Brenda Doe Decl. ¶ 9; *id*., Ex., 15 Carl Doe Decl. ¶ 8; *id*., Ex., 17, Eric Doe Decl. ¶ 7; *id*., Ex. 16, Diana Doe Decl. ¶ 9. Where approved, USCIS has necessarily found that separation would cause "extreme hardship" to a U.S. citizen spouse or child. *See* INA § 212(a)(9)(B)(v).  Unless the Consular Rules are enjoined, Individual Plaintiffs cannot move forward without a very high chance of denial, and the prospect of indefinite family separation that will follow.

Apart from the distress of living in the state of legal limbo in which they now exist, the Individual Plaintiffs cannot simply wait for a final judgment, as Defendants suggest. *See* Defs. Mem. at 20. Each day they are unable to move forward safely with their visa applications, they lose the enormous benefits of LPR status, such as work authorization and freedom from fear of removal, provided they follow the rules. For example, Brenda Doe would be able to contribute to the household income if she obtains work authorization, and given her husband's disability the family would benefit greatly from her income. Ehrlich Decl., Ex. 14 Brenda Doe Decl. ¶ 14. Waiting also presents the concrete risk that if Plaintiffs ultimately prevail in this case, and then move forward with consular processing, that their applications generally, and their I-601 waivers specifically, will be remanded to USCIS because they are out of date and the factual circumstances supporting their petition may have changed.  *See, e.g.,* 9 FAM 504.2-8(A)-(B) (directing officers who "have reason to believe that the beneficiary is not entitled to the status approved in the petition . . . [to] return the petition to the U.S. Citizenship & Immigration Services (USCIS) through the National Visa Center (NVC)").

*Second*, Defendants cannot credibly argue that the harm documented by Organizational Plaintiffs falls short of irreparable. The Organizational Plaintiffs' declarations and supplemental declarations set forth irreparable harm under the standards recognized in this circuit.

*See, e.g., Centro de la Communidad Hispana de Locust Valley* v. *Town of Oyster Bay*, 868 F.3d 104, 111 (2d Cir. 2017). Indeed, this Court recognized very similar types of irreparable harm experienced by organizational plaintiffs. *See MRNY*, 2019 WL 5484678 *17.  Preliminary relief would cause these harms to abate substantially if not completely. The Defendants' choice to apply the IFR to even those visa applications that are fully submitted and scheduled for consular processing in the imminent future or are waiting for scheduling, *see* Supp. Decl. of Charles Wheeler ¶ 3, Ex. A. (citing the New FAM); requires that the organizations representing clients perform substantial additional work on cases that, but for the new Consular Rules, were effectively finished. Supp. Decl. of Theo Oshiro ¶ 5; Supp. Decl. of Kim Nichols ¶ 4; Supp. Decl. of Elsie de Castillo ¶ 4; Supp. Decl. of C. Mario Russell ¶¶ 5, 6, 7; *see also* Supp. Wheeler Decl. ¶ 4 (explaining the challenges of providing clients advice on the New FAM). The chilling effect on visa applications combined with the substantial increase in time needed to prepare all immigrant visa applications is causing imminent financial losses for organizational plaintiffs. *See* Supp. de Castillo Decl. ¶ 7; Supp. Nichols Decl. ¶ 6,7; Supp. Oshiro Decl. ¶ 7-8. CLINIC hired a contract employee on short notice (Monday, February 24, 2020) to deal with the demand from its over 300 affiliates for information about the DOS rule and related issues. Supp. Wheeler Decl. ¶ 5.  These harms are not remedied by awaiting the ultimate relief Plaintiffs seek.  None of Plaintiffs claims allow for money damages. The sole case cited by Defendants in support of their argument, *A.X.M.S. Corp.* v. *Friedman*, 948 F. Supp. 2d 319, 336 (S.D.N.Y. 2013), is a case concerning monetary damages that were compensable without the need for injunctive relief.

   *Third,* Defendants fail to even address two of the forms of irreparable harm alleged by Plaintiffs. They ignore the Court's ability to make a finding of irreparable harm based on a violation of federal law, such as the Administrative Procedure Act. *See, e.g., Heublein* v. *FTC*, 539

F. Supp. 123, 128 (D. Conn. 1982); *see also* Mot. at 46. They also ignore the harm to organizational plaintiffs of being deprived of the opportunity to participate meaningfully in notice-and-comment rulemaking with respect the Consular Rules. *See Northern Mariana Islands* v. *U.S.*, 686 F. Supp. 2d 7, 17-18 (D.D.C. 2009) (granting preliminary injunction against implementation of DHS regulations issued as interim rules without advance notice and comment and finding failure to afford plaintiffs the opportunity to comment to be a form of irreparable harm).

Finally, Defendants do not even attempt to address the immense harm to the public interest set forth in Plaintiffs' moving papers, including the declarations of numerous experts, *See* Mot. at 47-49 (describing immense harm to public health, the economy, and the health and welfare of immigrant communities, and an increase in uncompensated costs of medical care in emergencies); Ehrlich Decl., Ex. 9, Ku Decl. Ex. B ¶¶ 26, 46-54 (describing public health impacts, including premature deaths); *id.*, Ex. 12, Trisi Decl. ¶¶ 22-26 (describing the harm immigrants and U.S. as a whole, including the labor market); *id.*, Ex. 11, Palanker Decl, Ex. A, ¶¶ 23, 26-28 (describing Healthcare Proclamation impact on uncompensated care); *id.*, Ex. 13, Sbrana Decl. ¶ 10 (same). In addition, twenty-one states, two localities, and six major cities have now filed an amicus brief in support of Plaintiffs' motion for a preliminary injunction, which paints a devastating picture of the impact that the Consular Rules will have on amici's health insurance markets by undermining Congress's objective of providing immigrants with access to comprehensive and affordable coverage, and directing immigrants to purchase coverage that does not comply with the ACA. *See* Multi-state Amicus Brief, at 15-22.

On the other side of the scale, Defendants merely cite to their interest in maintaining consistency between the public charge rule being enforced by DHS and the public charge rule being enforced by DOS in the context of consular processing. This is a problem of the agency's

own making, and is not a harm sufficient to outweigh the substantial harms to public health, the economy, and immigrant families themselves. The agency may not be facing this injunction had it issued its FAM Revisions and IFR for advance notice and comment, considered those comments, and made the necessary changes. The agency had ample time to do this, as the DHS Rule was first issued for notice and comment in August 2018.  Moreover, the record indicates that DOS's tolerance for inconsistency is actually quite high. The new standard applied in the context of consular processing under the FAM Revisions, which led to a 12-fold increase in immigrant visa denials, all the while DHS was still evaluating public charge under the 1999 Guidance standards.

The record in this case provides ample support for the Court's findings that Plaintiffs have established the equitable factors for injunctive relief.

## IV.   The Rule Should Be Enjoined Nationwide, but the APA Does Not Preclude More Modest Relief

Courts routinely hold that nationwide relief is "necessary to provide complete relief to plaintiffs" where, as here, an agency promulgates an unlawful rule with nationwide applicability. *Saget*, 375 F. Supp. 3d at 378; *Nat'l Mining Ass'n* v. *U.S. Army Corps. of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (when "regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioner is proscribed").[14] But the APA does not preclude statewide relief, and such a remedy here would provide relief for Plaintiffs and not run afoul of the Supreme Court's recent critiques of nationwide injunctions.

## V.   Defendants' Motion to Dismiss Must Fail

Defendants also move to dismiss Plaintiffs' equal protection and rehabilitation act complaints for failure to state a claim for relief. Fed. R. Civ. P. 12(b)(1)) and 12(b)(6).  *See* Defs.

---

[14]   *See, e.g.*, *Batalla Vidal*, 279 F. Supp. 3d at 437–48 ("Because the decision to rescind the DACA program had a 'systemwide impact,' the court will preliminarily impose a 'systemwide remedy.'"); *Pennsylvania* v. *President United States*, 930 F.3d 543, 575 (3d Cir. 2019).

Mem. 39–40, 44.  Where, as here, "the Rule 12(b)(1) motion is facial, *i.e.* based solely on the allegations of the complaint . . . [Plaintiffs] have no evidentiary burden" and "[t]he task of the district court is to determine whether the [complaint] alleges facts that affirmatively and plausibly suggests that [Plaintiffs have] standing to sue." *Carter* v. *HealthPort Technologies, LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (alterations and internal quotation marks omitted).  Under Rule 12(b)(6), "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 554, 570 (2007)).  Courts must "accept all factual allegations in the . . . complaint as true, and draw all reasonable inferences in [the Plaintiffs'] favor." *Rich* v. *Fox News Network, LLC*, 939 F.3d 112, 117 n.2 (2d Cir. 2019) (alterations and internal quotation marks omitted).  Just as this Court concluded that Plaintiffs are likely to succeed on the merits of their claims, it should conclude that Plaintiffs have sufficiently stated claims for relief under both Rules 12(b)(1) and 12(b)(6).  The Court should deny Defendants' motions to dismiss.

## A.     Plaintiffs Have Standing to Make All Their Claims.

For all the reasons that Plaintiffs have standing under the APA to seek preliminary relief, they have standing for the purposes of Defendants' motion to dismiss.

### 1.     *Plaintiffs Have Standing to Establish Equal Protection and Rehabilitation Act Violations*

Plaintiffs have made detailed allegations of discriminatory targeting by the President, his advisors, and other high-level Administration officials. Compl. ¶¶ 221-39.  And Defendants do not contest the disproportionate impact of the Consular Rules. As Plaintiffs have shown, the FAM Revisions caused a wildly disproportionate increase in public charge denials for Mexican and Central American immigrants. Compl. ¶ 84.  The IFR would have a disproportionate impact on

immigrants of color, particularly on Black and Latino applicants, even when, as analysis of census data shows, they are less likely than others to receive benefits once they become eligible. Ehrlich Decl., Ex. 10, Declaration of Jennifer Van Hook ("Van Hook Decl."), ¶¶ 11, 24, 26, 48.[15] The Proclamation would similarly target immigrants of color, who, compared with white immigrants, are less likely to have private health insurance. *Id.* ¶¶ 46, 75-76.

As Latino immigrants directly targeted by decisionmakers and subject to the dramatic and uncontested disproportionate impact of the Consular Rules, Individual Plaintiffs have standing to assert equal protection claims. Further, as this Court found in *MRNY*, where four of the five same organizations sought preliminary relief on their equal protection claims, this case "falls squarely in the category of those where the [organizational] plaintiff was forced to divert its resources from its usual mission-related activities because of the defendant's conduct." *MRNY*, 2019 WL 484638, at *4. Organizational plaintiffs have identical claims to standing here. "[N]othing prevents an organization from bringing a [civil rights] suit on its own behalf so long as it can independently satisfy the requirements of Article III standing." *Nnebe*, 644 F.3d at 156 (citation omitted). For the reasons explained above, the Organizational Plaintiffs easily satisfy Article III standing requirements here.

For similar reasons, Diana Doe, who lives in Brooklyn and has diabetes, has standing to assert claims under the Rehabilitation Act. *See also infra* at 45-6. Organizational Plaintiffs MRNY and ASC, whose missions include ensuring the health and well-being of the communities they serve, Ehrlich Decl., Ex. 18, Oshiro Decl. ¶¶ 5,10; *id.*, Ex. 19, Nichols Decl. ¶¶ 4, 5, 7-9, 12, 14-

---

[15]   Where, as here, a court is "considering a motion to dismiss for lack of subject matter jurisdiction, such as one for lack of standing, the Court may consider extrinsic evidence proffered by the parties in addition to facts alleged in the pleadings." *Bekker* v. *Neuberger Berman Grp. LLC*, 2018 WL 4636841, at *3 (S.D.N.Y. Sept. 27, 2018). Accordingly, Plaintiffs incorporate by reference the materials submitted in support of their motion for preliminary injunction.

18, have likewise alleged concrete harms caused by the Consular Rules.

### B.     Plaintiffs Have Standing to Assert Claims Against HHS

Plaintiffs have pleaded sufficient facts that, taken as true, "allow[] the court to draw the reasonable inference" the HHS is "liable for the misconduct alleged." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  The Proclamation was set to go into effect last November, and it specifically called on HHS to promulgate a list of healthcare plans that would be deemed approved. (84 Fed. Reg. 53992).  Additionally, HHS was tasked with issuing reports and policy recommendations on how the Proclamation was being implemented and how it might be amended to better achieve its aims (*id.* at 53993).  That has not happened because a federal court in Oregon enjoined the Proclamation from taking effect.  *Doe* v. *Trump*, No.  3:19-CV-1743-SI, 2019 WL 6324560, at *1 (D. Or. Nov. 26, 2019).  But Plaintiffs and this Court must presume that HHS is operating pursuant to the obligations the President has placed on them, and is taking steps to implement the Proclamation should it be allowed to go into effect. *See United States* v. *Chemical Foundation, Inc.*, 272 U.S. 1, 14-15 (1926) ("in the absence of clear evidence to the contrary, courts presume that [public officers] have properly discharged their official duties.").  And while presidential actions may not be subject to the APA, "agency actions implementing a presidential action may be reviewed under the APA, even when the agency action accomplishes a presidential directive." *Ser*v. *Employees Int'l Union Local 200 United* v. *Trump*, No. 1:19-CV-01073 EAW, 2019 WL 4877273, at *7 (W.D.N.Y. Oct. 3, 2019) (quoting *Int'l Refugee Assistance Project* v. *Trump*, 373 F. Supp. 3d 650, 665 (D. Md. 2019)).

Defendants' argue that HHS' failure to promulgate regulations related to the Proclamation render any claims against them invalid under the APA. This is wrong.  First, the APA expressly provides a cause of action for failure to promulgate regulations. 5 U.S.C.S. § 706 (1); *see also* 5 U.S.C.S. §§ 551, 704 (defining agency action as including an agency's failure to act, and making

agency actions reviewable, respectively).  Moreover, here, the secrecy and lack of transparency around HHS's actions has had a concrete negative effect on plaintiffs.  Plaintiffs cannot predict with any certainty how their insurance needs or foreseeable medical costs will be evaluated. As a result, the Doe Plaintiffs will be forced to purchase private insurance plans to guard against the disastrous consequence of denial including permanent separation from their homes and their families, Ehrlich Decl., Ex. 15, Carl Doe Decl. at ¶11; *id*., Ex. 14, Brenda Doe Decl. at ¶ 14, and the organizational Plaintiffs will have to expend additional resources guiding confused visa applicants through an opaque process. *Id*., Ex. 20, Castillo Decl. at ¶ 17; *id*., Ex. 19, Nichols Decl. at ¶¶ 14-17; *id*., Ex. 18, Oshiro Decl. at ¶ 35.

### C.     Plaintiffs State A Claim Under the Equal Protection Clause

Plaintiffs made detailed allegations that the Consular Rules were motivated by animus against Latinos and low-income immigrants of color and that the Rule disproportionately impacts members of those groups even when they do not use benefits. Compl. ¶¶ 22, 66-69, 284, 221-39. Defendants' argument that these allegations are insufficient is rooted in (1) a proposition that the claims here fall outside the protection of the Fifth Amendment because they address immigration, and (2) a pretense that well-documented animus of high-level officials, including the President, have no bearing on the Consular Rules or do not satisfy pleading standards. They are wrong.

First, Defendants point to *Trump* v. *Hawai'i*, 138 S. Ct. 2392, 2411 (2018) for the suggestion that courts need not evaluate "extrinsic statements" made by decision-makers when evaluating facially neutral executive action addressing immigration. Defs' Mem. at 46. *Hawai'i* addressed not a motion to dismiss, but a preliminary injunction, where plaintiffs were required to show a likelihood of success that a presidential proclamation issued under Section 1182(f) of the INA violated equal protection principles.  But the *Hawai'i* court, pointing to "the context of international affairs and national security," 132 S.Ct. at 2409, did not reach equal protection

principles under the First or Fifth Amendments. There is no support in that decision or any other for the proposition that Consular Rules addressing the admission of immigrants, including those who currently live within the United States, fall outside ordinary equal protection doctrine.

Furthermore, *Hawai'i* in no way bars the review of extrinsic statements on a motion to dismiss or in any other context. As the *Baltimore* court has stated in denying the government's motion to dismiss equal protection claims related to the FAM Revisions, "*Hawaii* in no ways holds that the President's statements are irrelevant. . . . Indeed, despite limiting its review, the *Hawaii* Court nonetheless considered 'extrinsic evidence'—namely, President Trump's statements." *Mayor & City Council of Baltimore*, No. CV ELH-18-3636, 2020 WL 869242, at \*19 (D. Md. Feb. 21, 2020) (collecting cases). Indeed, courts addressing similar constitutional claims have held that where high-level officials who "'influence[] or manipulate[]'" the decision-makers express racial animus, such statements are relevant to review of agency action.   *Saget* v. *Trump*, 375 F. Supp. 3d 280, 369 (E.D.N.Y. 2019) quoting *Ramos* v. *Nielsen*, 321 F. Supp. 3d 1083, 1098 (N.D. Cal. 2018).   In addition, expressions of animus need not be specifically related to release of the Final Rule; plaintiffs do not need to demonstrate a tight nexus between words and actions. *See, e.*g., *Saget* v. *Trump*, 345 F. Supp. 3d 287 (E.D.N.Y. 2018) (plaintiffs plausibly alleged an equal protection violation based on the President's statements); *Casa de Md., Inc.* v. *Trump*, 355 F. Supp. 3d 307, 325-26 (D. Md. 2018) (same); *New York* v. *U.S. Dep't of Commerce*, 315 F. Supp. 3d 766, 810 (S.D.N.Y. 2018) (same), *aff'd in part and rev'd in part*, 139 S. Ct. 953, 203 L.Ed.2d 146 (2019); *Centro Presente* v. *U.S. Dep't of Homeland Sec.,* 332 F. Supp. 3d 393, 414-15 (D. Mass. 2018) (same); *Batalla Vidal* v. *Nielsen*, 291 F. Supp. 3d 260, 279 (E.D.N.Y. 2018) (rejecting the argument that the President's statements were irrelevant to equal protection challenge to agency action).   As in *Baltimore*, "if President Trump harbors animus towards immigrants of color, and if

he encouraged the State Department to revise the FAM, then the amendments violate equal protection, even if officials within the State Department did not personally harbor racial animus." 2020 WL 869242, at *19.

Second, Plaintiffs easily satisfy pleading standards to make out a claim that the Consular Rules violate Equal Protection principles. Defendants do not contest the ample allegations and evidence of disproportionate impact on Latino, Black and Asian immigrants in Plaintiffs' complaint, nor could they; DOS was of course aware of the astonishing increase in public charge denials as a result of the FAM Revisions and their dramatic impact on immigrants from predominately nonwhite countries, especially Mexicans and Central Americans. Instead, they argue that Plaintiffs' allegations of animus are "generalized" rather than highly specific and related to Consular Rules, and thus that they do not satisfy the pleading requirements of *Iqbal* v. *Ashcroft*. 556 U.S. 662 (2009). This argument is wrong on both the law and the facts.

In *Iqbal*, a supervisory liability *Bivens* case, the Court dismissed plaintiff's damages claims against high-level policy-makers because the plaintiff could not plausibly connect those policies to lower-level employees' discriminatory acts. Here, Plaintiffs seek permanent injunctive relief against executive agencies and defendants in their official capacities because the policies themselves are discriminatory. Plaintiffs have supported these with detailed allegations of improper motive that bear directly on the substance of those policies. These allegations are directly connected to Defendants' policymaking decisions and are far from the "bare assertions" that failed in *Iqbal.* Plaintiffs have provided ample evidence of animus from President Trump and other high-level officials within the Administration and plausibly connected that evidence to the creation of the policies at issue here. Compl. ¶¶ 22, 84, 221-39.

Finally, Plaintiffs need not show either that the Consular Rules expressly discriminate or that animus is the sole motivating factor. *Washington* v. *Davis*, 426 U.S. 229, 241 (1976); *City of Yonkers*, 837 F.2d at 1223–24 (racial animus need only be "a significant factor" motivating government action). Instead, they may demonstrate discriminatory purpose with a range of evidence, including but not limited to: (1) "the impact of the official action, whether it 'bears more heavily on one race than another'"; (2) the historical background of a policy decision, "if it reveals a series of official actions taken for invidious purposes" as well as "administrative history . . . especially where there are contemporary statements by members of the decisionmaking body"; and (3) "[t]he specific sequence of events leading up to the challenged decision." *Village of Arlington Heights* v. *Metro. Housing Dev. Corp.*, 429 U.S. 252, 267–68 (1977) (citations omitted). These factors demonstrate that the Consular Rules are motivated by discriminatory animus.

The Consular Rules are thus subject to heightened scrutiny under *Arlington Heights*. *See, e.g.*, *Batalla Vidal*, 291 F. Supp. 3d at 274-77; *Saget* v. *Trump*, 375 F. Supp. 3d at 366-67 (E.D.N.Y. 2019); *Ramos* v. *Nielsen*, 336 F. Supp. 3d at 1098 (N.D. Cal. 2018). The Supreme Court's application of rational basis review in *Trump* v. *Hawaii* "was based on two considerations not at issue here: first, the limited due process rights afforded to foreign nationals seeking entry into the United States and the particular deference accorded to the executive in making national security determinations." *Centro Presente*, 332 F. Supp. 3d at 41. These considerations do not apply to immigrants who, like Individual Plaintiffs here, "are living and have lived in the United States for lengthy periods with established ties to the community." *Ramos*, 336 F. Supp. 3d at 1108. The Supreme Court recently recognized that rules based on suspect classifications are subject to heightened scrutiny when applied to immigrants in the United States. *Sessions* v. *Morales-Santana*, 137 S. Ct. 1678, 1689-90 (2017) (applying heightened scrutiny to gender-based

classifications in INA's citizenship provisions). *See also Dent* v. *Sessions*, 900 F.3d 1075, 1081 (9th Cir. 2018) (overturning prior ruling that rational basis review applied in case of gender-based classification in citizenship rules); *Tineo* v. *Attorney General of the United States*, ___ F.3d ___, 2019 WL 4180460 (3d Cir. Sept. 4, 2019) (same). Defendants have not attempted to put forth a compelling justification for the Consular Rules.

Even if rational basis scrutiny applied here, the Consular Rules do not satisfy it. Animus against a particular group "lacks a rational relationship to legitimate state interests." *Romer* v. *Evans*, 517 U.S. 620, 632 (1996); *see City of Cleburne* v. *Cleburne Living Ctr.*, 473 U.S. 432, 446-47 (1985) ("Furthermore, some objectives—such as a bare desire to harm a politically unpopular group—are not legitimate state interests [under rational basis review]." (quotation marks, alteration, and citation omitted)); *United States* v. *City of Yonkers*, 837 F.2d 1181, 1226 (2d Cir. 1987). These claims are not brought on behalf of low-income people generally, as Defendants claim, but low-income immigrants of color. *See* Compl. ¶¶ 218-20, 284-86. Plaintiffs have more than plausibly pled that the Consular Rules are motivated by discriminatory animus.

### D.     Plaintiffs State a Claim under the Rehabilitation Act

Defendants assert that the Department of State is not subject to Section 504 of the Rehabilitation Act for any visa processing conducted overseas. Defs' Mem. at 39. They are wrong. *First*, none of the plaintiffs – neither the organizational plaintiffs nor the individual plaintiffs – are outside of the United States so Defendants are not exempt from the application of the Rehabilitation Act. *Second*, the actions that run afoul of the Rehabilitation Act are the Consular Rules themselves – all of which have been promulgated by the Department of State in the United States. *Third*, there is no question that the Department of State is governed by the Rehabilitation Act and must conform its actions to comply with the statute. DOS' own regulations specify that it may not deny a benefit or service "on the basis of handicap" or "utilize criteria or methods of

administration" the purpose or effect of which would subject qualified handicapped persons to discrimination on the basis of handicap. 22 C.F.R. §144.130 (b)(3).[16]

Defendants also argue that the Consular Rules do not violate the Rehabilitation Act because they only treat health conditions as "a factor in a broader determination." Defs' Mem. at 39.  But the Consular Rules in fact expressly discriminate based on disability in clear violation of the Rehabilitation Act.  The Consular Rules treat disability as *multiple* negative factors in making public charge determinations: the IFR treats disability alone as a negative factor and also imposes a heavily weighted negative factor for applicants with disabilities who are uninsured and have neither the prospect of obtaining private health insurance nor the financial resources to pay for reasonably foreseeable medical costs.  *See* Compl. ¶¶192, 193.  And the Proclamation goes even further — requiring immigrants with disabilities to demonstrate greater financial resources to cover chronic health conditions and disabilities than immigrants without disabilities.  *See* Compl. at ¶¶195, 196.  Section 504 of the Rehabilitation Act prohibits Defendants from subjecting an applicant to a "more onerous" public charge standard solely because of her disability.  *Henrietta D.* v. *Bloomberg*, 331 F.3d 261, 276 (2d Cir. 2003).

## CONCLUSION

The Court should enter a preliminary injunction, set aside the IFR and the FAM Revisions such that the applicable consular standards are those that were in effect in December 2017 and postpone any implementation of the Proclamation.

---

[16]   Indeed, courts have found that the agency is subject to the statute – including with respect to Department of State employees outside of the United States in the Foreign Service.  *See e.g.*, *Taylor* v. *Rice*, 451 F.3d 898 (D.C. Cir. 2006)(applying Rehabilitation Act with respect to determination on reasonableness of disability accommodation requested by foreign service applicant); see also 3 FAM 4410(c)(9)) (FAM provisions defining foreign service grievances to include discrimination prohibited by Rehabilitation Act).

Dated:   New York, New York
         February 27, 2020

By: */s/ Andrew J. Ehrlich* _____

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
Andrew J. Ehrlich
Jonathan H. Hurwitz
Christopher Filburn

1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
aehrlich@paulweiss.com
jhurwitz@paulweiss.com
cfilburn@paulweiss.com

**CENTER FOR CONSTITUTIONAL RIGHTS**
Ghita Schwarz
Brittany Thomas
Baher Azmy

666 Broadway
7th Floor
New York, New York 10012
(212) 614-6445
gschwarz@ccrjustice.org
bthomas@ccrjustice.org
bazmy@ccrjustice.org

**THE LEGAL AID SOCIETY**
Susan E. Welber, Staff Attorney, Law Reform Unit
Kathleen Kelleher, Staff Attorney, Law Reform Unit
Susan Cameron, Supervising Attorney, Law Reform Unit
Hasan Shafiqullah, Attorney-in-Charge, Immigration Law Unit

199 Water Street, 3rd Floor
New York, New York 10038
(212) 577-3320
sewelber@legal-aid.org
kkelleher@legal-aid.org
scameron@legal-aid.org
hhshafiqullah@legal-aid.org


**THE NATIONAL IMMIGRATION LAW CENTER**
Joanna Elise Cuevas Ingram (JC 2704)
P.O. Box 170392
Brooklyn, NY 11217
(213) 373-5258
cuevasingram@nilc.org

Nicolas Espíritu (admitted *pro hac vice*)
3450 Wilshire Blvd., 108-62
Los Angeles, CA 90010
espiritu@nilc.org

Max S. Wolson* (*pro hac vice* pending)
P.O. Box 34573
Washington, DC 20043
wolson@nilc.org

Tanya Broder (admitted *pro hac vice*)
2030 Addison Street, Suite 420
Berkeley, CA 94704
broder@nilc.org


*Attorneys for Plaintiffs Make the Road New York, African
Services Committee, Asian American Federation, Catholic
Charities Community Services (Archdiocese of New York), and
Catholic Legal Immigration Network, Inc.*