**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MAKE THE ROAD NEW YORK, AFRICAN
SERVICES COMMITTEE, CENTRAL AMERICAN
REFUGEE CENTER NEW YORK, CATHOLIC
CHARITIES COMMUNITY SERVICES
(ARCHDIOCESE OF NEW YORK), CATHOLIC
LEGAL IMMIGRATION NETWORK, INC., ALICIA
DOE, BRENDA DOE, CARL DOE, DIANA DOE, and
ERIC DOE,

         Plaintiffs,

  -against-

MICHAEL POMPEO, *in his official capacity as*
*Secretary of State*; UNITED STATES DEPARTMENT
OF STATE; DONALD TRUMP, *in his official capacity*
*as President of the United States*; ALEX AZAR, *in his*
*official capacity as Secretary of the Department of Health*
*and Human Services*; and UNITED STATES
DEPARTMENT OF HEALTH & HUMAN SERVICES,

         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

<u>MEMORANDUM DECISION</u>
<u>AND ORDER</u>

19 Civ. 11633 (GBD)

GEORGE B. DANIELS, United States District Judge:

  Plaintiffs Make the Road New York, African Services Committee, Central American

Refugee Center New York, Catholic Charities Community Services (Archdiocese of New York),

Catholic Legal Immigration Network, Inc., Alicia Doe, Brenda Doe, Carl Doe, Diana Doe, and

Eric Doe bring this action against Defendants Michael Pompeo, in his official capacity as Secretary

of State; Alex Azar, in his official capacity as Secretary of the Department of Health and Human

Services; Donald Trump, in his official capacity as President of the United States; the United States

Department of State ("DOS"); and the United States Department of Health and Human Services

("HHS").  (Compl., ECF No. 1.)

At issue are multiple government actions that apply to individuals seeking to become lawful permanent residents ("LPRs"). First, Plaintiffs challenge DOS's January 2018 changes to Section 302.8 of Volume 9 of its Foreign Affairs Manual ("FAM"), which governs consular officer determinations of whether an individual applying for a visa is ineligible because he or she is likely to become a "public charge" (the "2018 FAM Revisions"). (*See* Compl. ¶ 3.) Second, Plaintiffs challenge DOS's October 11, 2019 rule, Visas: Ineligibility Based on Public Charge Grounds, 84 Fed. Reg. 54,996 (Oct. 11, 2019) (codified at 22 C.F.R. § 40.41) (the "DOS Rule"), which redefines the term "public charge" and establishes new criteria for public charge determinations during consular processing. (*See* Compl. ¶ 3.) The DOS Rule went into effect on February 24, 2020. (Defs.' Letter dated Feb. 11, 2020, ECF No. 50, at 1.) And third, Plaintiffs challenge the President's October 4, 2019 Proclamation, Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System, in Order to Protect the Availability of Healthcare Benefits for Americans, Proclamation No. 9945, 84 Fed. Reg. 53,991 (Oct. 9, 2019) (the "Proclamation"), as well as subsequent government actions to implement the Proclamation. (Compl. ¶ 3.) The Proclamation was scheduled to go into effect on November 3, 2019. (*Id.* ¶ 10.) However, on November 2, 2019, a federal district court in the District of Oregon issued a temporary restraining order enjoining the implementation of the Proclamation, *Doe #1 v. Trump*, 414 F. Supp. 3d 1307, 1319 (D. Or. 2019), and subsequently, on November 26, 2019, issued a preliminary injunction, *Doe v. Trump*, 418 F. Supp. 3d 573, 605 (D. Or. 2019). On May 4, 2020, the Ninth Circuit denied the government's request to stay the district court's preliminary injunction. *Doe #1 v. Trump*, 957 F.3d 1050, 1070 (9th Cir. 2020).

Plaintiffs seek, *inter alia*, (1) a judgment declaring that the DOS Rule, 2018 FAM Revisions, Proclamation, and agency actions implementing the Proclamation are unauthorized by

and contrary to law, (2) a *vacatur* of the 2018 FAM Revisions, DOS Rule, and Proclamation, and (3) an injunction enjoining Defendants from implementing, or taking any actions to enforce or apply, the 2018 FAM Revisions, DOS Rule, or Proclamation. (Compl. at 109–10.) Plaintiffs now move pursuant to Federal Rule of Civil Procedure 65 and the Administrative Procedure Act, 5 U.S.C. § 705, for a preliminary injunction enjoining Defendants from applying or implementing the 2018 FAM Revisions, DOS Rule, and Proclamation. (Notice of Mot., ECF No. 43.) Defendants, in turn, move to dismiss Plaintiffs' complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Notice of Mot. to Dismiss, ECF No. 53.) Plaintiffs' motion for a preliminary injunction enjoining the application or implementation of the 2018 FAM Revisions, DOS Rule, and Proclamation is GRANTED. Defendants' motion to dismiss is GRANTED to the extent that the President is dismissed as a party to this action.

## I.   FACTUAL BACKGROUND[1]

### A.  Immigrant Visas and Public Charge Determinations.

Under the Immigration and Nationality Act (the "INA"), an intending immigrant seeking permanent residence in the United States must apply for and be issued an immigrant visa through consular processing at a United States embassy or consulate. *See* 8 U.S.C. § 1202(a), (e); 22 C.F.R. § 42.62. Immigrants who are unlawfully present in the United States must also seek permanent residence through the consular process, as they are generally ineligible to adjust their status domestically. *See* 8 U.S.C. § 1255(a), (c)(2). Such individuals, however, are barred from

---

[1] The relevant factual background regarding the framework for public charge determinations prior to the implementation of the DOS Rule and a parallel United States Department of Homeland Security ("DHS") rule (the "DHS Rule") is set forth in greater detail in this Court's October 11, 2019 Memorandum Decision and Order in a related action, *Make the Road New York v. Cuccinelli*, 19 Civ. 7993 (GBD). *Make the Rd. N.Y. v. Cuccinelli*, 419 F. Supp. 3d 647, 654–55 (S.D.N.Y. 2019). Such background is incorporated by reference herein.

returning to the United States for a set time period if their unlawful presence exceeds 180 days, unless they are granted an I-601A waiver of inadmissibility. 8 U.S.C. § 1182(a)(9)(B)(i), (v). To secure an I-601A waiver, an immigrant must establish that he or she is the spouse or child of a United States citizen or LPR who would suffer extreme hardship if he or she were refused admission. *Id.* at § 1182(a)(9)(B)(v).

For those seeking family-sponsored immigrant visas, the first step is for a qualifying family member to submit a sponsorship petition (Form I-130) on behalf of the applicant. Once the petition is approved, the beneficiary must complete a visa application and, in most cases, be interviewed by a consular officer who will determine whether to grant or deny the application. *See* 8 U.S.C. § 1202(a), (e); 22 C.F.R. § 42.62. Part of the consular officer's evaluation entails determining whether the applicant is ineligible for a visa under the so-called "public charge" provision of the INA. *See* 8 U.S.C. § 1182(a)(4). As set out at 8 U.S.C. § 1182(a)(4), the government may find as inadmissible any noncitizen "who, in the opinion of the consular officer at the time of application for a visa, . . . is likely at any time to become a public charge." *Id.* at § 1182(a)(4)(A). In determining whether an applicant is likely to become a public charge, the consular officer must consider, at a minimum, the applicant's (1) age, (2) health, (3) family status, (4) assets, resources, and financial status, and (5) education and skills. *Id.* at § 1182(a)(4)(B).

Prior to the government actions at issue, "public charge" was defined as a noncitizen who has become or is likely to become "primarily dependent on the government for subsistence, as demonstrated by either (i) the receipt of public cash assistance for income maintenance or (ii) institutionalization for long-term care at government expense." Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 Fed. Reg. 28,689, 28,689 (May 26, 1999) (internal quotation marks omitted). This definition was set forth in field guidance issued in 1999

(the "Field Guidance") by the Immigration and Naturalization Service ("INS")—the predecessor agency to United States Citizenship and Immigration Services ("USCIS") and United States Immigration and Customs Enforcement ("ICE")—that "summarize[d] longstanding law with respect to public charge" determinations. *Id.*

### B. The 2018 FAM Revisions.

Until recently, consistent with the Field Guidance, the FAM defined "public charge" as a noncitizen who is likely to become "primarily dependent on the U.S. Government" for subsistence either from "[r]eceipt of public cash assistance for income maintenance" or "[i]nstitutionalization for long-term care at U.S. Government expense." (*See* Decl. of Andrew J. Ehrlich in Supp. of Pls.' Mot. for a Prelim. Inj. ("Pls.' Decl."), Ex. 3 (Illustration of changes from pre-2018 FAM to post-2018 FAM) ("Illustration of 2018 FAM Revisions"), ECF No. 45-3, at 2.) Prior to 2018, the FAM expressly prohibited consular officers from considering use of non-cash benefits in determining whether an applicant is likely to become a public charge, and provided a non-exclusive list of such non-cash benefits programs, including, *inter alia*, Supplemental Nutritional Assistance Program ("SNAP"), Medicaid, and Child Health Insurance Program ("CHIP"). (*See* Illustration of 2018 FAM Revisions at 4.) The FAM also directed consular officers to normally consider a valid affidavit of support sufficient to meet the requirements under 8 U.S.C. § 1182(a)(4)(A). (*Id.* at 23.)

On January 3, 2018, DOS implemented the 2018 FAM Revisions. The 2018 FAM Revisions did not explicitly redefine the term "public charge," but for the first time directed consular officers to negatively weigh the receipt (past or current) of any type of public assistance, including non-cash benefits, in determining whether to issue a visa to an applicant. (*See id.* at 8.) Among other changes, the 2018 FAM Revisions also reduced the value given to an affidavit of

support, specifying that it would merely be a "positive" factor rather than normally sufficient to satisfy the requirements under 8 U.S.C. § 1182(a)(4)(A).  (*See id.* at 6.)

### C. The DHS Rule and DOS Rule.

On October 10, 2018, DHS published a notice of proposed rulemaking, Inadmissibility on Public Charge Grounds, 83 Fed. Reg. 51,114 (Oct. 10, 2018), which sought, *inter alia*, to redefine "public charge" and amend the standard then used in public charge determinations with respect to applications for admission or adjustment of status. *See id.* at 51,114.  The notice provided a 60-day public comment period on the proposed rule. *Id.* at 51,116.  Subsequently, on August 14, 2019, DHS issued the DHS Rule, Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41,292 (Aug. 14, 2019) (codified at 8 C.F.R. pts. 103, 212, 213, 214, 245, 248), which was scheduled to take effect on October 15, 2019. *Id.* at 41,292.  However, between October 11 and October 14, 2019, five federal district courts, including this Court, issued preliminary injunctions enjoining the DHS Rule.[2] *Make the Rd. N.Y. v. Cuccinelli*, 419 F. Supp. 3d 647, 654 (S.D.N.Y. 2019); *New York v. U.S. Dep't of Homeland Sec.*, 408 F. Supp. 3d 334, 340 (S.D.N.Y. 2019); *Cook Cty., Illinois v. McAleenan*, 417 F. Supp. 3d 1008, 1014 (N.D. Ill. 2019); *Casa de Md., Inc. v. Trump*, 414 F. Supp. 3d 760, 767 (D. Md. 2019); *City & Cty. of San Francisco v. USCIS*, 408 F. Supp. 3d 1057, 1073 (N.D. Cal. 2019); *Washington v. U.S. Dep't of Homeland Sec.*, 408 F. Supp. 3d 1191, 1199 (E.D. Wash. 2019).

On October 11, 2019, the same day that the first of these injunctions was issued, DOS issued the DOS Rule, which largely mirrors the DHS Rule, and which DOS contended was "intended to align [its] standards with those of [DHS]." 84 Fed. Reg. at 54,996. The DOS Rule,

---

[2] Today, this Court also grants a new temporary injunction enjoining the DHS Rule during the COVID-19 national health emergency in two related actions that are now consolidated, *New York v. United States Department of Homeland Security*, 19 Civ. 7777 (GBD); *Make the Road New York v. Cuccinelli*, 19 Civ. 7993 (GBD).

like the DHS Rule, defines "public charge" as any noncitizen "who receives one or more public benefits . . . for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months' worth of benefits)." *Id.* at 55,014. In addition, the DOS Rule, like the DHS Rule, defines "public benefit" as both cash benefits and noncash benefits, such as SNAP, Medicaid, public housing, and Section 8 housing assistance. *Id.*

Invoking the "good cause" exception to the notice and comment requirements of the Administrative Procedure Act (the "APA"), DOS published the DOS Rule four days before its effective date of October 15, 2019. DOS alleged that good cause existed because, "[c]oordination of [DOS] and DHS implementation of the public charge inadmissibility ground is critical to [DOS's] interest in preventing inconsistent adjudication standards and different outcomes between determinations of visa eligibility and determinations of admissibility at a port of entry." *Id.* at 55,011. Implementation of the DOS Rule was delayed, however, pending approval by the White House Office of Management and Budget of a form required for processing visa applications. (*See* Defs.' Letter dated Feb. 11, 2020, ECF No. 50, at 1.) On February 11, 2020, Defendants informed this Court that DOS would begin implementing the DOS Rule on February 24, 2020, the same day that DHS intended to implement its own DHS Rule following the Supreme Court's January 27, 2020 order staying this Court's injunction of the DHS Rule. (*Id.* at 1–2.). Additionally, on February 27, Defendants represented to this Court that as part of its implementation of the DOS Rule, DOS updated the FAM to reflect the provisions of the DOS Rule, thereby overriding the 2018 FAM Revisions. (*See* Defs.' Add'l Submission in Opp'n to Pls.' Mot. for Prelim. Inj. ("Defs.' Add'l Submission"), ECF No. 67, at 2–3.)

### D. The Proclamation and Agency Actions Implementing the Proclamation.

On October 4, 2019, shortly before the publication of the DOS Rule, President Trump issued the Proclamation. *See* 84 Fed. Reg. 53,991. The Proclamation seeks to suspend, subject to certain exceptions, entry into the United States of any immigrant who cannot demonstrate either that he "will be covered by approved health insurance" within 30 days of arriving to the United States, or that he "possesses the financial resources to pay for reasonably foreseeable medical costs." *Id.* at 53,992. The Proclamation identifies eight forms of coverage that it deems to be "approved health insurance," plus "any other health plan that provides adequate coverage for medical care as determined by the Secretary of Health and Human Services." *Id.* It also explicitly excludes Medicaid from its list of "approved health insurance" for any individual over the age of 18. *Id.*

Plaintiffs allege that the Proclamation will be implemented by DOS and HHS, (Compl. ¶ 10), and that DOS has already taken several actions towards implementing it, (*see id.* ¶¶ 142–53). Plaintiffs identify three such actions in the complaint. First, on October 24, 2019, DOS published a 60-Day Notice of Proposed Information Collection: Public Charge Questionnaire, 84 Fed. Reg. 57,142 (Oct. 24, 2019), that proposed an information collection form to be used by consular officers "in assessing whether an applicant is likely to become a public charge." Though primarily focused on implementing the DOS Rule, the form also asks questions "to establish that the applicant will be covered by an approved health insurance plan within 30 days of entry into the United States, or that the applicant possesses sufficient financial resources to cover reasonably foreseeable medical costs." 84 Fed. Reg. at 57,143.

Second, on October 30, 2019, DOS published a Notice of Information Collection Under OMB Emergency Review: Immigrant Health Insurance Coverage, 84 Fed. Reg. 58,199 (Oct. 30,

2019) (the "Emergency Notice" or "Notice"). Noting that the Proclamation "authorizes the Secretary of State to establish standards and procedures for governing" determinations under the Proclamation, the Emergency Notice states that consular officers will ask immigrant visa applicants whether they will be covered by health insurance within 30 days of entry, and, if so, to "identify the specific health insurance plan, the date coverage will begin, and such other information related to the insurance plan as the consular officer deems necessary." *Id.* at 58,199–200. Consistent with the Proclamation, the Emergency Notice explains that if applicants do not have coverage, the Proclamation does not limit entry if they "possess financial resources to pay for reasonably foreseeable medical expenses." *Id.* at 58,200. And the Notice defines "reasonably foreseeable medical expenses" as those "related to existing medical conditions, relating to health issues existing at the time of visa adjudication." *Id.* The Emergency Notice invited public comments up to October 31, 2019. *Id.* at 58,199.

Third, DOS has issued directives to consular officials regarding the implementation of the Proclamation (All Diplomatic and Consular Posts Collective messages ("ALDACs")), including providing definitions of ambiguous terms. (Compl. ¶ 150.) Plaintiffs cite an ALDAC dated October 30, 2019 that (1) lists "narrow examples of when a person's entry would be 'in the national interest'" and therefore exempt from the Proclamation, and (2) "directs consular officers not to implement the Proclamation prior to . . . corresponding updates to the FAM." (Compl. ¶ 151–52.)

As noted, the Proclamation was intended to go into effect on November 3, 2019, but its implementation was enjoined by a temporary restraining order and subsequent preliminary injunction issued by the District of Oregon. *Doe*, 418 F. Supp. 3d at 582, 605.

**E. Plaintiffs.**

Plaintiffs Alicia Doe, Brenda Doe, Carl Doe, Diana Doe, and Eric Doe (the "Individual Plaintiffs") are all immigrants seeking lawful permanent residence or, in the case of Eric Doe, married to an immigrant who is seeking LPR status. (*See* Compl. ¶¶ 43–49.) Plaintiff Alicia Doe lives with her U.S. citizen husband and their two U.S. citizen daughters, one of whom suffers from severe disabilities stemming from cerebral palsy. (*Id.* ¶ 43.) Alicia is the primary caregiver for her disabled daughter. (*Id.* ¶ 44.) Alicia's husband "supports the family by working at a restaurant full-time for minimum wage," but the family, except for Alicia, also receives various forms of public assistance, including Supplemental Security Income related to Alicia's daughter's disabilities, SNAP, and public housing. (*Id.* ¶ 43.) Plaintiff Brenda Doe lives with her U.S. citizen husband and their three children, of whom two are U.S. citizens and one has LPR status. (*Id.* ¶ 45.) Brenda's husband "lost his sight due to glaucoma in 2015, and was forced to stop working due to his disability." (*Id.*) The family, except for Brenda, receives various forms of public assistance, including Social Security Disability benefits and SNAP. (*Id.*) Plaintiff Carl Doe lives with his U.S. citizen wife, who depends on him for emotional and financial support, and adult stepdaughter. (*Id.* ¶ 47.) Carl "owns his own business, from which he earned $20,000 last year." (*Id.*) Plaintiff Diana Doe lives with her U.S. citizen husband and U.S. citizen daughter. (*Id.* ¶ 48.) She is the sole caretaker for her husband, who is retired and disabled, and adolescent daughter. (*Id.*) Last year, her husband received Social Security income and retirement benefits totaling about $28,000. (*Id.*) Diana suffers from diabetes and has "typically paid out-of-pocket at neighborhood clinics to obtain health care." (*Id.*; Pls.' Decl., Ex. 16 (Decl. of Diana Doe), ECF No. 45-16, ¶ 16.) Plaintiff Eric Doe is a U.S. citizen. (Compl. ¶ 49.) His wife is seeking LPR status and works part-time cleaning homes. (*Id.*) Eric is "a superintendent for several New York City apartment

buildings, and makes approximately $52,000 per year." (*Id.*) Eric suffers from chronic leukemia that requires ongoing treatment. (*Id.*)

The five immigrants have all resided in the United States without authorization after entering without inspection. (*See* Compl. ¶¶ 44, 46–49.) Due to their unauthorized presence, they will have to leave the United States to undergo consular processing abroad in order to receive immigrant visas. Four of the immigrants have already received I-601A waivers of inadmissibility for unlawful presence, based on extreme hardship. (*Id.*) They are, therefore, permitted to seek permanent residence through consular processing without additional delay. *See supra* Part I.A. Additionally, all of the immigrants have secured a USCIS-approved I-130 petition that establishes a qualifying family relationship with a United States citizen and is the first step towards securing a family-based immigrant visa. (*Id.* ¶¶ 43–49.)

Plaintiffs Make the Road New York, African Services Committee, Central American Refugee Center New York, Catholic Charities Community Services (Archdiocese of New York), and Catholic Legal Immigration Network, Inc. (the "Organizational Plaintiffs") are nonprofit organizations that work with and for immigrants. (*See* Compl. ¶¶ 21–42.) They provide direct services, including legal, educational, and health-related. (Compl. ¶¶ 21, 24, 28, 34–35, 38–39.) Make the Road New York, for instance, conducts educational workshops on issues affecting immigrants, represents immigrants in removal proceedings, and assists immigrants in applying for benefits and accessing health services. (Compl. ¶ 21.) Similarly, African Services Committee provides legal representation in immigration proceedings, including representing sponsors and navigating consular processing; health-related services; and food pantry and nutrition services. (Compl. ¶ 24.) Organizational Plaintiffs also administer community outreach programs that, for

example, disseminate information on immigration policies, make referrals to social service providers, and host in-person trainings on immigration-related matters. (Compl. ¶¶ 30, 35, 38.)

## II.   DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

Defendants argue that Plaintiffs cannot meet the jurisdictional requirements of standing and ripeness, and therefore preliminary relief should be denied and this action should be dismissed. (Mem. in Opp'n to Pls.' Mot. for Prelim. Inj. and in Supp. of Mot. to Dismiss ("PI Opp'n & MTD Mem."), ECF No. 54, at 13–20, 22–23.) The proper procedural route for such a challenge is a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). *See All. for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 n.6 (2d Cir. 2006) ("[T]he proper procedural route [for a standing challenge] is a motion under Rule 12(b)(1)."); *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 261 F. Supp. 2d 293, 294 (S.D.N.Y. 2003) ("Ripeness is jurisdictional in nature and therefore properly considered on a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules.").

"A Rule 12(b)(1) motion challenging subject matter jurisdiction may be either facial or fact-based." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016). A facial challenge is "based solely on the allegations of the complaint or the complaint and exhibits attached to it," while a fact-based motion "proffer[s] evidence beyond the [complaint and attached exhibits]." *Id.* at 56–57. Where, as here, the defendants bring a facial challenge, the court must "accept[] as true all material factual allegations of the complaint," *id.* at 57 (quoting *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008)) (alterations omitted), and "draw[] all reasonable inferences in favor of the plaintiff," *id.* at 57 (quoting *Lunney v. United States*, 319 F.3d 550, 554 (2d Cir. 2003)).

### A. Plaintiffs Have Standing and Their Claims Are Ripe for Judicial Review.

Article III of the U.S. Constitution limits the judicial power of federal courts to "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1. To invoke this power, a plaintiff must have standing to sue. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (citation omitted). The plaintiff bears the burden of establishing standing, *Rajamin v. Deutsche Bank Nat'l Tr. Co.*, 757 F.3d 79, 84 (2d Cir. 2014) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009)), and such burden applies to each claim and form of relief sought, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). To demonstrate Article III standing, the plaintiff must show that (1) "it has suffered a concrete and particularized injury that is either actual or imminent," (2) "the injury is fairly traceable to the defendant," and (3) "it is likely that a favorable decision will redress that injury." *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007) (citing *Lujan*, 504 U.S. at 560–61). "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006) (citation omitted).

To be justiciable, Plaintiffs' claims must also be ripe—that is, they "must present 'a real, substantial controversy, not a mere hypothetical question.'" *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) (quoting *ASMAT Cable Ltd. v. Cablevision of Conn.*, 6 F.3d 867, 872 (2d Cir. 1993)). "The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Id.* (quoting *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003)). The constitutional requirement "overlaps with the standing doctrine, 'most notably in the shared requirement that the plaintiff's injury be imminent rather than conjectural or hypothetical.'" *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 110 (2d Cir. 2013) (quoting *Ross v. Bank of Am.*,

*N.A.*, 524 F.3d 217, 226 (2d Cir. 2008)).  Prudential ripeness, meanwhile, requires a court to "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Nat'l Org. for Marriage, Inc.*, 714 F.3d at 691 (quoting *N.Y. Civil Liberties Union v. Grandeau*, 528 F.3d 122, 131–32 (2d Cir. 2008)).

Defendants contend that Plaintiffs all fail to allege concrete and particularized injury that is actual or imminent, and therefore cannot meet the requirements for standing and ripeness. (*See* PI Opp'n & MTD Mem. at 13–20.)  In particular, Defendants claim that Individual Plaintiffs lack standing because neither they nor their family members allege any immediate plans to leave the country to apply for visas, and none of the actions challenged here "directly bar" Individual Plaintiffs from obtaining public benefits. (*Id.* at 16–18.)  Defendants maintain that Individual Plaintiffs additionally lack standing to challenge the Proclamation because neither they nor their family members allege any reasonably foreseeable medical costs that they are unprepared to cover, and therefore face no "more than a speculative prospect of suffering injury based on the Proclamation." (*Id.* at 15–16.)  Defendants further argue that none of Organizational Plaintiffs have suffered any concrete injury attributable to any of the challenged actions since the only harm alleged by these plaintiffs is that they have made changes to services they were already providing. (*Id.* at 18.)

Contrary to Defendants' assertions, Plaintiffs sufficiently allege that they have standing and that their claims are ripe for review.  To establish standing, plaintiffs "bringing a pre-enforcement facial challenge . . . need not demonstrate to a certainty" that they will be negatively affected, "but only that [they have] 'an actual and well-founded fear that the law will be enforced against' [them]." *Pac. Capital Bank, N.A. v. Connecticut*, 542 F.3d 341, 350 (2d Cir. 2008) (citations omitted).  Here, Individual Plaintiffs fear that their, or their family members', visa

applications would be denied under the public charge framework at issue, because of their or their households' health issues, income, English-language skills, and use of non-cash public benefits, among other reasons. (*See* Compl. ¶¶ 43–49, 253, 257.) Defendants do not contend that this fear is unreasonable, at least with respect to the 2018 FAM Revisions and DOS Rule. Instead, relying on the Supreme Court's decision in *Clapper v. Amnesty International USA*, Defendants argue that there is no "certainly impending" collision between Individual Plaintiffs' interests and the challenged government actions. (PI Opp'n & MTD Mem. at 17.) *See also Clapper*, 568 U.S. at 409 ("Thus, we have repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." (alterations in original) (citations omitted)). Individual Plaintiffs, however, adequately demonstrate that they or their family members are actively engaged in the process of applying for LPR status, including by obtaining approved I-130 petitions, as well as obtaining or preparing requests for I-601A waivers of inadmissibility. (*See* Compl. ¶¶ 43–49.) The fact that they have not specified dates on which they plan to leave the United States and submit visa applications to continue the DOS process does not turn their ongoing efforts into "someday intentions," as Defendants argue. (*See* PI Opp'n & MTD Mem. at 17.)

Moreover, in *Clapper*, the plaintiffs' theory of harm under the statutory scheme at issue was predicated on a series of decisions by government actors that determined whether such scheme would apply to the plaintiffs at all. *Clapper*, 568 U.S. at 410. In contrast, Individual Plaintiffs are undisputedly subject to the challenged government actions. Individual Plaintiffs or their family members have taken steps toward securing visas, and before any visas can be issued, consular officers *must* evaluate whether such individuals are likely to become public charges under the

challenged framework. Individual Plaintiffs' alleged harm is "certainly impending" and far from dependent on a "speculative chain of possibilities." *Clapper*, 568 U.S. at 414.

Finally, Defendants argue that Individual Plaintiffs cannot be harmed by the Proclamation, in particular. The Proclamation does not require immigrants to purchase "approved health insurance" so long as they do not have "reasonably foreseeable healthcare costs that they are not prepared to cover." (PI Opp'n & MTD Mem. at 15–16.) Defendants contend that Individual Plaintiffs or their family members seeking visas, as applicable, do not have any such expenses and therefore unreasonably fear exclusion under the Proclamation. This is plainly incorrect. Diana Doe suffers from diabetes, a chronic condition with potentially significant medical expenses. (Pls.' Decl., Ex. 16 (Decl. of Diana Doe), ECF No. 45-16, ¶ 16; Reply Mem. in Further Supp. of Pls.' Mot. for Prelim. Inj. and in Opp'n to Defs.' Mot. to Dismiss ("PI Reply & MTD Opp'n"), ECF No. 66, at 28.) Though she "has typically paid out-of-pocket at neighborhood clinics to obtain health care," (Compl. ¶ 48.), it is entirely unclear whether she can cover any "reasonably foreseeable" expenses as contemplated by the Proclamation. There is simply no guidance on how consular officers will determine what expenses related to existing medical conditions are "reasonably foreseeable." Without an "approved health insurance" plan, Diana Doe faces a non-speculative threat of denial of admission, especially considering the administration's intent to enforce the Proclamation "to the maximum extent possible" and the Proclamation's focus on the "strain [on] Federal and State government budgets," "higher costs on hospitals and other healthcare infrastructure," and other "large burden[s] on taxpayers" associated with uninsured individuals. 84. Fed. Reg. at 53,991, 53,993. To mitigate this risk, Diana Doe will be forced to purchase private health insurance that qualifies as "approved health insurance" under the Proclamation. Her fear of denied admission, absent costly compliance measures, is sufficient to establish standing. *See*

16

*Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 302 (1979) (holding that a plaintiff has standing to make a pre-enforcement challenge when "fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative."); *Hedges v. Obama*, 724 F.3d 170, 196–97 (2d Cir. 2013) ("[The Supreme Court] has applied [the *Babbitt*] principle in a number of cases challenging criminal statutes—finding standing where the plaintiff 'will have to take significant and costly compliance measures or risk criminal prosecution'—and in the civil context as well." (citations omitted)).  In sum, Individual Plaintiffs will unquestionably suffer "concrete and particularized" injuries that are "actual or imminent," given that they face indefinite family separation, high costs for private health insurance plans, and prolonged insecurity due to their uncertain immigration status.  And with every day that passes that these Individual Plaintiffs or their family members are unable to move forward with their visa applications out of fear of denial, they continue to be deprived of the many benefits of LPR status, including work authorization and legal security.

In any event, Organizational Plaintiffs sufficiently demonstrate that they will have to expend—and have *already* expended—significant time and resources to provide new services as a direct result of the 2018 FAM Revisions, DOS Rule, and Proclamation.  (*See, e.g.*, Compl. ¶¶ 23, 26–27, 29–30, 33, 37, 41–42.)  Courts have repeatedly found that an organization has standing where, as here, the defendant's conduct interferes with the organization's ability to carry out its mission or usual activities or forces the organization to divert its resources in order to prevent some adverse consequence on a class of individuals.  *See, e.g.*, *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 111 (2d Cir. 2017) ("[W]here an organization diverts its resources away from its current activities, it has suffered an injury that has been repeatedly held to be independently sufficient to confer organizational standing." (citations

omitted)); *Citizens for Responsibility & Ethics in Washington v. Trump*, 276 F. Supp. 3d 174, 190 (S.D.N.Y. 2017) ("[A]n organization has standing where it is forced to expend resources to prevent some adverse or harmful consequence on a well-defined and particularized class of individuals."), *rev'd on other grounds*, 953 F.3d 178 (2d Cir. 2019), *as amended* (Mar. 20, 2020).  And because Organizational Plaintiffs have adequately shown that their injuries are "imminent rather than conjectural or hypothetical," *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d at 110 (citation omitted), and that they "will endure hardship if decision is withheld," *Simmonds v. INS*, 326 F.3d 351, 359 (2d Cir. 2003) (citation omitted), their claims are also ripe for review.

**B. Plaintiffs' Have Standing to Assert Claims Against HHS and HHS Secretary Azar Regarding the Proclamation.**

Defendants also argue that Plaintiffs lack standing to assert any claims against HHS or HHS Secretary Azar, because "HHS is not responsible for" the 2018 FAM Revisions, the DOS Rule, or the Proclamation, and Plaintiffs therefore fail to identify any action "fairly traceable" to HHS that has caused them any injury.  (PI Opp'n & MTD Mem. at 15.)  Plaintiffs allege in their complaint, however, that HHS is responsible for implementing the Proclamation, (*see, e.g.*, Compl. ¶¶ 3, 10, 153 & n.48), and that the Proclamation "assigns to HHS a variety of responsibilities regarding its implementation and enforcement," (*id.* ¶ 53).  Indeed, the ninth form of "approved health insurance" listed in the Proclamation is "any other health plan that provides adequate coverage for medical care *as determined by the Secretary of Health and Human Services or his designee*." 84 Fed. Reg. at 53,992 (emphasis added).  Moreover, the Proclamation tasks HHS with issuing periodic reports and policy recommendations on "the continued necessity" of the Proclamation and any amendments that may be warranted to achieve its aims. *Id.* at 53,993.  In fact, Plaintiffs cite in their complaint a news article quoting an HHS spokesperson as saying, "HHS

will continue to work with the State Department to implement the president's proclamation," (Compl. ¶ 153 n.48), thereby implying that HHS is already acting to implement the Proclamation. Accordingly, Plaintiffs have standing to assert claims against HHS and Secretary Azar regarding the Proclamation. *See Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring in part and concurring in the judgment) ("Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." (citations omitted)).

## C. The President is Dismissed as a Defendant.

Plaintiffs' seek, in part, declaratory and injunctive relief against the President regarding the Proclamation, which raises a "thorn[y] standing question." *Franklin*, 505 U.S. at 802–03 (plurality opinion). Granting equitable relief against the President implicates serious constitutional questions. Generally, courts have no "jurisdiction of a bill to enjoin the President in the performance of his official duties." *Id.* (quoting *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866)). In *Franklin*, the Supreme Court issued a clear warning that an injunction against the President is an "extraordinary" remedy that should "raise[] judicial eyebrows." *Id.* at 802.

In this action, there is no reason to risk upsetting longstanding separation-of-powers principles. First, dismissing the President will not preclude judicial review of the Proclamation or other challenged governmental actions. Second, Plaintiffs' claims under the APA are not brought against the President, either personally or in his official capacity. Third, Plaintiffs' equal protection and *ultra vires* claims remain as this Court, of course, has authority to issue a declaratory judgment and enjoin lower executive officials and agencies from implementing the targeted government actions. *See, e.g., Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952). In

short, retaining the President as a party will have no substantive effect on the outcome of this action. Accordingly, the President is dismissed from this action.

## III.   DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must demonstrate "more than a sheer possibility that a defendant has acted unlawfully"; stating a facially plausible claim requires the plaintiff to plead facts that enable the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). The factual allegations pled must therefore "be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted).[3]

A district court must first review a plaintiff's complaint to identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. The court then considers whether the plaintiff's remaining well-pleaded factual allegations, assumed to be true, "plausibly give rise to an entitlement to relief." *Id.*; *see also Targum v. Citrin Cooperman & Co., LLP*, No. 12 Civ. 6909 (SAS), 2013 WL 6087400, at *3 (S.D.N.Y. Nov. 19, 2013). In deciding the 12(b)(6) motion, the court must also draw all reasonable inferences in the non-moving party's favor. *See N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 119–20 (2d Cir. 2013).

---

[3] "In deciding a motion to dismiss under Rule 12(b)(6), the court may refer 'to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.'" *Fishbein v. Miranda*, 670 F. Supp. 2d 264, 271 (S.D.N.Y. 2009) (quoting *Brass v. Am. Film Tech., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

Plaintiffs' complaint consists of four counts challenging the 2018 FAM Revisions, DOS Rule, Proclamation, and agency actions implementing the Proclamation. Specifically, in Counts I and II, Plaintiffs claim that the 2018 FAM Revisions, DOS Rule, and agency actions implementing the Proclamation violate the substantive requirements and procedural rules for agency action under the APA.[4] (Compl. ¶¶ 182–217, 266–281.) Under Count III, Plaintiffs allege that the 2018 FAM Revisions, DOS Rule, and Proclamation violate the equal protection guarantee of the Fifth Amendment. (Compl. ¶¶ 218–39, 282–89.) And finally, in Count IV, Plaintiffs claim that the Proclamation conflicts with the INA and is *ultra vires*. (Compl. ¶¶ 240–48, 290–94.)

### A. The Organizational Plaintiffs Are Within the Zone of Interests of the INA.

Defendants argue that Organizational Plaintiffs cannot state an actionable claim under the APA because they fall outside of the zone of interests of the INA. Specifically, Defendants argue "there is no indication that the provision of the INA at issue here—8 U.S.C. § 1182(a)(4)—reflects any concern for the interests of immigrant service and advocacy organizations." (PI Opp'n & MTD Mem. at 22.)

Defendants' arguments are unavailing. The zone-of-interests test is "not 'especially demanding,'" particularly as to the APA and its "generous review provisions." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (citation omitted). "The test forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (citation omitted). In considering whether Plaintiffs satisfy the zone-of-interests

---

[4] Plaintiffs claim is not that the Proclamation itself is subject to the APA, but that the agency actions implementing the Proclamation violate the APA. (*See, e.g.*, Compl. ¶¶ 195–98, 204–05; PI Reply & MTD Opp'n at 6 n.3.)

test, this Court is not limited to the specific provision at issue, but rather should consider Congress's overall purpose in enacting the INA. *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 401 (1987). Importantly, there is no requirement that Congress intended "to benefit the would-be plaintiff." *Id.* 479 U.S. at 401 (citation omitted). Additionally, economic injuries have regularly been sufficient to satisfy the test under various statutes, because a plaintiff "who is 'likely to be financially' injured . . . may be a reliable private attorney general to litigate the issues of the public interest." *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 154 (1970) (citations omitted); *see also e.g.*, *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1304–05 (2017). Organizational Plaintiffs fall within the INA's ambit; in particular, its basic purpose to provide intending immigrants with a framework for admission. Organizational Plaintiffs' very mission is to aid immigrants, including by navigating procedures for visa applications and adjustment of status. And their members and clients include individuals who are directly impacted by the particular governmental actions at issue. Moreover, Organizational Plaintiffs have already suffered economic injuries in their efforts to mitigate the potentially harmful effects of the 2018 FAM Revisions, DOS Rule, and Proclamation. *See supra* Part II.A. Organizational Plaintiffs' interests are thus, "at the least, '*arguably* within the zone of interests'" of the INA. *Bank of Am. Corp.*, 137 S. Ct. at 1303 (quoting *Ass'n of Data Processing Serv. Orgs., Inc.*, 397 U.S. at 153).

## B. Plaintiffs' Claims Challenging the 2018 FAM Revisions Are Not Moot.

On February 27, 2020, Defendants notified this Court that "[a]s part of its implementation of the Department of State's October 2019 public charge rule, the Government has updated its Foreign Affairs Manual (FAM) with new instructions reflecting the policy established by the October 2019 rule." (Defs.' Add'l Submission at 2.) Defendants therefore claim that "the January 2018 FAM guidance challenged in this case has been superseded, and the Department's consular

officers are no longer using it in the adjudication of visa applications." (*Id.* at 2–3.) Accordingly, Defendants argue that Plaintiffs' claims regarding the 2018 FAM Revisions are moot and should be dismissed. (Reply Mem. in Supp. of Mot. to Dismiss ("Defs.' Reply"), ECF No. 70, at 3–4.)

Defendants are correct that a claim *may* become moot "after a defendant voluntarily discontinues challenged conduct," *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 815 F.3d 105, 109 (2d Cir. 2016), but this is not the norm. Courts will find mootness in such a case only if "'(1) it can be said with assurance that "there is no reasonable expectation" that the alleged violation will recur' and '(2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" *Id.* (quoting *Cty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). In mootness inquiries, the defendants carry a heavy burden of persuasion. *See id.* at 110.

As preliminary matter, the challenged conduct has not ceased. Though there are differences between the 2018 FAM Revisions and the current FAM, at least some of the alleged harms associated with the 2018 FAM Revisions are still present in the most recent revisions. For example, consular officers are still directed to consider an applicant's use of non-cash benefits in determining whether he or she is likely to become a public charge. *See* 9 FAM § 302.8-2(B)(1), https://fam.state.gov/FAM/09FAM/09FAM030208.html.

Even assuming, *arguendo*, that the 2018 FAM Revisions were entirely superseded, Defendants' argument fails on the first prong of the *American Freedom Defense Initiative* analysis. Though the 2018 FAM Revisions are no longer being used by consular officers in the adjudication of visa applications, Defendants do not argue that there is no reasonable expectation that DOS will revert back to the 2018 FAM Revisions at a later time, including if this Court were to enjoin the DOS Rule. At oral argument on Plaintiffs' motion for a preliminary injunction, Defendants explained that if the DOS Rule were enjoined, the 2018 FAM Revisions would not automatically

be restored. (*See* Tr. of Oral Arg. dated Feb. 28, 2020, ECF No. 76, at 7:1–20.) According to Defendants, DOS would then need to consider how to comply with the injunction and issue new instructions to consular officers, and such instructions may or may not be "similar or identical" to the 2018 FAM revisions. (*Id.*) Simply put, Defendants do not represent that they *will not* engage in the voluntarily ceased conduct going forward. They do not foreclose the possibility of DOS reimplementing the 2018 FAM Revisions and even admit that any future updates to the FAM may be "similar or identical" to the 2018 FAM Revisions. (Tr. of Oral Arg. dated Feb. 28, 2020, ECF No. 76, at 7:8–10.)

DOS's decision to supersede the 2018 FAM Revisions does not render Plaintiff's claims moot and prevent this court from granting declaratory and injunctive relief. "A case becomes moot only when it is impossible for a court to grant 'any effectual relief whatever' to the prevailing party." *Am. Freedom Def. Initiative*, 815 F.3d at 109 (quoting *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012)). Where, as here, Defendants may later resume the challenged conduct, "an injunction provides 'effectual relief' because it precludes the defendant from reviving the challenged conduct in that manner." *Id.*

## C. The Challenged Government Actions Are Subject to Judicial Review.

### 1. The 2018 FAM Revisions, DOS Rule, and Emergency Notice

Defendants claim that the APA does not authorize judicial review of the 2018 FAM Revisions, DOS Rule, or agency actions implementing the Proclamation, including the Emergency Notice. Specifically, Defendants argue that Plaintiffs cannot challenge (1) "policy decisions" by agencies relating to admission or exclusion of immigrants, unless affirmatively authorized by Congress, (PI Opp'n & MTD Mem. at 21), and (2) agency action that is not final, (*id.* at 23).

Contrary to Defendants' suggestion otherwise, the APA does not exempt from review agency action that pertains to the admission or exclusion of immigrants. In support of their claim that judicial review of such action is barred, Defendants rely principally on *Fiallo v. Bell*, 430 U.S. 787 (1977), where the Supreme Court assessed the constitutionality of INA provisions that failed to give preferential status to the relationship between "illegitimate" children and their biological fathers. (*See* PI Opp'n & MTD Mem. at 21.) As Plaintiffs aptly observe, rather than finding the issue unreviewable, the Supreme Court "underscore[d] the limited scope of judicial inquiry into immigration *legislation*." *Fiallo*, 430 U.S. at 792 (emphasis added). The Court noted that it had "repeatedly emphasized that 'over no conceivable subject is the *legislative* power of Congress more complete than it is over' the admission of aliens." *Id.* (emphasis added) (citation omitted). *Fiallo* did not extend this limit on judicial review to *executive or agency action* implementing Congressional legislation like those at issue here.

The APA does limit judicial review to "final agency action," *see* 5 U.S.C. § 704, but the 2018 FAM Revisions, DOS Rule, and Emergency Notice[5] meet this standard.[6] Agency action is considered "final" under the APA where the action first, "mark[s] the consummation of the agency's decisionmaking process," and second, is "one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). Courts

---

[5] To the extent that Plaintiffs challenge under the APA *any and all* actions taken by DOS to implement the Proclamation, such claims are dismissed. The APA requires that a plaintiff "direct its attack against some particular 'agency action,'" *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990), and prohibits "broad programmatic" challenges to a general course of conduct, *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).

[6] Any claims against HHS or Secretary Azar under the APA are dismissed because Plaintiffs have not sufficiently alleged "final agency action" by such defendants.

take a "pragmatic" approach to finality. *Id.* at 1815 (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).

As an initial matter, the DOS Rule plainly qualifies as "final agency action" and Defendants do not claim otherwise. The 2018 FAM Revisions and Emergency Notice also satisfy the first condition of finality, as DOS gave no indication that the standards and procedures outlined therein were "merely tentative or interlocutory." *U.S. Army Corps of Eng'rs*, 136 S. Ct. at 1813. Defendants, however, argue that the 2018 FAM Revisions and the Emergency Notice have no "independent legal effect" and therefore fail as to the second prong. (*See* PI Opp'n & MTD Mem. at 24, 42; Defs.' Reply at 27.)  Defendants characterize the FAM as an "agency manual" that "provides guidance to [DOS] personnel on how to comply with legal requirements imposed by statutes and regulations." (PI Opp'n & MTD Mem. at 25.)  But the 2018 FAM Revisions are more than that. Despite DOS's purported intention to merely "clarify the agency's interpretation of the applicable statutes and regulations," *id.*, the 2018 FAM Revisions substantively changed the framework associated with public charge determinations. They "embodie[d] a conscious change in policy" and "legal consequences flow[ed]" from their implementation. *State of New York* v. *U.S. Immigration and Customs Enf't*, 431 F. Supp. 3d 377, 386–87 (S.D.N.Y. 2019).  According to the complaint, in fiscal year 2018, there was a twelve-fold increase in denials on public charge grounds.  (Compl. ¶ 84.)  This practical effect of the 2018 FAM Revisions corroborates the conclusion that they constitute a final agency action. *See, e.g., State of New York* v. *U.S. Immigration and Customs Enf't*, 431 F. Supp. 3d at 386 (citing a 1700 percent increase in civil immigration arrests by ICE officers around New York state courthouses in support of finding that an agency policy regarding courthouse arrests was a final agency action).

Legal consequences will flow from the Emergency Notice as well.  As Plaintiffs note, the Notice explicitly sought to "establish standards and procedures . . . governing" admissibility determinations under the Proclamation.  84 Fed. Reg. at 58,199.  The Notice imposes distinct obligations on visa applicants to demonstrate that they will be covered by approved health insurance within 30 days of entry or possess financial resources to pay for reasonably foreseeable medical expenses.  Under the Notice, applicants who state that they will have approved health insurance coverage are required to "identify the specific health insurance plan, the date coverage will begin, and such other information related to the insurance plan as the consular officer deems necessary." *Id.* at 58,199–200.  Additionally, the Emergency Notice limits "reasonably foreseeable medical expenses" to those related to "health issues existing at the time of visa adjudication." *Id.* at 58,200.  Contrary to Defendants' assertion that the Emergency Notice is "simply a preliminary step . . . to collect information," (Defs.' Reply at 28), the Notice provides standards for consular officers to implement the Proclamation with "direct and appreciable legal consequences" for visa applicants, *U.S. Army Corps of Eng'rs*, 136 S. Ct. at 1814 (quoting *Bennett*, 520 U.S. at 178); *see also Franklin*, 505 U.S. at 796–97 ("To determine when an agency action is final, we have looked to, among other things, whether its impact 'is sufficiently direct and immediate' and has a 'direct effect on . . . day-to-day business.'" (alterations in original) (citations omitted)).

   2.  *The Proclamation*

The Proclamation, itself, is also subject to judicial review.  In *Franklin*, the Supreme Court held that Presidential actions are not subject to review under the APA, *Franklin*, 505 U.S. at 801, but noted that such actions "may still be reviewed for constitutionality." *Id.* (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935)).  However, not "every claim alleging that the President exceeded his statutory authority

[is] considered a constitutional claim." *Dalton v. Specter*, 511 U.S. 462, 474 (1994). Such claims may be merely statutory, and in such cases, "[w]here a statute . . . commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available." *Id.* at 477.

Defendants argue that Plaintiffs' allegation that the Proclamation is *ultra vires* and violates separation of powers "is a statutory claim, not a constitutional [one]," (PI Opp'n & MTD Mem. at 43 (citing *Dalton*, 511 U.S. at 471–77)), and that review of such a statutory claim is impermissible under *Dalton* because the INA "commits the decision" to issue such a Proclamation "to the discretion of the President," (*id.* (quoting *Dalton*, 511 U.S. at 474)).

No court has found that Congress granted the President unfettered power, immune from judicial review, to issue a proclamation that directly conflicts with express provisions of the INA. Neither of the two Supreme Court cases on which Defendants rely—*Dalton* and *Trump v. Hawaii*, 138 S. Ct. 2392 (2018)—stand for the proposition otherwise. The *Dalton* Court made clear that not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution," 511 U.S. at 472, but by no means found that "action in excess of statutory authority can *never* violate the Constitution or give rise to a constitutional claim," *Sierra Club v. Trump*, 929 F.3d 670, 696 (9th Cir. 2019) (discussing *Dalton*) (alteration in original).

The President issued the Proclamation pursuant to 8 U.S.C. § 1182(f). Section 1182(f) provides the President with authority to "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate" whenever he finds that "entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). The text of the statute plainly provides the President with significant discretion to impose entry restrictions,

but under Defendants' interpretation, the President would have seemingly limitless authority to override the complex inadmissibility framework enacted by Congress and codified in the rest of Section 1182, so long as he claimed to be protecting the interests of the country.  This could not have been what Congress intended and stands in sharp contrast to the executive actions at issue in *Dalton*.  In *Dalton*, the Court considered a challenge to the President's decision to close a specific military facility pursuant to the Defense Base Closure and Realignment Act of 1990 ("Base Closure Act"), which had implemented an "elaborate selection process" designed "to provide a fair process that [would] result in the timely closure and realignment of military installations inside the United States."  *Dalton*, 551 U.S. at 464 (citation omitted).  As part of the selection process, the Secretary of Defense submitted recommendations to an independent commission that eventually made recommendations to the President, who then either approved or disapproved such recommendations.  *Id.* at 465.  The substance of the plaintiffs' challenge in *Dalton* was that the Secretary of the Defense and independent commission allegedly violated procedural requirements of the Base Closure Act in formulating their recommendations to close a specific facility.  In that context, the Court "explained that an allegation that the President had not complied with the statute would not necessarily become a constitutional claim through an *ultra vires* theory."  *Sierra Club*, 929 F.3d at 696 (citing *Dalton*, 551 U.S. at 472–73).  Unlike in *Dalton*, Plaintiffs' contention is not that the President simply did not fully comply with a congressionally prescribed process.  Rather, Plaintiffs claim that the President's actions affirmatively displaced a congressionally mandated test for admissibility.  If true, in issuing the Proclamation, the President implicated constitutional separation of powers concerns not present in *Dalton*.  Plaintiffs' allegations are thus appropriately considered as constitutional claims subject to judicial review.

In *Hawaii*, the Supreme Court recognized that "§ 1182(f) exudes deference to the President" and "grants the President broad discretion to suspend the entry of aliens into the United States," 138 S. Ct. at 2408. The Court, however, still "assume[d] without deciding that plaintiffs' statutory claims are reviewable," *id.* at 2407, and proceeded to evaluate whether the proclamation at issue exceeded the Executive's power or was otherwise unconstitutional, *id.* at 2408–12, 2418–23. As the court in the District of Oregon found in reviewing the same Proclamation at issue here, there is "no reason to forego review on the merits when the Supreme Court has [itself] engaged in such review." *Doe v. Trump*, 418 F. Supp. 3d at 589.

### D. Plaintiffs Demonstrate that the 2018 FAM Revisions, DOS Rule, and Emergency Notice Likely Violate the APA.

Under the APA, a reviewing court must "hold unlawful and set aside agency action" for certain specified reasons, including whenever such action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right"; or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C § 706(2)(A), (B), (C). Plaintiffs claim that the 2018 FAM Revisions, DOS Rule, and Emergency Notice conflict with these substantive requirements for agency action in all respects. Specifically, they contend, *inter alia,* that (1) the 2018 FAM Revisions and DOS Rule are inconsistent with the meaning of "public charge" under the INA and thus not in accordance with law, and (2) the 2018 FAM Revisions, DOS Rule, and Emergency Notice are arbitrary and capricious.[7] The APA also prohibits agency action that does not observe "procedure required by law," 5 U.S.C § 706(2)(D), and Plaintiffs

---

[7] Plaintiffs also allege a variety of other theories under which the 2018 FAM Revisions, DOS Rule, and Emergency Notice violate the APA's substantive requirements (e.g., Plaintiffs claim all three actions violate Section 504 of the Rehabilitation Act of 1973 and the 2018 FAM Revisions are impermissibly retroactive.). (*See e.g.,* Compl. ¶¶ 189–98, 269–70.) There is no need to address the validity of such theories because this Court finds that Plaintiffs otherwise adequately state a claim under Count I.

argue that the 2018 FAM Revisions, DOS Rule, and Emergency Notice violate the APA's procedural requirements as well.

### 1. The 2018 FAM Revisions and DOS Rule Are Likely Contrary to the INA.

As this Court found with respect to the DHS Rule—which Defendants admit "largely tracks" the DOS Rule and advances the same new definition of "public charge," (*see* PI Opp'n & MTD Mem. at 33)—Plaintiffs not only adequately allege, but are likely to succeed on the merits of their claim that Defendants lacked the authority to redefine "public charge" as they have in the DOS Rule, contrary to the INA and in violation of the APA. *See Make the Rd. N.Y.*, 419 F. Supp. 3d at 656, 660–61. The long-standing definition of "public charge" is someone who is primarily dependent on the government for subsistence. (*See* Compl. ¶¶ 5, 156–81.) Further, it is undisputed that the term has never been construed as receipt of 12 months of benefits within a 36-month period. Rather, prior to the implementation of the DOS Rule and the DHS Rule, public charge determinations were an inquiry about self-subsistence, not about lawful receipt of benefits that are in many cases temporary and supplemental. Moreover, there is no evidence that Congress ever intended for a redefinition of the term as that set forth in the DOS Rule or DHS Rule. (*See* Compl. ¶¶ 165–78.) Defendants' definition is plainly outside the bounds of the statute.

Similarly, the 2018 FAM Revisions likely exceed the limits of the "public charge" definition under the INA. While the 2018 FAM Revisions did not alter the explicit definition of "public charge," they required consular officers to evaluate the receipt of public assistance of *any type*, *at any time*, and by *any family member* in making such determinations. (*See* Illustration of 2018 FAM Revisions at 8.) Congress has repeatedly rejected attempts to consider non-cash benefits in the public charge analysis, (*see* Compl. ¶¶ 169–74)—a fact that strongly favors finding that DOS acted in excess of statutory authority in implementing the 2018 FAM Revisions, *see*

*Hamdan v. Rumsfeld*, 548 U.S. 557, 579–80 (2006) ("Congress' rejection of the very language that would have achieved the result the Government urges here weighs heavily against the Government's interpretation."). In fact, the Field Guidance, which outlined a public charge framework that Congress repeatedly endorsed, expressly excluded from public charge determinations consideration of non-cash assistance because such benefits "are by their nature supplemental and do not, alone or in combination, provide sufficient resources to support an individual or family." 64 Fed. Reg. at 28,692.

Defendants claim that the Supreme Court's order staying this Court's injunction of the DHS Rule "provides especially strong reason to reconsider [this Court's] earlier analysis." (PI Opp'n & MTD Mem. at 33.) To the contrary, the Supreme Court did not address the merits of the claim that the DHS Rule is unlawful. *See Wolf v. Cook Cty., Illinois*, 140 S. Ct. 681, 682 (2020) (Sotomayor, J., dissenting) (noting that in issuing a stay of the October 2019 Injunction, "[n]o Member of the [Supreme] Court discussed the application's merit apart from its challenges to the injunction's nationwide scope."). The appeal of this Court's order issuing the injunction of the DHS Rule is currently pending before the Second Circuit. As such, this Court's determination regarding the propriety of a preliminary injunction in that action remains undisturbed.

  2. *The 2018 FAM Revisions, DOS Rule, and Emergency Notice Are Likely Arbitrary and Capricious.*

An agency action is arbitrary and capricious if the promulgating agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "The scope of review under the 'arbitrary and capricious' standard is narrow[.]" *Id.* Nevertheless, the APA requires an agency to "engage in 'reasoned

decisionmaking,'" *Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015) (citation omitted), and to "articulate a satisfactory explanation for its action," *State Farm*, 463 U.S. at 43 (citation omitted). Where an agency changes an existing policy, the agency need not demonstrate "that the reasons for the new policy are *better* than the reasons for the old one," but it must "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (alteration in original). This requirement is heightened where the "new policy rests upon factual findings that contradict those which underlay its prior policy," *id.* (citation omitted), as "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy," *id.* at 516.

As this Court found in enjoining the DHS Rule, Defendants fail to provide any reasonable justification for changing through the DOS Rule the definition of "public charge" or the framework for determining whether an individual is likely to become a public charge. *See Make the Rd. N.Y.*, 419 F. Supp. 3d at 662–63. Defendants claim that the DOS Rule was "largely driven by a desire to conform [DOS's] standard to the standard adopted by DHS." (PI Opp'n & MTD Mem. at 37.) Defendants' argument rings hollow. A "desire" for consistency is far from a sufficient explanation for upending a framework that has been in place for decades, particularly where there is neither support for such a change in the history of U.S. immigration law, nor any indication that Congress wanted such a change. Moreover, Defendants took no action throughout the entire comment period for the DHS Rule, during which time they could have considered and addressed any arbitrary aspects of the DOS Rule. Defendants instead waited until just four days before the DHS Rule was originally to go into effect to rush to publish its own parallel rule without public debate.

Defendants offer no explanation whatsoever for their decision to implement the 2018 FAM Revisions. In fact, DOS has *never* provided a rationale for its substantial departure from the public

charge framework under the FAM that existed prior to January 3, 2018. Defendants similarly failed to engage in reasoned decisionmaking in publishing the Emergency Notice. First, the Notice establishes no workable standard for implementing the Proclamation. Despite providing some parameters for "reasonably foreseeable medical expenses," neither the Notice nor the Proclamation defines a number of other key terms needed to carry out the President's directive, particularly those required to determine whether a given health insurance plan qualifies as approved coverage. For example, the Proclamation considers a "visitor health insurance plan that provides *adequate coverage for medical care* for a minimum of 364 days" to be an approved plan. 84 Fed. Reg. 53,992 (emphasis added). The Notice, however, fails to provide any standard or guidance for what constitutes "adequate coverage for medical care." The Notice similarly leaves applicants and consular officers facing an unmoored inquiry as to the bounds of several other categories of approved health insurance, as it also fails to define such terms as, "unsubsidized health plan" and "catastrophic plan." (Mem. of Law in Supp. of Pls.' Mot. for a Prelim. Inj. ("PI Mem."), ECF No. 44, at 37; *see also* Compl. ¶ 204.) Additionally, as Plaintiffs correctly note, the Proclamation and the agency actions implementing it will likely result in "the very harms [that] the Proclamation purports to prevent." (PI Mem. at 37; *see also* Compl. ¶ 244–47.) The Proclamation, by its own terms, attempts to address the issue of uncompensated costs incurred by hospitals in treating uninsured patients. However, many of the "approved health insurance" plans are legally or practically unavailable to many immigrants, and Plaintiffs allege that multiple options do not provide comprehensive coverage for such services as prescription drugs, hospitalization or emergency care. (PI Mem. at 37; Compl. ¶ 245); *see also Doe v. Trump*, 418 F. Supp. 3d at 583–84. In limiting adequate healthcare options for immigrants, the Proclamation and Emergency Notice may increase, rather than decrease, the number of underinsured, or effectively

uninsured, American residents.  Defendants thus risk generating the uncompensated care costs that the Proclamation professes to address.

       3.   *The 2018 FAM Revisions, DOS Rule, and Emergency Notice Likely Violate the Procedural Requirements of the APA.*

The APA, subject to limited exceptions, requires an agency to provide for notice and comment before issuing a rule.  *See* 5 U.S.C. § 553(a)–(d).  Specifically, the agency must publish "[g]eneral notice of proposed rule making" and provide the public "an opportunity to participate in the rule making through submission of written data, views, or arguments."  *Id.* § 553(b), (c).  The APA's notice-and-comment requirements "are not mere formalities," but rather "serve the public interest by providing a forum for the robust debate of competing and frequently complicated policy considerations."  *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 115 (2d Cir. 2018).  These requirements do not apply, however, "to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice," or "when the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."  5 U.S.C. § 553(b)(A)–(B); *see also id.* § 553(d)(2)–(3).  "The burden is on the agency to establish that notice and comment need not be provided."  *Nat'l. Highway Traffic Safety Admin.*, 894 F.3d at 113–14 (citations omitted).

Plaintiffs have established a likelihood of success on the merits of their claim that the DOS Rule violated the APA's procedural requirements and that dismissal of this claim is inappropriate.  Defendants argue that DOS properly invoked the good cause exception to the notice-and-comment requirements, given the "impending effective date" of the parallel DHS Rule and the "critical" need to "promptly align" the public charge standards used by DOS and DHS.  (PI Opp'n & MTD Mem. at 31–32.)  As noted, the good cause exception applies only in circumstances where notice-and-comment is "impracticable, unnecessary, or contrary to the public interest."  5 U.S.C. §

553(b)(B). "Impracticality is . . . generally confined to emergency situations in which a rule would respond to an immediate threat to safety, such as to air travel, or when immediate implementation of a rule might directly impact public safety." *Nat'l. Highway Traffic Safety Admin.*, 894 F.3d at 114 (citing *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012)). The "unnecessary" prong "is confined to those situations in which the administrative rule is a routine determination, insignificant in nature and impact, and inconsequential to the industry and to the public." *Id.* (citing *Mack Trucks, Inc.*, 682 F.3d at 94). As to the "public interest" prong, because notice and comment is "[o]f course . . . regarded as beneficial to the public interest," "the use of notice and comment must actually harm the public interest" for the exception to apply. *Id.* (citing *Mack Trucks, Inc.*, 682 F.3d at 94–95).

None of the circumstances warranting invocation of the good cause exception are present. Rather, DOS's excuse for issuing the DOS Rule just days before it was intended to go into effect is a self-inflicted, artificial emergency to evade the notice-and-comment rulemaking process mandated under the APA. DHS issued its notice of proposed rulemaking in connection with the DHS Rule in October 2018. 83 Fed. Reg. 51,114. Defendants failed to act during the entire year in which DHS considered comments on its proposed rule, as well as during the two months following the release of the DHS Rule in August 2019. Instead, Defendants waited until only *four* days before the DHS Rule was to go into effect to publish the DOS Rule. Defendants had ample time before then to realize any purported need to align the DOS's public charge standard with the standard proposed and ultimately adopted by DHS. As Plaintiffs correctly note, "[i]f [Defendants'] rationale were enough to circumvent the APA, 'an agency unwilling to provide notice or an opportunity to comment could simply wait until the eve of a statutory, judicial, or administrative deadline, then raise up the "good cause" banner and promulgate rules without following APA

procedures.'" (PI Mem. at 24 (quoting *Nat'l Highway Traffic Safety Admin.*, 894 F.3d at 114–15)); *see also Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 205 (2d Cir. 2004) ("We cannot agree . . . that an emergency of [the agency's] own making can constitute good cause.").

Plaintiffs also sufficiently allege that the 2018 FAM Revisions and Emergency Notice violate notice-and-comment requirements, and are likely to prevail on these claims. Defendants maintain that such actions are interpretive rules and therefore exempt from APA procedural demands. When reviewing an agency's compliance with required procedures, courts distinguish between interpretive rules and substantive or legislative rules. While interpretative rules are not subject to rulemaking requirements, *see* 5 U.S.C. § 553(b)(A); *id.* § 553(d)(2), legislative rules "must comply with the notice and comment provisions of the APA," *Sweet v. Sheahan*, 235 F.3d 80, 90 (2d Cir. 2000) (citations omitted). However, the distinction between legislative and interpretive rules is somewhat amorphous. As the Supreme Court has acknowledged, the "precise meaning [of the term 'interpretive rule'] is the source of much scholarly and judicial debate." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015); *cf. Noel v. Chapman*, 508 F.2d 1023, 1030 (2d Cir. 1975) (noting that the distinction between rules subject to notice-and-comment and general statements of policy is "enshrouded in considerable smog.").

Still, courts have proffered some general principles for consideration. In this circuit legislative rules "are those that 'create new law, rights, or duties, in what amounts to a legislative act.'" *Sweet*, 235 F.3d at 91 (quoting *White v. Shalala*, 7 F.3d 296, 303 (2d Cir. 1993)). "Legislative rules have the force of law." *New York City Employees' Ret. Sys. v. S.E.C.*, 45 F.3d 7, 12 (2d Cir. 1995) (citations omitted). Interpretive rules, on the other hand, "merely 'clarify an existing statute or regulation.'" *Sweet*, 235 F.3d at 91 (quoting *United States v. Yuzary*, 55 F.3d 47, 51 (2d Cir. 1995)). Interpretive rules are "issued by an agency to advise the public of the

agency's construction of the statutes and rules which it administers." *Perez*, 575 U.S. at 97

(quoting *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, 99 (1995)). In *Sweet*, the Second

Circuit also described a "more comprehensive test for distinguishing legislative and interpretive

rules" set forth by the D.C. Circuit. *Id.* (citing *Am. Mining Cong. v. Mine Safety & Health Admin.*,

995 F.2d 1106, 1110–12 (D.C. Cir. 1993)). The *American Mining Congress* court detailed four

questions relevant to this inquiry:

> (1) whether in the absence of the rule there would not be an adequate legislative
> basis for enforcement action or other agency action to confer benefits or ensure the
> performance of duties, (2) whether the agency has published the rule in the Code
> of Federal Regulations, (3) whether the agency has explicitly invoked its general
> legislative authority, or (4) whether the rule effectively amends a prior legislative
> rule.

995 F.2d at 1112. If any of these questions are answered affirmatively, the rule is legislative rather

than interpretive. *Id.* Here, the 2018 FAM Revisions, at a minimum, effectively amended a prior

legislative rule—the public charge framework memorialized in the Field Guidance and the FAM

prior to January 3, 2018. Defendants contend that such prior rules were not legislative because

they did not go through notice-and-comment rulemaking. This arguably circular logic simply

ignores the fact that such agency actions established a substantive set of rules governing public

charge determinations beyond the minimum requirements set forth in the INA.

Defendants argue that the FAM cannot be legislative, because it does not carry any legal

force. Rather, it "provides guidance to [DOS] personnel on how to comply with legal

requirements" and "instruct[s] [DOS] personnel on [DOS] policies and procedures." (PI Opp'n &

MTD Mem. at 25.) Defendants claim that Volume 9 of the FAM, in particular, simply provides

"consular officers with the guidance needed to make informed decisions based on U.S.

immigration law and regulations." (*Id.* at 26.) Though "[a]n agency's characterization of a rule is

the 'starting point' for an analysis of its status as legislative or interpretive," *Mejia-Ruiz v. INS*, 51

38

F.3d 358, 365 (2d Cir. 1995) (citations omitted), it is just that—a starting point. And as the District of Maryland already found, Volume 9 of the FAM "contain[s] all the hallmarks of a legislative rule." *Mayor & City Council of Baltimore v. Trump*, 416 F. Supp. 3d 452, 505 (D. Md. 2019). Specifically, it institutes a comprehensive framework for public charge inadmissibility determinations that cannot be said to simply clarify what is set forth in the INA. The INA provides a list of five factors (i.e., age; health; family status; assets, resources and financial status; and education and skills) for consular officers to consider, at a minimum, in assessing whether a visa applicant is likely to become a public charge. The FAM's public charge provisions transform this basic directive into an intricate set of rules regarding, *inter alia*, the types of public assistance to be considered and excluded, the impact and reliability of an applicant's financial sponsor, and the specific information relevant to the officer's evaluation, and that the applicant must therefore provide. Also, the 2018 FAM Revisions substantially alter this framework by imposing new legal limitations on visa applicants not previously reflected in the FAM or INA, including eliminating a safe harbor for non-cash public assistance utilized by applicants or their family members. *See Sweet*, 235 F.3d at 91 ("Legislative rules can impose obligations on members of the public distinct from, and in addition to, those imposed by statute.") (citation omitted). Moreover, the public charge provisions of the FAM do not simply provide general guidance to consular officers to exercise their discretionary authority in inadmissibility determinations. Many of the directives are mandatory. *See id.* ("Legislative rules bind members of the agency and the public . . . .") (citation omitted). DOS cannot skirt notice-and-comment requirements by shoehorning a comprehensive legal regime into "guidance" for agency personnel and the public.

Similarly, Plaintiffs allege that DOS's Emergency Notice is a substantive rule. Defendants label the Emergency Notice as simply a preliminary step for information collection, but "[w]hen

determining whether an agency action is subject to [notice-and-comment], the court looks not to labels given by the agency, but rather to the nature of the impact of the agency action." *L.M. v. Johnson*, 150 F. Supp. 3d 202, 215 (E.D.N.Y. 2015) (citing *Lewis–Mota v. Sec'y of Labor*, 469 F.2d 478, 481–82 (2d Cir. 1972)).   The Emergency Notice carries legal force because it "create[d] new . . . duties" for immigrant visa applicants. *Sweet*, 235 F.3d at 91 (quoting *White*, 7 F.3d at 303).   The health insurance requirements imposed on immigrant visa applicants under the Proclamation and Emergency Notice were not previously contained in statute or regulation.   In issuing the Emergency Notice, DOS was not merely interpreting existing law.   DOS was acting to implement the statutory policy set forth in 8 U.S.C. § 1182(f), as specifically reflected in the Proclamation.   Rules that implement statutory policy are substantive in nature. *See United States v. Lott*, 750 F.3d 214, 217–18 (2d Cir. 2014) (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 302–03 (1979); *Am. Broad. Cos., Inc. v. FCC*, 682 F.2d 25, 32 (2d Cir. 1982)).   Simply put, DOS needed to take action to effect the President's directive in consular processing, and did so through the Emergency Notice.

Both of these agency actions (i.e., the 2018 FAM Revisions and the Notice) therefore qualify as substantive rules that required meaningful engagement with the public.   Plaintiffs were deprived of any such engagement, however, because DOS did not provide any notice or opportunity for comment on the 2018 FAM Revisions, (Compl. ¶ 83), and the Emergency Notice was open for comment for less than 48 hours, *see* 84 Fed. Reg. at 58,199.   Accordingly, Plaintiffs are likely to prevail on their claim that the 2018 FAM Revisions and Emergency Notice violated notice-and-comment requirements of the APA.

### E. Plaintiffs Adequately State a Claim Under the Equal Protection Clause.

Defendants move to dismiss Plaintiffs' claim that the 2018 FAM Revisions, DOS Rule, and Proclamation violate the equal protection guarantee under the Fifth Amendment, because they were motivated by discriminatory animus towards, and disproportionally harm, immigrants of color. Defendants argue that the complaint is devoid of allegations that any of the challenged actions was motivated by racial animus. (PI Opp'n & MTD Mem. at 44.)

Courts may look to a variety of circumstantial and direct evidence when "[d]etermining whether invidious discriminatory purpose was a motivating factor" for governmental action, including the disparate impact of the action, the "historical background of the decision," the "specific sequence of events leading up to the challenged decision," and "contemporary statements by members of the decisionmaking body." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–68 (1977). Plaintiffs provide substantial evidence of the disproportionate impact of the challenged government actions on immigrants from countries that are predominantly comprised of people of color (e.g., Mexico, India, Pakistan, Bangladesh, Haiti, and the Dominican Republic), (Compl. ¶¶ 221–28), which Defendants do not appear to dispute. Plaintiffs further allege, at length, in their complaint that the President "has a long and well-documented history of disparaging and demeaning immigrants, particularly those from Latin American, African, and predominately Muslim nations." (*Id.* ¶ 229.) These statements include, *inter alia*, allegedly expressing "dismay that the United States does not 'have more people from places like Norway,' contrasting such immigrants with those from '[expletive deleted] countries' such as Haiti and countries in Africa." (*Id.* ¶ 230). Moreover, Plaintiffs claim that other high-ranking decision makers have expressed similar hostility toward immigrants of color. Senior Policy Advisor Stephen Miller, who has taken an active role in furthering the President's immigration policies and

the changes to the public charge framework, in particular, (*id.* ¶ 235), has allegedly decried the costs of the United States immigration system associated with low-income immigrants and linked immigrants and people of color with low education, crime, and terrorism, (*id.* ¶¶ 234, 236).

The Supreme Court recently rejected an equal protection challenge to the decision to rescind the Deferred Action for Childhood Arrivals (DACA) program that was based, in part, on disparate impact on Latinos and alleged discriminatory statements by the President. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1915–16 (2020). Defendants argue that the plurality opinion in *Regents* strongly supports dismissal of Plaintiffs' equal protection claims in this case. (Defs.' Letter dated June 25, 2020, ECF No. 86.) Defendants point to two aspects of the plurality opinion, in particular. First, the plurality discounted the disparate impact of the rescission of DACA because "Latinos make up a large share of the unauthorized alien population," and so "one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program." *Regents*, 140 S. Ct. at 1915. The Court explained that "[w]ere this fact sufficient to state a[n] [equal protection] claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds." *Id.* at 1916. But here, Plaintiffs are not simply alleging that more immigrants of color are hurt by the agency action at issue. Instead, Plaintiffs cite evidence regarding the disproportionate *percentage* of nonwhite immigrants that would be hurt by the agency action at issue, as compared to the *percentage* of immigrants from predominantly white countries. (*See, e.g.,* Compl. ¶¶ 224–25.) Similarly, the complaint alleges that the 2018 FAM Revisions led to substantial increases in denials of immigrant visas on public charge grounds for individuals from countries with predominantly nonwhite populations, with little to no increase in denials on the same grounds for applicants from

predominantly white countries. (Compl. ¶ 223.) These findings are unaffected by the share of the immigrant population that is nonwhite.

Second, the *Regents* plurality dismissed the President's statements as "unilluminating" because they were "remote in time and made in unrelated contexts." *Id.* at 1916. Here, the President's statements cited by Plaintiffs were not "remote in time" to Defendants' issuance of the 2018 FAM Revisions, DOS Rule, and Proclamation, or a draft Presidential executive order that allegedly precipitated their promulgation. (*See* Compl. ¶¶ 69–70, 229–33.) For instance, Plaintiffs cite statements from January 2018, May 2018, and July 2019. (*Id.* ¶¶ 230.) The 2018 FAM Revisions, DOS Rule, and Proclamation were all announced within months of those statements. Moreover, as noted, Plaintiffs allegations also extend beyond the President's statements to include statements by high-level officials that are responsible for the public charge framework represented by the government actions at issue.

Further, the District of Maryland has already declined to dismiss an equal protection challenge to the 2018 FAM Revisions. *Mayor & City Council of Baltimore v. Trump,* 416 F. Supp. 3d at 511–15. As that court noted, "at this juncture, the [Plaintiffs] do[] not need to demonstrate a tight nexus between words and actions." *Id.* at 515 (citations omitted). As such, Plaintiffs have raised a plausible inference that issuance of the 2018 FAM Revisions, DOS Rule, and Proclamation was based, at least in part, on discriminatory motives and their claims survive Defendants' motion to dismiss.

### F.  Plaintiffs Demonstrate that the Proclamation is Likely Contrary to the INA and *Ultra Vires.*

Plaintiffs also make a compelling argument that the Proclamation is *ultra vires* and violates the INA by replacing the totality-of-circumstances assessment required under 8 U.S.C. § 1182(a)(4) with "a single factor requirement." (PI Reply & MTD Opp'n at 19)

The Proclamation seeks to address the public financial burden associated with permitting entry to uninsured immigrants. This stated purpose—to address concerns that immigrants may burden the public fiscally—falls squarely within the domain of the public charge provision of the INA, which instructs consular officers to consider "at a minimum" five enumerated factors in public charge inadmissibility determinations: "age;" "health;" "family status;" "assets, resources, and financial status;" and "education and skills." 8 U.S.C. § 1182(a)(4)(B)(i). Rather than assessing all five factors, the Proclamation focuses exclusively on the applicant's "ability to obtain 'approved' private health care coverage or to absorb medical costs." (PI Mem. at 32; *see also* Compl. ¶ 187.) If an immigrant is unable to meet the standard set forth in the Proclamation, he or she is automatically denied entry.

Section 1182(f) provides the President with wide latitude to supplement entry restrictions enumerated in the INA. *See Trump v. Hawaii*, 138 S. Ct. at 2408 ("§ 1182(f) vests the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA." (citations omitted)). However, his authority is not limitless. At a minimum, the President cannot supersede other inadmissibility provisions under the INA duly enacted by Congress. *See id.* at 2411 ("We may assume that § 1182(f) does not allow the President to expressly override particular provisions of the INA.") To hold otherwise would make a mockery of Constitutional separation of powers principles. Accordingly, Plaintiffs not only sufficiently allege, but are likely to prevail on their claim under Count IV that the Proclamation is *ultra vires*.[8]

---

[8] Moreover, though unlawful in its own right, the DOS Rule's treatment of health insurance coverage also conflicts with the Proclamation. The DOS Rule requires consular officers to consider lack of health insurance in the totality of circumstances rather than as a dispositive factor. 84 Fed. Reg. at 54,997 ("[L]ack of health insurance alone would not make an alien more likely than not to become a public charge at any time, but would instead be considered in the totality of the alien's circumstances.")

## IV.   PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Plaintiffs seek a preliminary injunction enjoining Defendants from applying the 2018 FAM Revisions, DOS Rule, and Proclamation. "[A] preliminary injunction is 'an extraordinary remedy never awarded as of right.'" *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (per curiam) (citation omitted). To obtain a preliminary injunction, the moving party must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The standard for a stay of agency action under 5 U.S.C. § 705 is the same as the standard for a preliminary injunction. *Nat. Res. Def. Council v. U.S. Dep't of Energy*, 362 F. Supp. 3d 126, 149 (S.D.N.Y. 2019).

Plaintiffs have demonstrated that they are at least likely to succeed on the merits of their claims that (1) the 2018 FAM Revisions and DOS Rule are contrary to the INA and in excess of statutory authority, *see supra* Part III.D.1., (2) the 2018 FAM Revisions, DOS Rule, and Emergency Notice are arbitrary and capricious, *see supra* Part III.D.2., (3) the 2018 FAM Revisions, DOS Rule, and Emergency Notice violate notice-and-comment procedural requirements of the APA, *see supra* Part III.D.3., and (4) the Proclamation is *ultra vires*, *see supra* Part III.F. Plaintiffs also establish the remaining elements for preliminary relief.

### A. Plaintiffs Have Demonstrated That They Will Suffer Irreparable Harm Absent a Preliminary Injunction

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citation omitted). "To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer 'an injury that is neither remote nor speculative, but actual and imminent,' and one that cannot be remedied 'if a court waits until

the end of trial to resolve the harm.'" *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (citation omitted). Plaintiffs, however, need only show "a *threat* of irreparable harm, not that irreparable harm already ha[s] occurred." *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010).

Plaintiffs are likely to suffer irreparable harm absent a preliminary injunction. Individual Plaintiffs provide a strong basis for finding that each of the challenged government actions will result in the denial of their or their family member's visa applications and that such denial will, in turn, result in indefinite family separation. Courts, including those within this Circuit, have recognized indefinite family separation as a form of irreparable injury. *See, e.g.*, *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (identifying "separated families" as "substantial injuries and even irreparable harms"); *Doe v. Trump*, 418 F. Supp. 3d at 598–99 (granting preliminary injunction and finding family separation caused by Proclamation to be basis for irreparable harm); *Martinez v. McAleenan*, 385 F. Supp. 3d 349, 371 (S.D.N.Y. 2019) ("[C]ourts recognize the irreparable harms that stem from being unlawfully separated from family."); *J.S.R. v. Sessions*, 330 F. Supp. 3d 731, 742–43 (D. Conn. 2018) (issuing preliminary injunction and finding that family separation was irreparable injury). Irreparable injury is particularly likely for four of the Individual Plaintiffs, as USCIS already determined—in approving I-601A waivers of admissibility—that their families would suffer "extreme hardship" if separated. (*See* Compl. ¶¶ 44, 46–47, 49); *see also* 8 U.S.C. § 1182(a)(9)(B)(v). Plaintiffs also adequately establish that they will likely be treated negatively under the challenged actions for using benefits for which they and their families are legally eligible, and required to purchase costly insurance plans for which they will never be reimbursed.

Lastly, Organizational Plaintiffs have established that they are suffering an injury in fact based on the diversion of their resources and irretrievable frustration of their missions. *See supra* Part II.A. Because pending visa applications that were submitted before the DOS Rule was implemented will nonetheless be subject to the DOS Rule, Organizational Plaintiffs are also being forced to dedicate significant resources and perform additional work on cases that, but for the new standards, were effectively complete. (*See* PI Reply & MTD Opp'n at 37.)

## B. The Balance of Hardships and Public Interest Weigh in Plaintiff's Favor.

The remaining factors warranting preliminary relief—"that the balance of equities tips in [the plaintiff's] favor" and "that an injunction is in the public interest," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)—"merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The public interest weighs heavily in favor of an injunction. As an initial matter, there is no public interest in allowing Defendants to proceed with unlawful, arbitrary, and capricious executive or agency actions that exceed their statutory authority. *See Planned Parenthood of N.Y.C., Inc. v. U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018) ("It is evident that '[t]here is generally no public interest in the perpetuation of unlawful agency action.' . . . The inverse is also true: 'there is a substantial public interest in "having governmental agencies abide by the federal laws that govern their existence and operations."'") (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)); *Hawaii v. Trump*, 878 F.3d 662, 700 (9th Cir. 2017), *rev'd and remanded on other grounds*, 138 S. Ct. 2392 (2018) ("It is axiomatic that the President must exercise his executive powers lawfully. When there are serious concerns that the President has not done so, the public interest is best served by 'curtailing unlawful executive action.'" (citation omitted)).

Plaintiffs provided extensive reports of the adverse consequences that implementation of the 2018 FAM Revisions, DOS Rule, and Proclamation will have on Plaintiffs, as well as on Individual Plaintiffs' families, Organizational Plaintiffs' clients, immigrant communities throughout the country, and the general public.   These consequences include family destabilization, shortages in the labor market, increased medical costs, uncompensated medical care, and other economic and public health harms.   (*See, e.g.*, Suppl. Decl. of Andrew J. Ehrlich in Supp. of Pls.' Mot. for a Prelim. Inj. ("Pls.' Suppl. Decl."), Ex. 9 (Decl. of Leighton Ku in Supp. of Pls.' Mot. for a Prelim. Inj.), ECF No. 60-1, ¶¶ 13–14, 18; Pls.' Suppl. Decl., Ex. 12 (Decl. of Danilo Trisi, Ph.D.), ECF No. 60-2, ¶¶ 23–26; Pls.' Decl., Ex. 13 (Decl. of Lisa Sbrana in Supp. of Pls.' Mot. for a Prelim. Inj.), ECF No. 45-13, ¶ 10; Pls.' Decl., Ex. 16 (Decl. of Diana Doe), ECF No. 45-16, ¶¶ 9–13); Pls.' Decl., Ex. 17 (Decl. of Eric Doe), ECF No. 45-17, ¶ 8.)

Twenty-one states, two localities, and six cities filed an amici brief describing their interests and the significant harm that they will endure with the 2018 FAM Revisions, DOS Rule and Proclamation in effect. (*See* Brief of Amicus Curiae in Supp. of Pls.' Mot. for a Prelim. Inj., ECF No. 49-2.)   They explain that because the government actions challenged in this case will reduce the number of lawful immigrants, the actions will "cause substantial economic harm to Amici, including by diminishing revenue collection, dampening the creation of small businesses, and reducing employment in key sectors of the economy." (*Id.* at 8.)   They further explain that the Proclamation directs immigrants to purchase limited or temporary insurance plans that technically satisfy the Proclamation's requirements but do not actually provide comprehensive coverage. (*Id.* at 19.)   As a result, immigrants will be left underinsured and at greater risk of incurring uncompensated costs that will ultimately fall on and burden local and state governments. (*Id.* at 19, 22.)

The ongoing COVID-19 pandemic highlights the potentially devastating effects that the government's new public charge framework could have on public health and safety.  To date, COVID-19 has afflicted over four million U.S. residents and caused close to 150,000 deaths across all 50 states and the District of Columbia.  In the wake of the pandemic, USCIS indicated that it "will neither consider testing, treatment, nor preventative care . . . related to COVID-19 as part of a public charge inadmissibility determination, . . . even if such treatment is provided or paid for by one or more public benefits, as defined in the [DHS Rule]." *Public Charge Alert*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/green-card/green-card-processes-and-procedures/public-charge (last updated Mar. 27, 2020).  Still, reports show that the new public charge framework continues to have a chilling effect on immigrants, who have foregone coronavirus-related medical care to which they are legally entitled out of fear that seeking such care will jeopardize their immigration status.  Miriam Jordan, '*We're Petrified': Immigrants Afraid to Seek Medical Care for Coronavirus*, N.Y. Times, Mar. 18, 2020, https://www.nytimes.com/2020/03/18/us/coronavirus-immigrants.html; Maanvi Singh, '*I Have a Broken Heart': Trump Policy Has Immigrants Backing Away from Healthcare Amid Crisis*, Guardian, Mar. 29, 2020, https://www.theguardian.com/world/2020/mar/29/i-have-a-broken-heart-trump-policy-has-immigrants-backing-away-from-healthcare-amid-crisis.  This chilling effect, in turn, undoubtedly hampers efforts to contain the virus and protect the public health of residents across the country.  Moreover, the government's decision to craft a special exemption to the public charge framework for coronavirus is an implicit acknowledgment that the public health risks outweigh any motive to dissuade immigrants from accessing public benefits.

Meanwhile, the hardships that Defendants allege that they will face if an injunction is issued are "logistical burdens" of complying with a "temporary injunction," and inconsistent

application by DOS and DHS of the public charge rule.  (PI Opp'n & MTD Mem. at 48.)[9]  The

balance of equities and public interest clearly tip in Plaintiffs' favor.

### C. A Nationwide Injunction is Appropriate.

As this Court found with respect to its preliminary injunction regarding the DHS Rule, and

for additional reasons, a nationwide injunction is both necessary to redress the harms caused by

the 2018 FAM Revisions, DOS Rule, and Proclamation, and appropriate given the strong federal

interest in uniformity of the national immigration policies at issue here.  *See Make the Rd. N.Y. v.*

*Cuccinelli*, 419 F. Supp. 3d at 666–68; *see also Texas v. United States*, 809 F.3d 134, 187–88 (5th

Cir. 2015) (upholding a nationwide injunction of the Deferred Action for Parents of Americans

and Lawful Permanent Residents (DAPA) immigration relief program, in part, because the

Constitution requires and Congress has called for uniform administration of immigration laws).

The scope of preliminary injunctive relief generally should be "no broader than necessary to cure

the effects of the harm caused by the violation," *Church & Dwight Co. v. SPD Swiss Precision*

*Diagnostics, GmBH*, 843 F.3d 48, 72 (2d Cir. 2016), but "is dictated by the extent of the violation

established, not by the geographical extent of the plaintiff," *Califano v. Yamasaki*, 442 U.S. 682,

702 (1979).  The likely unlawful agency actions in this case apply universally, to determinations

by U.S. immigration officials regarding the inadmissibility of immigrant visa applicants around

the world.  Limited relief would simply not protect the interests of all stakeholders.  A

geographically restricted injunction, in particular, would result in different inadmissibility

determinations based solely on location.  The effect of the government actions at issue should not

---

[9] Defendants insist that another harm is "[i]nterference with the exercise of authority granted to the President and the Department of State." (*Id.*)  Plaintiffs, however, adequately demonstrate that the President and DOS exceeded their authorities under the INA.  *See supra* Part III.D.1. and III.F.

depend on what side of the George Washington bridge between New York and New Jersey one fortuitously finds oneself.

Moreover, a geographically limited injunction would be especially unworkable in a case such as this, where consular officers on foreign soil would have to determine how to apply different rules to different applicants. Such a remedy invites arbitrary enforcement and creates more questions than it answers. For example, would the consular officer look to where the applicant lived in the United States? What if the applicant moved recently or intends to live somewhere else upon admission? Is the location where the applicant's family resides more appropriate for consideration? If an applicant is working with an Organizational Plaintiff, should officers look to the location of such organization? Such an injunction would undoubtedly lead to inconsistent applications of the DOS Rule and Proclamation (and 2018 FAM Revisions, to the extent they are reimplemented). Thus, a preliminary injunction entirely barring the 2018 FAM Revisions, DOS Rule, and Proclamation is appropriate. [10]

---

[10] This Court is cognizant of the equitable and constitutional concerns regarding nationwide injunctions. *See, e.g., Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599 (2020) (Gorsuch, J., concurring). Nevertheless, in the appropriate circumstances, "district courts sitting in equity have the authority to issue nationwide injunctions." *Saget v. Trump*, 375 F. Supp. 3d 280, 378 (E.D.N.Y. 2019) (citing *Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 451 (1932)). To be sure, a court's authority to issue nationwide injunctions is a power that should be exercised sparingly, and certainly cannot be applied in conflict with each circuit's own determination of its appropriateness. This Court certainly does not discount legitimate concerns, but concludes that the convoluted geographic patchwork of artificially limited temporary relief, in this case, is just as likely to be "patently unworkable, sowing chaos for litigants, the government, courts, and all those affected." *Dep't of Homeland Sec. v. New York*, 140 S. Ct. at 600 (Gorsuch, J., concurring) (discussing the costs associated with nationwide injunctions).

## V.    CONCLUSION

Defendants' motion to dismiss, (ECF No. 53), is GRANTED to the extent that the President is dismissed as a party to this action.

Plaintiffs' motion for a preliminary injunction, (ECF No. 43), is GRANTED.  Defendants are enjoined from enforcing, applying, implementing, or treating as effective the 2018 FAM Revisions, DOS Rule, and Proclamation until further order of this Court, the Circuit Court of Appeals, or the United States Supreme Court.

The Court of Clerk is directed to close the motions accordingly.

Dated: New York, New York
        July 29, 2020

SO ORDERED.

GEORGE B. DANIELS
United States District Judge